UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DOCKET NO. 09-CR-272 (EMK)

UNITED STATES OF AMERICA,

v.

MARK A. CIAVARELLA, JR. and
MICHAEL J. CONAHAN,

Defendants.

BRIEF OF THE UNITED STATES IN OPPOSITION TO
DEFENDANTS' PRETRIAL MOTIONS

DENNIS C. PFANNENSCHMIDT
United States Attorney

GORDON A.D. ZUBROD
MICHAEL CONSIGLIO
CHRISTIAN FISANICK
WILLIAM S. HOUSER
AMY PHILLIPS
Assistant U.S. Attorneys
U.S. Attorney's Office
Suite 311, Federal Building
Scranton, Pennsylvania 18501
(570) 348-2800

# TABLE OF CONTENTS

**Page**

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

I.  Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III. Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    A.  Motions for Use of a Jury Questionnaire, Change of Venue
       and Individual Voir Dire. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        1.  Motion to Utilize a Jury Questionnaire. . . . . . . . . . . . . . . . . . 26

        2.  Motion for Change of Venue. . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        3.  Motion for Individual Voir Dire and
           Additional Peremptory Challenges. . . . . . . . . . . . . . . . . . . . . . 32

           a.  Individual Voir Dire. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

           b.  Additional Peremptory Challenges. . . . . . . . . . . . . . . . . 38

    B.  Motion to Produce and Preserve Tapes of Law Enforcement
       Interviews. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

    C.  Motion to Suppress Evidence Obtained From Recorded
       Conversations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

    D.  Motion to File Additional Pre-Trial Motions. . . . . . . . . . . . . . . . . 46

    E.  Motion for Hearing on Authenticity and Audibility of Audio
       Recordings, Accuracy of Transcripts and Deletion of Non-
       Pertinent and Prejudicial Material. . . . . . . . . . . . . . . . . . . . . . . . . 46

i

F.  Motion for Notice Under FRCP 12(b)(4)(B) of Government's
    Intent to Use Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

G.  Motion for Written Notice Under FRCP 404(b) and 609 of
    Intent to use Uncharged Misconduct Evidence. . . . . . . . . . . . . . . . . . . . 52

    1.  Rule 404(b) Notice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

    2.  Rule 609 Notice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

H.  Motion for Written Notice Under FRE 807 of Intent to Use
    Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

I.  Motion for Bill of Particulars. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

J.  Motion for Disclosure of Brady and Giglio Materials. . . . . . . . . . . . . . . 61

K.  Motion for Discovery. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

L.  Motion to Dismiss RICO Counts 1 & 2. . . . . . . . . . . . . . . . . . . . . . . .   67

M.  Motion to Dismiss Racketeering Acts 1-3 and Counts 3-14
    (Challenge to Honest Services Charges). . . . . . . . . . . . . . . . . . . . . . . . 76

    1.  Quid Pro Quo Bribery Honest Services Fraud. . . . . . . . . . . . . . . 78

    2.  Conflict of Interest Theory of Honest Services Fraud. . . . . . . . . 81

    3.   Constitutionality of Honest Services Fraud. . . . . . . . . . . . . . . . . 86

N.  Motion to Dismiss Counts 15 through 24 (Title 18, U.S.C. § 666). . . . 87

O.  Motion to Dismiss Counts 3, 7, 11, 15-17, 26-29, 31-33, and 44
    (Statute of Limitations). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

P.  Motion to Dismiss the Indictment Based on Outrageous Government
    Misconduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

1. The Sixth Amendment Right to Counsel.. . . . . . . . . . . . . . . . . 102

2. Recording the Defendants' Conversations Did Not Constitute an
   Intrusion Into the Attorney-Client Relationship . . . . . . . . . . . . 103

3. The Pre-Indictment Recording of the Defendants' Conversations
   Did Not Violate the Sixth Amendment. . . . . . . . . . . . . . . . . . . 105

4. The Burden of Proof. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

5. The Pre-Indictment Recording of the Defendants' Conversations
   Did Not Violate the Fifth Amendment Due Process Clause Nor
   Were the Defendants Prejudiced. . . . . . . . . . . . . . . . . . . . . . . . 109

6. Any Claim of Attorney-Client Privilege Is Defeated By
   the Crime Fraud Exception. . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

Q. Motion to Disqualify Judge (Defendant Ciavarella Only). . . . . . . . . . 115

   1. The Presentence Reports. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

   2. The Citizen's Voice Articles. . . . . . . . . . . . . . . . . . . . . . . . . . . 119

R. Motion for Early Disclosure of Jencks Material. . . . . . . . . . . . . . . . . 124

S. Motion to Inspect Grand Jury Minutes. . . . . . . . . . . . . . . . . . . . . . . 125

   1. The Defendants Are Not Entitled to Early and
      Unrestricted Grand Jury Access to Assist the Defendants in
      Preparation of Their Defense. . . . . . . . . . . . . . . . . . . . . . . . . . 126

   2. The Defendants' Groundless Speculation That
      Disclosure of the Grand Jury Materials "May"
      Reveal a Basis for a Motion to Dismiss the Indictment
      Does Not Constitute a Showing of Particularized Need. . . . . . . 134

3.  The Defendants Have Not Identified What Ministerial Records They Seek Or Suggested Any Reason Why These Records Are Necessary to Their Case. . . . . . . . . . . . . . . . . . . 135

T.  Motion For Pre-Trial Conference. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

U.  Motion to Preserve Notes, Reports and Evidence. . . . . . . . . . . . . . . 139

IV.  Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

# TABLE OF AUTHORITIES

## FEDERAL CASES

Barry v. Bergen County Probation Department,
        128 F.3d 152 (3d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Bast v. United States, 542 F.2d 893 (4th Cir. 1976). . . . . . . . . . . . . . . . . . 132, 133

Black v. United States,
        USSC Docket No. 08-876. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

In re Boston's Children First, 244 F.3d 164 (1st Cir. 2001). . . . . . . . . . . . . 122, 123

Brady v. Maryland, 373 U.S. 83 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . 61, 66, 128

In re Cement-Concrete Block, Chicago Area,
        381 F. Supp. 1108 (N.D. Ill. 1974). . . . . . . . . . . . . . . . . . . . . . . . . . . .   132

Connors v. United States, 158 U.S. 408 (1895). . . . . . . . . . . . . . . . . . . . . . . . . . 32

Eisenburg v. Gagnon, 766 F.2d 770 (3d Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . 40

Fisher v. United States, 425 U.S. 391 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . 113

Giglio v. United States, 405 U.S. 150 (1972). . . . . . . . . . . . . . . . . . . . . . . 61, 62, 63

In re Grand Jury 95-1, 118 F.3d 1433 (10th cir. 1997). . . . . . . . . . . . . . . . . 66, 128

In re Grand Jury Investigation, 445 F.3d 266 (3d Cir. 2006). . . . . . . . . . . . . . . . 41

In re Grand Jury Investigation (DiLoreto),
        630 F.2d 996 (3d Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   136

In re Grand Jury Proceedings, 604 F.2d 798 (3d Cir. 1979). . . . . . . . . . . . . . . . 113

In re Grand Jury Subpoenas 04-124-03 and 04-124-05,
        454 F.3d 511 (6th Cir. 2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Haines v. Liggett Group Inc., 975 F.2d 81 (3d Cir. 1992). . . . . . . . . . . . . . . . . 122

Haire v. United States, 543 U.S. 1109 (2005).. . . . . . . . . . . . . . . . . . . . . . . . . 66

Herring v. United States, — U.S. —,  129 S. Ct. 695 (2009). . . . . . . . . . . . . . . 44

Hudson v. Michigan, 547 U.S. 586 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Irvin v. Dowd, 366 U.S. 717 (1961). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Kirby v. Illinois, 406 U.S. 682 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

Kyles v. Whitley, 514 U.S. 419 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62, 64

Maine v. Moulton, 474 U.S. 159 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . 113, 114

Massiah v. United States, 377 U.S. 201 (1964). . . . . . . . . . . . . . . . . . . . . 106, 114

Matter of Bevill, Bresler &Schulman Asset Management Corp.,
        805 F.2d 120 (3d Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Michigan v. DeFillipo, 443 U.S. 31 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Mu'Min v. Virginia, 500 U.S. 415 (1991).. . . . . . . . . . . . . . . . . . . 28, 33, 34, 35, 36

Ovalle Marquez v. United States,
        258 F. Supp. 2d 7 (D.Puerto Rico 2003).. . . . . . . . . . . . . . . . . . . . . . . . 40

Patton v. Yount, 467 U.S. 1025 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 31

Pennsylvania v. Ritchie, 480 U.S. 39 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Pittsburgh Plate Class v. United States, 360 U.S. 395 (1959). . . . . . . . . . . . . . . 132

Rock v. Zimmerman, 959 F.2d 1237 (3d Cir. 1992),
    overruled on other grounds,
    Brecht v. Abrahamson, 507 U.S. 619 (1993). . . . . . . . . . . . . . . . . . . . . 29, 30

Sabri v. United States, 541 U.S. 600 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

Salinas v. United States, 522 U.S. 52 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

In re Search Warrant for Law Offices Executed on March 19, 1992,
    153 F.R.D. 55 (S.D.N.Y. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

In re Special Grand Jury (For Anchorage, Alaska),
    674 F.2d 778 (9th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125, 135

Skilling v. United States,
    USSC Docket No. 08-1394. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

Strickler v. Greene, 527 U.S. 263 (1999). . . . . . . . . . . . . . . . . . . . . . . . 64, 66, 128

United Kingdom v. United States, 238 F.3d 1312 (11th Cir. 2001). . . . 66, 128, 135

United States v. Addonizio, 451 F.2d 49 (3d Cir. 1971). . . . . . . . . . . . . . 56, 57, 58

United States v. Aimone, 715 F.2d 822 (3d Cir. 1983). . . . . . . . . . . . . . . . . . . . . 68

United States v. Almeida, 341 F.3d 1318 (11th Cir. 2003). . . . . . . . . . . . . . . . . . 41

United States v. Alonso, 740 F.2d 862 (11th Cir. 1984). . . . . . . . . . . . . . . . . . . . 71

United States v. Amazon Industrial Chemical Corp.,
    55 F.2d 254 (5th Cir. 1931) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

United States v. Ammar, 714 F.2d 238 (3d Cir. 1983). . . . . . . . . . . . . . . . . . . . 106

United States v. Angellili, 660 F.2d 23 (2d Cir. 1981). . . . . . . . . . . . . . . . . . . . . 69

United States v. Antico, 275 F.3d 245 (3d Cir. 2001). . . . . . . 78, 81, 82, 83, 84, 85

United States v. Armodica, 515 F.2d 49 (3d Cir. 1975). . . . . . . . . . . . . . . . . . . . . 57

United States v. Azad, 809 F.2d 291 (6th Cir. 1986). . . . . . . . . . . . . . . . . . . 67, 129

United States v. Bacheler, 611 F.2d 443 (3d Cir. 1979). . . . . . . . . . . . . . . . . 69, 75

United States v. Bagley, 473 U.S. 667 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

United States v. Baker, 617 F.2d 1060 (4th Cir. 1980). . . . . . . . . . . . . . . . . . . . . 71

United States v. Balter, 91 F.3d 427 (3d Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . 114

United States v. Besmajian, 910 F.2d 1153 (3d Cir. 1990). . . . . . . . . . . . . . . . . . 70

United States v. Blackwood, 768 F.2d 131 (7th Cir. 1982). . . . . . . . . . . . . . . . . . 69

United States v. Boffa,
        513 F. Supp. 444 (D. Del. 1980), aff'd in part, rev'd in part on other
        grounds, 688 F.2d 919 (3d Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

United States v. Booker, 125 S.Ct. 738 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

United States v. Brown, 555 F.2d 407 (5th Cir. 1977). . . . . . . . . . . . . . . . . . . . . . 71

United States v. Brown, 595 F.3d 498 (3d Cir. 2010). . . . . . . . . . . . . . . . . . 45, 118

United States v. Caceres, 440 U.S. 741 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

United States v. Cafaro, 480 F. Supp. 511 (S.D.N.Y. 1979). . . . . . . . . . . . . . . . . 59

United States v. Campanale, 518 F.2d 352 (9th Cir. 1975). . . . . . . . . . . . . . . . . . 76

United States v. Carbo, 572 F.3d 112 (3d Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . 78

United States v. Castro, 89 F.3d 1443 (11th Cir. 1996). . . . . . . . . . . . . . . . . . . . . 93

United States v. Cicco, 938 F.2d 441 (3d Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . 90

United States v. Conforte, 624 F.2d 869 (9th Cir. 1980). . . . . . . . . . . . . . . . . . . 122

United States v. Cook, 530 F.2d 145 (7th Cir. 1976). . . . . . . . . . . . . . . . . 63, 65, 127

United States v. Cooley, 1 F.3d 985 (10th Cir. 1993). . . . . . . . . . . . . . . . . 120, 122

United States v. DeLaurentis, 230 F.3d 659 (3d Cir.2000). . . . . . . . . . . . . . . . . 77

United States v. De Peri, 778 F.2d 963 (3d Cir.1985). . . . . . . . . . . . . . . . . . . . . . 29

United States v. Deerfield Spec. Papers, Inc.,
       501 F. Supp. 796 (E.D.Pa. 1980).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

United States v. Fanning, 477 F.2d 45 (5th Cir. 1973).. . . . . . . . . . . . . . . . . . . . 133

United States v. Fearn, 589 F.2d 1316 (7th Cir. 1978).. . . . . . . . . . . . . . . . . . . . 63

United States v. Fischbach & Moore, Inc., 576 F. Supp. 1384 (W.D.Pa. 1983). . 53

United States v. Foskey, 636 F.2d 517 (D.C. Cir. 1980). . . . . . . . . . . . . . . . . . . 53

United States v. Frumento, 563 F.2d 1083 (3d Cir. 1977). . . . . . . . . . . . . . . . . . 68

United States v. Geise, 597 F.2d 1170 (9th Cir. 1979).. . . . . . . . . . . . . . . . . . . . 58

United States v. General Motors, 352 F. Supp. 1071 (E.D. Mich. 1973).. . . . . . 133

United States v. Grass, 239 F.Supp. 2d 535 (M.D.Pa. 2003). . . . . . . . . . . . . . . 110

United States v. Grubb, 11 F.3d 426 (4th Cir. 1993). . . . . . . . . . . . . . . . . . . 73, 75

United States v. Haire, 371 F.3d 833 (D.C. Cir. 2004).. . . . . . . . . . . . . . . . 66, 128

United States v. Hayes, 231 F.3d 663 (9th Cir. 2000). . . . . . . . . . . . . . . . 106, 110

United States v. Henry, 447 U.S. 264 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . 106

ix

United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . 62

United States v. Higgs, 713 F.2d 39 (3d Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . 61

United States v. Hughes, 413 F.2d 1244 (5th Cir. 1969). . . . . . . . . . . . . . . . . . 132

United States v. Jones, 730 F.2d 593 (10th Cir. 1984). . . . . . . . . . . . . . . . . . 49, 50

United States v. Joseph, 526 F. Supp. 1091 (E.D. Pa.). . . . . . . . . . . . . . . . . . . . . 69

United States v. Kemp, 500 F.3d 257 (3d Cir. 2007). . . . . . . . . . . . . . . . . 79, 80, 81

United States v. Kennedy, 225 F.3d 1187 (10th Cir. 2000). . . . . . . . . . . . . . . . . 105

United States v. Kilrain, 566 F.2d 979 (5th Cir. 1978). . . . . . . . . . . . . . . . . . . . . 58

United States v. LeCroy, 348 F. Supp. 2d 375 (E.D. Pa. 2004). . . . . . . . . . . . . . 41

United States v. Local, 560, International Brotherhood of Teamsters,
     581 F. Supp. 279 (D.N.J. 1984), aff'd 780 F. 2d 267 (3d Cir. 1985). . . . . . 72

United States v. Leon, 469 U.S. 897 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

United States v. Mariani, 7 F. Supp. 2d 556 (M.D. Pa 1998). . . . . . . . . . . . . . . 124

United States v. Massey, 89 F. 3d 1433 (11th Cir. 1996). . . . . . . . . . . . . . . . . . . 93

United States v. Mastroianni, 749 F.2d 900 (1st Cir. 1984). . . . . . . . . . . . . . . . 108

United States v. McDade, 28 F.3d 283 (3d Cir. 1995). . . . . . . . . . . . . . . . . . . . . 68

United States v. McGeehan, 584 F.3d 560 (3d Cir. 2009). . . . . . . . . . . . . . . . . . 82

United States v. Miramontez, 995  F.2d 56 (5th Cir. 1993). . . . . . . . . . . . . . 67, 129

United States v. Moeller, 987 F.2d 1134 (5th Cir. 1993). . . . . . . . . . . . . . . . . . . 90

x

United States v. Morrison, 449 U.S. 361 (1981). . . . . . . . . . . . . . . . . . . . 105, 109

United States v. Murphy, 323 F.3d 102 (3d Cir. 2003). . . . . . . . . . . . . . . . . . 83

United States v. Murphy, 569 F.2d 771 (3d Cir. 1978). . . . . . . . . . . . . . . . . 124

United States v. Onori, 535 F.2d 938 (5th Cir. 1976).. . . . . . . . . . . . . . . . . . 50

United States v. Orena, 32 F.3d 704 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . 71

United States v. Panarella, 277 F.3d 678 (3d Cir. 2002). . . . . 78, 81, 82, 83, 84, 85

United States v. Papia, 399 F. Supp. 1381 (D. Wis. 1975).. . . . . . . . . . . . . . . 59

United States v. Pellulo, 399 F.3d 197 (3d Cir. 2005). . . . . . . . . . . . . . . . . . 63

United States v. Pepe, 747 F.2d 632. . . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 127

United States v. Percevault, 490 F.2d 126 (2d Cir. 1974). . . . . . . . . . . . . . . . 63

United States v. Perez,
        67 F.3d 1371 (9th Cir. 1995), withdrawn on other grounds,
        116, F.3d 840 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

United States v. Perkins,
        596 F. Supp. 528 (E.D.Pa.) affirmed, 749 F.2d 28 (3d Cir. 1984). . . . . . . 68

United States v. Phillips, 219 F. 3d 404 (5th Cir. 2000). . . . . . . . . . . . . . . . . 90

United States v. Proctor & Gamble, 356 U.S. 677 (1958). . . . . . . . . 129, 133, 135

United States v. Provenzano, 688 F.2d 194 (3d Cir. 1982). . . . . . . . . . . . . . . 68

United States v. Rankin, 870 F.2d 109 (3d Cir.1989). . . . . . . . . . . . . . . . . 77, 78

United States v. Rogers, 751 F.2d 1074 (9th Cir. 1985).. . . . . . . . . . . . . . . . 108

United States v. Rosa, 891 F.2d 1063 (3d Cir. 1989)........................ 56

United States v. Russell, 411 U.S. 423 (1973). .......................... 100

United States v. Sanchez-Gonzalez, 294 F.3d 563 (3d Cir. 2002)........ 65, 127

United States v. Santos-Cruz, 2000 WL 326191 (E.D. Pa. 2000). ............ 47

United States v. Schier, 438 F.3d 1104 (11th Cir. 2006). ............... 66, 128

United States v. Schwimmer, 924 F.2d 443 (2d Cir. 1991). ................ 104

United States v. Sliker, 751 F.2d 477 (2d Cir. 1984)........................ 48

United States v. Smith, 776 F.2d 1104 (3d Cir. 1985)...................... 58

United States v. Sotomayor-Vazquez, 249 F.3d 1 (1st Cir. 2001)............ 90

United States v. Starks, 515  F.2d 112 (3d Cir. 1975). .................. 47, 48

United States v. Stepney, 246 F. Supp. 2d 1069 (N.D.Cal. 2003). ........... 107

United States v. Swiderski, 593 F.2d 1246 (D.C. Cir. 1978)................. 71

United States v. Thompson, 685 F.2d 993 (6th Cir. 1982)................... 69

United States v. Triumph Capital Group, Inc.,
        211 F.R.D. 31 (D. Conn. 2002)..................................... 42

United States v. Turkette, 452 U.S. 576 (1981). ..................... 68, 70, 72

United States v. Vignola,
        464 F. Supp. 1091 (E.D.Pa.),
        aff'd, 605 F.2d 1199 (3d Cir. 1979)....................... 69, 74, 75

United States v. Vitillo, 490 F.3d 314 (3d Cir.2007).................... 77, 90

United States v. Voigt, 89 F.3d 1050 (3d Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . 103

United States v. Wecht, 484 F.3d 194 (3d Cir. 2007).. . . . . . . . . . . . . . . . 116, 120

United States v. West, 574 F.2d 1131 (4th Cir. 1978). . . . . . . . . . . . . . . . . . . . . 49

United States v. Whitfield, 590 F.3d 325 (5th Cir. 2009).. . . . . . . . . . 91, 92, 93, 94

United States v. Zolin, 491 U.S. 554 (1989).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Upjohn Co. v. United States, 449 U.S. 383 (1981).. . . . . . . . . . . . . . . . . . . . . . . 41

Weatherford v. Bursey, 429 U.S. 545 (1977). . . . . . . . . . . . . . . . . . . . . . . 103, 104

Wong Tai v. United States, 273 U.S. 77 (1927). . . . . . . . . . . . . . . . . . . . . . . . . . 57

Weyhrauch v. United States, USSC Docket No. 08-1196. . . . . . . . . . . . . . . . . . 86

## STATE CASES

Kremer v. State Ethics  Commission, 469 A.2d 593 (Pa. 1983).. . . . . . . . 84, 85, 86

## FEDERAL STATUTES

18 U.S.C. §666 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87, 88, 90, 92, 95

18 U.S.C. §1343. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. §1346. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 78

18 U.S.C. §3282. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

18 U.S.C. § 3500. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63, 64, 126, 127, 139

26 U.S.C. §6531(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

26 U.S.C. §7206(l). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

28 U.S.C. § 455(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

## STATE CONSTITUTIONAL PROVISIONS, STATUTES AND RULES

18 Pa. C.S. §1109(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

65 Pa. C.S. §1103(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

42 Pa. C.S. §1902. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

42 Pa. C.S. §6307. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

Pa. Constitution, Art. 5, Section 17.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

Pa. R.J.A. rule 505(l). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

## FEDERAL RULES

Fed. R. Crim. P. 7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Fed. R. Crim. P. 11. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 117

Fed. R. Crim. P. 12. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 451, 67, 76, 77

Fed. R. Crim. P. 16. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63, 65, 127

Fed. R. Crim. P. 24. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38

Fed. R. Crim. P. 26. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Fed. R. Evid. 104.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Fed. R. Evid. 401.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Fed. R. Evid. 404.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 53, 54, 55

Fed. R. Evid. 609.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 54, 55

Fed. R. Evid. 807. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Fed. R. Evid. 901. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 49

**MISCELLANEOUS**

5 Saltzburg, Martin & Capra,
    Fed. R. Evid. Manual §901.02 (8th ed. 2002). . . . . . . . . . . . . . . . . . . . . . . 49

116 Cong. Rec., part 26, Oct.7, 1970, p. 35344. . . . . . . . . . . . . . . . . . . . . . . . 76

Canon 3(C)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

Canon 5(C)(l). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

Ruggero J. Aldisert, <u>Logic for Lawyers: A Guide to Clear Legal Thinking</u>
    (3d ed. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . .118

U.S.S.G. §§4A1.2(a)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

## I. **Procedural History**

On January 26, 2009, the Defendants Mark Ciavarella, Jr. and Michael

Conahan were charged in a felony information with honest services wire fraud, in

violation of Title 18, United States Code, §§ 1343 and 1346. On February 12,

2009, the Defendants both pleaded guilty to the charge in accordance with the

terms of binding plea agreements entered with the Government under Rule

11(c)(1)(C) of the Federal Rules of Criminal Procedure. The Court reserved ruling

on the proposed plea agreements pending review of a presentence investigation

report.

On July 31, 2009, the Court rejected the binding plea agreements. The

Defendants moved to withdraw their guilty pleas on August 24, 2009.

On September 9, 2009, a federal grand jury in Harrisburg returned a forty-

eight count indictment charging Defendants with racketeering and other offenses.

The Defendants entered not guilty pleas on September 15, 2009. After receiving

three extensions of time within which to file pre-trial motions, the Defendants

filed multiple pre-trial motions on March 1, 2010. Briefs in support of the motions

were filed by the Defendants on March 15, 2010. The Government sought one

extension of time and now files this brief in response to the Defendants' pre-trial

motions.

1

## II.  <u>Statement of Facts</u>

Although the exact facts of the case will not be established until evidence and witness testimony are presented at trial, what follows is a summary of the evidence the Government currently expects to produce at trial.

Defendants Michael T. Conahan and Mark A. Ciavarella, Jr. were judges of the Court of Common Pleas for Luzerne County, Pennsylvania. Between approximately January 2002 and January 2007, Michael T. Conahan served as President Judge.  Between approximately 1996 and June 2008, Mark A. Ciavarella, Jr. served as Judge of the Juvenile Court; he was named President Judge in January of 2007.

The Defendants owed a fiduciary duty, as alleged in the Indictment, to the citizens of the Commonwealth of Pennsylvania and to the Judiciary of the Commonwealth of Pennsylvania to refrain from conduct that constituted a conflict of interest and to recuse themselves from matters in which they had a conflict of interest. Part of the fiduciary duty owed by each judge included the duty arising from his position as judge to disclose to the parties in matters occurring before him material information relevant to his ability to engage in impartial decision-making. The judges were also required to file a truthful annual statement of financial

2

interests with the Administrative Office of the Pennsylvania Courts ("AOPC"),
reporting the source of any income, direct or indirect.

The evidence will show that between January 2003 and December 2006 the
Defendants derived more than $2.9 million in improper income in exchange for
official actions and anticipated official actions, including, but not limited to,
entering into agreements guaranteeing placement of juvenile offenders with PA
Child Care, LLC; taking official action to remove funding from the Luzerne
County budget for the Luzerne County Juvenile Detention Facility; facilitating the
construction of juvenile detention facilities and an expansion to one of those
facilities by PA Child Care and Western PA Child Care, LLC; directing that
juvenile offenders be lodged at juvenile detention facilities operated by PA Child
Care and Western PA Child Care; summarily granting motions to seal the record
and for injunctive relief in a civil case related to PA Child Care; and, through their
actions, assisting PA Child Care and Western PA Child Care to secure agreements
with Luzerne County worth tens of millions of dollars for the placement of
juvenile offenders, including an agreement in late 2004 worth approximately
$58,000,000.

The Defendants employed a number of schemes to hide the income they
received including, but not limited to, causing income to pass through

3

intermediaries and causing false records to be created.  A chronology of some of the significant events in this case is contained in the paragraphs that follow.

In 2000, Luzerne County officials began to evaluate alternatives to repairing the Luzerne County Juvenile Detention Facility which was located at North River Street, Wilkes-Barre, Pennsylvania. This facility, although licensed by the Pennsylvania Department of Public Welfare, was in a state of disrepair.  Among the officials involved in these discussions were President Judge Michael T. Conahan and Judge Mark A. Ciavarella, Jr.

In 2000, Mark Ciavarella, Jr. asked Robert Powell, an attorney for the Luzerne County Planning Commission, to participate with others in discussions regarding the future of the county owned juvenile detention facility. In turn, Powell enlisted the services of Attorney Gregory Zapalla. Powell, Zapalla, Robert Mericle (owner of Mericle Construction Company), and Luzerne County officials began to investigate the feasability of building a detention facility.  Mericle was tasked with selecting a site for the facility.  Ultimately, when it appeared that Luzerne County would not build its own juvenile detention facility, Powell, Zapalla, and others decided to build a private facility and sell it or lease it to Luzerne County.

In approximately 2001, Robert Powell advised Mark Ciavarella, Jr. that Powell and others might construct a private facility. A meeting was held at the office of Mericle Construction Company with Powell, Gregory Zapalla, Mark Ciavarella and a number of Luzerne County officials in attendance.

Also in about 2001, Robert Powell had a conversation with Michael Conahan about the need to locate financing for the facility. Michael Conahan referred Powell to the Minersville Safe and Deposit Bank in Minersville, Pennsylvania. Conahan had a long-standing relationship with the bank and its president. Powell obtained financing through Minersville Safe and Deposit Bank, and in September 2001, he purchased the land at Grimes Industrial Park, Pittston Township, Pennsylvania, where PA Child Care was eventually constructed.

On Christmas Eve 2001, shortly after the land was purchased and the construction agreement was signed, Robert Powell and Michael Conahan drove to the site together. During this visit, Conahan indicated to Powell that Ciavarella was going to have to be compensated in connection with the facility. Powell understood Conahan to mean that Conahan and Ciavarella wanted money in exchange for Conahan's assistance in closing the county-run detention facility and in exchange for Ciavarella making sure that the facility was kept full of juvenile offenders.

5

Additional financing was sought for construction.  Financial institutions requested copies of contracts for the detention of juvenile offenders or lease agreements to be assured the facility would not fail. Without these contracts or lease agreements, financing was not obtainable.  On January 29, 2002, Michael Conahan, acting in his capacity as President Judge of Luzerne County, signed a "Placement Guarantee Agreement" with PA Child Care guaranteeing the placement of juvenile offenders for an annual sum of $1,314,000. The document was supplied to a bank in support of a financing package which was approved. In February 2002, Robert Powell signed a construction agreement with Mericle Construction to build PA Child Care in Pittston Township for $6,719,137.

Construction commenced in the spring of 2002 and finished just before the Department of Public Welfare granted PA Child Care a license in March 2003. In December 2002, Michael Conahan, acting in his capacity as President Judge of Luzerne County, took official action to remove funding from the Luzerne County Court budget for the Luzerne County Juvenile Detention Facility, effectively closing the county-run facility.

Robert Mericle told Mark Ciavarella that Mericle would pay Ciavarella a $997,600 fee because Ciavarella recommended Mericle for the construction project.  Ciavarella asked Mericle to disperse the fee through Robert Powell.

6

Powell was told by Michael Conahan that Mericle would pay the judges a "commission" or "referral fee" and that the funds were to be dispersed through Powell. Thereafter, Mericle instructed Powell to sign paperwork, including a statement that construction was complete, so that Mericle would receive final payment. Additionally, Mericle asked Robert Powell to sign paperwork relating to the payment of the Conahan and Ciavarella referral fee. The paperwork made it appear as if the fee paid to the judges was actually paid to Powell.

Powell signed the documents on January 16, 2003. The documents called for the payment of $997,600 to Powell upon completion of the project. Powell provided wire transfer instructions to Robert Mericle after discussing the issue with Michael Conahan.

Robert Powell arranged for an attorney to receive a wire transfer of $610,000 from Mericle Construction Company. The money was transferred by Mericle on January 21, 2003. On January 28, 2003, the attorney wire transferred $610,000 to Beverage Marketing of PA, Incorporated, a business owned by Michael Conahan.

At the direction of Michael Conahan, the bookkeeper for Beverage Marketing of PA transferred the $610,000 as follows:

| Date | Amount | Destination of Transfer |
|------|--------|-------------------------|
| January 28, 2003 | $330,000 | Ciavarella's bank account (Citizen's Bank) |
| April 30, 2003 | $75,000 | Ciavarella's bank account (Citizen's Bank) |
| July 15, 2003 | $75,000 | Ciavarella's bank account (Citizen's Bank) |
| August 13, 2003 | $25,000 | A third party known to the Defendants |
| August 21, 2003 | $105,000 | "Michael T. Conahan, Trustee" account (Leesport Bank, also used by Beverage Marketing) |

In an effort to disguise the true disposition of the funds transferred from the Beverage Marketing account, Michael Conahan directed that false entries be made in the books and records of the company, including an entry that the $610,000 was an expense for "Consulting Fees Joe Smith."

On January 24, 2003, Robert Mericle wire transferred $387,600 -- the remaining balance of the $997,600 fee to be paid to the judges -- to an account controlled by Robert Powell. To disguise the ultimate disposition of part of these funds Michael Conahan directed in August 2003 that Powell write a check in the amount of $326,000 to Powell himself and write "for deposit only" on the back of

the check.  Conahan instructed Powell to endorse the check and to give it to Conahan.

Powell followed Conahan's instructions and, on August 29, 2003, Powell's check in the amount of $326,000, drawn on an account of Vision Holdings, LLC, was deposited into a bank account of Conahan's wife.

Testimony at trial will establish that in approximately February 2003, one or more juvenile probation officers for Luzerne County were summoned to Mark Ciavarella, Jr.'s office and put on the telephone with Michael Conahan. Michael Conahan expressed displeasure with delays in admissions of juvenile offenders to PA Child Care.  Thereafter, weekly reports were often provided to Mark Ciavarella, Jr. indicating the number of beds utilized at PA Child Care.  On a number of occasions, probation officers developed non-custodial treatment plans for juvenile offenders which were rejected by Mark Ciavarella, Jr. in favor of custodial dispositions.  Testimony will establish that Mark Ciavarella, Jr. and others acting at his behest, exerted pressure on Probation Office staff to recommend detention of juvenile offenders. On some occasions, probation officers were pressured to change recommendations of release to recommendations of detention.

9

In January 2004, Michael Conahan, Mark Ciavarella, Jr., and their spouses formed Pinnacle Group of Jupiter, LLC, a limited liability corporation. The sole asset of the corporation was a condominium in Jupiter, Florida recently purchased by the Conahans and Ciavarellas for close to $1,000,000. Beginning in January of 2004 the judges demanded that Powell make kick-back payments to the judges by check in connection with the operation of the detention facility. The trial evidence will show that Michael Conahan and Mark Ciavarella used the Florida condominium as a means to conceal those "kick-back" payments.

Powell wrote kick-back checks to Pinnacle Group of Jupiter from an account of Vision Holdings, Inc. At the direction of Michael Conahan, many of the checks bore fraudulent notations to make them appear to be payments for monthly rental of the condominium or boat slip fees. Robert Powell also made wire transfers of kick-back payments to the checking account of Pinnacle Group of Jupiter per instructions he received from Conahan and Ciavarella. The check and wire payments, totaling $590,000, were paid or deposited on about the dates indicated:

| **Date** | **Amount of Payment** | **Form of Payment** |
|---|---|---|
| January 20, 2004 | $ 18,000 | check |
| January 20, 2004 | $ 52,000 | check |

| February 24, 2004 | $ 78,000 | check |
| February 24, 2004 | $ 75,000 | check |
| February 24, 2004 | $ 47,000 | check |
| May 3, 2004 | $ 75,000 | check |
| May 3, 2004 | $ 25,000 | check |
| July 12, 2004 | $ 120,000 | wire transfer |
| September 23, 2004 | $ 100,000 | wire transfer |

In May 2004, due to the success of the PA Child Care facility, Gregory Zapalla and Robert Powell purchased land in Butler County for the construction of a second juvenile detention facility. The facility, to be operated under the name "Western PA Child Care," was constructed by Mericle Construction at a cost of $9,745,300. Michael Conahan indicated to Powell that Conahan and Ciavarella also want to receive money in connection with the construction of the second facility.

On October 26, 2004, the Pennsylvania Department of Public Welfare began a scheduled audit of PA Child Care. Robert Powell received a draft of the audit report before it was completed. The report disclosed irregularities in billing and costs. Powell told Michael Conahan about the report. Conahan told Powell to

11

file a motion to seal the audit and to claim the report contained proprietary

information.  Conahan indicated that the motion would be granted.

On December 17, 2004, at Michael Conahan's direction, PA Child Care

filed an ex parte Motion to Seal the Record, an ex parte Motion for Special Relief

Requesting a Temporary Injunction, and a Complaint.  That same day,  ex parte

and without a hearing, Conahan signed an order enjoining any parties from

disclosing the audit's contents.  Additionally, Michael Conahan issued an order

sealing the audit from public view. When he issued these orders, Michael Conahan

did not disclose to the litigants the financial benefits he received and intended to

receive in the future from the participants in the construction and operation of PA

Child Care and Western PA Child Care.

In late 2004, the Luzerne County Commissioners entered into a $58,000,000

contract with PA Child Care to house juveniles for 20 years.

On February 24, 2005, PA Child Care and Mericle Construction entered

into an agreement to expand the facility. The cost of that expansion was

$841,664.65.

An understanding was reached that Robert Mericle would pay Mark

Ciavarella a fee in connection with the construction of Western PA Child Care and

the expansion of PA Child Care. On June 24, 2005, the initial construction of

12

Western PA Child Care was completed. Robert Powell signed paperwork indicating that the construction was complete, and authorizing the payment of the brokerage fee. On July 15, 2005, Mericle Construction wire transferred $1,000,000 to Pinnacle Group of Jupiter.  On February 2, 2006, $150,000 was wire transferred by Mericle Construction as a fee for the expansion of the PA Child Care facility.

The trial evidence will show that, shortly after the judges received the $150,000 payment from Robert Mericle, they demanded cash from Powell.  To conceal the cash payments and to prevent the filing of currency transaction reports, Powell and others acting at his request obtained cash by structuring payments from Powell's bank accounts in amounts under $10,000.  An employee of the Powell law firm delivered at least three of the cash payments to Michael Conahan.  Additional cash payments were transferred to Conahan in other ways. The last cash payment, in the amount of $31,500, was made to Conahan in December 2006.

At trial, the Government expects to prove at least the following cash payments to the judges by Powell:

| Date | Amount of Cash Payment |
|------|------------------------|
| August 16, 2006 | Payment of $42,000 |

13

November 1, 2006          Payment of $20,000

November 20, 2006         Payment of $50,000

December 18, 2006         Payment of $31,500

During calendar years 2003 through 2008, Mark Ciavarella, Jr., as juvenile Court judge for Luzerne County, detained hundreds of juveniles at the PA Child Care and Western PA Child Care facilities.  At none of those proceedings did Ciavarella disqualify himself or disclose to the juveniles or their attorneys, if represented, the financial benefits he was receiving from the participants involved in the construction and operation of those facilities.

In calendar years 2004, 2005, 2006 and 2007, Michael Conahan and Mark Ciavarella, Jr. filed statements of financial interest with the AOPC.  They were required to disclose in those statements the direct and indirect sources of income or gifts received by them and their wives during the previous calender years.  Conahan and Ciavarella never disclosed any of the payments they received from Robert Powell and Mericle Construction Company.

Michael Conahan, Mark Ciavarella, Jr. and Robert Powell became aware that their activities were under investigation by federal authorities when witnesses received grand jury subpoenas.  Conahan, Ciavarella and Powell retained lawyers and entered into a mutual defense agreement.  During the summer of 2008, Powell

14

indicated through counsel that he wished to meet with investigators, cooperate

fully and enter into a plea agreement with the United States. Powell advised

investigators that Conahan and Ciavarella had demanded and received kickbacks

from him as previously described. Powell agreed to discuss these matters with the

judges and to record those conversations.

Before employing this investigative technique, the United States Attorney

for the Middle District of Pennsylvania directed that the matter be reviewed by the

U.S. Attorney's District Ethics Officer. The District Ethics Officer approved

recording the conversations but directed that a taint team, consisting of an

Assistant United States Attorney (AUSA), a secretary and an agent, none of whom

had involvement in the investigation, review all recorded conversations and make

any redactions to the transcript and to the tape recording itself that would reveal

any trial strategy or the substance of any conversations between the Defendants

and their attorneys. The District Ethics Officer also directed that, after the taint

team AUSA had reviewed each transcript and tape, the Ethics Officer also would

review each to insure that privileged information was not disclosed to the

members of the investigative team.

The United States Attorney selected an AUSA and a secretary for the "taint"

team. Likewise, the FBI selected an agent unconnected with the investigation to

15

handle the recordings and to turn them over to the U.S. Attorney's Office taint team for transcription and review.  Once the AUSA on the "taint" team reviewed each tape and the transcript and made redactions, each was turned over to the Ethics Officer who reviewed and approved the transfer of each redacted recording and transcript to the investigative team.

Powell met with Defendants Conahan and Ciavarella six times between July 21 and September 4, 2008.  Each meeting was recorded.[1]

The first recording was made on July 21, 2008.  The "taint" team was not in place until July 25, 2008.  Nevertheless, the same procedure was followed for both the pre- and post-"taint" team setup.  After each recording was made by Powell using the recording device, the investigative case agent took temporary custody of the recording device, downloaded the recording onto a CD.  Since the recording is automatically wiped out on the recording device, the investigative case agent listened to the CD for a few seconds only to make sure that the recording device had worked and that the CD had actually downloaded the conversation.  Once the investigative case agent determined that the recording device had worked and that the conversation had been transferred to the CD, he stopped listening and made

---

[1]During pretrial discovery, the "taint" team provided the six unredacted recordings and transcripts to the defense.  To this date, no prosecutors on the prosecution team have heard or seen the unredacted recordings and transcripts.

two duplicate disks of each recording. One copy was provided to the U.S. Attorney's Office taint team. One copy was maintained in the FBI office as a "work copy." The investigative case agent "spot" checked both duplicate discs to make sure that the conversation had transferred to each disk. The original recording was sealed and sent to the FBI Office in Philadelphia.

The Defendants have been provided with a copy of the recording of each meeting. A review of the redacted tapes and transcripts indicates that Powell discussed his multiple cash payments with the judges and the parties discussed ensuring that all of their stories were the same. It was agreed they would deny that the cash payments were ever made by Powell. They talked about ways to discredit an intermediary who had delivered several of the cash payments to Conahan.

Excerpts of some of the recordings follow. In the first recorded discussion, Powell and Conahan discussed a potential lawsuit against Powell by his partner Greg Zapalla relating to the handling of PA Child Care. Powell and Conahan expressed their concern that cash payments to the judges might be disclosed as a result of discovery in the lawsuit and Conahan made clear that Powell had to deny that any cash went to Conahan:

17

* * *

| | |
|---|---|
| Powell: | Here's the way I see this unfolding. A civil lawsuit, have to make me answer interrogatories and a request for production of documents. |
| Conahan: | Ummmm. |
| Powell: | And then through that look at all the disbursements that were made from Pa Child Care here to me. And Western PA Child Care. |
| Conahan: | So, what are you saying? |
| Powell: | **It's where the cash came from.** |
| Conahan: | Well, there's nothing we can do about that. If he files a suit, he files a suit. |
| Powell: | **But that puts us in an untenable position.** |
| Conahan: | **In what way?** |
| Powell: | **Well, what if they put me under oath?** |
| Conahan: | **Well, they're gonna. They already know about [name redacted](the name of an intermediary who delivered cash to Conahan from Powell]. You know that [name redacted]'s been talked to.** |
| Powell: | No. |
| Conahan: | Okay. **Let me tell you something. If you want to check me, I'm not wearing a wire.** |
| Powell: | Neither am I. |

* * *

(Emphasis Added).

18

After discussing the fact that the intermediary who gave cash to Conahan met with federal investigators and told them about the cash, the conversation continued:

* * *

Powell:      **It's the cash I'm worried about, Mike.**

**Conahan:**   **Well, I don't know, Bob.  I'm not... told you what my position on that  was.  It's not changing.**

**Powell:**   **No, that's what I'm gonna say, too. But...I mean I...I don't....**

**Conahan:**   **[The Feds have knowledge about] the cash.**

Powell:      I don't remember [name redacted] getting those draws.  Unless she cashed them.

Conahan:     I saw the checks.

Powell:      Did she cash them?

Conahan:     The checks were cashed by [name redacted] (an employee of the Powell law firm).

Powell:      [name redacted].

Conahan:     [name redacted].

* * *

Conahan:     **Bob, I'm going to tell you something right now....This is my story. I'm never changing this story.  I leased you that apartment for 15 grand a month for 60 months.**

* * *

19

Conahan:      Tell you one thing right now.  I never lied to you and I never will.  I'd never do anything to hurt you but ***I never got the cash from anybody.  That's the story.  And you better stick to it.***

Powell:        ***I'll stick to it.***

\* \* \*

Conahan:      Bobby, if there's anything coming out of 40 Degrees North (a company in which Powell had an ownership interest) or PA Child Care .  ***Cash, you just gotta say it didn't come to me.*** [Emphasis added].

Powell:        Alright.

Conahan:      When this is all done, whatever we have to sit down to work it out or help each other, we'll do it.

(Emphasis Added).

        In a conversation on July 2, 2008, Powell, Conahan and Civarella once

again discussed concern over what an intermediary would tell investigators about

cash payments made to the judges.

\* \* \*

Powell:        I don't know if it means anything or not, but I can see [name redacted] sticking to her story, Mike, with the cash.  She frightens the shit out of me.  She's going to say she delivered cash.

Ciavarella:    Well, whatever she says, she says. [I] can't stop her from saying it.  I just know what I know.

\* \* \*

20

Powell:        Greg [Zapalla] has a team up there [at PA Child Care] auditing the books, to see what payments were made out of PA Child Care, Western PA Child Care.  I think we're getting sued.

Ciavarella:    [We] can't stop him from doing it.  I mean, assholes who does it.  I mean the bottom line is none of the money came out of him...It was all out of Mericle's [unintelligible] gig.  So he can sue us all he wants.  He didn't pay the finder's fee.  Mericle paid it.

Conahan:       **If Rob Mericle had never gone to him, we wouldn't have this problem.  It would never have come up.**

Powell:        **And if I wouldn't have given [name redacted] that fucking cash to deliver**.

Conahan:       You know....

Powell:        **She's the weak link**.  That's why she's not here tonight.  I don't even think she's here.  Like she's hiding somewhere.

*  *  *

Powell:        Well, where the rubber meets the road is where [Zapalla] is gonna say that he wants to see the draws from PA Child Care, **and then he's going to want access to the law firm books because that's where I got the cash out of, from the law firm.**

Conahan:       Mmm Hmm.

Powell:        I don't have to give him that.  But I think that's what part of **the suit's going to be is for him to get access to see the payments from PA Child Care to the law firm turned into cash, to you guys**.

Conahan:       Mmm Hmm.

Powell:        'Cause right now, he has no right to them, to the law firm books.

Ciavarella:    Was PA Child Care paying legal fees to the firm?

21

Powell:         No.  I had no other way to get the money out.  I didn't want to take it directly from PA Child Care.

Ciavarella:     Well, how did you justify the fees into the firm?

Powell:         Draw.  I took it as a draw.

Conahan:        But you're allowed to do that.

Powell:         But what his fear is about that I never told him, for obvious reasons.  I wasn't going to tell him I was taking the draw.

Conahan:        The problem [name redacted] has is she never gave me anything.  So there wasn't anything given to her.  She has it. Or someone has it.

                                    * * *

Ciavarella:     ...***I was the one who directed [Mericle] where to send that money and I was the one who gave him the instructions as to where to send it.***

                                    * * *

Powell:         Well, [Mericle's] grand jury testimony is that I was the grand orchestrator of everything.

Ciavarella:     Well I guarantee you, Bobby Powell, that will not be the testimony comes out of my mouth because I'm gonna tell that fucking grand jury exactly how that deal came down.  You had nothing to do with He had nothing to do with it.  I had nothing to do with it, other than Rob Mericle coming to me and saying want to do this for you.  That's how that deal came down.

                                    * * *

Conahan:        [Mericle] knew that we [Conahan and Ciavarella] owned Pinnacle.  He knew who owned Beverage Marketing.

22

Powell:      Well, if that's the case, then our only problem is the cash and [name redacted].

Conahan:     Well....

Powell:      ...and if somebody sees [redacted] at the [person's workplace redacted], I wish you would get word to me somehow, some way, 'cause I call up there and there's no answer.

Conahan:     We have to fight this Mericle thing....

Ciavarella:  You know, I could see [Mericle] testifying, this is the file.

* * *

Powell:      **We're both gonna have to stick to that, Mickey, 'cause [name redacted] is gonna testify.**

Conahan:     **[unintelligible] testify [unintelligible] one box filled with cash. She doesn't know what's in the other ones. There's only one that she knows.**

Powell:      **It's going to be our word against hers.**

Conahan:     Mark (Ciavarella), do me a favor.

* * *

Conahan:     Listen, you paid me rent for my condo. You didn't pay me rent for my condo to shut the juvenile detention center down or fix cases. This thing with Mericle, this Mericle, I gotta fight it. And I got no boxes from [name redacted]. Nobody gave boxes to [name redacted]. If somebody gave boxes to [name redacted], she has them....Mark doesn't know [unintelligible] [name redacted]. I talked to you. Because I wanted to keep him outta this.

Powell:      He doesn't know about the cash?

Conahan:     No.

23

Powell:        Alright.  I'm glad you told me.

Conahan:       No.  That's not what I was saying.

Powell:        I'm sorry.

Conahan:       That's OK.  So [unintelligible] comes down I'm gonna say forget
               whatever you just heard.  The only thing Mark knows, Mark does not
               know the rent you and I negotiated for the condo.  It's $15,000 for 60
               months. $900,000.  That's what you were supposed to pay.
               Whenever you paid, you paid.  You left.  So, the only thing Mark
               knows is the conversation with Mericle.  He doesn't know about the
               rent to the cond.  He knows that you paid me rent.  He doesn't know
               about any boxes.  That's why he's our most credible witness.

Powell:        I understand.

Conahan:       ***So, as long as you stick to your story, the condo rent, okay.  And he
               solves this problem.  If [name redacted] got boxes, she kept them.***

Powell:        ***Alright, then I  won't ever say anything to him again.***

Conahan:       ***And the only one that you can testify to is when she says that she
               saw you put cash in one box.  Her first story was she didn't.  Then
               she flipped and she says she did.  Okay.  But I'm gonna tell you, she
               didn't give me any boxes.  And if you gave her stuff to give to me,
               the [name redacted], it was documents.  Maps.  It was anything.
               And you did things by courier.  You never gave them to her.***

Powell:        ***That's our story.  We'll stick to it.***

Conahan:       Yeah.  She's wearing a wire.  That's why she didn't show up today.

                                    * * *

(Emphasis Added).

24

The evidence will show that between 2003 and 2008, Michael Conahan and Mark Ciavarella, Jr. earned approximately the following salaries as judges:

| Year | Mark Ciavarella, Jr. | Michael Conahan |
|------|---------------------|-----------------|
| 2002 | $ 119,341.29 | $ 120,493.64 |
| 2003 | $ 121,256.92 | $ 122,424.24 |
| 2004 | $ 124,170.44 | $ 125,365.86 |
| 2005 | $ 137,276.64 | $ 138,459.24 |
| 2006 | $ 151,513.11 | $ 152,818.54 |
| 2007 | $ 153,510.62 | $ 152,219.61 |
| 2008 | $ 158,861.92 | $ 62,386.24* |

*Michael Conahan earned $58,926 as a Senior Judge

Michael Conahan and Mark Ciavarella, Jr. failed to pay taxes on more than $400,000 for tax years 2003 through 2006. The additional tax due and owing resulted from the Defendants' under-reporting and mis-characterizing of more than $2,900,000 in income they accepted from Robert Powell and Robert Mericle.

Federal income tax returns filed with the IRS by Ciavarella and Conahan for tax years 2003 through 2006 were materially false to the extent that they mis-characterized and under-reported income they received from Powell and Mericle.

The Defendants have been provided with the specific IRS calculations regarding their reported taxable income, unreported taxable income and tax due and owing.

## III.  Argument

### A.    Motions for Use of a Jury Questionnaire, Change of Venue and Individual Voir Dire

The Defendants have filed motions for use of a jury questionnaire, for change of venue and for individual voir dire.  These motions all relate to the Defendants' concerns over pretrial publicity.

The Defendants have asked the Court to consider the questionnaire, venue and voir dire motions in conjunction with one another.  (Br., p. 3).[2]  Although the Government does not concur in all of the relief sought, the Government does agree that the motions are related and that it is appropriate for the Court to consider them together.

### 1.    Motion to Utilize a Jury Questionnaire

The Defendants request that the Court permit use of a juror questionnaire in this case.  The Government concurs that use of such a questionnaire is a matter

---

[2]With the exception of the "Motion to Disqualify Judge," all of the pretrial motions and briefs filed by the Defendants were filed by Defendant Conahan and joined by Defendant Ciavarella.  Accordingly, references in each section of the Government's brief to "Br." and "Mot." are to the briefs and motions filed by Defendant Conahan that correspond to the particular section of the Government's brief where the references occur.

that lies within the discretion of the Court and that the use of a questionnaire in this case may help insure selection of a fair and impartial jury and may expedite the selection of the jury.

The Defendants have not submitted a proposed questionnaire.  Accordingly, the Government suggests that counsel for the parties engage in good faith discussions to attempt to agree upon potential questions that might be included in such a questionnaire and that any disagreements as to potential questions be submitted to the Court for resolution.

### 2.    Motion for Change of Venue

The Defendants have moved the Court to transfer this case to Delaware "[i]n view of the extensive and pervasive pretrial publicity, public anger and hostility against the Defendant...and the expert opinion of Dr. Patterson as well as evidence to be presented by the Defendant at a hearing in this matter."  (Mot., p. 5).[3]  The Government requests that the Court deny the motion for change of venue without prejudice to the Defendants' right to re-file the motion in the future if the results of the proposed jury questionnaire and trial <u>voir</u> <u>dire</u> indicate it is appropriate to do so.

----

[3]It is unclear from the Defendants' motions and brief why they chose Delaware, as opposed to any other location outside of the Middle District of Pennsylvania, to conduct their survey and as their proposed trial location.

Rule 21(a) of the Federal Rules of Criminal Procedure requires a trial Court to transfer a proceeding to another district "if the Court is satisfied that so great a prejudice against the Defendant exists in the transferring district that the Defendant cannot obtain a fair and impartial trial there."

The Government recognizes that there are cases in which "adverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed." Patton v. Yount, 467 U.S. 1025, 1031 (1984), citing Irvin v. Dowd, 366 U.S. 717, 723 (1961).

An example of such a case was described in the Supreme Court's opinion in Irvin v. Dowd, 366 U.S. 717 (1961). In Irvin, the Court held that pretrial publicity in a capital case had so tainted the jury pool in the county where the trial took place that the Defendant was entitled as a matter of federal constitutional law to a change of venue; the record showed the trial Court had excused over half of a panel of 430 persons because their opinions of the Defendant's guilt were so fixed that they could not be impartial, and 8 of the 12 jurors who sat had formed an opinion as to the Defendant's guilt before trial.

Irvin, however, was a murder case involving "extraordinary publicity," Mu'Min v. Virginia, 500 U.S. 415, 427 (1991), that had a remarkably prejudicial effect on the minds of potential jurors. See id. at 428. In order to invoke Irvin's

28

presumption of prejudice, "[t]he community and media ... reaction must have been so hostile and so pervasive as to make it apparent that even the most careful <u>voir dire</u> process would be unable to assure an impartial jury." <u>Rock v. Zimmerman</u>, 959 F.2d 1237, 1252 (3d Cir. 1992), <u>overruled on other grounds by</u> <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993). "Such cases are exceedingly rare." <u>Id.</u> at 1253. <u>See</u> <u>also</u> <u>United States v. De Peri</u>, 778 F.2d 963, 972 (3d Cir.1985) ("It is the rare case in which adverse pretrial publicity will create a presumption of prejudice that overrides the jurors' assurances that they can be impartial.").

In support of their motion, the Defendants claim that the results of a survey of jury-eligible residents of the Middle District of Pennsylvania establish that 72.5% of respondents indicate a familiarity with this case and that 68.8% of those people indicate they "feel" the Defendants are "definitely or probably guilty" based upon what they "know about this incident" <u>See</u> "Affidavit of Arthur H. Patterson, Ph.D. In Support of Michael T. Conahan's Motion to Transfer Venue," pp. 5, 14, 17.

It is noted that in order to determine the possible effect of publicity on the jury pool in this case, the survey conducted by the Defendants asked respondents only, "[b]ased on what you know about this incident, do you feel the judges are...'Definitely guilty,' 'Probably guilty,' 'Probably not guilty,' or 'Definitely not

29

guilty?'" "Affidavit of Arthur H. Patterson, Ph.D.," pp. 17, 58. The Defendants'
survey did not include any attempt to determine the answers to the key questions
relevant to jury selection, namely, what the respondents knew about the case and
whether, if admonished not to consider information received outside of the
Courtroom, they could nevertheless be fair and impartial until the conclusion of
the case.  See generally, "Affidavit of Arthur H. Patterson, Ph.D.," Exhibit 2.[4]

The Government recognizes there has been significant publicity regarding
this case; however, the publicity has occurred largely in Luzerne and Lackawanna
Counties.  The vast majority of the front page news articles, political cartoons,
television news articles and televised campaign advertisements cited in support of
the Defendants' motions for individual voir dire and change of venue reached
primarily residents of Luzerne and Lackawanna Counties.  See "Affidavit of
Arthur H. Patterson, Ph.D.," Exhibit 3, pp. 9-25, 32-36, 39, 42-43, 48-49, 54.[5]  If

_____

[4]In Rock v. Zimmerman, 959 F.2d 1237 (3d Cir. 1992), the United States
Court of Appeals for the Third Circuit affirmed a trial Court's denial of a motion
for change of venue in a high-profile murder case in which the transcript of voir
dire examination confirmed that community sentiment did not "utterly corrupt" the
trial atmosphere; this was so even though a defense survey of community attitudes
before trial showed that 93.7% of those interviewed had "heard of" the
Defendant's case and that, similar to the defense survey in this case,  68% of that
group believed the Defendant to be guilty. Rock v. Zimmerman, 959 F.2d at 1253.

[5]The results of the survey of "jury-eligible residents of the jurisdictions of
the United States District Court for the Middle District of Pennsylvania and the

this case is tried in federal Court in Scranton, potential federal jurors will be

selected from a total of eight Middle District of Pennsylvania counties, not just

from Luzerne and Lackawanna Counties where most of the publicity has occurred.

    In addition, most of the front page publicity regarding this case occurred

before October of 2009.  See "Affidavit of Arthur H. Patterson, Ph.D.," Exhibit 3,

pp. 9-13, 17-19, 26, 29, 32-34, 37, 40-46, 48-50, 53.  It is likely this case will not

be tried for a number of additional months and it is clear that the passage of time

can have "a profound effect on the community and, more important, on the jury in

softening or effacing opinion." Patton v. Yount, 467 U.S. 1025, 1033 (1984)

    It is respectfully suggested that it is premature for the Court to rule on the

Defendants' motion for change of venue.  The Government suggests that use of a

jury questionnaire, with some questions designed to determine the extent to which

potential jurors have knowledge of the case and the extent to which those potential

jurors have formed opinions about the case, and careful voir dire examination of

potential jurors will permit the parties and the Court to assess whether a fair and

impartial jury can be selected in the Middle District of Pennsylvania or whether

---

United States District Court - District of Delaware" are not broken down by
county so the extent to which respondents in Luzerne and Lackawanna Counties
affect the overall Middle District results is unclear.  See "Affidavit of Arthur H.
Patterson, Ph.D.," pp. 5, 12-26.

there is a need to change of venue.

### 3.    Motion for Individual <u>Voir</u> <u>Dire</u> and Additional Peremptory Challenges

### a.    Individual <u>Voir</u> <u>Dire</u>

The Defendants have moved the Court to "order that each prospective juror will be questioned individually by counsel during <u>voir</u> <u>dire</u>..." (Br., p. 2). The Government opposes the Defendants' requests for individual <u>voir</u> <u>dire</u> and for <u>voir</u> <u>dire</u> questioning by counsel.

The fact that <u>voir</u> <u>dire</u> is a matter relegated to the discretion of the trial Court is established by more than 100 years of Supreme Court jurisprudence. "[A] suitable inquiry is permissible in order to ascertain whether the juror has any bias, opinion, or prejudice that would affect or control the fair determination by him of the issues to be tried. That inquiry is conducted under the supervision of the Court, and a great deal must, of necessity be left to its sound discretion." <u>Connors</u> <u>v. United States</u>, 158 U.S. 408, 413 (1895).

> [O]ur own cases have stressed the wide discretion granted to the trial Court in conducting <u>voir</u> <u>dire</u> in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias. Particularly with respect to pretrial publicity, we think this primary reliance on the judgment of the trial Court makes good sense. The judge of that Court sits in the locale where the publicity is said to have had its effect and brings to his evaluation of any such claim his own perception of the depth and extent of news stories that might influence a juror. The trial Court, of course, does not impute his own

32

perceptions to the jurors who are being examined, but these perceptions should be of assistance to it in deciding how detailed an inquiry to make of the members of the jury venire.

Mu'Min v. Virginia, 500 U.S. 415, 427 (1991).

In Mu'Min, the Supreme Court affirmed a Defendant's first degree murder conviction and death sentence even though 8 of the 12 jurors (66.66%) who served in the case answered that they had read or heard something about the case. However, none of those 8 indicated that he had formed an opinion as to guilt, or that the information would affect his ability to judge the Defendant solely on the basis of the evidence presented at trial.  Id. at 428.

The facts of the Mu'Min case and the voir dire process employed by the trial Court are instructive for the present case. The significant pretrial publicity in the Mu'Min case included news reports discussing the details of the murder of Gladys Nopwasky committed by the Defendant while the Defendant was on a lunch break from a prison work detail.  The pretrial publicity also included information about the Defendant's prior criminal record, the fact that he had been rejected for parole six times, accounts of the Defendant's alleged prison infractions, details of a prior murder for which the Defendant was serving a sentence at the time of Ms. Nopwasky's killing, and indications that the Defendant had confessed to killing Ms. Nopwasky.  Id. at 418.

33

The trial Court in the Mu'Min case rejected the Defendant's request for individual voir dire.  Instead, the Court summoned 26 potential jurors into the Courtroom and questioned them as a group.  When asked by the judge whether anyone had acquired any information about the alleged offense or the Defendant from the news media or any other source, 16 of the potential jurors replied they had.  The prospective jurors were not asked about the source or content of the prior knowledge but were asked the following four questions:

> (1) Would the information that you heard, received, or read from whatever source, would that information affect your impartiality in this case?
>
> (2) Is there anyone that would say what you've read, seen, heard, or whatever information you may have acquired from whatever the source would affect your impartiality so that you could not be impartial?
>
> (3) Considering what the ladies and gentlemen who have answered in the affirmative have heard or read about this case, do you believe that you can enter the Jury box with an open mind and await until the entire case is presented before reaching a fixed opinion or conclusion as to the guilt or innocense of the accused?
>
> (4) ...In view of everything that you've seen, heard or read, or any information from whatever source that you've acquired about this case, is there anyone who believes that you could not become a Juror, enter the Jury box with an open mind and wait until the entire case is presented before reaching a fixed opinion or a conclusion as to the guilt or innocence of the accused?

Id. at 419-20.

One of the 16 panel members who admitted to having prior knowledge of

34

the case answered in response to these questions that he could not be impartial, and was dismissed for cause. The Defendant then moved that all potential jurors who indicated that they had been exposed to pretrial publicity be excused for cause. This motion was denied as was Defendant's renewed motion for a change of venue based on the pretrial publicity. Id.

The trial Court then conducted further voir dire of the prospective jurors in panels of four and asked follow-up questions to determine whether each juror "could enter the jury box with an open mind and wait until the entire case was presented before reaching a conclusion as to guilt or innocence." Id. at 421, 1903.

Jurors in the Mu'Min case were selected from Prince William County, Virginia, where the murder was committed. Id. at 417. It is respectfully suggested that pretrial publicity in the present case has been no more pervasive than pretrial publicity that routinely occurs in high profile murder cases that are fairly tried to verdict in counties where the murders occur. In addition, if the present case is tried in federal Court in Scranton, potential federal jurors will be selected from many Middle District of Pennsylvania counties, not

35

just from Luzerne and Lackawanna Counties where most of the publicity has occurred.

Given that most of the Defendants' concern over selecting an impartial jury relates only to prospective jurors' exposure to pretrial publicity, there is no reason why the many questions typically asked by the Court during voir dire relating to matters other than exposure to publicity cannot be directed to the entire panel instead of to individual jurors.   It is respectfully suggested that the Court can assure selection of an impartial jury through use of the Court's normal general voir dire with follow-up questions to individual jurors, similar to those asked by the trial Court in the Mu'Min case, if individual jurors indicate they have knowledge of the case obtained from outside of the Court proceedings.

Aside from being consistent with the approved procedure employed by the trial Court in Mu'Min, the proposed process will satisfy the three-step procedure established by the United States Court of Appeals for use by district courts to determine whether publicity during the course of a trial has prejudiced the jury: first, the Court determines whether the news coverage is prejudicial; second, if it is, the Court determines whether any jurors were exposed to the coverage; and, third, if exposure did occur, the Court examines the exposed jurors to determine if

36

the exposure compromises their impartiality.  Barry v. Bergen County Probation

Dept., 128 F.3d 152, 163 (3d Cir. 1997) (internal quotations omitted).

Rule 24 of the Federal Rules of Criminal Procedure permits the Court to

examine prospective jurors or to permit the attorneys for the parties to do so.  See

Fed.R.Crim.P. 24(a)(1).  If the Court conducts the examination, the Court must

permit the attorneys for the parties to ask further questions that the Court considers

proper or to submit further questions that the Court may ask if it considers them

proper.  Fed.R.Crim.P. 24(a)(2)(A)&(B).

In the interest of consistency and efficiency, the Government requests the

Court to conduct all voir dire examination of prospective jurors.  To insure the

jury selection process proceeds fairly and smoothly, and to minimize the

likelihood of objections during the voir dire process, it is also requested that the

Court require the parties, if they so desire, to propose voir dire questions to the

Court in advance of trial and to permit counsel for all parties to voice concerns or

lodge objections, if appropriate, to any proposed questions.  It is requested that the

Court ask the approved questions and any follow-up questions requested by

counsel for any party during the actual examination of prospective jurors.

### b.    Additional Peremptory Challenges

In this case, the Defendants have requested 10 peremptory challenges each. (Br., p. 7). They claim they need a total of 20 peremptory challenges "in view of the nature and complexity of the case, potential severe penalties associated therewith, and the extensive, pervasive and prejudicial pretrial publicity..." Id. at pp. 7-8.

While a Court may allow additional peremptory challenges in multi-Defendant trials, Rule 24(b) of the Federal Rules of Criminal Procedure normally allows a Defendant or Defendants jointly a total of 10 peremptory challenges. See Fed.R.Crim.P. 24(b) & (b)(2).

The Defendants have not proffered sufficient reasons to support their request for twice the normal number of peremptory challenges. Their assertion that they need additional peremptory challenges because of alleged "pervasive and prejudicial pretrial publicity" is not compelling since the Court will strike for cause any potential juror who is shown through the voir dire process to be prejudiced against the Defendants. In addition, their assertion that the "nature and complexity of the case" supports the need for each Defendant to independently exercise "a full complement of peremptory challenges..." is not convincing since, as described in the Statement of Facts, the Government's theory of the case is

38

simple and the Defendants have implicitly acknowledged the mutuality of their defenses by entering into a mutual defense agreement.

The Government opposes the motion for additional peremptory challenges since the granting of the Defendants' request for double the normal number of peremptory challenges will significantly and needlessly lengthen the jury selection process.

In the alternative, if the Court elects to grant additional peremptory challenges, then the Government requests that the Court grant significantly fewer additional challenges than requested by the Defendants.

### B.    Motion to Produce and Preserve Tapes of Law Enforcement Interviews

The Defendants have moved the Court to order the Government to produce and preserve tapes of law enforcement interviews. The Government has no such tapes to produce or preserve and is unaware of the existence of any such tapes.

### C.    Motion to Suppress Evidence Obtained From Recorded Conversations

The Defendants allege that the attorney-client privilege, work-product privilege, and joint defense privileges enjoyed by the Defendants were violated when the Government recorded conversations between Robert Powell and the Defendants. These allegations are similarly raised in the Defendant's Motion to

39

Dismiss the Indictment based upon Outrageous Government Misconduct. The allegations that the Government violated the privileges of the Defendants are unfounded for the same reasons articulated in the Government's response to the Defendants' Outrageous Government Misconduct motion. (<u>See</u> Section "P" of this Brief). Even assuming that portions of the recorded conversations could be interpreted as the fruits of the joint defense agreement, suppression of the entire audiotapes is an inappropriate remedy.

The joint defense privilege "protects communications between an *individual and an attorney for another* when the communications are 'part of an on-going and joint effort to set up a common defense strategy.'" <u>Matter of Bevill, Bresler &Schulman Asset Management Corp.</u>, 805 F.2d 120, 126 (3d Cir. 1986) <u>quoting Eisenburg v. Gagnon</u>, 766 F.2d 770, 787 (3d Cir. 1985) (emphasis added). "In order to establish the existence of a joint defense privilege, the party asserting the privilege must show that (1) the communications were made in the course of a joint defense effort, (2) the statements were designed to further the effort, and (3) the privilege has not been waived." <u>Bevill</u>, 805 F.2d at 126.

The joint defense privilege is an extension of the attorney-client privilege. <u>Ovalle Marquez v. United States</u>, 258 F. Supp. 2d 7 (D.P.R. 2003). The attorney-client privilege protects communications made by a client to an attorney in

confidence. In re Grand Jury Investigation, 445 F.3d 266, 274 (3d Cir. 2006). The

purpose of the privilege is to encourage "full and frank communications between

attorneys and their clients and thereby promote broader public interests in the

observance of law and administration of justice." Upjohn Co. v. United States, 449

U.S. 383, 389 (1981). However, the privilege does have the effect of "withholding

relevant information from the factfinder". United States v. Zolin, 491 U.S. 554,

562 (1989). "When a Defendant conveys information to the lawyer of his co-

Defendant, as opposed to his own lawyer, the justification for protecting the

confidentiality of the information is weak." United States v. Almeida, 341 F.3d

1318, 1324 (11th Cir. 2003). Therefore, "the burden is on the party asserting a joint

defense agreement to demonstrate that the clients reasonably believed that their

statements were being made within the context and in furtherance of their joint

defense." United States v. LeCroy, 348 F. Supp 2d. 375, 382 (E.D. Pa. 2004).

In this case, the Defendants have failed to allege and meet their burden.

Defense counsel were not present during any of the recorded conversations.  Also,

in none of the redacted recordings is the advice of any attorney representing the

Defendants repeated.  The pertinent conversations involve discussions between the

Defendants and Powell about events that happened in the past and speculation and

planned action in response to the grand jury investigation. With respect to the

former, discussions between co-conspirators, outside of the presence of their counsel, about the steps they took to commit the alleged crimes do not become privileged simply because of the existence of a joint defense agreement. With respect to the latter, their statements were part of a concerted effort to obstruct the grand jury investigation.  As argued in the response to the Motion to Dismiss the Indictment for Outrageous Government Misconduct (See Section "P" of this Brief), these communications between Powell and the Defendants cannot be privileged because of the crime-fraud exception.

The defense has challenged the procedure employed by the United States Attorney's office to keep privileged communications from the prosecution team. The defense appropriately notes that district courts have expressed mixed approval of taint teams.  United States v. Triumph Capital Group, Inc., 211 F.R.D. 31, 43 (D. Conn. 2002) ("The use of a taint team is a proper, fair and acceptable method of protecting privileged communications..."); In re Search Warrant for Law Offices Executed on March 19, 1992, 153 F.R.D. 55, 59 (S.D.N.Y. 1994) ("reliance on the implementation of a Chinese Wall, especially in the context of a criminal prosecution, is highly questionable"). However, the majority of the authority cited by the Defendants arises from cases where the Government seized documents from an attorney's office or an organization represented by counsel.

42

Those circumstances create a whole different dynamic to utilization of remedial measures to protect privileged communication. In those circumstances, the records which have been seized by the Government are known to the parties involved. The urgency of timely disclosure is less and utilization of defense counsel to sift through the documents for privileged communication is potentially manageable.

In this circumstance, the Government was engaged in an undercover investigation with a cooperating co-conspirator which created an urgency that is not present in the document search warrant cases cited by the defense. In re Grand Jury Subpoenas 04-124-03 and 04-124-05, 454 F.3d 511, 522-23 (6th Cir. 2006) ("[G]overnment taint teams seem to be used primarily in limited, exigent circumstances in which Government officials have already in the Government's possession, and so the use of the taint team to sift the wheat from the chaff constitutes an action respectful of, rather than injurious to, the protection of privilege.") Obviously, consultation with any member of the defense team would have effectively terminated the recordings. In the course of this undercover investigation, the Government had a substantial need to be able to expeditiously separate privileged communications from the Defendants' plans to obstruct the functioning of the grand jury. The in-house taint team expedited this process and

allowed investigators familiar with the investigation to review redacted transcripts of the recordings in a timely manner and thereby forestall the obstruction of justice.

Even assuming that there were marginal intrusion by the prosecution team into some privileged communications, suppression of evidence is not an appropriate remedy. "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Herring v. United States, — U.S. —, 129 S.Ct. 695, 702 (2009) (exclusionary rule does not apply to items from an individual mistakenly arrested upon an arrest warrant recalled months earlier).  An "assessment of the flagrancy of the police misconduct constitutes an important step in the calculus" of applying the exclusionary rule. United States v. Leon, 469 U.S. 897, 911 (1984).  The abuses that gave rise to the exclusionary rule "featured intentional conduct that was patently unconstitutional."Herring, — U.S. —, 129 S. Ct. at 702.

In the Fourth Amendment context, the Courts have repeated found that good faith or unintentional violations do not require suppression of evidence. See Leon, 469 U.S. at 922 (good faith reliance upon an improperly issued search warrant does not result in the suppression of evidence); Hudson v. Michigan, 547 U.S. 586

(2006) (violation of knock and announce rule when executing search warrant does not require suppression of evidence); Michigan v. DeFillipo, 443 U.S. 31, 40 (1979) (search incident to arrest for a criminal statute later declared unconstitutional does not result in suppression).

Recently, in the context of possible ethical violations by an assistant United States Attorney communicating with represented Defendants, the Third Circuit held that suppression of evidence is not an appropriate remedy. United States v. Brown, 595 F.3d 498, 516 (3d Cir. 2010) (suppression of recorded conversation between informant and represented party inappropriate even if Assistant United States Attorney violated ethical rule by having informant make contact with represented party pre-indictment).

In this case, attorneys for the Government recognized the Defendants attorney-client/ joint defense privileges and immediately took steps to protect their interests. In good faith, the attorneys relied upon precedent recognizing the use a "taint team" as an acceptable means of protecting attorney-client/ joint defense privileges. Finally, the attorneys faithfully adhered to longstanding policies of the Department of Justice that authorize the use of taint teams. Because the conduct was not patently unconstitutional and the Government agents involved relied upon

a good faith belief that use of a taint team sufficiently protects the Defendants rights, the remedy of suppression is not appropriate.

In conclusion, the defense fails to identify which portions of the audio-recordings constitute communication of the joint defense agreement. Rather, the defense generally asserts that the information included "defense strategy." The Government is without factual basis to counter the allegation or to argue for appropriate remedy. Simply, the audio-recordings do not contain legal defense strategy; the recordings contain evidence of plans by the Defendants to obstruct a grand jury investigation and suborn perjury, neither of which are protected by a joint defense privilege. If the process employed by the Government resulted in an intrusion into privileged communications, the violation was unintentional and not worthy of the extreme remedies sought by the Defendants.

### D.    Motion to File Additional Pre-Trial Motions

The Government opposes the filing of additional pretrial motions except as to matters that could not have reasonably been discovered by the Defendants in the exercise of due diligence.

### E.    Motion for Hearing on Authenticity and Audibility of Audio Recordings, Accuracy of Transcripts and Deletion of Non-Pertinent and Prejudicial Material

The Defendants seek an order of Court requiring a pretrial hearing

concerning recorded conversations between them and a cooperating Government witness. They seek to have this Court determine whether the tapes and transcripts of the tapes are sufficiently accurate, authentic, audible, and non-prejudicial to allow their introduction at trial. The Defendants cite United States v. Starks, 515 F.2d 112 (3d Cir. 1975), in support of their request. Since they have presented no instances of recordings they believe to inaccurate, non-authentic, inaudible, or prejudicial, their motion should be denied.

While the Defendants correctly set forth the seven Starks factors in their brief, (Br., p. 3), they miss the point: in order for the Court to order a Starks hearing, there has to be an actual dispute as to the contents of the tapes or any transcripts derived therefrom. The Government has made available to the Defendants' counsel the recordings which may be offered in this case. Additionally, complete transcripts of the conversations were prepared and produced to the Defendants for their review.[6] Yet, at this time, the Defendants have not indicated to the Government or to the Court what portions of the

_____

[6] The Government would note that it is not even required to transcribe all tapes if the Defendant has access to the recordings before trial. See United States v. Santos-Cruz, 2000 WL 326191, *3 (E.D. Pa. Mar. 15, 2000) (not precedential).

recordings they believe are inaudible.[7]

Consistent with the longstanding practice in the Middle District of Pennsylvania, before any hearing on these matters, counsel should meet in good faith to discuss the recordings and transcripts determine whether agreement can be reached as to whether portions of the recordings are inaudible or whether portions of the transcripts are inaccurate. Only if counsel cannot reach agreement should a motion for a Starks hearing be considered.

Should counsel ultimately not be able to resolve these matters in a good faith, the following legal precepts will apply to the Court's consideration of this issue. First, in order to be relevant and admissible, the tape recording evidence must have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Authentication "represent[s] a special aspect of relevancy," Fed. R. Evid. 901(a), Advisory Committee's Notes, in that evidence cannot have a tendency to make the existence of the disputed fact more or less likely if the evidence is not that which its proponent claims. United States v. Sliker, 751 F.2d 477, 497-99 (2d Cir. 1984). "The requirement of authentication

---

[7] Defendant Conahan couches his argument only in vague terms asserting that the recordings are of such poor quality that the trier of fact "will be unable to determine the accuracy of the Government's proposed transcript." (Br., p. 5).

48

or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a).

Before admitting evidence for consideration by the jury, this Court must also determine whether its proponent has offered a satisfactory foundation from which the jury could reasonably find that the evidence is authentic. See Fed. R. Evid. 104(b), Advisory Committee's Notes; see also Fed. R. Evid. 901(a), Advisory Committee's Notes; see generally 5 Saltzburg, Martin, & Capra, Federal Rules of Evidence Manual § 901.02 (8th ed. 2002).  Although this Court is charged with making this preliminary determination, because authentication is essentially a question of conditional relevancy, the jury ultimately resolves whether evidence admitted for its consideration is that which the proponent claims.  Id.

Appellate Courts have consistently allowed district courts wide latitude in determining if a proponent of recordings laid an adequate foundation from which the jury reasonably could have concluded that the recordings were authentic and, therefore, properly admitted. See, e.g., United States v. Jones, 730 F.2d 593, 597 (10th Cir. 1984); United States v. West, 574 F.2d 1131, 1138 (4th Cir. 1978). Typically, appellate courts employ an abuse of discretion standard of review to a

district court decision to admit recordings into evidence and will not find error

unless the foundation for admission is "clearly insufficient to insure the accuracy

of the recording." <u>Jones</u>, 730 F.2d at 597.

Appropriate guidelines for use of transcripts at trial were set forth in <u>United

States v. Onori</u>, 535 F.2d 938, 946-49 (5th Cir. 1976).  The Court in <u>Onori</u> held

that transcripts given to the jury are utilized for a limited purpose; therefore, a

determination of the transcripts' accuracy is typically a jury function rather than a

judicial one constituting a precondition to admission. <u>Id.</u> at 947-48. The opinion

stated that the preferred procedure was to have the parties arrive at a "stipulated"

transcript to be given to the jury; if the parties cannot agree on all portions of the

transcript, then the transcript may contain both versions of the disputed portions,

or the Court may give two transcripts to the jury with an instruction that the jury

decide which version, if any, to accept. <u>Id.</u> at 948-49.

Since the accuracy of a transcript is basically a factual determination, the

opinion further held that the defendants in that case, having been offered the

opportunity to present their own version of the transcript and to have their own

expert witness testify as to errors in the government's, had not shown reversible

error in the district court's refusal to rule on the accuracy of the Government's

transcript before giving it to the jury.  <u>Id.</u> at 949.

50

Given this legal backdrop, the Government submits that a pretrial hearing at this juncture is unnecessary. The Defendants have not identified even one recording in the Government's evidence that they believe would fail the <u>Starks</u> test. The parties should try to resolve any issues in good faith before turning to this Court. If the parties are unsuccessful, the Defendants should identify those recordings or transcripts that they challenge. If they believe any of the Government's transcripts are inaccurate, they can present their own to the Court or the jury for consideration. The Court should deny this motion.

### F.    Motion for Notice Under FRCP 12(b)(4)(B) of Government's Intent to Use Evidence

The Government has provided voluminous discovery to the Defendants in accordance with Rule 16 of the Federal Rules of Criminal Procedure. In accordance with Rule 12(b)(4)(B), through their receipt of discovery, the Defendants have been put on notice of the Government's intent to use any and all of the materials provided as evidence-in-chief at trial. As trial preparation continues, it is possible the Government will identify additional evidence for use at trial. The Defendants will be notified of any such additional evidence in a timely fashion before trial so as to permit them time to move to suppress the evidence, if they deem it appropriate to do so. The Government intends to permit

counsel for the Defendant to examine all trial exhibits in the possession of the Government well in advance of trial.

### G.    Motion for Written Notice Under FRCP 404(b) and 609 of Intent to Use Uncharged Misconduct Evidence

#### 1.  Rule 404(b) Notice

The Defendants have moved the Court to order the Government to provide the Defendants with written notice of uncharged misconduct evidence it will offer at trial pursuant the Federal Rules of Evidence Rule 404(b). The Defendants have also specifically requested that the Government advise each Defendant  of this information with respect to each Defendant and any co-conspirator named in the indictment, regardless of whether the co-conspirator was charged or merely named in the Indictment.  The Defendant asks that the information be provided sufficiently in advance of trial so the Court may consider the proposed evidence.

Rule 404(b) of the Federal Rules of Evidence governs the admissibility of evidence of other crimes, wrongs or acts.  The rule provides that "upon request of the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the Court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial."

The Government views the motion of the Defendants as a request for notice of the Government's intention to offer such evidence.

The Government recognizes that pre-trial disclosure of Rule 404(b) material is helpful to minimize speculation by the defense as to the Government's theory of the relevance of such information and to avoid delays at trial.  Courts have encouraged pretrial disclosure by the Government of its intention to introduce evidence of prior bad acts.  See United States v. Foskey, 636 F.2d 517, 525-26 (D.C. Cir. 1980); United States v. Fischbach & Moore, Inc., 576 F. Supp. 1384, 1397-98 (W.D. Pa. 1983).  This early disclosure has been encouraged in order to facilitate the Court's determination as to the admissibility of evidence under Rule 404(b).

In the instant case, the Government will endeavor to provide defense counsel with reasonable pretrial notice of Rule 404(b) evidence.  As counsel and the Court are aware, the existence of Rule 404(b) evidence often does not become known until serious trial preparation is underway.

## 2.  Rule 609 Notice

The Defendants have also asked the Court to order the Government to provide early notice of any evidence that the Government intends to introduce at trial pursuant to Rule 609 of the Federal Rules of Evidence.  Rule 609 requires

advance notice of the intent of a party to introduce evidence of a conviction more than 10 years' old to impeach a witness.

If either Defendant testifies at trial, the Government may seek to impeach the credibility of the Defendant or Defendants through introduction of appropriate records of conviction, if the Defendant has been convicted of any crimes.  Any such offer will be made in accordance with the requirements of Rules 609 and 404 of the Federal Rules of Evidence.  At this time,  the Government is not aware of any convictions of either Defendant.  As for other defense witnesses, however, the Government is not able to determine whether it will attempt to impeach a witness with a conviction more than 10 years' old since the Government does not yet know who the Defendants' witnesses will be.  If the Government wishes to impeach a defense witness with such a conviction, the Government will give the required "sufficient advance written notice" in order to allow the Defendant "a fair opportunity to contest the use of such evidence."  Fed. R. Evid. 609(b).

Therefore, by way of this Brief, the Defendants are hereby put on notice that, under Fed. R. Evid. 609, depending upon the witnesses the Defendants present at trial, the Government may seek to impeach the credibility of those witnesses with convictions including those that are more than 10 years' old.

While the Defendants have made the appropriate requests for Rule 404(b) and Rule 609 notices, the motion requesting an order compelling such written notices should be denied.

### H.    Motion for Written Notice Under FRE 807 of Intent to Use Evidence

The Defendants have asked the Court to order the Government to disclose whether or not the Government intends to offer evidence pursuant to Rule 807 of the Federal Rules of Evidence, the residual exception to the hearsay rule. It is not necessary for the Court to enter such an order. At this time, the Government does not intend to introduce any statement covered by Rule 807. If the Government's intention changes, the Government will advise the Defendants accordingly and will provide notice of the particulars of the statement, including the name and address of the declarant. In accordance with Rule 807, any such disclosure will be made sufficiently in advance of trial to permit the Defendants a fair opportunity to prepare to meet the proposed statement.

### I.    Motion for a Bill of Particulars

The Defendants have moved the Court to order the Government to provide a bill of particulars in this case. The Defendants claim they "are unable to ascertain

from the face of the Indictment the nature of the case...because of the lack of specificity." (Mot., p. 2).

It is respectfully suggested that the Defendants are not entitled to a bill of particulars as to any of the requested information.

Rule 7(f) of the Federal Rules of Criminal Procedure allows a district Court to direct the filing of a bill of particulars. In determining whether to grant a motion for a bill of particulars, a trial Court must strike a "prudent balance" between the Defendant's interest in securing information and the Government's interest in not committing itself to facts before it is in a position to do so. <u>United States v. Rosa</u>, 891 F.2d 1063, 1066 (3d Cir. 1989). A bill of particulars should only be granted "where the indictment is too vague or indefinite to reasonably allow a Defendant to prepare his defense." <u>See</u> <u>United States v. Addonizio</u>, 451 F.2d 49, 64 (3d Cir. 1971).

The 78-page Indictment in this case clearly describes the Government's theory of the case, summarizes the evidence and is not vague in any way. In addition, the Defendants have been provided with complete discovery of all material discoverable under Rule 16. Moreover, because of the unusual procedural posture of this case, the Defendants have had the opportunity to review presentence investigation reports that were prepared in connection with Rule

56

11(c)(1)(C) plea agreements that were rejected by the Court. Those presentence reports provided the Defendants with a detailed summary of the evidence as well as an overview of the Government's theory of prosecution. The detailed Statement of Facts section of this brief also provides notice of the anticipated trial evidence.

It is noted that the purpose of a bill of particulars is to inform the Defendant of the nature of the charges against him so that he may adequately prepare his defense, to avoid surprise at trial, and to allow the Defendant to plead his conviction as a bar to another prosecution. Wong Tai v. United States, 273 U.S. 77, 82 (1927); United States v. Addonizio, 451 F.2d 49, 63-64 (3d Cir. 1971).

None of the purposes for ordering a bill of particulars will be advanced substantially by a bill of particulars in this case. The charges against the Defendants are clear, the Defendants have been provided with discovery that will minimize surprises at trial, and the Defendants are presently in a position to plead a bar to further prosecution if they are convicted in this case.

While granting a bill of particulars lies within the sound discretion of the Court, United States v. Armodica, 515 F.2d 49, 54 (3d Cir. 1975), the Court may consider the scope of information available through discovery as well as the information set forth in the indictment in determining the appropriateness of

57

ordering a bill of particulars in a given case.  See, e.g., United States v. Boffa, 513 F. Supp. 444, 485 (D. Del. 1980), aff'd in part, rev'd in part on other grounds, 688 F.2d 919 (3d Cir. 1982).  Courts have repeatedly recognized that compliance with the discovery requirements of Rule 16 often obviates the need for entry of an order compelling the Government to file a bill of particulars.  United States v. Geise, 597 F.2d 1170, 1180 (9th Cir. 1979); United States v. Deerfield Spec. Papers, Inc., 501 F. Supp. 796, 809 (E.D. Pa. 1980).

A bill of particulars is not a discovery device and "is not intended to provide the Defendant with the fruits of the Government's investigation"; instead, a bill of particulars is intended to give the Defendant the minimum amount of information necessary to permit the Defendant to conduct his own defense.  United States v. Smith, 776 F.2d 1104, 1111 (3d Cir. 1985); see also, United States v. Kilrain, 566 F.2d 979, 985 (5th Cir. 1978).  In particular, there is no requirement that the Government "weave the information at its command into the warp of a fully integrated trial theory for the benefit of the Defendants...."  United States v. Addonizio, 451 F.2d at 64; see also United States v. Boffa, 513 F. Supp. at 485. Moreover, the Government is not obligated to reveal the precise means by which the crimes were carried out or its general legal theory of the Defendant's guilt.

58

United States v. Cafaro, 480 F. Supp. 511, 517 (S.D.N.Y. 1979); United States v. Papia, 399 F. Supp. 1381, 1384 (D. Wis. 1975).

Although the Defendants have specific notice of the Government's theories and proofs by way of a detailed Indictment and through discovery they have been provided, they have nevertheless unreasonably asked the Court to order the Government to provide a bill of particulars as to at least 55 matters, many of which, if required to be provided in the form of a bill of particulars, will lock the Government into specific proofs and unfairly limit the consideration and interpretation of evidence by the jury.

For example, even though the Defendants have access to the books and records of Beverage Marketing of PA, Inc. and Pinnacle Group of Jupiter and can read those books and records themselves, their motion asks the Court to order the Government to "[s]pecify the false entries alleged to have been made" in the books and records of those entities.  (Mot., pp. 3-4)  Similarly, although the identity of "Participant #1" has been made known to the Defendants through discovery, has been widely reported in the press, and is readily apparent to them from the Statement of Facts section of this brief and the pre-sentence investigation report prepared in connection with the rejected plea agreements, the Defendants

nevertheless have asked the Court to order the Government to specifically identify him. (Mot., p. 3).

As another example of the unreasonableness of the Defendants' request, paragraph 6 of the Indictment clearly states "the Defendants employed a number of schemes in an attempt to hide the income they received including, but not limited to, causing income in the form of cash, checks and wire transfers to pass through intermediaries and causing false records to be created."  In spite of this clear language putting them on notice of the nature of the schemes, in spite of being provided specific notice of the dates and amounts of cash payments and wire transfers, and in spite of having been provided with copies of the allegedly false records, the Defendants nevertheless ask for a bill of particulars to "[i]dentify the schemes that the Defendants are alleged to employ to hide the income..."  (Mot., p. 3).

Similarly, although the Indictment and discovery detail the specific manner in which millions of dollars were transferred to the Defendants from "Participant #1" and "Participant #2" by check, wire transfer and cash, the Defendants nevertheless request a bill of particulars to "specify the financial relationship that the Defendants failed to disclose" in their statements of financial interests.  (Id.).

60

There are numerous similar examples of what the Government suggests are attempts by the Defendants to unreasonably force the Government to provide the Defendants with the Government's fully integrated trial theory. Given the detailed Indictment, the discovery provided and the presentence investigation report that was prepared in connection with the rejected Rule 11(c)(1)(C) plea agreements, there is no need for a bill of particulars in this case.

**J.     Motion for Disclosure of Brady and Giglio Materials**

The Government is aware of its responsibility to promptly provide the Defendant with any information which is exculpatory within the meaning of Brady v. Maryland, 373 U.S. 83 (1963). Government counsel will advise defense counsel of any such information.

The Government is also aware of its responsibility to provide the Defendant with impeachment material within the meaning of Giglio v. United States, 405 U.S. 150 (1972). However, Giglio impeachment material need not be provided until the time of disclosure of Jencks Act materials. See United States v. Higgs, 713 F.2d 39, 44 (3d Cir. 1983). The Government intends to provide the Defendant with Jencks and Giglio materials no later than the Friday before trial, assuming trial is scheduled for a Monday.

The Defendants have made a request for information in accordance with

United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991).  In accordance with policy,

the Defendants' request has been forwarded to the United States Attorney's

Brady/Giglio coordinator.  Any material received in response to the request will be

provided to the Defendants no later than the time of disclosure of Giglio material.

### K.    Motion for Discovery

The Defendants have made a general request for discovery and inspection.

The United States responds in this brief with a list of all items turned over in

discovery.  See Attachment A.  The Defendants go further, however, and request

the Court to order the disclosure of Jencks material, arguing that it is Brady

material.  The United States acknowledges that the Supreme Court has held that

there is an obligation on the part of the United States to disclose materially

favorable evidence regardless of whether the Defendant requests the exculpatory

evidence or not.  United States v. Bagley, 473 U.S. 667, 682 (1985); Kyles v.

Whitley, 514 U.S. 419, 433 (1995).  It also must disclose evidence that could be

used to impeach Government witnesses.  Giglio v. United States, 405 U.S. 150

(1972).  This would include any agreement with a Government witness for

testimony in exchange for monetary compensation or favorable treatment in the

criminal justice system, especially when the witness' testimony is an important

62

part of the Government's case.  Id. at 154-55.  Finally, the United States'

constitutional duty to disclose continues throughout the proceedings.

Pennsylvania v. Ritchie, 480 U.S. 39, 60 (1987).

The United States is not required, however,  to turn over evidence available

to the defense from other sources, United States v. Pellulo, 399 F.3d 197, 215-16

(3d Cir. 2005).[8]  Also, Rule 16(a)(2) of the Federal Rules of Criminal Procedure

specifically excludes from pretrial discovery (1) "reports, memoranda, or other

internal Government documents made by the attorney for the Government or other

Government agencies in connection with the investigation or prosecution of the

case; and (2) statements made by Government witnesses or potential Government

witnesses except as provided under the Jencks Act, 18 U.S.C. § 3500.  Thus,

written or oral statements of witnesses, including coconspirators and

codefendants, are not discoverable under Rule 16.  United States v. Fearn, 589

F.2d 1316 (7th Cir. 1978); United States v. Cook, 530 F.2d 145 (7th Cir. 1976);

United States v. Percevault, 490 F.2d 126 (2d Cir. 1974).

---

[8]    Although the vast majority of the evidence turned over to the defense
was readily available from other sources, the United States has turned it over
anyway.  The disclosed documents include the IRS tax analysis.  See Attachment
A.

The Defendants further request, however, certifications by the prosecutor that all law enforcement authorities involved have been queried regarding the requested discovery and that a good faith effort was made to obtain the requested discovery.  They further seek a certification that certain Department of Justice Guidelines have been complied with. Other than a general request for exculpatory/impeachment evidence, the Defendants do not further identify the evidence sought.

The United States is aware of its discovery obligations under federal law and pursuant to Department of Justice guidelines.  United States v. Caceres, 440 U.S. 741, 754-56 (1979).  Jencks material will be turned over pursuant to 18 U.S.C. § 3500.  The United States declines, however, to provide any certifications requested by the Defendants, as such a production request is not supported by the case law cited in their briefs.  Those cases and Department of Justice guidelines place the responsibility upon the United States  for locating and turning over Brady and Giglio material but do not require or suggest that the United States must certify to the defense the nature of their efforts.  Strickler v. Greene, 527 U.S. 263 (1999) (prosecutor has a duty to learn of any evidence favorable to the defense which is known to the other acting on the Government's behalf, including the police); Kyles v. Whitley, 514 U.S. 419 (1995) (prosecutor remains responsible for

duty to disclose favorable evidence to Defendant, regardless of whether police investigators failed to inform prosecutor of evidence).

Rule 26.2 incorporates the Jencks Act into the Federal Rules of Criminal Procedure and limits discovery until after the witness has testified on direct examination. Likewise, Federal Rules of Criminal Procedure 16(a)(2) & (3) specifically exclude from pretrial discovery statements made by government witnesses or potential government witnesses, including grand jury testimony, except as provided under the Jencks Act. United States v. Cook, 530 F.2d 145 (7th Cir. 1976). A defendant's request for statements must be sufficiently precise to identify the particular statements sought. United States v. Sanchez-Gonzalez, 294 F.3d 563, 568 (3d Cir. 2002) (discovery properly denied because Defendant failed to show with reasonable particularity that requested material existed). Requests are invalid if they are overly broad. United States v. Pepe, 747 F.2d 632, 657-58 (11th Cir. 1984) (Jencks Act request over broad where Government would have been forced to find and produce all statements that witness, a former participant in organized crime, ever made about organized crime and usury).

In the context of a criminal trial, the Defendants are not entitled to review prior testimony of Government witnesses until the completion of their direct

examination.[9]    United States v. Haire, 371 F.3d 833, 841 (D.C. Cir. 2004)

(statements made by cooperating Defendants at trial not discoverable until

witnesses testified on direct examination, vacated on other grounds, Haire v.

United States, 543 U.S. 1109 (2005).  Regarding witnesses who appeared before

the grand jury but who will not be called upon to testify, the Defendants have no

right of access to such testimony.  United States v. Schier, 438 F.3d 1104, 1112

(11th Cir. 2006) (a Defendant is not entitled to statements of non-testifying

witnesses under the Jencks Act).[10]

A party seeking disclosure of grand jury material under Federal Rule of

Criminal Procedure 6(e) must demonstrate a "particularized need."  United

Kingdom v. United States, 238 F.3d 1312, 1321 (11th Cir. 2001) (particularized

need not demonstrated by broad request for all grand jury materials); In re Grand

Jury 95-1, 118 F.3d 1433, 1437-39 (10th cir. 1997) (assertions of possible injustice

---

[9]    However, consistent with the practice of the U.S. Attorney's Office for
the Middle District of Pennsylvania, all Jencks material will be turned over to the
Defendants no later than the Friday before a trial commencing on a Monday.

[10] Of course, the United States is under an ongoing obligation to disclose
evidence favorable to the accused pursuant to Brady v. Maryland, 373 U.S. 83, 87
(1963); Strickler v. Greene, 527 U.S. 263, 281-82 (1999) (Brady violation occurs
when: (1) withheld evidence is favorable to accused because it is exculpatory or
impeaching, (2) evidence was suppressed by the Government, either willfully or
inadvertently; and (3) prejudice ensued).

too vague to overcome the overriding policy interest in grand jury secrecy); United States v. Miramontez, 995 F.2d 56, 59-60 (5th Cir. 1993) (particularized need was not shown because the request was general and did not specify which portion of the proceedings should be disclosed); United States v. Azad, 809 F.2d 291, 294-95 (6th Cir. 1986) (per curiam) (particularized need not shown when the request for wide-ranging search to bolster unsubstantiated claim of prosecutorial misconduct was based on prosecutor's "off-hand remarks").

In short, the United States acknowledges its responsibility to locate and to turn over exculpatory and impeaching material.  It is not required, however, to certify to the Defendants the nature of its effort to comply with federal law and Department of Justice guidelines, nor is it required to turn over Jencks material at this stage in the proceeding.[11]

## L.    Motion to Dismiss RICO Counts 1 & 2

Pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B), the Defendants seek dismissal of Counts One and Two of the Indictment, arguing that an essential element, the definition of the "enterprise," was not "properly alleged."  (Br., p. 2). This is so, they argue, because the Luzerne County Court of Common Pleas cannot

---

[11]  The United States incorporates by reference its Brief in Opposition to the Defendants' Motion to Inspect Grand Jury Minutes and/or Be Provided With Certain Related Documents.

be a racketeering enterprise since the criminal acts of which the Defendants are accused "were not committed through or associated with the Luzerne County Court of Common Pleas."  (Br., p. 3).

The United States responds that the Courts of Appeals have given a broad reading to the term "enterprise," noting that Congress has mandated a liberal construction of the RICO statute in order to effectuate its remedial purposes and pointing to the expansive use of the word "includes" in the statutory definition of the term.  In fact, it is universally recognized that the list of enumerated entities in Section 1961(4) is not exhaustive but merely illustrative.  United States v. Turkette, 452 U.S.  576, 580 (1981) ("[t]here is no restriction upon the associations embraced by the definition [of enterprise]"); United States v. Aimone, 715 F.2d 822, 828 (3d Cir. 1983); United States v. Perkins, 596 F. Supp. 528, 530-31 (E.D. Pa.) aff'd, 749 F.2d 28 (3d Cir. 1984).

Thus, public and Governmental entities as well as private entities may constitute a RICO "enterprise," including commercial entities such as corporations, United States v. Frumento, 563 F.2d 1083, 1090-92 (3d Cir. 1977); benevolent and non-profit organizations such as unions and union benefit funds, United States v. Provenzano, 688 F.2d 194, 199-200 (3d Cir. 1982); Governmental units such as offices of governors, state and congressional legislators, United

68

States v. McDade, 28 F.3d 283, 295-96 (3d Cir. 1995) (Congressman and his

Congressional offices in Washington and Scranton); United States v. Thompson,

685 F.2d 993 (6th Cir. 1982) (en banc) (Governor of Tennessee).

     The types of public and government entities coming under the RICO statute

are too numerous to cite.  However, for the purposes of this brief, courts and

judicial offices have long been held to fall within the definition of "enterprise."

United States v. Bacheler, 611 F.2d 443, 450 (3d Cir. 1979) (Philadelphia Traffic

Court); United States v. Joseph, 526 F. Supp. 1091 (E.D. Pa.) (Office of the Clerk

of Courts of Lehigh County, Pennsylvania); United States v. Vignola, 464 F.

Supp. 1091 (E.D.Pa.),  aff'd, 605 F.2d 1199 (3d Cir. 1979); United States v.

Blackwood, 768 F.2d 131, 137-38 (7th Cir. 1982) (Cook County Circuit Court);

United States v. Angellili, 660 F.2d 23, 30-34 (2d Cir. 1981) (New York City

Civil Court).

     The Defendants argue that the Court of Common Pleas of Luzerne County is

nothing more than a "phrase referring to a judicial district" whose judges "can be

sent anywhere in the state in order to hear and decide cases."  (Br., p. 3).  The

lynchpin of the defense argument is that the Luzerne Count Court of Common

Pleas is "incapable of being...acted through."  (Br., p. 3).  This is an odd assertion

since, but for the Defendants' status as Luzerne County Common Pleas Judges,

they would not have been importuned with bribes to exercise their discretionary power as judges while sitting in Luzerne County.[12]  Moreover, while the Luzerne County Court of Common Pleas may be a judicial district, it is much more than that.  It is also an office, since its key members sit as a Court to resolve civil and criminal litigation, primarily in Luzerne County.  It is not simply an inert area of land:   it is an enterprise under the RICO statute.

Second, the Defendants argue that the Luzerne County Court of Common Pleas is not an organization, did not function as a continuing unit, and was not an entity separate from the pattern of activity alleged in the Indictment.  (Br., p. 6).  These assertions fly in the face of settled law.  First, proof that the enterprise in question has a legal existence satisfies the enterprise element.  Turkette, 452 U.S. at 581.  For example, proof of a RICO enterprise consisting of a governmental office, such as a police department or a state office, can be established by showing that the governmental office or department was created by statute, regulation or ordinance.  The District Court can take judicial notice of the statute, regulation or ordinance authorizing the office or department.  As one Court noted, the definition

_____

[12]Indeed, as the prosecution of Judge Michael Toole of the Luzerne County Court of Common Pleas makes clear, the use by judges of the discretionary authority vested in them by the citizens of Luzerne County to accept kickbacks and rewards is by no means limited to the present case.

of the term "enterprise" is of necessity a shifting one, given the fluid nature of criminal associations. United States v. Swiderski, 593 F.2d 1246, 1249 (D.C. Cir. 1978). In fact, the United States is not even required to specify in a RICO indictment whether the enterprise is a "legal entity" or a "group of individuals associated in fact," provided that the indictment is otherwise sufficient. United States v. Alonso, 740 F.2d 862, 870 (11th Cir. 1984); United States v. Baker, 617 F.2d 1060, 1061 (4th Cir. 1980) (county sheriff's office is either a legal entity or a group of individuals associated in fact); United States v. Brown, 555 F.2d 407, 415 (5th Cir. 1977) (Macon, Georgia Police Department is at least a group associated in fact, and may also be a legal entity). The legal definition of "enterprise" is much more fluid than the Defendants suggest.

Third, the Defendants contend that the "associates" of the enterprise did not function as a "continuing unit," because the Luzerne County Court of Common Pleas "encompasses many offices and the judicial district employs individuals in a variety of capacities." (Br., pp. 3, 6). The very concept of "enterprise," however, assumes that individuals within an enterprise may perform radically different functions. In fact, a single enterprise may be found even where members of an association-in-fact enterprise form opposing factions. United States v. Orena, 32 F.3d 704, 710 (2d Cir. 1994).

71

The Supreme Court in Turkette held that an enterprise does not require a hierarchical structure or even any particular structure "beyond what [is] necessary to perpetuate the predicate crimes."  Rather, to prove an enterprise, Turkette merely required evidence of an ongoing organization, formal or informal and evidence that "**various** associates function as a continuing unit."  452 U.S. at 583 (Emphasis added).  In other words, in a governmental enterprise, not every person in the governmental unit needs to be involved in the criminal activity.  It is sufficient if some of the people within the Governmental organization commit the predicate criminal acts using their positions within the governmental organization to do so.

Fourth, the Defendants argue that the enterprise charged in the Indictment is not an entity separate and apart for the pattern of activity in which it engages. (Br., p. 6).  It is incontestable that a corrupt judge, using his position to accept kickbacks, is not co-terminus with the other judges in the same county who are not so engaged.  However, in United States v. Local, 560, International Brotherhood of Teamsters, 581 F. Supp. 279, 329-30 (D.N.J. 1984), aff'd, 780 F.2d 267 (3d Cir. 1985),  the Third Circuit held that while RICO requires the showing of a "person" as a separate element apart from the "enterprise," these elements need not be mutually exclusive.  In the same way, the Court of Common Pleas for Luzerne

72

County had a life separate and apart from the Defendants and the Defendants clearly engaged in their judicial misconduct without the knowledge and consent of at least some of their fellow judges. In that sense, they were "separate and apart" from the enterprise. Nevertheless, they were also a part of the enterprise as elected members of the Luzerne County judiciary assigned to handle litigation on behalf of the citizens of Luzerne County. This is not inconsistent with their functioning as a "person" under the RICO statute, notwithstanding their connection with the enterprise. In other words, a Defendant's identity as a "person" does not, by the mere fact of his association with the enterprise, merge with the enterprise.

In the case of United States v. Grubb, 11 F.3d 426 (4th Cir. 1993), a state judge was charged with using his judicial office to influence elections by illegally raising campaign contributions. The Fourth Circuit concluded that "[w]e...have a defendant who undeniably is employed by and operates or manages the enterprise...." Id. at 438-39. The same reasoning applies to the present case. The Defendants used the discretionary function made possible by their position as Common Pleas judges to commit illegal acts, i.e., taking kickbacks and rewards. Their judicial office had an affect on interstate commerce, thereby making it an "enterprise" within the meaning of the RICO statute.

Thus, Defendants' argument that "'[t]he Luzerne County Court of Common Pleas' is just a phrase referring to a judicial district" misstates the facts and fundamentally misconstrues the nature of the charged enterprise. They attempt to distinguish the case from United States v. Vignola, 464 F. Supp 1091 (E.D. Pa.), aff'd, 605 F.2d 1199 (3d Cir. 1979) by arguing that Vignola, the President Judge of the Philadelphia Traffic Court, received kickbacks from other employees of the traffic Court. The Defendants further try to distinguish their case from Vignola by saying the Philadelphia Traffic Court was "a specific division of the first judicial district (and not the geographic district) through with the Defendant allegedly acted." (Br. p. 4). This is precisely the argument that the District Court rejected in Vignola as "contrary to the plain language of RICO...." 464 F. Supp. at 1095. The District Court reasoned that the RICO statute was aimed at removing racketeering influences from enterprises engaged in, or the activities of which affect, interstate commerce. Thus, the focus was upon **acts** (such as bribery) that had been identified under the RICO statute as racketeering acts. To that end, the District Court, concluded, "Congress has given 'enterprise' the broad definition previously quoted. This definition makes no exception for public entities such as the judiciary." The District Court noted that federal Courts "have been in near-unanimity in rejecting challenges to the characterization of a particular entity as an

74

'enterprise' and have held that [police departments, redevelopment authorities, the state senate, tax bureaus] were all enterprises within the meaning of RICO." Id. at 1096 (citations omitted). The District Court went on to hold that the judiciary had an affect on interstate commerce and therefore constituted an enterprise under the RICO statute. Id. at 1097.

Thus the focus is twofold: (1) Whether the **acts** charged constituted racketeering acts under the statute, and (2) whether the governmental **entity** where/through which the racketeering acts were committed had an **affect** on interstate commerce. If the answer to each question is "yes," then the governmental entity is an "enterprise" under the RICO statute.[13] In such situations, the use of one's judicial office to commit racketeering acts qualifies that office for designation as an "enterprise." Grubb, 11 F.3d at 438-39.

Finally, the Defendants urge that there must be findings regarding organized crime infiltration into trial Courts. (Br., p. 5). This argument was explicitly rejected in Vignola. 464 F. Supp. at 1095-96. Moreover, the legislative history of Title IX shows that Congress had taken pains to make a conviction dependent

---

[13]United States v. Bacheler, 611 F.2d 443, 450 (3d Cir. 1979), also held that the Philadelphia Traffic Court was an "enterprise" under the RICO statute, citing the Congressional and Supreme Court mandates that the statute was to be liberally construed.

upon **behavior**, and not on an individual's "status" as a member of an organization influenced by organized crime. When faced with various proposals to incorporate a definition of organized crime, Congress flatly rejected the attempt, aware of the impossibility of definition. 116 Cong. Rec., part 26, Oct. 7, 1970, p. 35344. The decision not to include in the statute a definition of "organized crime" was a conscious decision on the part of Congress. The absence of any allegation that particular Defendants were in any way connected with or their organizations infiltrated by organized crime does not affect the status of the prosecution. United States v. Campanale, 518 F.2d 352, 363-64 (9th Cir. 1975).

The short answer is that, contrary to the Defendants' arguments, where a state Court judge is charged with taking kickbacks in exchange for his discretionary acts as a judge, the judiciary is an enterprise, based upon its affect on interstate commerce. The Defendants' argument is without merit and should be rejected.

### M.    Motion to Dismiss Racketeering Acts 1-3 and Counts 3-14 (Challenge to Honest Services Charges)

Pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B), the Defendants seek the dismissal of predicate acts one through three of Count One and Three through Ten of the Indictment. The Defendants allege that the indictment fails to

sufficiently allege honest services fraud under either bribery or conflict of interest theories. (Br., p. 2). In addition, the Defendants argue that honest services fraud is vague and over broad, and therefore the statute is unconstitutional. Id.

When considering a motion to dismiss a charge under Federal Rule of Criminal Procedure 12(b)(3)(B), a Court should accept as true the facts alleged in the indictment and determine if those facts constitute a violation of the law as charged. United States v. Besmajian, 910 F.2d 1153, 1154 (3d Cir. 1990). "A pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the Government's evidence." United States v. DeLaurentis, 230 F.3d 659, 660 (3d Cir.2000). "An indictment is generally deemed sufficient if it: (1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the Defendant of what he must be prepared to meet, and (3) allows the Defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution." United States v. Vitillo, 490 F.3d 314, 321 (3d Cir.2007) (quoting United States v. Rankin, 870 F.2d 109, 112 (3d Cir.1989). The indictment need contain no greater specificity than the statutory language "so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a

77

subsequent prosecution." United States v. Rankin, 870 F.2d at 112 (citations omitted).

For a Defendant to be found guilty of mail or wire fraud, the Government must prove three elements: "(1) the Defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of the mails or interstate wire communications in furtherance of the scheme." United States v. Antico, 275 F.3d 245, 262-63 (3d Cir. 2001). "Honest services fraud" is a form of fraud defined by statute as "a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. §1346. Honest services fraud typically arises in two contexts. United States v. Panarella, 277 F.3d 678, 690 (3d Cir. 2002). The first form of honest services fraud is the outright bribery of a public official. United States v. Carbo, 572 F.3d 112, 114 (3d Cir. 2009). A second form of honest services fraud involves the failure by a public official to disclose a conflict of interest. United States v. Antico, 275 F.3d 245, 262-63 (3d Cir. 2001). Contrary to the assertions of the Defendants, the indictment sufficiently alleges a violation of honest services fraud under both theories.

### 1. Quid Pro Quo Bribery Honest Services Fraud

The bribery theory of honest services fraud generally occurs when a person accepts something of value in exchange for an official action. United States v.

78

Panarella, 277 F.3d 678, 690 (3d Cir. 2002). Combining the express language of the charges, the allegations incorporated by reference, as well as the plain implications that arise from factual allegations, it is clear that the indictment sufficiently alleges a bribery theory for honest services fraud.

First, the indictment tracks the statutory language of honest services fraud. (Indictment ¶¶ 29-36, 69, 82, 84-85); see United States v. Kemp, 500 F.3d 257, 280-81 (3d Cir. 2007). Far beyond recounting the elements of the offense, the indictment repeatedly notifies the Defendants that they are being charged with having taken official acts in response to payment. Count One of the indictment notifies the Defendants that they are being charged with "secretly deriving more than $2,800,000 in income, in addition to the compensation to which they were lawfully entitled, *in exchange for* their official actions and anticipated official actions." (Indictment, ¶ 5) (emphasis added). In addition, in Count One the Defendants were charged with engaging in state and federal bribery racketeering acts. Taken in its totality, it is clear from the indictment that the Government is pursuing a bribery theory of honest services fraud.

With respect to the allegations in Counts Three through Ten, the Defendants were expressly notified that the Government is proceeding under a bribery theory of honest services fraud:

79

> As further described herein, the Defendants defrauded the citizens of
> the Commonwealth of Pennsylvania and deprived those citizens of
> their right to the honest services of the Defendants by: (1) engaging in
> undisclosed biased decision-making for personal gain; and (2)
> knowingly soliciting, extorting and accepting *quid pro quo bribes* as
> part of a generalized agreement to improperly exert influence on
> behalf of the bribe payer as specific opportunities arose to do so.

(Indictment ¶ 73) (emphasis added).

The Defendants cite United States v. Kemp, 500 F.3d 257 (3d Cir. 2007) as

authority supporting their argument that the bribery theory honest services was

insufficiently alleged. (Br., pp. 7-9).  Their reliance upon Kemp is misplaced.

Under a similar challenge to the sufficiency of an indictment's that charged the

bribery theory of honest services fraud, the Third Circuit held that an indictment

which "plainly alleges honest services fraud" and specifically alleges that

individuals "provided benefits ... in exchange for favorable decisions" by a

Government official is sufficient. Id. at 280.  The Court further addressed the

circumstance where a stream of benefits occurs over a period of time and is not

specifically married to one official act.  The Third Circuit approved of the jury

instructions on this issue, including the following: "[W]here there is a stream of

benefits given by a person to favor a public official, ... it need not be shown that

any specific benefit was given in exchange for a specific official act.  If you find

beyond a reasonable doubt that a person gave an official a stream of benefits in

implicit exchange for one or more official acts, you may conclude that bribery has occurred. " Id. at 281.   In this case, the indictment factually outlines in explicit detail the stream of benefits given to the Defendants over years and expressly alleges that these benefits were given "in exchange for"or were "quid pro quo bribes."  As such, the indictment sufficiently alleges the bribery theory of honest services fraud.

### 2.  Conflict of Interest Theory of Honest Services Fraud

Under the conflict of interest theory of honest services fraud, a violation occurs when (1) a public official conceals a financial interest; (2) the concealment violates a legal duty to disclose; and (3) the official takes discretionary action in an official capacity that the official knows will directly benefit the concealed interest – regardless of whether that concealed interest improperly influenced the official's actions. See Panarella, 277 F.3d at 680; Antico, 275 F.3d at 263.  The Defendants contend that the indictment is insufficient because it fails to alleged a violation of state criminal law – which the Defendants argue is a necessary limitation of the scope of a public official's criminal liability for honest services fraud. (Br., pp. 5-7). This challenge fails because honest services fraud does not require a corresponding state criminal statute to define the scope of a official's

duties. Rather, the official duties must arise from a recognized fiduciary relationship where the duties can be clearly defined.

The Third Circuit has addressed how to define a public official's duty to the public under honest services fraud. The Courts have clearly and repeated held that at a minimum a violation of a state criminal law concerning disclosure qualifies as honest services fraud. Panarella, 277 F.3d at 695 ("a public official who conceals a financial interest in violation of state criminal law while taking discretionary action that the official knows will directly benefit that interest commits honest services fraud"); Antico, 275 F.3d at 263("When coupled with the duty imposed by state and local conflict of interest laws, Antico's failures to disclose his financial business arrangement . . . and to recuse himself from taking action . . . fall within the scope of honest services fraud"). Whether that duty extends beyond state criminal laws has been suggested[14] by the Third Circuit and recently expanded to include conduct that violates a clearly defined fiduciary relationship.

_____

[14]"Although we hold that the existence of a violation of state law, coupled with the other facts discussed above, is *sufficient* to establish honest services wire fraud in this case, we need not decide whether a violation of state law is *necessary* for nondisclosure of a conflict of interest to amount to honest services fraud. Our decision in United States v. Antico, 275 F.3d 245, 2001 U.S. App. LEXIS 25318 (3d Cir. 2001), suggested in dicta that a violation of state law is not necessary for nondisclosure of a conflict of interest to constitute honest services fraud." Panarella, 277 F.3d at 699 n.9.

United States v. McGeehan, 584 F.3d 560 (3d Cir. 2009) (the fiduciary relationship between corporate officers and a corporation, which is established in law and clearly defined, may serve as a basis for honest services fraud charge); See United States v. Murphy, 323 F.3d 102, 116 (3d Cir. 2003) (right to honest services is not owed by county political party chairman because there is no defined fiduciary duty owed to the public from such an individual).

Judges clearly are in a fiduciary relationship with the public they serve. First, their fiduciary obligations arise simply by the judge's status as public officials. Panarella, 277 F.3d at 696 ("A public official is a fiduciary toward the public, ... and if he deliberately conceals material information from them he is guilty of fraud.") "Duties to disclose material information affecting an official's impartial decision-making and to recuse himself exist within this fiduciary relationship regardless of a state or local law codifying a conflict of interest." Antico, 275 F.3d at 264. The failure to disclose material conflicts of interest by public officials – even if not technically in violation of state and local reporting laws – "violate[s] the fiduciary relationship between a public servant charged with disinterested decision-making and the public he serves." Id. at 264. The essential requirement is that the fiduciary relationship be grounded in state or federal law and that those duties are clearly defined. See Murphy, 323 F.3d at 117.

83

The state criminal laws at issue in <u>Panarella</u> and <u>Antico</u> are the offense of failure file accurately file annual statements of financial interest (18 Pa.C.S. §1109(b)) and the prohibition for engaging in a conduct that constitutes a conflict of interest (65 Pa.C.S. §1103(a)). <u>Panarella</u>, 277 F.3d at 694; <u>Antico</u>, 275 F.3d at 263. The Third Circuit noted that "the common law duty to disclose is codified by Pennsylvania statute, which requires public officials to file annual Statements of Financial Interest and criminalizes intentional misrepresentations in these statements." <u>Panarella</u>, 277 F.3d at 696.

These criminal statutes were previously applicable to members of the judiciary and failure to accurately file statements or disclose conflicts of interest exposed members of the judiciary to criminal sanctions. <u>Kremer v. State Ethics Commission</u>, 469 A.2d 593 (Pa. 1983). This changed when the Pennsylvania Supreme Court ruled that application of these criminal statutes to judges violated the separation of powers provisions of the Pennsylvania Constitution. <u>Id.</u> at 595 ("the financial disclosure provisions of the Ethics Law infringe on our power to supervise Courts and are, therefore, unconstitutional as applied in the instant case"). As a result, the Pennsylvania Supreme Court issued an administrative order upon all members of the judiciary requiring them to annually file statements of financial interest that publicly discloses a judge's receipt of gifts, income, and

84

things of value. (Order of the Supreme Court of Pennsylvania, No.47, dated April 13, 1984). These statements of financial interest are almost identical to the statements filed by all other public officials under the Pennsylvania State Ethics Act. See Panarella, 277 F.3d at 680; Antico, 275 F.3d at 263.  Although Kremer removed the state criminal sanctions, the administrative order clearly established a clearly defined obligation for judges to accurately report to the public that officer's financial interests .

The fiduciary duty owed by judges is not only grounded in common law – because of their status as public officials – but arises from the Pennsylvania Constitution.[15]  These fiduciary duties are further defined by the Code of Judicial Conduct.[16] As the Pennsylvania Supreme Court noted, "[p]ursuant to our

_____

[15] "Justices and judges shall not engage in any activity prohibited by law and shall not violate any canon of legal or judicial ethics prescribed by the Supreme Court." Art. 5, Section 17(b).
    "No justice, judge or justice of the peace shall be paid or accept for the performance of any judicial duty or for any service connected with his office, any fee, emolument of perquisite other than the salary and expenses provided by law." Art. 5, Section 17(c).

[16] Canon 3(C)(1) "Judges should disqualify themselves in a proceeding in which their impartiality might reasonably be questioned."
    Canon 5(C)(1) "Judges should refrain from financial and business dealings that tend to reflect adversely on their impartiality, interfere with the proper performance of their judicial duties, exploit their judicial position, or involve them in frequent transactions with lawyers or persons likely to come before the Court on which they serve."

supervisory power, we have established a Code of Judicial Conduct applicable to judges, which rules contain detailed provisions designed to prevent conflicts of interest, financial or otherwise." Kremer, 469 A.2d at 595. In light of the fiduciary obligations imposed by common law upon all public officials and specific obligations imposed by the Pennsylvania Constitution, Code of Judicial Conduct and administrative orders, it clear that judges in the Commonwealth of Pennsylvania are placed on sufficient notice of their fiduciary obligations to the public and the litigants before them. These obligations clearly prohibit concealing material financial information from the public and litigants appearing before them. The indictment's allegations that the Defendants violated these duties for their self-enrichment forms a sufficient legal basis for the honest services prosecution.

### 3.  Constitutionality of Honest Services Fraud

Finally, the Defendants allege that honest services fraud as applied to the facts alleged in the indictment is unconstitutional because it is vague and over broad. The above referenced authority of the Third Circuit clearly establish the present viability and constitutionality of honest services fraud. The Defendants request that the trial be postponed until the United States Supreme Court has decided matters of Weyhrauch v. United States, USSC Docket No. 08-1196; Black v. United States, USSC Docket No. 08-876; and Skilling v. United States,

86

USSC Docket No. 08-1394. The United States responds that the indictment as

charged fully meets the elements of honest services law in this circuit as it now

exists.  Although it is anticipated that the United States Supreme Court will issue a

ruling upon this issue before the conclusion of its term on July 1, 2010, the

Government requests that the Court deny the request for postponement of trial on

this basis.   If the law of honest services fraud is changed to a degree which

fundamentally alters the viability of these charges, this Court can reconsider its

ruling on this motion at that time.

### N.    Motion to Dismiss Counts 15 through 24 (Title 18, U.S.C. § 666)

The Defendants have moved the Court to dismiss Counts 15 through 24 of

the Indictment arguing that the Government failed to allege essential elements of

Title 18 U.S.C. § 666(a)(1)(B).  The Defendants claim "the Indictment fails to

specify which official actions that the Defendants took, or intended to take, within

the scope of their agency with the AOPC."  (Mot. p. 3).  They also further that "the

Indictment also fails to allege that the planning, construction and operation of

juvenile detention facilities owned, constructed and operated by PA Child Care

and Western PA Child Care was connected with any business, transaction, or

series of transactions of the AOPC."  (Id.).  The Defendants argue that "without

these essential elements, the violations of 18 U.S.C. § 666(a)(1)(B) alleged in Counts 15 through 24 of the Indictment must be dismissed..." (Id.).

Contrary to the assumption implicit in the Defendants' motion, Counts 15 through 24 of the Indictment do not relate solely to actions of the Defendants taken as agents of the AOPC. Those counts also relate to actions of the Defendants taken as agents of the Court of Common Pleas and Luzerne County.

Counts 15 through 24 of the Indictment allege that the Defendants, "as elected Judges of the Court of Common Pleas for Luzerne County were agents for a *number of Government entities*, including but not limited to, the Administrative Office of the Pennsylvania Courts ("AOPC"), an agency of the Commonwealth of Pennsylvania that employed the Defendants as judges." (Emphasis added). See Indictment, ¶ 90. Counts 15 through 24 of the Indictment also incorporate by reference the allegations of all previous counts of the Indictment. Id., ¶ 89. Those additional allegations identify numerous examples of actions taken by the Defendants as agents of Luzerne County and of the Court of Common Pleas for Luzerne County. See, e.g., Indictment, ¶¶ 1 (Defendants served as judges of the Court of Common Pleas for Luzerne County), 5 (listing actions taken by the judges in their official capacity as representatives of Luzerne County and of the

Court of Common Pleas for Luzerne County), 9-10 (describing action taken by Defendant Conahan in his capacity as President Judge of Luzerne County), 75 (alleging that defendants were "acting on behalf of the Court of Common Pleas for Luzerne County").

The fact that Counts 15-24 of the Indictment relate to the Defendants' actions not only as agents of the AOPC but also as agents of Luzerne County and the Court of Common Pleas is also made evident by the allegation contained in those Counts that "[t]he Commonwealth of Pennsylvania, Luzerne County and the Court of Common Pleas each received federal assistance in excess of $10,000 during each one-year period beginning on January 1, 2002 and extending through December 31, 2007." See Indictment, ¶ 91.

Thus, even if the Court were to find that the Indictment did not sufficiently specify which official actions the Defendants took, or intended to take, as agents of the AOPC, such a defect would not require the dismissal of Counts 15 through 24 since the Indictment also alleges the Defendants engaged in corrupt activities as agents of Luzerne County and of the Court of Common Pleas.

Moreover, contrary to the Defendants' argument, the Indictment specifies sufficient official actions taken by the Defendants as agents of the AOPC.

89

The United States Court of Appeals for the Third Circuit has made clear that Title 18 U.S.C. §666 is intended to be "extremely broad in scope." United States v. Vitillo, 490 F.3d 314, 321 (3d Cir. 2007), citing United States v. Sotomayor-Vazquez, 249 F.3d 1, 8 (1st Cir. 2001). The "statute seeks to ensure the integrity of vast quantities of federal funds." Id., citing United States v. Cicco, 938 F.2d 441, 445 (3d Cir. 1991) (quoting the legislative history of § 666). "Although the conduct prohibited by section 666 need not actually affect the federal funds received by the agency, there must be some nexus between the criminal conduct and the agency receiving federal assistance." United States v. Moeller, 987 F.2d 1134, 1137 (5th Cir. 1993). "[T]he funds in question need not be purely federal, nor must the conduct in question have a direct effect on federal funds. The statute possibly can reach misuse of virtually all funds of an agency that administers the federal program in question." United States v. Phillips, 219 F.3d 404, 411 (5th Cir. 2000), citing Salinas v. United States, 522 U.S. 52 (1997). In Sabri v. United States, the Supreme Court explained why courts have interpreted section 666 broadly in this regard: "[m]oney is fungible, bribed officials are untrustworthy stewards of federal funds, and corrupt contractors do not deliver dollar-for-dollar value." Sabri v. United States, 541 U.S. 600 (2004).

90

Under Pennsylvania law, any reference to the AOPC is deemed a reference to the Court Administrator of Pennsylvania "who shall, either personally, by deputy, **by other duly authorized personnel of the system**, **or by duly authorized agent**, exercise the powers and perform the duties by statute vested in and imposed upon the Administrative Office. See 42 Pa.C.S. § 1902 (Emphasis added).

The Pennsylvania state judicial "system" is regulated by the provisions of the Pennsylvania Rules of Judicial Administration (Pa.R.J.A.). "System" is defined by Rule 102 as "the unified judicial system of this Commonwealth." The rules treat all Pennsylvania state courts as existing under the umbrella of one judicial system. The AOPC is defined by Rule 102 as the "central office for the administration of the unified judicial system." The AOPC has numerous functions, set forth in Rule 505, including "to review the operation and efficiency of the system and of all offices related to and serving the system." Pa. R.J.A. Rule 505(1).

In support of their motion to dismiss, the Defendants rely on United States v. Whitfield, 590 F.3d 325 (5th Cir. 2009). In Whitfield, the United States Court of Appeals for the Fifth Circuit reversed the section 666 convictions of two judges on the ground that their decisions as presiding judges in two lawsuits not related to

court business were not made "in connection with any business, transaction, or

series of transactions" of the Mississippi Administrative Office of Courts

("AOC").  Whitfield, 590 F.3d at 345-347.  The Court noted that, under

Mississippi law, the AOC's purpose was to "assist in the efficient administration

of the *nonjudicial* business of the courts of the state." Id. at 346 (emphasis in

original).  Although the Court assumed the judges to be agents of the AOC, the

Court stated that the judges' acceptance of bribes in connection with litigation

unrelated in any way to the business of the AOC involved the *judicial* business of

the Mississippi courts.  Id.

Although the Whitfield court reversed the § 666 convictions on the narrow

facts of that case, the court nevertheless opined that there are situations in which

corrupt judicial conduct would support a conviction under § 666:

> § 666 was intended to protect the integrity of federal funds, and not as a
> general anti-corruption statute...Of course state judges could be subject to §
> 666 in certain circumstances.  For example, if the state court system
> received federal funding for the purpose of appointing counsel in death
> penalty habeas proceedings, and a state court judge accepted a bribe in
> exchange for appointing a particular attorney as habeas counsel, § 666
> would clearly be implicated, even if the actual funds used to pay counsel
> were state funds.

United States v. Whitfield, 590 F.3d at 346.

As an illustration of the type of judicial conduct that would fall under the provisions of section 666, the  Whitfield court approvingly cited the section 666 convictions of judicial defendants in United States v. Massey, 89 F.3d 1433 (11th Cir. 1996), for their role in a bribery scheme in which state judges accepted kickbacks from attorneys in exchange for appointments as special assistant public defenders, an arrangement which garnered the attorneys and the judges significant fees at the expense of the county which was a recipient of federal funds. See United States v. Whitfield, 590 F.3d at 346, citing United States v. Massey, 89 F.3d 1433, 1436-37 (11th Cir. 1996), United States v. Castro, 89 F.3d 1443, 1447-48 (11th Cir. 1996).

Among other things, the Indictment in the present case alleges that the Defendants, who were state court judges for the Luzerne County Court of Common Pleas, including Defendant Ciavarella who was the County's juvenile court judge, accepted kickbacks from the builders and operators of juvenile detention facilities in exchange for taking official actions to assist in the construction and operation of the facilities, an arrangement which garnered the operators of the facilities and the judges millions of dollars at the expense of the county which was a recipient of federal funds.  This alleged conduct is precisely

the sort of conduct the Whitfield court opined would support the conviction of a judge under section 666.

Unlike the facts of Whitfield which involved bribes paid in connection with litigation totally unrelated to the business of the Court, the alleged corrupt conduct of the Defendants in this case involved actions of the Defendants that were inextricably linked to the business of the court system, the operations and efficiency of which the AOPC is charged to review.  See Pa. R.J.A. Rule 505(1). Among other things, the Indictment alleges the Defendants acted corruptly in connection with the construction and operation of juvenile detention facilities, the placement of juvenile offenders,  and in adopting unlawful procedures in juvenile court proceedings.  All of these allegations relate to matters that were inherently part of the operations of the court system.

For example, in furtherance of its obligation to review the operation and efficiency of the court system, the AOPC is authorized to review records of juvenile court proceedings.  The applicable section, 42 Pa.C.S. § 6307, strictly limits inspection of court files and records in juvenile proceedings to very few entities, including, "[t]he Administrative Office of Pennsylvania Courts." Paragraph 79 of the Indictment  charges:

that the defendant MARK A. CIAVARELLA, JR. adopted procedures in juvenile court which resulted in juveniles appearing without counsel and without creation of a normal court record...The adoption of these procedures resulted in violation of the constitutional right to counsel afforded juvenile offenders and created the potential for an increased number of juveniles to be sent to the juvenile detention facilities of PA Child Care and Western PA Child Care.

To the extent that the AOPC was charged with reviewing the operation and efficiency of the court system, the allegation that Defendant Ciavarella adopted procedures that denied juveniles the right to counsel and that failed to create a normal court record are clearly actions he took that were connected with the business of the AOPC.

Given the foregoing, Counts 15- 24, taken together with other parts of the Indictment incorporated by reference, sufficiently set forth the essential elements of Title 18 U.S.C.§ 666 as to the Defendants' actions as agents of the AOPC.  In the alternative, even if the Court determines that the allegations of the Indictment are insufficient as to the AOPC, the Indictment nevertheless alleges sufficient corrupt actions of the Defendants as agents of Luzerne County and of the Court of Common Pleas in connection with the business of those entities.  The Defendants do not even challenge the sufficiency of those allegations.  Accordingly, the Defendants' motion to dismiss Counts 15-24 should be denied.

95

O.     **Motion to Dismiss Counts 3, 7, 11, 15-17, 26-29, 31-33, and 44**
       **(Statute of Limitations)**

The Defendants have moved the Court to dismiss Counts 3,7, 11, 15-17, 26-29, 31-33 and 44 of the Indictment on statute of limitations grounds.[17]  With the exception of Count 44, the challenged counts are subject to the five-year statute of limitations generally applicable to criminal offenses pursuant to 18 U.S.C. § 3282.[18]  The Defendants claim the statute of limitations ran on the challenged counts between January 26, 2009, the date of the filing of the Informations and

_____

[17]In support of his motion to dismiss counts allegedly outside the statute of limitations, Defendant Ciavarella did not file a brief and simply "joins in the Motion of the co-defendant, Michael T. Conahan, to Dismiss Counts 3, 11, 15-17, 26-29, 31-33, 44..." (Mot. p. 1).  Contrary to Defendant Ciavarella's apparently mistaken impression, Defendant Conahan did not move to dismiss Counts 11, 26-29 and 44 and did not file a brief in support of dismissal of those Counts.  In the interest of efficiency, the Government will assume for purposes of argument in this Brief that Defendant Ciavarella's argument in support of dismissal of Count 11would mirror Defendant Conahan's argument with regard to Count 7 and that Defendant Ciavarella's argument in support of dismissal of Counts 26-29 would mirror Defendant Conahan's argument with regard to Counts 31-33.

[18]In light of Defendant Ciavarella's failure to file a brief in support of his motion to dismiss Count 44, the Government respectively requests that the Court deem the motion as withdrawn pursuant to Local Rule 7.5.  Since Defendant Conahan has not filed a similar motion, the Government suspects that Defendant Ciavarella overlooked the fact that, unlike the other challenged Counts, Count 44 alleges a violation of tax law under 26, U.S.C., § 7206(1).  That section is governed by a six-year statute of limitations, instead of the general five-year statute that applies to the other challenged counts.  See 26 U.S.C. § 6531(5).

Plea Agreements later rejected by the Court, and September 9, 2009, the date of filing the Indictment.

However, contrary to the Defendants' argument, they entered into plea agreements that included waivers of any statute of limitations defense.  Under the terms of the plea agreements, once the Defendants withdrew their guilty pleas, the waivers permitted the government to file all charges against them that were not barred by the statute of limitations as of the date of the plea agreements.

In January 2009, in the interest of pursuing plea negotiations, the Defendants signed waivers through February 16, 2009 of any statute of limitations defense for any offenses for which the applicable statute of limitations had not run as of January 13, 2009.  On January 26, 2009, the Defendants entered plea agreements with the government.

Page 1 of each plea agreement provides that "[t]he defendant and counsel for both parties agree that the United States Sentencing Commission Guidelines which took effect on November 1, 1987, as amended and interpreted by United States v. Booker, 125 S. Ct. 738 (2005), will apply to the offenses to which the defendant is pleading guilty."

Numbered paragraph 1 of each plea agreement contained a statute of limitations waiver:

The defendant agrees, however, that the United States may at its sole election prosecute any charges currently under investigation related to this matter in the event that the charge(s) to which the defendant has pleaded guilty pursuant to this agreement are subsequently vacated or set aside by the district court or any appellate court. The defendant further agrees to waive any defenses to the prosecution of these charges based upon laches, the assertion of speedy trial rights, any applicable statute of limitations or any other grounds in the event that the defendant successfully vacates or sets aside any conviction or sentence of incarceration imposed pursuant to this plea agreement. This waiver does not apply in the event that the statutes(s) under which this prosecution was brought is later declared unconstitutional.

The plea agreement entered by each Defendants was a Rule 11(c)(1)(C) binding plea agreement that contemplated a guilty plea proceeding that would be followed by a sentencing proceeding at which a prison sentence of 87 months would be imposed. Thus, to the extent the agreement provided for a statute of limitations waiver "in the event that the defendant successfully vacates or sets aside any conviction **or** sentence of incarceration" it is clear that the word "conviction" as used in the plea agreement referred to each defendant's guilty plea, not to his sentence. This meaning is consistent with the meaning of the word "conviction" as utilized in the United States Sentencing Commission Guidelines which, in accordance with the provisions of each plea agreement, apply to the offenses to which the defendants pleaded guilty. See, e.g. U.S.S.G. §§ 4A1.2(a)(4) (referring to situations in which a defendant "has been convicted of an offense, but

not yet sentenced" and noting that "'[c]onvicted of an offense' for the purposes of this provision, means that the guilt of the defendant has been established, whether by guilty plea, trial, or plea of <u>nolo contendere</u>") ; 4B1.2(c) ("The date that a defendant sustained a conviction shall be the date that the guilt of the defendant has been established, whether by guilty plea, trial, or plea of <u>nolo contendere</u>").

In accordance with the terms of their plea agreements, the Defendants pleaded guilty on February 12, 2009, before five years had passed on any of the challenged counts.  On July 31, 2009, the Court rejected the plea agreements citing the post-plea conduct of the Defendants as the impetus for the decision.  <u>See</u> MDPA Docket # 3:09-CR-0028, Doc. Entry 39.  Thereafter, on August 24, 2009, the Defendants withdrew their guilty pleas.  <u>See</u> MDPA Docket#3:09-CR-0028, Doc. Entry 44 (Ciavarella) and 45 (Conahan).

By way of withdrawal of their pleas, the Defendants "vacated and set aside" their convictions and, in accordance with their plea agreements, are foreclosed from asserting any statute of limitations defenses as to any charges that were not barred by the statute of limitations as of the date the plea agreements were entered.

In the alternative, if the Court determines that the Defendants' plea agreements did not contain a valid statute of limitations waiver, then Count 3 of the Indictment nevertheless is not barred by the statute of limitations since it is

99

encompassed within the pending Information.  Count 3 of the Indictment charges

the defendants with wire fraud in connection with the transfer of $120,000 from an

account of Vision Holdings, Inc. to an account of the Pinnacle Group of Jupiter on

July 12, 2004.  That conduct is specifically charged in paragraph 25 of the

Information.  The Defendants inaccurately claim that the Information only charges

the Defendants with "non-disclosure conflict of interest honest services wire

fraud" and that Count 3 of the Indictment "charges the Defendant with non-

disclosure, self-dealing and quid pro quo honest services fraud." In fact, paragraph

5 of the Information charges quid pro quo honest services fraud in that the

Defendants derived "more than $2,600,000 in income, in addition to the

compensation to which they were lawfully entitled, in exchange for official actions

and anticipated official actions."

### P.    Motion to Dismiss the Indictment Based On Outrageous Government Misconduct

The Defendants argue that all charges against them must be dismissed for

"outrageous government misconduct."  This is so, they contend, because the

United States used Robert Powell in an undercover capacity while he was still a

member of the joint defense agreement.  Citing United States v. Russell, 411 U.S.

423, 431-32 (1973), the Defendants assert that such a use of Powell was "shocking

to the universal sense of justice" and "so outrageous that common notions of fairness and decency would be offended were judicial process invoked to obtain a conviction against the accused."  (Br., p. 5).

The United States responds that (1) a joint defense agreement is merely an extension of the attorney-client privilege (which does not change or enlarge the privilege); (2) the attorney-client privilege was not violated in meetings between three targets of the federal corruption investigation (indeed, no counsel were present for the meetings); (3) pre-indictment undercover recordings of targets of an investigation is a legitimate, long-recognized, investigative tool authorized by law; (4) the United States took affirmative steps, in keeping with the ethical standards of the Department of Justice, to keep *any* information that might remotely be considered as covered by the attorney-client privilege from the investigation/prosecution team; (5) the Sixth Amendment right to counsel had not attached at the time of the pre-arrest, pre-indictment meetings between Robert Powell and the defendants; and (6) the crime fraud exception to the attorney-client privilege defeats the Defendants' argument that their criminal conversations were somehow protected from law enforcement scrutiny by the mere fact of the existence of a joint defense agreement; and (7) if there exists a joint defense agreement requiring the loyalty of all signatories, even when the conversation

101

involves the planning of criminal activity, it is void as a matter of law and public policy.

Knowing that no violations of the Fifth and Sixth Amendments occurred during the recorded meetings, the Defendants have as a last resort raised a spurious claim of "outrageous government conduct" in connection with legitimate investigative methods which violated no constitutional prohibition or rule of law. Indeed, the Defendants do not even argue that a violation of the Sixth Amendment right to counsel occurred, simply that the joint defense agreement was violated by one of the parties.  Further, based upon scrupulous adherence to the Department of Justice's guidelines and prosecutorial standards of conduct on the part of prosecutors and investigators, no intrusion into the attorney-client relationship occurred, no details of defense strategy were obtained by the United States, nor was the defense illegally prejudiced by the intercepted conversations, which laid out a scheme to commit perjury and obstruction of justice.  The fact that individuals planning criminal acts have retained counsel does not create a blanket immunity to plan and execute their criminal scheme.

### 1.  The Sixth Amendment Right to Counsel

Once a Defendant's right to counsel has attached, Government intrusion into the attorney-client relationship violates the Sixth Amendment if the

Defendant can show a realistic possibility that he or she was prejudiced by that intrusion.  Weatherford v. Bursey, 429 U.S. 545, 558 (1977).   Four factors are relevant to the determination of whether the Defendant suffered any injury from the alleged intrusion: (1) whether the Government purposely intruded into the attorney-client relationship (Id. at 557); (2) whether any evidence offered at trial was obtained directly or indirectly from the intrusion (Id. at 552); (3) whether the prosecutor obtained any details of the Defendant's trial preparation or defense strategy (Id. at 552); and (4) whether the overheard conversations had been used in any other way to the substantial detriment of the Defendant.  (Id. at 554).  See also United States v. Voigt, 89 F.3d 1050, 1066-67 (3d Cir. 1996) (the Defendant's submission must demonstrate an issue of fact as to each of the three following elements: (1) the Government's objective awareness of an ongoing, personal attorney-client relationship between its informant and the Defendant; (2) deliberate intrusion into that relationship; and (3) actual and substantial prejudice). As will be argued, below, since the Defendants had not been charged with any crimes, the Sixth Amendment right to counsel had not attached at the time the contested recordings were made.

       **2.**      **Recording the Defendants' Conversations Did Not Constitute an Intrusion Into the Attorney-Client Relationship**

103

Under the Weatherford test, the evidence does not support that any intrusion into the attorney-client relationship occurred. A joint defense agreement is not a new privilege; it is merely the application of the attorney-client privilege to a specific factual setting. The United States scrupulously kept any such potential information that might have constituted legitimate defense strategy from investigators and prosecutors by erecting a wall between the investigative team and the "taint" team. This process was overseen by the Ethics Officer, who reviewed the work of the "taint" team and approved/disapproved all disclosures to the investigative team. The United States Attorney and the Chief of the Criminal Division were not permitted access to the work of the "taint" team. It is settled law, however, that even an intentional intrusion into an attorney-client relationship warrants careful scrutiny but does not require automatic reversal unless the conduct of the Government was "manifestly and avowedly corrupt." United States v. Schwimmer, 924 F.2d 443, 446-47 (2d Cir. 1991) (**post** indictment intrusion). The care taken by the United States to avoid discovering any attorney-client communications or defense strategy during the recorded conversations between

104

the Defendants and Robert Powell undermines any assertion that the United

States' conduct was "manifestly and avowedly corrupt." Id. at 446-47.[19]

### 3. The Pre-Indictment Recording of the Defendants' Conversations Did Not Violate the Sixth Amendment

Even assuming arguendo that there was an intrusion into the attorney-client

relationship, pre-indictment Government intrusion does not violate the Sixth

Amendment right to counsel. United States v. Kennedy, 225 F.3d 1187, 1194 (10th

Cir. 2000). The right to counsel attaches only "at or after the initiation of

adversary judicial criminal proceedings whether by way of formal charge,

preliminary hearing, indictment, information, or arraignment." Kirby v. Illinois,

406 U.S. 682, 689 (1972). In fact, the Supreme Court has held that even a

deliberate, post-indictment Government intrusion into the attorney-client

relationship does not warrant dismissal of the indictment in the absence of

"demonstrable prejudice, or substantial threat thereof." United States v. Morrison,

449 U.S. 361, 365 (1981). (**post** indictment intrusion).

---

[19]Moreover, the Court, unlike the prosecutors in this case, can have access to the unredacted recordings and transcripts. An *in camera* review of the unredacted evidence would quickly reveal whether any useable information could have been gleaned from listening to such conversations. If the Court finds no such information contained in the unredacted material, then the entire defense argument is moot. The Government will provide the Court with the unredacted recordings and transcripts upon request.

The Third Circuit's position regarding **pre**-indictment contacts between a cooperating witness and a targeted co-conspirator could not be more clear.  In United States v. Ammar, 714 F.2d 238 (3d Cir. 1983), a cooperating witness met with a defendant and recorded incriminatory conversations between them.  At the time, the government was aware that the co-conspirator had appeared with counsel before a federal grand jury and had invoked her Fifth Amendment right to against self-incrimination and had refused to testify. Id. at 260.  The meeting with the defendant and the cooperating witness occurred prior to her indictment.  Citing Massiah v. United States, 377 U.S. 201, 206 (1964), and United States v. Henry, 447 U.S. 264, 273 (1980), the Third Circuit rejected the defendant's Sixth Amendment claim, holding that, when the government uses undercover agents to obtain incriminating statements from persons who are not in custody but suspected of criminal activity prior to the time charges are filed, the Sixth Amendment is not implicated.  Ammar, 714 F.2d at 260-61.  See also United States v. Hayes, 231 F.3d 663, 672-75 (9th Cir. 2000) (en banc) (use against defendant of pre-indictment incriminating tape recording of his conversation with coconspirator, in absence of counsel did not violate right to counsel, though Defendant had been served with a target letter, was represented by counsel and the Government had conducted the depositions of material witnesses pursuant to Court order).

106

In fact, a joint defense agreement which purports to create a "general duty of loyalty to all participating defendants" is "unacceptable" and supported by "neither precedent nor sound policy." United States v. Stepney, 246 F. Supp. 2d 1069, 1083 (N.D. Cal. 2003) (citations omitted). The Stepney court went further and found that "[a] duty of loyalty between parties to a joint defense agreement would create a minefield of potential conflicts." This would include the fact that such an agreement would eliminate the utility of employing separate counsel, effectively creating a situation in which all signing defendants were represented jointly by a team of all signing attorneys. The court held that such a situation would be "ethically impermissible." Id. at 1083.

It should be noted that the use of Robert Powell to record his conversations with the defendants was done with the full knowledge and permission of his attorneys, who were under no obligation to announce to the other members of the joint defense agreement that their client had become a cooperating witness. Any such duty of loyalty would have been "ethically impermissible."

The defendants have not bothered to introduce the actual joint defense agreement or point to a specific passage in the agreement that would have limited the use of Robert Powell in dealing with the defendants. If the agreement purports

107

to restrict counsel from allowing his client to work with federal investigators in an

undercover capacity during the pre-indictment phase of the case, such an

agreement would be null and void for interfering with  Robert Powell's Sixth

Amendment right to counsel.

### 4.  The Burden of Proof

The Defendants bear the burden of proving a Government intrusion into

defense strategy sessions and trial preparation.  United States v. Mastroianni, 749

F.2d 900, 907-08 (1st Cir. 1984) (**post** indictment intrusion) (Defendant bears the

burden of proving informant conveyed confidential information learned at a

defense meeting to the  Government; the burden then shifts to the Government to

show that no prejudice resulted or will result from the use of the information).

This is a difficult standard to meet.  Because it is such a drastic step, dismissal of

an indictment is a disfavored remedy.  In United States v. Rogers, 751 F.2d 1074,

1076-77 (9th Cir. 1985), the Defendant's former attorney divulged confidential

information to the IRS during its **pre**-indictment investigation of the Defendant.

The Ninth Circuit held that the Sixth Amendment was not implicated.  Therefore,

even if the defendants can show that an important privilege or right, such as those

asserted here, was violated during the grand jury stage of a criminal prosecution,

the indictment will not be dismissed unless the defendants can show prejudice.

108

<u>United</u> <u>States v. Morrison</u>, 449 U.S. 361, 365, 101 S.Ct 665, 668 (1981) ("absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate").

> **5.    The Pre-Indictment Recording of the Defendants' Conversations Did Not Violate the Fifth Amendment Due Process Clause Nor Were the Defendants Prejudiced  by the Recording of Their Criminal Conversations**

In the present case, Robert Powell met privately with the defendants, either together or separately.  No charges had been returned against any of the parties, although the three men were aware of the investigation and had signed a Joint Defense Agreement (JDA).  No attorneys were present.  The suggestion by the defendants that there existed "an ongoing, personal attorney-client relationship between Informant Powell, his counsel, the Defendant and his counsel as well as all other parties to the Joint Defense Agreement" is spurious.  (Br., p. 5).  The attorney-client privilege attaches to subject matter, ***not*** to individuals who may have represented someone in an unrelated civil matter. There was no attorney-client relationship between Powell and the Defendants.  They were simply  targets of the same grand jury investigation. Their actual attorneys were not present for the recorded meetings.  There may have been a joint defense agreement among the parties to cooperate and not to share information gained **as the result of the joint**

109

**defense meetings**.  However, there has **never** been a prohibition against recording

conversations between a targeted Defendant who has retained counsel and a

cooperating Government witness in a **pre**-indictment context.  <u>United States v.</u>

<u>Hayes</u>, 231 F.3d 663, 675 (9th Cir. 2000).

The issue was neatly captured by Judge Rambo in <u>United States v. Grass</u>,

239 F. Supp. 2d 535 (M.D.Pa. 2003):

> The fact that Defendants erroneously believed that they were
> consulting with a friendly ear, rather than a government agent, does
> not change this analysis.  Put another way, although Defendants could
> not have reasonably known that the government was monitoring their
> conversations with [the undercover informant], they likewise could
> not have reasonably believed that they were communicating with their
> attorneys at the time the three men decided to meet to discuss matters
> related to the various investigations arising out of their tenures as Rite
> Aid officers.

<u>Id.</u> at 547.

In other words, the Defendants' ill-advised, pre-indictment communications

with the target of a federal grand jury investigation were in no way connected to

an attorney-client privilege and cannot be refashioned into such a claim by

asserting the mere existence of a joint defense agreement.

No such disclosure of attorney-client information was obtained as the result

of those meetings.  The three targets of the federal investigation discussed how

they would deal with the testimony of an intermediary, who had, at Powell's

direction, transported the kickbacks in Fed Ex boxes between Powell and the

Defendant Conahan who subsequently turned some portion of the cash over to

Ciavarella. The tenor of the conversations involved the three men, if they were

indicted, committing perjury, namely, the parties discussed telling a false narrative

that they had received no money from Powell and attacking the intermediary's

testimony as not credible.[20]  Powell repeatedly pointed out that he had in fact paid

them cash on several occasions. The Defendants replied that they needed to testify

that they had received no cash from Powell and warned Powell that he had better

keep to that story. They also discussed continuing with the fictitious documentary

paper trail that they had created to impede the investigation, namely, that the

recorded payments made by Powell to a company held in the name of the

Defendants' wives but controlled by the Defendants was for the rental of the

condominium owned by the Defendants in Florida, when in fact the payments

were kickbacks.

In these recorded conversations between Powell, Ciavarella and Conahan,

the three men independently corroborated many of the essential facts previously

---

[20]    The strategy of attacking the intermediary's credibility at trial was hardly
a revelation, since this is the standard strategy in all trials where credibility is at
issue. Such a statement is tantamount to saying that the defendants intended to try
the case.

disclosed by Powell to investigators. For example, in the course of these recorded conversations the judges acknowledged receiving cash payments, as Powell had stated to investigators.

In addition, the recorded conversations reflected, and confirmed that Powell, Conahan and Ciavarella were carefully monitoring the progress of the grand jury and had been informed of the substance of Robert Mericle's testimony before the grand jury.

Finally, the recorded conversations confirmed that the intermediary had made deliveries on behalf of Powell to the judges, and contained discussions between Conahan, Ciavarella and Powell regarding how the three men could discredit the intermediary if she reported the delivery of these payments to federal investigators.

### 6.    Any Claim of Attorney-Client Privilege Is Defeated By the Crime Fraud Exception

Even a cursory review of the recordings demonstrates that the so-called "defense strategy" involved perjury, subornation of perjury and obstruction of justice. It is clear that the attorneys representing the defendants were not invited to the discussion because it involved ongoing criminal activity on the part of Conahan, Ciavarella and, purportedly, Powell. The attorney-client privilege can

be overridden if the client uses a lawyer's service to further a continuing or future crime. <u>Fisher v. United States</u>, 425 U.S. 391, 403 (1976); <u>In Re Grand Jury Proceedings</u>, 604 F.2d 798, 802 (3rd Cir. 1979).  In determining whether the crime fraud exception applies, the client's intention controls and the privilege may be denied even if the lawyer is altogether innocent.   604 F.2d at 802.  As the transcripts of the recorded conversations make clear, the conversations between Robert Powell and the defendants involved subornation of perjury, perjury and obstruction of justice.  <u>See</u> Statement of Facts.

Moreover, the defendants cannot successfully maintain that they were legally or constitutionally prejudiced by the pre-indictment investigation.  There is no constitutional right to suborn perjury or to obstruct justice.  In <u>Maine v. Moulton</u>, 474 U.S. 159 (1985), a **post**-indictment statement obtained from a represented Defendant, during which the Defendant discussed his criminal involvement in the crimes charged and simultaneously discussed obstructing the prosecuting by tampering with the witnesses.  <u>Id.</u> at 164-66.  The Supreme Court ruled that the recorded statements were inadmissible because the Defendant had been indicted, arraigned and was represented by counsel.  <u>Id.</u> at 176-77.  The Supreme Court went on to observe, however, that recording the Defendant's statements about obstructing justice by tampering with witnesses was "entirely

proper to continue an investigation of the suspected criminal activities of the Defendant and his alleged confederates even though the Defendant had already been indicted." Id. at 179 (citing Massiah, 377 U.S. 201, 206 (1984)).   Thus, the Supreme Court reversed the conviction because the recorded statements had been taken **post** indictment, but held that the statements themselves were "entirely proper" in a **pre**-indictment context, notwithstanding representation by counsel. As the Court in Maine v. Moulton, observed, "[T]o exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities." Id. at 180.

In fact, in the case of United States v. Balter, 91 F.3d 427 (3d Cir. 1996), the Third Circuit found no due process violation in a pre-indictment investigation in which an informant  recorded a suspect already represented by an attorney, since this was a contact "authorized by law."  To hold otherwise, the Third Circuit noted, would "serve only to insulate certain classes of suspects from ordinary pre-indictment investigation....[and] would significantly hamper legitimate law enforcement operations by making it very difficult to investigate certain individuals."   Id. at 436.

114

This is precisely the factual predicate in the present case. The United States obtained evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached. The procedures followed by federal investigators and prosecutors in obtaining that evidence conformed to the requirements of the Due Process Clause of the Fifth Amendment. Furthermore, the recorded statements revealed ongoing criminal activities of perjury, subornation of perjury, obstruction of justice and witness tampering ("That's our story and you had better stick to it"). Thus, a pre-indictment investigative practice that the Supreme Court found "entirely proper" and which the Third Circuit found conformed with the Due Process Clause cannot be said to have been "so outrageous that due process principles would absolutely bar the Government from invoking judicial process to obtain a conviction." (Br., p. 4). Conahan's and Ciavarella's argument should be rejected.

## Q. <u>Motion to Disqualify Judge (Defendant Ciavarella Only)</u> [21]

The recusal of a federal district Court judge is a serious matter, no more so when the Senior Judge involved has served a lengthy, distinguished tenure; presided over hundreds, if not thousands, of criminal proceedings; and has an

---

[21]References to "Br." in this section of the Government's brief are to the "Brief of Mark A. Ciavarella, Jr. In Support of Motion for Disqualification."

enviable record of temperance.   Defendant seeks recusal based on two grounds:
(1) The Court, in deciding whether to accept Defendant's plea agreement, had
access to and  read the pre-sentence reports of Defendant and co-Defendant
Conahan.  Defendant alleges that these reports contained "ex parte
recommendations and assessments by the Probation department describing
'scandalous conduct' by Conahan"; he also alleges that the Court reviewed public
statements made by the Defendant; and (2) The Court made extra-judicial
statements to a local newspaper.  (Br., pp. 9-12).  The Government respectfully
submits that recusal is not warranted, and the motion should be denied.

The federal recusal statute sets forth the applicable standard: "[a]ny ... judge
... of the United States shall disqualify himself in any proceeding in which his
impartiality might reasonably be questioned."  28 U.S.C. § 455(a).[22] The Third
Circuit Court of Appeals has opined that "the test for recusal under § 455(a) is
whether a reasonable  person, with knowledge of all the facts, would conclude that
the judge's impartiality might be questioned."  United States v. Wecht, 484 F.3d
194, 213 (3d Cir. 2007) (citation omitted).

---

[22] Subsection (b) also requires recusal because of other factors, such as a
judge's "personal knowledge of disputed evidentiary facts concerning the
proceeding."  The Defendant has not argued for disqualification under this
subsection.

Within this appropriate legal framework, the Government turns to the

Defendants allegations, *seriatim*.

## 1. The Presentence Reports

The Defendant argues that the Court should recuse itself because in

deciding whether to accept Defendant's plea agreements "it had access to and

read the presentence reports" which contained the ex parte recommendations of

Probation describing the conduct of Defendant and co-Defendant Conahan.

Additionally, according to the Defendant, the Court "appears to have reviewed

certain public statements made by Defendant, which may be derived from extra-

judicial sources." Rejection of Defendant's argument should take little moment.

This particular case is no different than the garden-variety case where a Court

exercises its discretion and rejects a negotiated plea agreement after reviewing a

presentence report. Recusal is not mandated.

To the extent that the Defendant argues sinister implications from the

Court's review of the presentence reports--implications requiring the Court's

recusal--the Government points out that when considering acceptance of a Rule

11(c)(1)( C) plea agreement, "the Court may accept the agreement, reject it, or

*defer a decision until the Court has reviewed the presentence report*." Fed. R.

Crim. P. 11(c)(3)(A) (emphasis added). Conveniently ignoring this rule, the

117

Defendant then blithely proceeds to set up an extensive straw person argument[23] that the Court has been exposed to hearsay, potentially inadmissible or factually disputed evidence, ex parte communications from probations officers, and evidence from extrajudicial sources. (Br., pp. 10-12).  He ultimately concludes that the Court has prejudged the case and must pass it on to another judge.

This argument is fallacious.  The Court's rejection of a binding plea agreement after reviewing a presentence  report–a rejection which is clearly permitted by Rule 11–does not lead to the inescapable conclusion that the Court has prejudged the case and must now disqualify itself.  If Defendant's argument were taken to the logical extreme, whenever a judge rejects a plea agreement after reviewing a controversial or disputed presentence  report, recusal would be required, a proposition at odds with both law and reality.  Cf., e.g., United States v. Brown, 595 F.3d 498, 517-23 (3d Cir. 2010) (Court may reject–even in harsh terms--binding plea agreement and force Defendant to trial before Court).

Defendant posits several factors weighing in favor of recusal.  (Br., pp. 11-12).  They are all unpersuasive:

---

[23] "[F]allacy of irrelevance [the fallacy of the strawperson] occurs whenever we advance as an argument something that has nothing to do with the point at issue." Ruggero J. Aldisert, Logic for Lawyers: A Guide to Clear Legal Thinking 170-71 (3d ed. 1997).

(1) In rejecting the plea agreement, the Court found Defendant, in denying the existence of a *quid pro quo*, to be less than credible. Without authority, the Defendant exalts this finding as "directly related to factual issues to be decided." Factual issues, however, will be decided by the jury, not the Court.

(2) The Court's exposure to the completely proper and appropriate recommendations and assessments of Probation "fosters further prejudice." Apart from being a conclusion made in a vacuum, once again, this strawperson falls because factual issues will be decided by the jury, not the Court.

(3) The Court's extrajudicial comments will significantly impact jury selection. These comments are discussed *infra*, but this argument is speculative until voir dire.

(4) Transfer of this case to another judge would not delay the proceedings. This is a non-germane consideration. The Defendant's and Government's right to a fair trial is not fundamentally governed by considerations of economy and expediency.

## 2.    The Citizen's Voice Articles

Defendant further argues that recusal is mandated based upon an August 2, 2009, article in *The Citizen's Voice* where the Court–in the words of the

119

reporter–"casually discussed"[24]  aspects of the case "portending the sentiments he expressed Friday in a five page memorandum rejecting the plea agreements," (quoted Br., p. 5), and a subsequent March 3, 2010 article where the Court stated that while a discussion with the reporter may have taken place, "I don't make it a practice of discussing cases that appear before me. ... I don't engage in commenting on the details of a case. Any lawyer you know and any reporter you know would tell you that."  (Def. Ex. 1.)  This media coverage also does not require the Court's disqualification.

"Removing a judge from an ongoing trial should be considered seriously and made only rarely."  Wecht, 484 F.3d at 226 (Bright, J., concurring and dissenting.)  And "section 455(a) must not be so broadly construed that it becomes, in effect, presumptive, so that recusal is mandated upon the merest unsubstantiated suggestion of personal bias or prejudice."  United States v. Cooley, 1 F.3d 985 (10th Cir. 1993) (citation omitted). The Tenth Circuit  has listed various  grounds where disqualification under section 455(a) is not warranted:

---

[24] The Government finds it telling that the Defendant has characterized the discussion as "an impromptu contact between this Court and Sisak [, the reporter,] near an elevator outside a Courtroom."  (Br., p. 4).

–"rumor, speculation, beliefs, conclusions, innuendo, suspicion, opinion, and similar non-factual matters";

–"the mere fact that a judge has previously expressed an opinion on a point of law or has expressed a dedication to upholding the law or a determination to impose severe punishment within the limits of the law upon those found guilty of a particular offense";

\* \* \*

–"mere familiarity with Defendant(s), or the type of charge, or kind of defense presented";

\*\*\*

–"reporters' personal opinions or characterizations appearing in the media, media notoriety, and reports in the media purporting to be factual, such as quotes to the judge or others, but which are in fact false or materially inaccurate or misleading.."

\* \* \*

Id. at 993-94 (citations omitted).

In Cooley, the judge voluntarily appeared on the national television news program *Nightline* during the pendency of a highly notorious case involving abortion clinics.  The court of appeals found that this unusual act conveyed

121

personal involvement by the judge in the issue, thus mandating disqualification. Id. at 995.

The First Circuit, in a case cited by Defendants, used the Cooley analysis and disqualified a judge for participating in a telephonic interview with a reporter to defend the judge's rulings in a case. In re Boston's Children First, 244 F.3d 164 (1st Cir. 2001). The other "judicial interview" cases cited by Defendant demonstrate a similar lack of judicial restraint.[25]

Despite Defendant's vigorous arguments to the contrary, what transpired here falls woefully short of the egregious conduct requiring disqualification. Initially, the August 2, 2009 article itself belies any action on behalf of the Court to solicit an interview or seek publicity. Indeed, the reporter apparently caught the Court on his way out of the Courtroom, near the elevator, and casually struck up a conversation. It was apparently so inconsequential that the Court couldn't

---

[25] Haines v. Liggett Group Inc., 975 F.2d 81 (3d Cir. 1992), also cited for support by Defendants, is inapposite. There, the judge overstepped his bounds and stated his personal opinion of the case in a pre-trial ruling that was widely reported in the media. But cf. United States v. Conforte, 624 F.2d 869 (9th Cir. 1980) (no grounds for recusal on basis of "bias and prejudice" where judge presiding over bench trial had previously stated to educational institution seeking a donation that it should not accept Defendant's money because he ran a house of prostitution).

remember the substance of it later.[26]  With straightforward candor the Court later admitted the conservation may have occurred as reported but noted for the reporter the Court's  policy of not commenting on pending cases. Unlike facts in cases such as Boston's Children First, which condemn Courts that give media interviews designed to defend rulings, the March 3, 2010 article paints a largely innocuous portrait of what happened.

Additionally, the Government would submit that the substance of the comments reported is not significantly different from the Court's five-page, publicly issued opinion rejecting the plea agreements.  Now that the plea agreements have been rejected, the Defendant has a right to a jury trial.  This case, having been placed back on the trial list, is at a stage where any comments or opinions expressed in the process of rejecting a plea are immaterial: The Defendant will have his "day in Court," if he so chooses, through the exercise of his constitutional right to a jury trial.[27]

---

[26] The Court stated that it had not read the newspaper article and was unaware of it until the instant motion was filed. (Def. Ex. 1.)

[27] To the extent that the Defendant argues that the Court's comments "will significantly impair jury selection," (Br., p. 12), the Government would argue that the issue is premature and is best left for voir dire.

123

To the extent that the Defendant argues in the alternative that the Court should assign this case to another judge for fact finding, the Government would argue that such action is unnecessary. The Court here does not contend that there is a material, factual dispute in what was reported in the August 2, 2009 article. At issue is rather a legal question of whether an informal, casual, or impromptu conversation reported in the media–and consistent with the Court's views expressed in a written opinion--rises to the level of judicial misconduct requiring disqualification.  It does not.

The Motion for Recusal should be denied.

### R.     Motion for Early Disclosure of Jencks Material

The Defendants have moved the Court to enter an order requiring the Government to provide Jencks materials at least 30 days before trial.  (Br., pp. 1-2).

The law on this issue is clear: "[t]his Court cannot require early production of Jencks material."  United States v. Mariani, 7 F. Supp. 2d 556, 564 (M.D. Pa 1998) (Vanaskie, J.), citing United States v. Murphy, 569 F.2d 771, 773 (3d Cir. 1978).

The Government, however, does not wish to cause any trial delays and intends to provide the Defendant with Jencks and Giglio materials no later than the

Friday before trial, assuming trial is scheduled for a Monday.  Aside from providing these materials several days before trial, it is typically the practice of counsel for the Government to advise defense counsel of the general order of the Government's witnesses during trial to aid defense counsel in preparation for cross-examination.

Given the foregoing, it is respectfully suggested that the Defendants' motion for early disclosure of Jencks material should be denied.

### S.  <u>Motion to Inspect Grand Jury Minutes</u>

The Defendants argue that they should be permitted to inspect the transcripts of testimony that occurred before the grand jury and be provided with "certain related documents."  (Br., p. 1).  This is so, they argue, because the transcripts are necessary (a) to assist them in their preparation for trial, (b) because grounds **may** exist for a motion to dismiss the Indictment, and (c) because the public, and therefore they, have a **right** to access grand jury "ministerial" records. (Br., pp. 5, 9-10).[28]

---

[28]"Ministerial" records are defined as those which "generally relate to the procedural aspects of the impaneling and operating of the...grand jury...as opposed to records which relate to the substance of the...grand jury's investigation."  <u>In re Special Grand Jury (For Anchorage, Alaska)</u>, 674 F.2d 778, 779-81 (9th Cir. 1982).

125

The United States responds that disclosure of grand jury testimony of trial witnesses is now covered by 18 U.S.C. § 3500, the Jencks Act, that the Defendants have shown no particularized need for advanced disclosure, that their request for records of the grand jury to see if grounds "may" exist for a motion to dismiss the indictment is nothing more than a "fishing expedition," long rejected under federal law and practice, and that ministerial records are separate and distinct from the substantive testimony and records that the Defendants seek.

### 1.     The Defendants Are Not Entitled to Early and Unrestricted Grand Jury Access to Assist the Defendants in Preparation of Their Defense

Title 18, United States Code, §§ 3500 (a) and (e) state:

> **(a)** In any criminal prosecution bought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the Defendant) shall be the subject of a subpena (sic), discovery, or inspection until said witness has testified on direct examination in the trial of the case.

> **(e)** The term "statement", as used in subsections (b), ( c ), and (d) of this section in relation to any witness called by the United States, means —

> > (3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

126

Rule 26.2, which incorporates the Jencks Act into the Federal Rules of Criminal Procedure, limits discovery until after the witness has testified on direct examination.  Likewise, Rule 16(a)(2) & (3) specifically exclude from pretrial discovery statements made by Government witnesses or potential Government witnesses, including grand jury testimony, except as provided under the Jencks Act.  United States v. Cook, 530 F.2d 145 (7th Cir. 1976).  A Defendant's request for statements must be sufficiently precise to identify the particular statements sought.  United States v. Sanchez-Gonzalez, 294 F.3d 563, 568 (3d Cir. 2002) (discovery properly denied because Defendant failed to show with reasonable particularity that requested material existed).   Requests are invalid if they are overly broad. United States v. Pepe, 747 F.2d 632, 657-58 (11th cir. 1984) Jencks Act request over broad where Government would have been forced to find and produce all statements that witness, a former participant in organized crime, ever made about organized crime and usury).

Thus, the Defendants' claim that they have a complete right of access to grand jury testimony of all witnesses prior to the commencement of trial is belied by the very terms of 18 U.S.C. § 3500.  In the context of a criminal trial, the Defendants are not entitled to review prior testimony of Government witnesses

127

until the completion of their direct examination.[29]   United States v. Haire, 371

F.3d 833, 841 (D.C. Cir. 2004) (statements made by cooperating Defendants at

trial not discoverable until witnesses testified on direct examination), vacated on

other grounds, 543 U.S. 1109 (2005).  Regarding witnesses who appeared before

the grand jury but who will not be called upon to testify, the Defendants have no

right of access to such testimony.    United States v. Schier, 438 F.3d 1104, 1112

(11th Cir. 2006) (a Defendant is not entitled to statements of non-testifying

witnesses under the Jencks Act).[30]

      A party seeking disclosure of grand jury material under Federal Rule of

Criminal Procedure 6(e) must demonstrate a "particularized need."  United

Kingdom v. United States, 238 F.3d 1312, 1321 (11th Cir. 2001) (particularized

need not demonstrated by broad request for all grand jury materials); In re Grand

Jury 95-1, 118 F.3d 1433, 1437-39 (10th cir. 1997) (assertions of possible injustice

---

[29]However, consistent with the practice of the U.S. Attorney's Office for the
Middle District of Pennsylvania, all Jencks material will be turned over to the
Defendants prior to the commencement of trial.

[30]Of course, the United States is under an ongoing obligation to disclose
evidence favorable to the accused pursuant to Brady v. Maryland, 373 U.S. 83, 87
(1963) Strickler v. Greene, 527 U.S. 263, 281-82 (1999) (Brady violation occurs
when: (1) withheld evidence is favorable to accused because it is exculpatory or
impeaching; (2) evidence was suppressed by the Government, either willfully or
inadvertently; and (3) prejudice ensued).

too vague to overcome the overriding policy interest in grand jury secrecy); <u>United States v. Miramontez</u>, 995 F.2d 56, 59-60 (5th Cir. 1993) (particularized need was not shown because the request was general and did not specify which portion of the proceedings should be disclosed); <u>United States v. Azad</u>, 809 F.2d 291, 294-95 (6th Cir. 1986) (<u>per curiam</u>) (particularized need not shown when the request for wide-ranging search to bolster unsubstantiated claim of prosecutorial misconduct was based on prosecutor's "off-hand remarks").

In considering applications for disclosure of grand jury transcripts the Court's task is to scrutinize the request against the reasons for the rule of secrecy. These reasons are:  (1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before the grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect the innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt.  <u>United States v. Proctor & Gamble</u>, 356 U.S.  677,

682 n.6, 78 S.Ct 983, 986 (1958), <u>citing</u> <u>United States v. Amazon Industrial</u>

<u>Chemical Corp.</u>, 55 F.2d 254, 261 (5th Cir. 1931)).

     The Defendants argue that there is no longer any need to protect grand jury

secrecy because "the grand jury in this case completed its work long ago."  (Br. p.

4).  This assertion is inaccurate.  The grand jury has continued its investigation

into corruption in Luzerne County, which has led to a number of charges against

public officials, including a third Court of Common Pleas judge.[31]

     Even were the grand jury's work completed, compelling reasons remain for

cloaking its proceedings in secrecy.  First, as the United States' Brief in

Opposition to the Defendants' Motion to Dismiss the Indictment for Outrageous

Government Conduct points out, during the grand jury's inquiry into their

conduct, the Defendants engaged in an effort to suborn perjury and to obstruct

justice, telling Robert Powell how to testify and warning him that he had "better

stick to [the story]".  Early disclosure of grand jury testimony would only serve to

provide an opportunity for the Defendants to further demonstrate their contempt

for the judicial process by further acts of witness tampering.

----

[31]    Judge Michael Toole, who has pleaded guilty and is awaiting
sentencing.

Second, numerous individuals testified who are innocent themselves of wrongdoing but whose reputations would be ruined if their names were disclosed. In order to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes, the secrecy of the grand jury is critical, particularly in a culture of corruption that the Defendants did much to perpetuate.

Third, the secrecy of the grand jury is needed to protect the innocent accused from disclosure of the fact that he/she had been under investigation. The Defendants' demand for the grand jury minutes is as potentially damaging as it is unlimited and unrestricted.

Fourth, the continued secrecy of the grand jury transcripts is needed to encourage witnesses to testify without fear of retaliation. This investigation was conducted in a context of widespread fear among potential witnesses that they would and will lose their livelihood if their cooperation was discovered. Part of the reason that the Defendants were able to trample on the rights of juveniles and their families was that no one dared to call them to task for their illegal and unconstitutional behavior. To turn over the names and testimony of these individuals this far in advance of trial runs a grave risk that these individuals would suffer reprisals from those not yet indicted, as a way of warning others not

131

to cooperate in the ongoing investigation.  As the Fourth Circuit noted in Bast v. United States, 542 F.2d 893 (4th Cir. 1976), "[T]he secrecy of grand jury proceedings encourages witnesses to testify without fear of retaliation and protects the independence of the grand jury." Id. at 896.

The cases cited by the Defendants do not support their position.  In fact, the Defendants are unable to produce a single case where the Jencks Act was abrogated in favor of the unrestricted discovery to which they now claim a right.  Instead, they cite cases involving civil requests, in most cases under the Sherman Anti-Trust Act, for grand jury testimony of its officers and employees relating to completed criminal trials.  In most of these cases, the Courts of appeals refused disclosure.    In cases where disclosure was granted, it was under strictly limited circumstances.  Pittsburgh Plate Glass v. United States, 360 U.S. 395 (1959) (post trial request for grand jury testimony denied: no particularized need); In re Cement-Concrete Block, Chicago Area, 381 F. Supp. 1108, 1110 (N.D. Ill. 1974) (civil anti-trust suit where criminal Defendants had already inspected the grand jury material: limited post trial disclosure appropriate); United States v. Hughes, 413 F.2d 1244, 1255 (5th Cir. 1969)[32] (although blanket demands for records do not suffice to establish materiality, there is a significant double jeopardy issue based upon the "exceptional and extraordinary nature of the [anti-trust] statute;"

---

[32]Cited in Defendant Conahan's brief as "U.S. Concrete v. Hughes."

limited disclosure permitted) (post-trial demand in civil proceeding); <u>United States</u>

<u>v. General Motors</u>, 352 F. Supp. 1071, 1072-73 (E.D. Mich. 1973) (inapplicable: a

Bill of Particulars may be answered without violating grand jury secrecy); <u>Bast v.</u>

<u>United States</u>, 542 F.2d 893, 894 (4th Cir. 1976) (witness who had previously

testified before the grand jury filed suit against United States and applied to the

Court for a transcript of his grand jury testimony; application denied:  no

particularized need shown and ends of justice did not require disclosure); <u>United</u>

<u>States v. Fanning</u>, 477 F.2d 45, 49 (5th Cir. 1973) (Defendant sought grand jury

testimony from a similar but unrelated investigation; district court reviewed grand

jury testimony and found no particularized need: application denied).  The

Supreme Court's view of disclosure of grand jury material, as set forth in <u>Proctor</u>

<u>& Gamble</u>, remains the standard for considering any request for disclosure:

> [It is a] "long-established policy that maintains the
> secrecy of the grand jury proceedings in the federal
> Courts....This 'indispensable secrecy of grand jury
> proceedings' . . . must not be broken except where there
> is a compelling necessity. There are instances when the
> need will outweigh the countervailing policy. But they
> must be shown with particularity."

<u>United States v. Proctor & Gamble</u>, 356 U.S.  at 682.

The Defendants have failed to show a particularized need for early

disclosure of witness testimony before the grand jury, let alone the testimony of

individuals who will not be called at trial.  Moreover, discovery of grand jury

testimony is appropriately controlled by the Jencks Act.

**2.     The Defendants' Groundless Speculation That Disclosure of the Grand Jury Materials "May" Reveal a Basis for a Motion to Dismiss the Indictment Does Not Constitute a Showing of Particularized Need**

The Defendants further argue, however, that their motion "must" be granted

because grounds "may" exist for a motion to dismiss the Indictment.  The

Defendants complain that, unless the Court orders such disclosure, they have been

placed in a "Catch 22" dilemma, that is, they have no way of knowing whether

what occurred before the grand jury forms the basis for dismissal of the

Indictment.  (Br., p. 9).

In making this argument, the Defendants implicitly acknowledge that they

have no basis for believing that **any** misconduct occurred, nor can they show a

"particularized need" unless the District Court waives that requirement until they

have reviewed the grand jury proceedings.  This is precisely the sort of "fishing

expedition" that 18 U.S.C. § 3500 was intended to prevent.  As the Ninth Circuit

noted in United States v. Perez, 67 F.3d 1371, 1381 (9th Cir. 1995), withdrawn on

other grounds, 116, F.3d 840 (9th Cir. 1997), particularized need is not shown by

speculative claims of prosecutorial misconduct.  A bald request for grand jury

material can never constitute a showing of particularized need.  United Kingdom

v. United States, 238 F.3d at 1321.

The Defendants have produced nothing that would justify a departure from the Supreme Court's "long-established policy that maintains the secrecy of the grand jury proceedings in the federal Courts." The "indispensable secrecy" of grand jury proceedings must not be broken except where there is a compelling necessity. United States v. Proctor & Gamble, 356 U.S. at 682. No such showing has been made in this case.

### 3. The Defendants Have Not Identified What Ministerial Records They Seek or Suggested Any Reason Why These Records are Necessary to Their Case

Finally, the Defendants contend that they are entitled to "ministerial" records of the grand jury. They define the term "ministerial" as referring to records that reveal the procedural workings surrounding the empaneling and operating of the grand jury, yet remain distinct from records which relate to the substance of the grand jury's investigation. In re Special Grand Jury (For Anchorage, Alaska), 674 F.2d 778, 779-81 (9th Cir. 1982). The Anchorage Court, and the individuals seeking the records, identified the "ministerial" documents as those referring to orders authorizing the creation/extension of the grand jury, records dealing with grand juror attendance at the sessions, documents relating to the appointment of a special prosecutor, voting records relating to extensions, 6(e) disclosure notices and the like. These were clearly documents relating to the mundane procedural details of summoning and running a grand jury. Id. at 779.

"Ministerial" records are distinguished from records that deal with the substance of the grand jury investigation, in other words, "matter occurring before the grand jury." As to the afore stated **ministerial** records, the Anchorage Court held that there existed a common law right of access to public records and remanded the case for a hearing to determine whether the particular records sought fell within the scope of the public access right. Id. at 784.

The Defendants, however, use a linguistic sleight of hand to include documents subpoenaed by the grand jury under the term "ministerial records."In the case of In re Grand Jury Investigation (DiLoreto), 630 F.2d 996 (3d Cir. 1980),[33] they argue that any document reviewed by the grand jury does not convert it into a "matter occurring before the grand jury." (Br., p. 11). The implication is that, if the subpoenaed records are not matters occurring before the grand jury, then they are of necessity "ministerial" records to which the public should be granted free access. Here again, the Defendants don't bother to identify to which documents they are referring. Are they seeking truly "ministerial" documents dealing with the empaneling process? Or are they seeking subpoenaed records relating to other matters?

---

[33]The actual caption of the case is In re Grand Jury Investigation, Appeal of New Jersey State Commission of Investigation, 630 F.2d at 996. In order to avoid confusion, however, this brief will use the term given it by Defendants, that is, DiLoreto.

DiLoreto does not support the Defendants' claim of a right to grand jury access. The case involved an ongoing federal grand jury investigation looking into dental care plans. The grand jury had subpoenaed records from two dental plan consulting services ("Subjects"). While the grand jury investigation was ongoing, the New Jersey State Commission of Investigation ("Commission") sought access to the subpoenaed records in order to enable it to investigate and prosecute violations of state law. The Commission's motion to the U.S. District Court for disclosure was opposed by the Subjects and not opposed by the United States Attorney's Office. Id. at 997-98. The District Court denied the Commission's motion on the ground that it failed to show a "particularized need" or a "compelling necessity" sufficient to overcome the secrecy encompassed by Federal Rule of Criminal Procedure 6(e). Id. at 999.

The Third Circuit reversed, holding that the policy of secrecy is not absolute as to subpoenaed records since the records were ordinary business records not created specifically for the grand jury. Id. at 1000. The Third Circuit noted as significant to their holding a combination of factors, that is, the documents were sought in furtherance of a lawful investigation flowing from the Commission's legitimate statutory investigative authority, the U.S. Attorney's Office had no opposition to the request and the federal grand jury investigation was unrelated to the matters for which the Commission wanted the records. The Third Circuit held

that the party objecting to the production must prove that the policy of grand jury secrecy would be jeopardized by the disclosure.  If the objecting party could not prove it, then the request for access was not governed by Rule 6(e).  The case was remanded to the District Court for evaluation of whether a disclosure of the Subjects' business records to the Commission would reveal "matters occurring before," or the content of, the grand jury proceedings.  Id. at 1001.

Clearly, the Defendants in the present case are not seeking the records subpoenaed before the grand jury for the purpose of conducting "a lawful investigation flowing from [their] legitimate investigatory authority."  Id. at 1001. Moreover, although they have not identified the records they seek, it is clear that the Defendants are not seeking "ministerial" records (if they are, then they should identify them by name, as was done by the petitioners in Anchorage). Under the rationale of the DiLoreto case cited by the Defendants, they are not entitled to the records because they are not a legitimate investigative authority.

Since the United States has turned virtually all of its records over to the defense, one suspects that the "records" sought by the Defendants are the transcripts of witnesses appearing before the grand jury.  One cannot tell from the Defendants' briefs.  In their response, the Defendants should name the documents that they seek.  Either way, the Defendants' attempts to bypass Rule 6(e) and 18

U.S.C. § 3500 by getting early disclosure of Jencks material is without merit and should be rejected by the District Court.

### T.    Motion for a Pre-Trial Conference

The Government concurs in the Defendants' motions for a pre-trial conference and requests that the Court schedule such a conference approximately two weeks before trial.

### U.    Motion to Preserve Notes, Reports and Evidence

The Defendants have requested that the Court enter an order requiring that all Government law enforcement agents retain and preserve their rough notes taken as part of the investigation.

The Government is prepared to honor the Defendant's request to preserve and produce for inspection rough notes of testifying trial witnesses. Accordingly, counsel for the Government has spoken with the lead investigator in this case from the Scranton Office of the FBI and has requested that all rough notes prepared in relation to the present case be preserved. Counsel for the Government has made the same request to the lead investigator in this case from the Scranton Office of the Internal Revenue Service, Criminal Investigation Division.

The Government proposes to provide defense counsel with a copy of the rough notes relating to the interview of any testifying witness at the time of

provision of Jencks/<u>Giglio</u> materials which will be provided to the Defendant shortly before trial.

Accordingly, there is no need for the Court to enter an Order requiring the preservation and/or production of rough notes and the Government respectfully requests that the motion be denied.

**IV.  <u>Conclusion</u>**

For the foregoing reasons, with the exception of the motions for use of a

jury questionnaire and for a pre-trial conference, it is respectfully requested that

the Defendants' pretrial motions be denied.

Respectfully submitted,

DENNIS C. PFANNENSCHMIDT
UNITED STATES ATTORNEY

/s/ Gordon A.D. Zubrod
/s/ Michael Consiglio
/s/ Christian A. Fisanick
/s/ William S. Houser
/s/ Amy Phillips

Assistant U.S. Attorneys
Office of the U.S. Attorney
William J. Nealon Federal Building
235 N. Washington Avenue
Scranton, Pennsylvania  18501
570-348-2800

Dated:  May 11, 2010