1

```
                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA :
                         :
                         :
                         :
     vs                  :    09-CR-272
                         :
                         :
                         :
MARK A. CIAVARELLA       :
                         :
                         :
```

```
      BEFORE:        THE HONORABLE EDWIN M. KOSIK

      PLACE:         COURTROOM NO. 1

      PROCEEDINGS:   JURY TRIAL

      DATE:          TUESDAY, FEBRUARY 8, 2011
```

```
APPEARANCES:


For the United States:  GORDON ZUBROD, ESQ.
                        WILLIAM HOUSER, ESQ.
                        MICHAEL CONSIGLIO, ESQ.

For the Defendant:      ALBERT FLORA, ESQ.
                        WILLIAM RUZZO, ESQ.
```

2

INDEX TO WITNESSES

| FOR GOVERNMENT: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| BENJAMIN WYLAM | 46 | 86 | | |
| NICHOLENE DiPASQUALE | 102 | 124 | 127 | 127 |
| THOMAS MAKOWSKI | 128 | 155 | 167 | 171 |
| ROBERT MERICLE | 182 | | | |

3

1          (The jury was sworn at this time.)

2          THE COURT:  Before we begin, I just want to take a

3    few minutes to tell you what you can expect in this case.  Can

4    you hear me okay?  At the outset you are going to be hearing

5    opening statements.  You will hear from the government.  The

6    purpose of the opening argument is to tell the jury why the

7    government is here and what it is that they are going to

8    present in the form of evidence for the jury's consideration in

9    order to sustain the burden of proof that they have in a case

10   such as this.

11          At the conclusion of the government's opening

12   statement, the defense has an option to either open or not open

13   their case remembering that the defense is not obligated to do

14   anything whatsoever during the course of this trial unless they

15   elect to do so.  Following the opening statements, the

16   government will start calling witnesses who will be sworn and

17   take the stand.  The government will examine those witnesses on

18   direct examination.  They will ask questions, and the witnesses

19   will answer those questions under oath.  At the conclusion of

20   that witness' testimony, the defense then has a right to

21   examine or cross-examine the witness.

22          The purpose of cross examination is to have the

23   witness repeat something essential to the knowledge of the

24   defense , to confront a witness that witness may have said on

25   another occasion or to some other authority.

4

1          The reason for the cross examination is to test the
2     credibility of the witness that's testifying.  The defense has
3     a right to do that.  Ultimately, if you hear any witness from
4     the defense, the government would have the same privilege of
5     cross-examining witnesses that may be offered by the defense.
6     When the government presents all its evidence, there's legal
7     motions that we tend to out of the presence of jury.  Then we
8     determine whether or not the case is going to rest there or
9     whether we are going to proceed any further in the trial of the
10    case.

11          You'll be hearing witnesses on a continuing basis.
12    It's very important that the jurors not come to any conclusions
13    concerning the particular witness' testimony because that would
14    be premature.  I say premature with respect to any witness
15    that's going to testify because ultimately the jury is allowed
16    to consider the testimony of witnesses in the context of
17    determining if they want to believe it or disbelieve it until
18    everything is presented in this case and you hear final
19    arguments from both sides.  And even then it would be premature
20    because the judge then has a responsibility of charging the
21    jury as to the jury's responsibility how you can consider the
22    evidence that was presented for your consideration remembering
23    that you and only you have to decide what you believe or
24    disbelieve in this case.

25          We all may have a function, but your ultimate

5

1   function is to determine the truth of what is presented for

2   your consideration and then determining whether the government

3   has sustained its burden and ultimately issue a verdict one way

4   or the other.  I think that will suffice.  I invite the

5   government now to proceed with their opening statement.

6            MR. ZUBROD:  May it please the Court, Mr. Ruzzo, Mr.

7   Flora, ladies and gentlemen of the jury.  My name is Gordon

8   Zubrod.  This is Bill Houser and Mike Consiglio.  We are

9   assisting the United States attorneys, and we have been

10  summoned by the United States Attorney to prosecute this case.

11  The case was investigated by Special Agent Maria Grabinski of

12  the Internal Revenue Service, Special Agent Bill Wylam from the

13  Internal Revenue Service, Special Agent Joe Noone of the

14  Federal Bureau of Investigation, Special Agent James Glenn and

15  Rick Sutherton of the Federal Bureau of Investigation.  Over

16  the next several days, maybe weeks, my colleagues and I will be

17  presenting to you the evidence that was gathered in the case.

18           You'll be hearing the testimony of witnesses that

19  were spoken to in the case and the entire investigation put

20  before you.  The defendant in this case is Mark Ciavarella.

21  Until recently he was the president judge of Luzerne County.

22  Prior to that, he was the juvenile court judge of Luzerne

23  County.  There's another name of a judge whom you will hear a

24  fair amount of during these proceedings, and that is Michael

25  Conahan.

1          Michael Conahan for most of the time set forth in

2    this indictment Michael Conahan was president judge of Luzerne

3    County while the defendant, Mark Ciavarella, was the juvenile

4    court judge for Luzerne County.  Mr. Ciavarella is charged with

5    conducting the affairs of the court of common pleas to a

6    pattern of racketeering activity.  I will explain that at

7    length.  Judge Kosik will do that for you.  Racketeering --

8    it's an umbrella charge that shows a pattern of underlying

9    crimes that all fit together.  The underlying crimes that fit

10   under this umbrella are Mr. Ciavarella is charged with having

11   used the mails and wires to deprive the citizens of Luzerne

12   County and of the Commonwealth of Pennsylvania of the right to

13   his honest services as a judge for the Court of Common Pleas

14   for Luzerne County.  He's also charged with receiving bribes,

15   kickbacks or rewards, whatever name -- all sorts of names being

16   put to that for taking official action or having taken official

17   action.  He's charged with money laundering, taking dirty

18   money, running it through financial system to make it look like

19   it's clean money.  He's charged with extorsion, shaking people

20   down for money and using the power of his office to get the

21   money and separately he's charged with tax fraud.

22          In other words, Mark Ciavarella when he became judge

23   was placed in a position of special trust.  He has used his

24   judicial office to enrich himself through bribery, kickbacks,

25   rewards and extortion in direct violation of his duty and oath

7

1   as a judge, and then he hid the money.  That's what this case

2   is about.

3          As a Pennsylvania judge, Mark Ciavarella is bound by

4   an oath and by honor to conduct himself according to very

5   particular -- a very particular code of conduct enforceable

6   under criminal law.  Mr. Ciavarella was bound by his duty that

7   applies to all Pennsylvania judges, a duty to the citizens to

8   conduct himself in a certain way.  That duty included the duty

9   to refrain from engaging in prohibited activity that is

10  prohibited by law such as the duty not to take money or to

11  accept payment of any fees or perks other than his salary and

12  expenses as provided by law, the duty such as the duty to

13  disqualify himself in any case where he has some kind of

14  personal financial or vested interest, for example, if he

15  sitting as a judge and he's in a business relationship with one

16  of the attorneys or one of the parties in the case, he has a

17  duty under law to disqualify himself.

18         The duty included the filing of an annual statement

19  of financial interest with the Administrative Office of the

20  Pennsylvania Courts reporting to the court any source of

21  income, any gifts, any business relationships, any creditors.

22  Most seriously, Mark Ciavarella had a duty not to solicit or to

23  accept bribes, kickbacks or rewards from people who appeared

24  before the Court or who did business with the Court on a

25  regular basis.

8

1          He had a duty not to extort money under the use of

2   the color of his official office.  He had the duty not to

3   engage in money laundering.  He had a duty not to -- he had a

4   duty to pay his taxes.  The evidence will show that Mark

5   Ciavarella violated these duties.

6          And it's a duty that as a Pennsylvania judge he owed

7   to the citizens of this Commonwealth because Mark Ciavarella

8   and his coconspirator, Michael Conahan were engaged in

9   racketeering activity.  In other words, they turned the court

10  of common pleas into a criminal enterprise using their judicial

11  positions to take bribes, kickbacks using the mails and wires

12  to put the criminal scheme into effect to extort money using

13  the power of their office, conceal the payments of bribes and

14  kickbacks and extorsion by make illegal payments look like

15  business transactions with other individuals knowing that the

16  money will eventually wind up in their pockets and by not

17  paying the taxes that were due and owing to the United States.

18  Now, how did Mark Ciavarella and Michael Conahan abuse their

19  positions of trust to enrich themselves in violation of law?

20          How did Mark Ciavarella turn the office of judge, the

21  high office of judge, into a cash cow, into a money making

22  machine where he and Michael Conahan illegally took in millions

23  of dollars and hid it from public scrutiny?  It began with a

24  building of a youth detention center.  Mark Ciavarella didn't

25  like the county run detention facility.  It was old.  He didn't

9

1 think it was fit to house juveniles.  He felt it was

2 inadequate, poor place to do treatment of juveniles.  Yet the

3 Department of Public Welfare year after year would examine and

4 approve it as fit for use to house juveniles.

5          In 2000, Mr. Ciavarella reached out to an attorney by

6 the name of Robert Powell.  Robert Powell was a Luzerne County

7 attorney who had a great deal of experience in land development

8 and in municipal bonds.  Robert Powell was also a Luzerne

9 County attorney who had a very successful personal injury

10 practice.  Mr. Ciavarella contacted Robert Powell and asked him

11 to look into building a youth detention center in Luzerne

12 County to replace the old county owned youth detention center.

13 Mr. Ciavarella brought a man by the name of Robert Mericle to

14 the table.

15          Robert Mericle was going to build it.  He is a very

16 successful builder in the Wilkes-Barre area and in Luzerne

17 County and surrounding counties.  He was a very, very close

18 friend of Mark Ciavarella's.  He scouted out building sites,

19 chose the best one.  He put together a building plan.  He laid

20 it out, and then the name of the building that was going to be

21 built by Robert Powell, the owner, was PA Child Care.  And

22 here's where it gets interesting.  Here is where the conspiracy

23 started to take shape and take off.

24          In July of 2001, Robert Mericle, the builder,

25 approached Mark Ciavarella.  And he told him that he was going

1    to give him a finder's fee as a reward for giving him the job,

2    getting him to the table, to build PA Child Care.  Robert

3    Mericle made money because of Mark Ciavarella because of his

4    efforts.  So when he was paid for the building, he essentially

5    kicked back a portion of that money, gave back -- he rewarded

6    him for the portion of that money calling it a finder's fee.

7              And the evidence will show that Mark Ciavarella split

8    that money with Michael Conahan.  Mr. Mericle told Mr.

9    Ciavarella that it was legal to pay a finder's fee, that he had

10   done so on numerous occasions with private businesses.  Now,

11   while it may be legal for a private businessman to give a

12   commission or finder's fee to another private business men, it

13   certainly is not legal to give it to a judge.  You all know if

14   you ever bought a house you go -- you have gotten a realtor,

15   the realtor goes out and scouts and shows you a house you like

16   and he goes to the realtor of the seller and they get together

17   and they negotiate back and forth and they work out a price and

18   there's a closing.  At the closing you pay a fee, four or six

19   percent.  That fee is split between both realtors.  It's common

20   business practice.  There's nothing illegal between two

21   businessmen giving each other commissions and finder's fees.

22   It's quite another thing to pay it to a judge, particularly

23   when you pay that money to a judge for helping you get a

24   contract to build the youth detention center and particularly

25   when the owner of the youth detention center through whom some

1   of the money is being funneled will also be profited by the

2   decisions of the judge in his judicial rulings in deciding

3   whether or not children are going to be sent to the place he

4   got money for for putting it together.

5            Now, you will never hear a person who pays a bribe

6   say, I paid a bribe in exchange for somebody doing something.

7   They always say, no, it was a friend, it was a reward, I was

8   trying to thank him and so on.  But a finder's fee is bringing

9   the person -- two people together into a mutually beneficial

10  financial relationship.  It's what the law calls a quid pro

11  quo, this for that, in other words, you did this for me, I'm

12  going to give you something in return to thank you for giving

13  it to me.  It is illegal for a judge to take that money, and

14  every judge knows that.  It's what the -- it gets worse,

15  however.  PA Child Care needed millions of dollars to get

16  built.  And Robert Powell, the owner of PA Child Care, was

17  unable to get financing.  He couldn't get a bank to back the

18  venture.  That's what Mark Ciavarella and his coconspirator,

19  Michael Conahan, aware since July 2001 that they would only get

20  a finder's fee -- a sum of money if PA Child Care was built,

21  again using their judicial offices to ensure that PA Child Care

22  would be built and that the children would be sent there

23  instead of to the county facility.

24           They intended to use the power of their judicial

25  office to remove obstacles to the building of PA Child Care.

12

1  In the summer of 2001, having been told by the builder, Robert

2  Mericle, that he was going to pay them a huge finder's fee,

3  Mark Ciavarella and Michael Conahan took steps and they knew

4  that -- took steps to ensure PA Child Care would get the

5  funding needed for the building and the construction of PA

6  Child Care.

7         Mark Ciavarella knew that Michael Conahan was surely

8  about to become the president judge of Luzerne County in

9  January of 2002.  He was in that powerful position.  He had the

10 power to make it happen.  Mr. Ciavarella had the power of where

11 to send the kids, but Michael Conahan had the power to get the

12 place built.  The conspiracy started early.  In the summer 2001

13 Michael Conahan told Robert Powell that when he became the

14 president judge he was going to sign an agreement guaranteeing

15 an annual lease payment to PA Child Care for the placement of

16 juveniles at PA Child Care.  He agreed that the -- the

17 agreement was going to enable Powell to go and get the

18 financing.  All of the parties -- Robert Mericle, the builder,

19 Robert Powell, the owner, Mark Ciavarella, the juvenile court

20 judge and Michael Conahan would soon become the president

21 judge, knew and agreed that Powell should wait until Michael

22 Conahan became the president judge, which he did, in January of

23 2002.

24         Now, around Christmas of 2001, Michael Conahan met

25 with Robert Powell, and he told him that Mark Ciavarella was

13

 1  going to need to get something out of the building of PA Child
 2  Care.  Robert Powell, an attorney, was alarmed by the
 3  conversation because he knew he would have to pay the judges to
 4  get business.  He was a lawyer.  He knew that was illegal.
 5          In January of 2002, Michael Conahan became the
 6  president judge and immediately set to work to make PA Child
 7  Care happen.  In that same month, Judge Conahan agreed to -- in
 8  writing to send the Luzerne County juveniles to PA Child Care
 9  once it was built.
10          The he additionally agreed and guaranteed that
11  Luzerne County would pay an annual fee to PA Child Care in an
12  amount of $1.3 million per year for 20 years.
13          THE COURT:  Keep your voice up steadily.  You have a
14  tendency to trail off.
15          MR. ZUBROD:  Thank you, Judge.  None of the
16  commissioners were aware this was taking place, they had
17  committed to pay $1.3 million a year for 20 years and over $26
18  million.  As a matter of fact, at the same time, the
19  commissioners were trying to build their own county run youth
20  detention center.  Michael Conahan set out to block it, and he
21  did.  He did it by knowing that if PA Child Care was built then
22  and only then would he get the money.  But the placement
23  guarantee was what Robert Powell needed to get the business.
24          The building of PA Child Care started in March 2002,
25  went right through to 2003.  It was completed in January of

14

1   2003.  As the completion of PA Child Care drew near, Michael

2   Conahan moved aggressively to assure PA Child Care would get

3   all of the Luzerne County children detention.  The end of 2002

4   was a particularly active time.  Michael Conahan, I believe it

5   was, in October 2002 advised the county commissioners that

6   there would be no money set aside in the judicial budget for

7   the running of Luzerne County Youth Detention Center.  That led

8   to wholesale layoffs of the staff.

9          In December of 2002, agents of the court were

10  directed to return the license to operate the Luzerne County

11  Youth Detention Center to the Department of Public Welfare.

12  This essentially forced the closure of the youth detention

13  center because without the money to run it, without the staff

14  to run it, without a license to run it, it effectively shut

15  down the center.  Remember as you hear the testimony concerning

16  the actions of Michael Conahan that he is charged as a

17  coconspirator with Mark Ciavarella.  In a conspiracy the act of

18  one is chargeable to another.  So ultimately if you find that

19  the two judges were in -- had agreement as to what the criminal

20  scheme could be, then the acts of Michael Conahan are charged

21  with Mark Ciavarella and vice versa.  Mr. Ciavarella was also

22  active in ensuring that PA Child Care would get Luzerne

23  County's children.

24          In December of 2003, he knew that he was -- when he

25  knew he was poised to receive a huge finder's fee from Robert

1    Mericle, the builder, Mark Ciavarella made public statements
2    against the continued operation of the Luzerne County Youth
3    Detention Center.  In February of 2003, Judge Ciavarella, as
4    the juvenile court judge, sent order out to juvenile probation
5    officers telling them he expected them to violate every -- any
6    juveniles' probation even for the most technical violations.
7    Probation officers will testify that Judge Ciavarella and his
8    alter ego, Sandra Brulo, pushed them hard into PA Child Care.
9    Let's talk for a moment about the next payment for the building
10   of PA Child Care.

11            In January of 2003, Robert Mericle had completed the
12   building of PA Child Care.  A certificate of completion was
13   prepared, and that laid the groundwork for disbursement of
14   funds for the loan.  The evidence will show that Mark
15   Ciavarella and Michael Conahan knew what was about to happen,
16   the payment from Mericle was illegal.  First, Pennsylvania law
17   forbids any judge from getting income outside of his salary as
18   a judge.  Secondly, Mark Ciavarella knew he was going to be
19   sending kids there and that he had a financial relationship,
20   not only with the builder of PA Child Care but with the owner
21   of PA Child Care as the evidence will show.

22            Mark Ciavarella and Michael Conahan knew the Mericle
23   kickbacks were illegal also because they hid them from public
24   scrutiny.  Consider the following.  Robert Mericle, who the
25   builder, will testify that he told Mark Ciavarella that he

16

1   would be receiving a finder's fee.  Mark Ciavarella instructed

2   Robert Mericle to run the money through Robert Powell, the

3   builder.  Then Mark Ciavarella and Michael Conahan approached

4   Powell and told him that the money that Mericle was going to

5   pay was going to be funneled through him and he was going to

6   give the money to them.

7           And Mericle to do that it prepared a fraudulent

8   document, false document, to make it appear as if he had paid

9   the money to Robert -- the finder's fee to Robert Powell and

10  not to Mark Ciavarella.  Robert Powell will testify that he

11  immediately knew that he had been placed in the middle of an

12  illegal kickback and he knew the judges were forbid to receive

13  the payments, particularly in this case where the county would

14  be paying PA Child Care to house juveniles and Judge Ciavarella

15  would be the one to decide where to send the juveniles.  If he

16  refused to pay he wouldn't get any children from Luzerne

17  County.  He was sat saddled with a mortgage of $12 million that

18  he was joint and liable for with his partner.  If he refused,

19  he would not only get anything from Luzerne County but it was

20  unlikely he would get any business or sufficient business from

21  any other county because if the home county refuses to send

22  children to a particular center, the other county will begin to

23  wonder why and they will not send them either.  If he refused

24  he knew Mark Ciavarella and Michael Conahan could ruin it.

25          Robert Mericle and Robert Powell signed the

17

1   fraudulent document known as a registration and commission

2   agreement.  This was a finder's fee, $997,600 Robert Mericle

3   was going to pay Mark Ciavarella and was going to be made to

4   look as if Powell is getting the money.  Powell signed it well

5   known he just placed himself in the middle of a criminal

6   conspiracy.  Mark Ciavarella also knew that it was illegal.

7   Consider what happened next.

8           The next thing that Mark Ciavarella -- Ciavarella's

9   direction and Michael Conahan's direction, Mericle wire

10  transferred a total of $997,000 in such a way to make it look

11  as if it was payment to Robert Powell when, in fact, it was

12  designed from the beginning to be paid to Mark Ciavarella and

13  Robert Powell.  First of all, the out of that $997,000,

14  $387,000 was wire transferred to Robert Powell.  Michael

15  Conahan told Robert Powell to hold on to the $387,000 until the

16  judges called for it.  Then there was another $610,000 that was

17  sent to an attorney by the name of Robert Matta, who is an

18  attorney in Schuylkill County, Pennsylvania.  Matta at

19  Conahan's direction sent the $610,000 to Beverage Marketing of

20  Pennsylvania, which is owned by Michael Conahan.

21          Ultimately, that money went from Beverage Marketing.

22  And three checks were issued to Mark Ciavarella, $333,000 in

23  January, $75,000 in April and $75,000 in July for a total of

24  $480,000 --

25          THE COURT:  Excuse me.  I hate to interrupt you, but

18

1  I'm not sure all of the jurors are seeing what you're pointing

2  to.  And I'd appreciate it if you talk to the jurors instead of

3  the exhibit.

4        MR. ZUBROD:  Yes, sir, I will.  The -- later Robert

5  Powell was directed to take the $380,000 -- the $387,000 and

6  give -- send 326,000 to Barbara Conahan, who is the wife of

7  Michael Conahan.  The -- in essence when you see -- in essence,

8  Ciavarella got $480,000 from this transaction and Conahan got

9  $456,000 from this it transaction ultimately essentially

10  deducting out some expenses on Conahan's side, they split the

11  money 50/50.  Neither Mark Ciavarella, nor Michael Conahan

12  declared any of this money.  They didn't do it on their

13  financial interest report to the Administrative Office of the

14  Pennsylvania Courts.  They didn't do it on their tax returns.

15        The crime doesn't stop there.  It gets worse.  In

16  October 2003, Robert Powell took his boat -- Reel Justice -- to

17  Jupiter, Florida to dock at a marine.  In December of 2003,

18  Mark Ciavarella and Michael Conahan created a company called

19  Pinnacle Group of Jupiter in the names of their wives, a

20  limited liability corporation.  In February 2004, Mark

21  Ciavarella and Michael Conahan used Pinnacle Group of Jupiter

22  to by a luxury condominium down at the marina where Robert

23  Powell docket his boat.

24        Then in 2004, they turned on Robert Powell.  Mark

25  Ciavarella and Michael Conahan met with Robert Powell and they

1  said, we need more money.  And Powell said to them, don't tell

2  me you burned through a million dollars.  Their response was,

3  yeah, we burned through it, and we want more.

4         They told Powell that they had established Pinnacle

5  Group of Jupiter to make his payments to them look legitimate.

6  Powell protested that he didn't have the money, he was getting

7  PA Child Care up and running there were lots of expenses.

8  Michael -- Mark Ciavarella was holding a sheet of paper with

9  the money that Luzerne County had already paid to PA Child

10  Care.  And Ciavarella and Conahan told him, you have no option

11  but to pay us.  That's extorsion, so Powell paid them.  He felt

12  he had no other choice other than being financially ruined.

13         He felt if he refused they would use their judicial

14  office to keep children from going there and that would destroy

15  him.  At Michael Conahan's direction, Powell was told to

16  disguise the payments to look like rental payments to -- for

17  the condo and rental even though he was already paying for the

18  rental slip, even though Michael Conahan and Mark Ciavarella

19  did not have a rental slip to rent to him.

20         Robert Powell also wire transferred 220,000 -- these

21  are the payments -- we will look at them in more detail.  But

22  you will note you will note that in January he wrote two checks

23  and deposited them and when you see the checks, he identified

24  them as rental payments for January, February, March, April and

25  then the next one would be a payment for March, April, May and

1  the next would be May, June, July.  He was often paying twice,

2  putting down anything he could.  He paid $70,000 on January

3  20th.  He deposited three more checks all on the same date or

4  most of them on the same date for $200,000.  And then in --

5  that was in February.  In -- in January -- or in May he

6  deposited another hundred thousand dollars in rental payments

7  and then he wire transferred a total of $220,000 to them.

8         He paid a total of $590,000 in less than nine months

9  for the rental of the condominium, a condominium that he will

10  testify he used twice in three years.  By the summer of 2004,

11  Robert Mericle and his partner had decided they were going to

12  expand their operation into western Pennsylvania.  In June of

13  2004, they contracted with Robert Mericle to build Western PA

14  Child Care.  Mericle built Western PA Child Care for

15  approximately 9.7 million and change although there were other

16  figures in there that raised it when you get into security

17  devices and so on and other equipment.  By June of 2005,

18  Western PA Child Care had been completed.  The judges demanded

19  another finder's fee.  They wanted another finder's fee, and

20  Robert Mericle was willing to pay it.  But they wanted to make

21  it look like the money had gone through Robert Powell, the

22  owner.  Again Powell, is required to sign one of these

23  fraudulent registration and commission agreements indicating

24  that he was the one being paid the finder's fee.

25         This time at the direction of Michael Conahan, Robert

1    Powell sent a letter to Robert Mericle directing him to send

2    the money to Pinnacle Group of Jupiter.   In July 2005, Robert

3    Mericle wired $1 million to Pinnacle Group of Jupiter, and they

4    characterized it as rental income.   Money was deposited into

5    the Pinnacle Group account, and then Mrs. Ciavarella withdrew

6    part of the money, and it was deposited by Mark Ciavarella into

7    an account where Mr. Ciavarella was the only signatory.

8            In other words, Mericle's $1 million was disguised

9    and concealed and ultimately placed into the hands of Mark

10   Ciavarella and Michael Conahan.   Ciavarella didn't announce it,

11   pay it on his tax returns, and he didn't report it to the

12   Administrative Offices of the Pennsylvania Courts.

13           Robert Mericle paid another finder's fee to Mark

14   Ciavarella and Michael Conahan in January 2006.   Mericle built

15   an expansion for PA Child Care February 3rd, 2006.   In February

16   2006 having signed another of the fraudulent finder's fee

17   agreement, Robert Powell -- Robert Powell -- Robert Powell

18   signed the finder's fee, Robert Mericle wired $150,000 for the

19   $1 million expansion to the Pinnacle Group of Jupiter.   Once

20   again, Conahan and Ciavarella hid the income by falsely

21   characterizing it as rental income on their tax returns and by

22   using the finder's fee agreement that Mericle had filled out

23   saying the money was going to Robert Powell.

24           There was another finder's fee agreement relating to

25   the expansion of Western PA Child Care.   Mericle sent Powell

1  another fraudulent finder's fee agreement for a payment of

2  another $150,000 finder's fee on the expansion.  That money was

3  never paid because by that time the federal investigation was

4  well underway.

5         In between the payment of these finder's fees by

6  Robert Mericle through Robert Powell, Mark Ciavarella and

7  Michael Conahan continued to extort the owner, Robert Powell,

8  for money.  Powell took his boat out of the boat slip in

9  Jupiter, Florida and moved it to Costa Rica to get as far away

10 from Michael Conahan and Mark Ciavarella as possible.  Thus,

11 the so called rental checks paid by Robert Powell to Pinnacle

12 Group of Jupiter couldn't work anymore because he wasn't there

13 and his boat wasn't there.  So in August of 2006, Michael

14 Conahan and Mark Ciavarella demanded Robert Powell start paying

15 them cash.  It started when Mr. Ciavarella and Michael Conahan

16 demanded that Powell meet with them.  He kept ducking.  In

17 fact, he took his family away to Italy for a month earlier in

18 the summer of 2006 the day he got back they were at his door.

19 They said we need some more money.

20        Mr. Ciavarella had with him a list of the earnings of

21 the earnings of PA Child Care, Inc. -- Luzerne County paid PA

22 Child Care and Western PA Child Care.  He told Robert Powell he

23 knew how much money he was making and he knew he was making a

24 lot of money and Robert Powell owed him for the children that

25 he sent there and he needed to come up with the money for it.

1  That is a kickback.  That is extorsion.  Robert Powell told

2  both Ciavarella and Conahan he couldn't pay it, he didn't have

3  the money.  They began to threaten him.

4        Mark Ciavarella at some point said, look, if you can

5  take your children and family to Italy, you can pay us.

6  Michael Conahan said this is the way the world works.  Your

7  bills will catch up.  Powell knew that they had him.  In

8  addition to running PA Child Care and Western PA Child Care,

9  Robert Powell was also a very active trial lawyer in Luzerne

10 County and judges have enormous power in determining the

11 outcome of a case.  He paid the money.  In August of 2006, he

12 began paying them in cash.  He made four payments, one in

13 August 2006, one in October, one in November, one in December.

14        He did it by instructing his treasurer to take the

15 money out of banks in amounts under $10,000 because you have to

16 report on a currency transaction report any cash transaction in

17 excess of $10,000 so he instructed his treasurer take it out in

18 amounts under $10,000.  He paid them more than $140,000 in four

19 months.  He was able to get the money to write out checks to

20 various employees, write the employees' names on the back of

21 the checks and then cash the checks.

22        Powell directed Owens to bring the money to him and

23 he would put the checks -- or he'd put the cash into Fed Ex

24 boxes -- standard square Fed Ex box.  And then once it was in

25 the Fed Ex box, he will do -- direct one of the junior partners

24

1   in the firm, Jill Moran, a young attorney, to deliver the boxes

2   to Michael Conahan.  He also delivered Fed Ex boxes filled with

3   cash to Judge Conahan's clerk, also known as the tipstaff.  He

4   will be testifying in the case.  Jill Moran will also be

5   testifying in the case.  She will testify that she was unaware

6   of what was in the boxes until the last box.  The last box --

7   Robert Powell called her into his office to pick up another Fed

8   Ex box.  She got there in time to see him stuffing bills in

9   large denominations and a large number of bills into the box.

10  She was alarmed because she knew that her boss was about to

11  direct her to bring a large sum of cash to the president judge

12  of Luzerne County, but she delivered it in any case.  You will

13  be hearing from several of the individuals that I mentioned.

14  You will be hearing from the owner, Robert Powell.  You will

15  hear from Robert Mericle, the builder of PA Child Care.  You

16  will hear from Jill Moran, Robert Matta, attorney who wired the

17  $610,000 from Mericle -- that was given to him from Mericle

18  that he sent on to Beverage Marketing, which was sent on to

19  Mark Ciavarella.  You will hear from Pat Owens, the employee

20  who structured the transactions for the Powell law firm and got

21  the cash to Robert Powell to pay the extortion of Mark

22  Ciavarella and Michael Conahan.  You will hear from the

23  probation office.  You will hear from accountants who put the

24  together tax returns.  They were unaware the number of tax

25  returns were unreported by hundreds of thousands of dollars.

1           You will hear from county commissioners who at the

2    time this was going on were trying to build a youth detention

3    center and were blocked at every stage by Michael Conahan.  You

4    will hear from experts on judicial ethics on finances and on

5    taxes.  You are here to decide a very important matter.  First,

6    you will have to determine whether Mark Ciavarella committed

7    any of the underlying criminal charges:  Conspiracy, bribery,

8    kickbacks, extorsion, using the mail to defraud the citizens of

9    Pennsylvania and Luzerne County of their right to his honest

10   services, money laundering and separate tax fraud.

11           You also must decide if these acts were part of a

12   larger pattern of racketeering activity.  We've charged dozens

13   of underlying criminal activity.  You're going to have to find

14   at least two were committed.  And if you find that Mr.

15   Ciavarella or Mr. Conahan committed at least two of those acts

16   and if you determine that the acts were part of a larger

17   pattern of racketeering activity, that is were the underlying

18   crimes random or did they fit together into a pattern of

19   racketeering activity related to and made possible by the fact

20   that Mark Ciavarella and Michael Conahan were judges.

21           We will ask you then to find Mark Ciavarella guilty

22   not only of the underlying criminal acts but of racketeering

23   and conspiracy to commit racketeering.  I'm guessing that you

24   have begun to suspect by now that this is not -- this is going

25   to be a complicated case.  It is not an easy case.  It's not a

26

1  drug buy bust case.  It covers years of criminal activity.  It

2  covers million -- it traces millions of dollars to bank

3  accounts through shell corporations to businesses.  It involves

4  multiple and complex business transactions and financial

5  transactions.  It deals with numerous criminal statutes that

6  you're going to have to -- you will have to focus to get your

7  hands on.  You will have to work your way carefully through a

8  lot of evidence, business and constructive evidence, court

9  records, tax and financial records, criminal statutes.  You

10  will have to weigh the credibility of witnesses.

11         It will require steady concentration on the witness

12  testimony and upon the documents that are presented to you.

13  It's going to require close attention and hard work.  And after

14  it's all over even -- you will have to listen to me again.  You

15  will have to listen to Bill Ruzzo and Al Flora.  Then Judge

16  Kosik will instruct you extensively on what the law is that

17  you're going to have to decide.

18         You will have to concentrate at each point and during

19  some complex testimony at times the inevitable intention will

20  be for your mind to wonder for you to get weary, for you to

21  lose attention.  But you have to fight through it.  You have to

22  -- this is an important case.  It's important to Mr.

23  Ciavarella.  It's important to the citizens of Luzerne County

24  and Pennsylvania.  It's important to the victims in this case,

25  and it's important to the United States.  It's important that

27

1    you well and faithfully do your job.

2            Remember that Mr. Ciavarella, as Judge Kosik has told

3    you, stands before you cloaked with a presumption of innocence.

4    That means he doesn't have to a prove thing to you.  We have to

5    prove everything to you.  We have to prove every element of

6    every offense beyond a reasonable doubt.  Now I ask you to

7    listen carefully to Bill Ruzzo.  After you hear all the

8    evidence, we will ask you to return a verdict of guilty against

9    Mr. Ciavarella for all of the offenses charged in this

10   indictment.  All of us and all signs of this from Judge Kosik,

11   to my colleagues at the other table to all of us here, we want

12   to thank you for the time and the attention that you are

13   willing to give to this case.  We are ready to begin.

14           MR. RUZZO:  We will open, Your Honor.

15           THE COURT:  You want to open now?

16           MR. RUZZO:  Yes.  Your Honor.  May it please the

17   Court, Mr. Zubrod, Houser, Mr. Consiglio, Mr. Ciavarella, most

18   importantly, you, ladies and gentlemen of the jury.  Mr. Zubrod

19   gave you an outline of his evidence and pretty much explained

20   what an opening statement is.  So let's just get right to it.

21   What Mr. Zubrod said or what I say is not evidence.  Let me

22   tell you this.  Initially, Mark Ciavarella never accepted a

23   bribe or kickback, and he never extorted Mr. Powell.  Let's go

24   to where I can begin.

25           This is not about whether Mark Ciavarella had a

28

1  conflict of interest or whether he violated the judicial code

2  or rules of professional responsibility.  The case is about

3  essentially whether the government, the United States, these

4  prosecutors, and these investigators could prove to you beyond

5  a reasonable doubt whether Mark Ciavarella extorted Mr. Powell

6  or took a bribe or a kickback from Robert Mericle.  And as Mr.

7  Zubrod did, started at the beginning, and I'm going to start

8  with you at the beginning also.

9          In the middle of the late 90s in Luzerne County,

10  there stood a structure called the juvenile detention facility.

11  Mr. Ciavarella was not the only person who believed that the

12  place wasn't the best.  He found this out because Sandy Brulo,

13  who I suspect you will be hearing from, invited Mark Ciavarella

14  -- then Judge Ciavarella to have lunch at the juvenile

15  detention facility with the children who were there who were

16  confined and detained there.  Mark looked -- they took a look

17  at that place.  In agreement with a lot of other people who had

18  been in that facility, including Sandra Brulo, who was at that

19  time chief of juvenile probation -- he observed leaky pipes,

20  rodent infestation, rats, no indoor recreational facility,

21  windows were broken in the facility so that sometimes at night

22  drugs would flow out the windows or in the window from friends

23  of the people who were detained there.  That was the state of

24  the juvenile facility.

25          Judge Ciavarella at that time, Mark Ciavarella,

29

1    decided this is not a place for children.  This is 1998, '99.
2    There was no plan to build a new facility yet, no one knew who
3    was going to be involved.  The government would have you
4    believe some conspiracy started in 1998, 1999.  Robert Mericle,
5    Bob Powell were not on the scene.  The only thing on scene was
6    disagreement how the facility should be built, where it should
7    be built, who should build it.  It was only a germ and a dream.
8    Mark at that time went to the county commissioners.  He went to
9    actually a friend of his commissioner at the time, Tom Makowski
10   and asked Tom, is it feasible for the commissioners to build
11   this facility -- build a new modern facility.  Some of the
12   commissioners wanted to do it.  Some of them didn't.  Mark
13   thought it was going to be built by the county.

14          Again, Mericle wasn't in the picture nor was Robert
15   Powell because Mark had anticipated that the county was going
16   to build this.  But it wasn't to be.  For one reason or
17   another, whether the county didn't have the money, whether they
18   couldn't flow the bond issue, they did try to flow the bond
19   issue at one time -- it didn't work out.  Some of the
20   commissioners changed their mind about building the facility,
21   county sponsored facility.  Some of them didn't.

22          During that time where the new juvenile facility was
23   just a germ of an idea, Mark Ciavarella was a colleague and
24   friend of Michael Conahan.  And he knew that Mike Conahan aside
25   from his position as a judge was a businessman and that he knew

1  some developers and if it was possible that he knew money

2  people and he could encourage them to get in the same room and

3  discuss is this possible, is it feasible, can it be done

4  because at all costs, Mr. Ciavarella believed, and I believed

5  he had convinced at the time Judge Conahan -- Michael Conahan,

6  that this was the way to go, that a new facility would be

7  needed.  And at one time as these discussions were going on,

8  there was going to be a joint facility for Luzerne County and

9  Lackawanna County.

10         And Michael Conahan got some people, some business

11 professional men from Lackawanna County and Luzerne County to

12 try to develop the place, try to get a site.  And at that time

13 Robert Mericle was a member of -- I shouldn't say member.  He

14 was one of the people who were getting together and trying to

15 determine the feasibility of a new juvenile facility.  Robert

16 Mericle was a very successful businessman.  He was in real

17 estate, builder and other things.  He was a fairly young man to

18 be that successful.  But he was very successful, and he wanted

19 people who was involved in the feasibility and planning the

20 possibility of a new juvenile facility.

21         Mark Ciavarella was rarely, if ever, at any of those

22 meetings in developing the juvenile facility.  One thing leads

23 to another.  Years go by.  The conditions at the county run

24 Bastille on the hill was deteriorating further, and a new

25 juvenile facility was necessary.  Now, what did Michael Conahan

1   do?  I think there will be some testimony that Michael Conahan

2   closed the juvenile facility.  Michael Conahan did not close

3   the juvenile facility.  First of all, he didn't have the power

4   to do that.  What he did was say the Court was not going to use

5   the money in its budget to fund the juvenile facility.  That

6   doesn't mean the county didn't have the money to run it.  The

7   county could have taken that money just taken out of the budget

8   and the county still had the money.  But at any rate, the

9   facility was closed.  In the meantime, people from --

10  authorities from Luzerne County were sending juveniles to other

11  places, other counties, other facilities.  This is a costly

12  proposition.

13          If the juvenile is detained or arrested, and if the

14  police are going to detain the juvenile, the juvenile has to be

15  taken to -- elsewhere.  It's an expense.  Moreover, if they

16  were taken to different counties, families can't visit them,

17  treatment is less effective.  So it's not a good thing.  It's

18  better to have a facility locally where families can visit

19  where police don't have to take up their valuable time and

20  resources to transport people to distant counties.  There's no

21  question a modern facility were people -- where juveniles can

22  be detained and if possible if there was a treatment facility,

23  be treated long term and placed longer term than in overnight

24  detention.

25          Now, supposedly and according to Mr. Zubrod, Mark

1  Ciavarella accepted a bribe from Robert Mericle.  Let's talk

2  about that.  All that Mark Ciavarella did to help Robert

3  Mericle was to recommend to him see if you can put a bid in,

4  see if -- could you build something -- is this something you

5  can build.  Robert Powell is developing PA Child Care,

6  developing the juvenile facility.  Mericle and -- Mark coached

7  him I think at C. Y. C. as a swimming coach.  They were

8  friends.  All he did was alert him to the possibility that he

9  can build a place.  There was no bribe or kickback.  What could

10 Mark Ciavarella do for Robert Mericle in his capacity as a

11 judge?  Nothing.  He recommended he put in a bid.  You'll hear

12 the testimony of Robert Mericle.

13       He asked -- by the way, this wasn't a public project.

14 So it wasn't mandatory a private guy gets to bids on a project.

15 But Robert Mericle said, what do you have, what do you have

16 when you have a construction company.  Build it.  Robert Powell

17 told Mr. Mericle, I have X. amount per square foot.  And Rob

18 Mericle told him, I can build a place better and cheaper, much

19 cheaper.  And that is why Mericle got the contract to build the

20 place because it was cheaper and he can build it more

21 efficiently and he can build a better place.

22       After he gets the contract, he knows he's going to be

23 the builder.  It is only then that Mark Ciavarella finds out

24 he's going to get a finder's fee, broker's fee, whatever you

25 want to call it.  How does he find out?  Robert Mericle calls

1   Mark's chambers and asks if he can come over to see him.  He

2   comes over, and Mark Ciavarella was on the second floor --

3   Luzerne County Courthouse.  Majority of the courtrooms are on

4   the third floor.  There are one or two courtrooms on the second

5   floor.  Mark was on the second floor.  Bob Mericle comes in and

6   says, I'm going to take care of you, I am going to give you a

7   finder's fee.  Mr. Ciavarella wasn't even familiar with the

8   process.  He says, what are you going to give me?  He says, I'm

9   going to give you a finder's fee for alerting me to the

10  project.  We have kids in college, I'm going to take care of

11  you.  Mr. Ciavarella says, could you do that?  Is it legal for

12  you to do this?  And Mericle says, I do it all the time.  Bob

13  Mericle will come in here and tell you he did it all the time.

14  And Mark Ciavarella is pleased, I'm going to get money, it's a

15  finder's fee, it's for recommending a friend, my friend is

16  going to make money on the project, he's going to cut me --

17  he's going to give me a finder's fee.

18          And that's when Mr. Ciavarella goes up to Mr.

19  Conahan's chambers on the third floor.  He goes up and tells

20  him you, won't believe this, Mericle came in my chambers and

21  said he's going to give me a finder's fee for alerting him to

22  the project.  And he eventually made money, and he explained to

23  then Judge Ciavarella -- Michael Conahan that he was going to

24  get the finder's fee.  And he said to Mr. Conahan at that time,

25  you know, you were the one who put these people in the room who

34

1  got this project going, and I'm going to share it with you.

2  There was no conspiracy between Michael Conahan and Mark

3  Ciavarella.  They didn't even know -- neither one of them they

4  were going to get this finder's fee.  And they both thought

5  that the finder's fee was legal.

6          And they weren't the only people who thought that

7  this finder's fee was legal.  And Mr. Mericle still thinks it's

8  legal, and he was assured that this finder's fee and that --

9  the money that he gave to Mr. Ciavarella who eventually shared

10  the money with Michael Conahan was legal and there was nothing

11  illegal about it and there wasn't -- it wasn't a bribe and

12  kickback because Mr. Mericle is going to testify, and he's

13  going to verify that the following dialog took place in this

14  very courtroom not too long ago at a time when Robert Mericle

15  entered a guilty plea on September 2nd, 2009.  The following

16  dialog took place.  And the plea was in front of Judge Kosik at

17  that time, and Judge Kosik made an inquiry for an explanation

18  of why such a convoluted arrangement existed to pay a finder's

19  fee.

20          And the government counsel said as follows:  This is

21  regarding the Mericle money.  I will explain it, Your Honor, he

22  says.  We spent an extensive amount of time both investigating

23  and researching the law in this area, meaning the area of the

24  finder's fee.  Referral fees are a common place practice.  They

25  are a legal practice in real estate and in the building market.

35

1  Fee splitting between the parties, for example, between Judge

2  Ciavarella and Mr. Powell, that kind of fee splitting is also

3  common practice in the real estate business.  As the Court

4  would know, if someone buys a house and there is a realtor

5  representing one party, a realtor representing the other, they

6  split the fee, which is in essence a finder's fee.

7           Then Judge Kosik says, I don't know that, but go

8  ahead.  The government counsel says, all right, this is not a

9  kickback or a bribe in any sense.  That's worth repeating.

10 This is not a kickback or a bribe in any sense.  It is a common

11 practice.  It is not a legal quid pro quo.  It is a common

12 practice between businessmen in real estate transactions.  Mr.

13 Mericle simply paid a finder's fee to the judges in accordance

14 with standard practice.  To him his payment of the fee was what

15 he had done hundreds of times before and was not related to the

16 office that the judges held or any decision by the judges.  He

17 had contracted with a private party, Mr. Powell, to build a

18 business, a private business.  The judges steered Mr. Powell to

19 Mr. Mericle because he can build that building cheaper than

20 anyone else.  In fact, he was the lowest bidder.  This is why

21 Mr. Powell chose him.  Mr. Powell simply paid the finder's fee

22 and given the money to Robert Powell to distribute as directed

23 by Mr. Ciavarella if -- I'm sorry -- I misread that.

24          Had Mr. Powell simply paid the finder's fee and given

25 the money to Robert Powell to distribute as directed by Mr.

36

1  Ciavarella, there would have been no prosecution of Mr.

2  Mericle.  He had no knowledge of what happened to the money

3  once he gave it to Mr. Powell, and he continued, he did know

4  that money ultimately was going to go to Judge Ciavarella and

5  later found out it was going also to Judge Conahan.

6          The crime -- Mr. Mericle's crime when the Internal

7  Revenue Service approached Mr. Mericle and asked about the

8  finder's fee, Mr. Mericle failed to disclose to the IRS that he

9  knew that the money was intended to be paid to Judge

10  Ciavarella.  By the time he appeared in the grand jury, Mr.

11  Mericle was aware that the money was also going to Judge

12  Conahan and split between them.  Knowing that Mr. Mericle

13  failed to disclose to the grand jury that he was aware who the

14  ultimate recipients of that money were, that failure to

15  disclose made him an accessory after the fact to the tax fraud

16  perpetrated by Judge Conahan and Judge Ciavarella.  This is the

17  basis for the misprision charge.  He failed to disclose what he

18  knew -- directly asked about it.  And that will tell you a

19  little bit about what I just told you before I started reading

20  this.

21          There's one more thing.  The Court asked -- stated --

22  Judge Kosik -- I want to emphasize the distinction between --

23  it's my recollection that in the case of the two judges, you

24  represented there was a quid pro quo between Mr. Powell and

25  between the judges.  That is not the case in this instance; is

1    that correct?  And Mr. Zubrod said, no, sir, that is not.  I

2    don't believe there's anything in that discourse different from

3    what I told you about how the Mericle money was paid at the

4    time to Judge Ciavarella.  Remember this.  Robert Mericle came

5    to Mark Ciavarella and asked him -- told him he was going to

6    give him a finder's fee, which there was no bribe.  There's no

7    kickback.  Once Mark Ciavarella was given the finder's fee and

8    the place was built, Robert Mericle had no interest whatsoever

9    if one child -- juvenile was sent there or a million.  It

10   didn't matter if the place burned down right after Mr. Mericle

11   was paid.  It didn't matter to him.  It didn't matter.

12              Now, the fact that the -- the path that the money

13   took no one is going to disagree with.  The government had all

14   their diagrams up and tracing the money went here, the money

15   went there.  Keep in mind, if that money wasn't the proceeds of

16   an illegal act, the proceeds of a bribe or a kickback, it's no

17   one's business what anybody does with the money.  If I hit the

18   lottery and I didn't want my wife to know, and I sent it

19   through a different transaction, that's not a crime.  So keep

20   your eye on the ball.  Keep your eye on whether the money was

21   illegal because if the money is legal -- if there was no bribe

22   or kickback, then it doesn't matter what happened to the money.

23   And it's pretty hard anyway in this day and age to make a wire

24   transfer and have it secret.  All of these transactions were

25   found very quickly and very easily.  By any investigator that

38

1    wanted to take the time to do it.  The money all ended up --
2    all the money from Mr. Mericle ended up easily traced and into
3    the account one way or another of Mr. Ciavarella.  So much for
4    being a genius.  And I believe that you will hear exactly what
5    I told you how this came about from Mr. Mericle.  I believe you
6    will be hearing from him as a government witness.  The
7    government is going to call him.

8            He's going to verify what I told you at the plea
9    hearing.  He's going to verify everything -- everything I told
10   you about how the transaction came about between Mark
11   Ciavarella and him meaning, Robert Mericle.  Now, let's talk a
12   little bit about Mr. Powell.  Mr. Powell is a guy who is a very
13   successful civil lawyer, very successful personal injury
14   practice.  He got some very large verdicts.  He's a very large
15   man himself.  Why am I telling you this?  Because we're going
16   to show you through cross examination into our own witnesses
17   that Robert Powell is not a man to be extorted.  He was a
18   division one basketball player, big guy, six-five, six-six,
19   maybe 250, 240, athletic, assertive lawyer.  He's not a man to
20   be easily extorted.  That's number one.  Number two, to extort
21   someone you have to have a hammer, you need something -- either
22   somebody will come to me and extort me, you're cheating on your
23   wife, I want money -- I am not married -- so that's not going
24   to work.

25            But let's assume that has some moral transgression

39

1  that I have and they said we are going to extort, okay.  You

2  have a hammer.  Let's say they had a way of not getting me

3  clients in my law practice, we're going to spread some rumor

4  about you, you're not going to get any more clients -- that

5  will be a good thing -- but I'm financially ruined.  So that's

6  another way they can extort you.  They can extort you with

7  physical violence, but you need something.  As the government

8  said during the plea, you need something, and you need a quid

9  pro quo.  What could the quid quo pro be?  What can it be?

10  First of all, even the government told you that there were

11  various placement agreements.  I am not going to go through all

12  that.  But all of these agreements between the county

13  commissioners, number one, the county commissioners, of which

14  Michael Conahan and Mark Ciavarella are not a member of the

15  county commissioners, had made agreements guaranteeing

16  placement and detention in Pennsylvania Child Care, facility

17  owned by Mr. Powell.  How in the world was Mark going to extort

18  him?  That's all non-sense by Mr. Powell to disguise the money

19  that he was taking in large sums from PA Child Care, whether it

20  was authorized or not by his partner.  This is an excuse from

21  Robert Powell to try to get out of any trouble he may have been

22  in either with the law or with his partner and eventually the

23  law.  Robert Powell was a -- he was spending, 35, $40,000 on

24  his credit card bill.  He bought an airplane for a couple

25  million dollars, which he used occasionally.  He bought a boat

40

1  which he used occasionally, expensive boat, use that's

2  occasionally.

3          By the way, speaking of a boat and plane, Mike

4  Conahan paid Mericle during -- I'm sorry -- paid Powell, Robert

5  Powell during this time for use of his plane, about $50,000.

6  And Mark Ciavarella and Mike Conahan paid him over $50,000 for

7  the use of his boat.  Now, if you are extorting someone, do you

8  go and pay them thousands of dollars for the use of their toys?

9  I suggest not.  Or by the way, during this period of time

10  Robert Powell supposedly to get away from the extortioners took

11  a trip to Costa Rica, took his boat down there and so he flew

12  down there -- and who do you think flew on the same plane with

13  him?  I think it was his private plane.  Who do you think flew

14  to Costa Rica?  One of the guys he was trying to get away from.

15  Mike Conahan.  He flew down to Costa Rica in Powell's private

16  plane.  I don't know about you, ladies and gentlemen.  But if I

17  am trying to get away from somebody, I don't invite them in my

18  private plane or if I have a limo -- I am trying to get away

19  from them, I am not hanging around with my extortioners.

20  Another thing, he socialized a lot -- this is Robert Powell --

21  socialized a lot with Mark Ciavarella and with Michael Conahan

22  all during this period of time.  He had a drink with him -- I

23  think he was a regular visitor to Mike Conahan's house on

24  Friday -- late Friday afternoon, early evening for a drink.

25  They socialized together.

1          If I am being a victim of extortion, probably
2    wouldn't be out having a drink with the persons that are
3    extorting me.  And as far as the cash in a box, Mark Ciavarella
4    doesn't know that's true.  He doesn't know anything about that
5    cash.  He doesn't know anything about it.  And he didn't know
6    anything about the rent in the condo or how it came about.  How
7    do we know that, and how are you going to know that more
8    importantly?  Because the government wired Robert Powell -- and
9    I'm assuming you're not so naive to believe that a wire is not
10   something that doesn't incriminate someone -- a wire is
11   designed to get someone to incriminate himself or herself.

12          Well, how is Mark Ciavarella incriminated on the wire
13   that the government had?  He's not.  There's -- as a matter of
14   fact, what he said during that wire is exculpatory, meaning not
15   only does it not incriminate him, it's favorable to him.
16   There's a conversation -- and Mark Ciavarella is not there at
17   the beginning of the conversation -- at the very end because
18   during that conversation Michael Conahan says, do me a favor --
19   addressing Mark -- do me a favor.  The favor is then
20   unintelligible, but the favor is I want to talk to Bob Powell
21   alone.  And Mark walks away.  Mark Ciavarella walks away.
22   There's a conversation between Conahan and Bob Powell.  And
23   Conahan says to Powell, Mark doesn't know about the cash or the
24   rent, and Bob Powell, government witness, seeks a favor from
25   the government.  He says, oh, I'm glad you told me that, I

42

1  didn't know that.  Conahan and Powell are alone.  I'm glad you

2  told me that, I didn't know.

3       Now, this seeker of favor who knows that the more he

4  incriminates the so-called suspects, the better off he is.  He

5  doesn't say, what do you mean he doesn't know about the cash?

6  The man has been extorting me.  He doesn't say, wait a minute,

7  wait a minute, get him in here right now, he knows all about

8  this.  Powell is a lawyer.  He's a smart guy.  He could have

9  done himself a lot of good by asking a direct question to Mark

10  Ciavarella.  Does he say during that conversation, I can

11  incriminate these guys very easily?  Why doesn't he say on that

12  wire when Conahan says, Mark doesn't know anything about this,

13  what do you mean, you guys are draining me, you have all my

14  money.  Why doesn't he say that?  He just stands there.  He

15  takes it.  Mike Conahan tells him, that's my story, I never got

16  cash but -- we don't know if Conahan got cash or he didn't get

17  cash.  But we know this.  And the evidence will show you this,

18  Mark Ciavarella did know about it, didn't intend for it to

19  happen, any cash, and didn't get any and didn't conspire with

20  Michael Conahan to extort anyone.  The extortion of Powell when

21  you see him and when you hear the facts about Powell is

22  ridiculous.  Nobody that we know of was extorting Mr. Powell.

23       He socialized with everyone -- with everyone -- I

24  mean the people he actually accused, the guy he got away from

25  -- trying to get away from, he traveled with, he stayed at the

1   condo.  The rent that he called rent was rent as far as Mr.

2   Ciavarella knew.  As a matter of fact, Mr. Ciavarella was not

3   involved in the founding of Pinnacle, that corporation that

4   owned the condo in Jupiter, Florida.  His wife was named as a

5   member of the corporation six months, eight months later.  The

6   only thing Mark Ciavarella knew about the agreement was that

7   Powell agreed to pay rent as he was told, 15,000 a month for

8   five years.  I forget if it was five or six years.  He told

9   that was going to be his rent, if you want to pay in advance,

10  Mark was very happy to accept it.  You have to put that into

11  context about the things that Powell did and spent money

12  crazily.  Put it in that context.  True.  It's easy to say to

13  yourself, he was paying a lot of money for a place which he

14  stayed occasionally.  I think there may be some dispute when he

15  stayed there or when his family was there.  He didn't use it

16  all the time or while he had his boat there.  His boat captain

17  stayed there at the condo.  He had access if he wanted to.  The

18  fact he paid that money doesn't mean he was extorting .  I

19  don't think -- I think the evidence will show that it was rare

20  for Mark Ciavarella to have a conversation alone with Bob

21  Powell, wasn't that -- not a practice.  As I told you at the

22  beginning of our -- I am going to say dialog, but it has been a

23  monolog, not dialog, as I told you, the case is about an

24  extortion and bribe and kickbacks.

25          Robert Mericle is going to tell you the money he gave

44

1  was not a bribe or a kickback.  We have assurance from the

2  government that they didn't think it was a bribe or a kickback.

3  And Mark Ciavarella is going to tell you there was no quid pro

4  quo, there was no bribe or kickback, and Mr. Mericle.  And he's

5  going to tell you that to him the accusation by Robert Powell

6  that he was extorted is almost ludicrous that Mark Ciavarella

7  would extort Robert Powell.  Powell had the knowledge to go

8  right to the authorities, right to the authorities, I am being

9  extorted.  And the government would have you to believe, I had

10  him by the throat, they wouldn't send kids there.  Go to the

11  authorities.  Then wear a wire when you're being extorted.

12  Then your business will be very successful.  You assisted

13  someone in getting extorsions.  You have a facility in Luzerne

14  County that's convenient.  You have a partner that has money.

15  Where else are they then going to send juveniles?  Where else?

16  Just as it would be so foolish for Mark Ciavarella not to send

17  children -- juveniles in a detention or for other reasons,

18  treatment or anything.  There's a facility six miles away from

19  the courthouse, seven miles.  I'm going to look ridiculous if I

20  send detain ease or adjudicated delinquents anywhere else.

21  Where is the hammer for the extorsion?  The guy wore a wire and

22  couldn't get an admission because you can't admit something --

23  he didn't extort him.  Where is that?  Where is this big

24  successful smart lawyer looking for favors from the government

25  that he couldn't get the smoking gun?  You know why he didn't

1    get the smoking gun?  There was no smoking gun.

2           THE COURT:  Excuse me.  I will give you as much time

3    as you want.  The jurors have been sitting for an hour half.

4           MR. RUZZO:  It was my thinking.  I thank you for

5    reminding me.  I am not going to take their time but a few

6    minutes more.  Look, all we're asking you -- I shouldn't say

7    all.  You're all intelligent people.  You've all been around

8    the world.  But we're asking you for something that's an

9    intellectual exercise.  We want you to separate.  If you can't

10   find that Mark Ciavarella extorted Bob Powell, you can't find

11   that he got a kickback or a bribe from Robert Mericle.  You

12   have to acquit him on almost all these charges the taxes

13   notwithstanding.  As I asked you in the beginning, you're not

14   the board of judicial conduct.  Whether Mr. Ciavarella is

15   guilty of some judicial misconduct for not reporting on his

16   form that he got the money and where he got it, that's not your

17   business.  How he transferred the money, that's your business

18   if you find that the money was procured illegally.  But if you

19   don't find a kickback or extortion, throw out where the money

20   went and how it got there and throw out an ethical violation

21   that he had, there's no question he should have used better

22   judgment on that bench, and there was no question that he

23   should have put -- maybe if he did all that, we wouldn't be

24   here.  There's no question about that.  I won't insult your

25   intelligence about the tax except to say one thing.  He did pay

46

1   tax the one year, and he declared this income from Pinnacle,

2   whether that was the right source, but he did pay the taxes.

3   As to the other tax charges, I am not going to insult your

4   intelligence.  I am not making a big deal about it.  Keep those

5   things in mind, and I thank you very much for the attention

6   that you have paid me.  I know I got into some things that -- I

7   believe it is very important.  This is important to all of us.

8   It's important to you and to us.  It's important to Mark

9   Ciavarella.  And on his behalf, let me express his thanks for

10  the way you paid attention and braved the weather.  In the end,

11  I think you will see things my way.  I hope you do.  It's your

12  job and no one else's job to determine facts and whether the

13  government proved its case beyond a reasonable doubt.  And Mr.

14  Zubrod gave more fair analysis of what you have to do about the

15  presumption of innocence.  I will expect no less and no more

16  from him.  Thank you very much, ladies and gentlemen.

17          THE COURT:  Thank you.  We will take a 10-minute

18  recess.

19          (A brief recess was taken.)

20          THE COURT:  Call your first witness, please.

21          MR. HOUSER:  The government calls Ben Wylam.

22          BENJAMIN WYLAM, called as a witness, being duly

23  sworn, testified as follows:

24          MR. HOUSER:  Your Honor, before I begin the

25  questioning of Mr. Wylam, the Court will be glad to hear the

47

1  parties have stipulations regarding the admissibility of

2  evidence that goes for the government and defense.  We expect

3  that will speed things along.  However, as a preliminary

4  matter, I have to identify and move the admission of quite a

5  few exhibits because Agent Wylam will be testifying as a

6  summary witness today.  So at this time, I would offer the

7  following exhibits:  Government's Exhibit 3.2, 3.3, 3.4, 3.6,

8  3.7, 3.8, 3.9, 3.10, 3.14, 3.15, 3.16, 3.17, 3.18, 4.2, 4.3,

9  4.4, 4.5, 4.6, 4.7, 4.9, 4.10, 4.11, 4.12, 4.13, 4.14, 4.15,

10 4.16, 4.17, 4.18, 4.19, 4.20, 4.21, 4.22, 4.23, 4.24, 4.25,

11 4.26, 4.27, 4.28, 4.29, 4.30, 4.31, 4.32, 4.33, 4.34, 4.36,

12 5.1, 5.2, 5.3, 5.4, 5.5, 5.6, 5.7, 5.8, 5.9, 6.5, 7.6, 8.1,

13 8.2, 8.3, 8.4, 8.5, 8.6, 8.7, 8.9, 8.9, 8.10, 8.11, 8.12, 8.13,

14 8.14, 8.15, 8.16, 8.17, 8.18, 8.19, 8.20, 8.21, 15.2, 16.1.1,

15 16.1.2, 16.1.3, 16.1.4, 16.2, 16.3, 16.4, 16.5, 16.6.1, 16.6.2,

16 16.6.3, 16.6.4, 16.7, 16.8, 16.9, 16.10, 16.11, 16.12.1,

17 16.12.2, 16.12.3, 16.13, 16.14, 16.15, 16.16, 16.17, 17.1,

18 17.2, 20.1, 20.2, 20.3, 20.4, 20.5, 20.6, 20.7, 20.11, 20.14,

19 20.15, 23.1, 23.2, 23.3, 23.4, 24.1, 24.2, 25.1, 25.2, 28.1,

20 28.2.  We move will the admission of those exhibits, and I

21 don't believe there's objection.

22            MR. FLORA:  No objection, Your Honor.

23            MR. HOUSER:  There is one small matter I have to

24 place on the record at sidebar if you don't mind.

25            (The following discussion took place at sidebar:)

48

1          MR. HOUSER:  Judge, we had an understanding among the

2   parties that we will reserve objections to the openings until

3   after the openings had been made, and we have a motion in

4   limine regarding the statement that Mr. Ruzzo referred to in

5   his opening.  I want make to clear the government has not

6   waived its objection to that.  The government believes that was

7   an unfair use of that statement.  The government believes that

8   statement will ultimately not be admissible in this case.  And

9   so I just want make clear our objection is on the record to

10  that so we are not deemed to have waived that.

11          (The discussion concluded at sidebar.)

12  DIRECT EXAMINATION

13  BY MR. HOUSER:

14  Q.   What's your name, sir?

15  A.   Ben Wylam.

16  Q.   How old are you employed?

17  A.   I am a special agent with the United States Department of

18  Treasury, Internal Revenue Service Criminal Investigation.

19  Q.   How long have you been employed by the IRS?

20  A.   Employed in that capacity for the past 27 years.

21  Q.   What -- as an agent of the IRS in the criminal

22  investigation division, what is your job?

23  A.   My job is to investigate financial investigations,

24  criminal tax law violations, money laundering and other

25  financial transactions.

49

1  Q.   And let me direct your attention to May of 2007.  Did you

2  become involved -- did you become involved in the investigation

3  during that month into allegations of misconduct?

4  A.   Yes, I did.

5  Q.   And how did it come to pass that you became involved in

6  the investigation?

7  A.   I received a request from the United States Attorney's

8  Office to join a grand jury investigation jointly with the

9  Federal Bureau of Investigation.

10  Q.   And when you joined for the IRS, was there another agent

11  you worked with during the investigation?

12  A.   Yes, Special Agent Grabinski and also Special Agent

13  Sutherland from the Federal Bureau of Investigation.

14  Q.   Since that time, were there -- have other FBI agents

15  become involved in the case?

16  A.   Yes, they have.

17  Q.   Who would those agents be?

18  A.   Special Agent James Glenn and Special Agent Joe Miller.

19  Q.   When you became involved in this investigation initially,

20  can you give the jury a sense of what were the general

21  allegations?

22  A.   General allegation was that there was a civil litigation

23  attorney, Robert Powell in Luzerne County who a financial

24  relationship with two judges in Luzerne County, Michael Conahan

25  and Mark Ciavarella.

50

1  Q.    And at that time, was there an allegation -- without

2  getting into, just as a general statement -- was there an

3  allegation there may have been something improper about the

4  relationship?

5  A.    Yes.

6  Q.    Now, Agent Wylam, you know that the government -- the

7  United States has called you today as a summary witness,

8  correct?

9  A.    That's correct.

10  Q.    I want to ask you to be careful not to indicate what

11  anyone said, just give us a summary of some of the transactions

12  that have -- you investigated, okay?

13  A.    Yes, sir.

14        THE COURT:  Before you do that, you laid the ground

15  work for his summary, the exhibits you admitted?

16        MR. HOUSER:  Those were the exhibits, Judge.

17        THE COURT:  The jury doesn't know what the exhibits

18  represent.

19        MR. HOUSER:  I am just making a little bit of an

20  introduction with the agent.

21  BY MR. HOUSER:

22  Q.    Now, when you were asked to become involved in the

23  investigation, did you have to take some steps internally

24  within your agency to obtain permission to join the

25  investigation?

51

1  A.    Yes, we did.

2  Q.    What did you have to do?

3  A.    We had a request permission from our counsel, and our

4  counsel then authorized it, and it was transferred down to the

5  Department of Justice tax Division.  The Department of Justice

6  Tax Division gave us authorization to work with the United

7  States attorney's office as well as the Federal Bureau of

8  Investigation.

9  Q.    Did take the time to get the necessary approvals before

10 you actually started taking steps in the investigation?

11 A.    Yes, it did.

12 Q.    All right.  At what point did you start taking what I

13 would call overt steps in the investigation, in other words,

14 taking steps that would make it clear to someone that the IRS

15 was investigating?

16 A.    It would have been approximately October of 2007 when we

17 served a grand jury subpoena on Barbara Conahan, wife of

18 Michael Conahan.

19 Q.    And you served a grand jury subpoena for what -- and not

20 specifically.  But why do you use grand jury subpoenas?

21 A.    A subpoena was served for production of records as well as

22 potentially testimony.

23 Q.    Okay.  Now, during the course of the investigation, did

24 you and other agents serve many subpoenas?

25 A.    We did.

1  Q.    And did you subpoena numerous financial institutions?

2  A.    Yes.

3  Q.    Businesses?

4  A.    Yes, sir.

5  Q.    Individuals?

6  A.    Yes, sir.

7  Q.    Okay.  And during the course of the investigation, did you

8  become familiar with a number of the people who ultimately

9  became subjects of the investigations and targets of the

10 investigation?

11 A.    We did.

12 Q.    All right.  Let me direct your attention to Government's

13 Exhibit 20.15.  First of all, what is Government's Exhibit

14 20.15?

15 A.    20.15 is a photographic depiction of individuals

16 identified during the course of investigation and their roles

17 pertinent to the investigation as well as entities that they

18 were involved with.

19 Q.    And is it fair to say that this government exhibit

20 identifies just some of the people who may be mentioned in this

21 case and just some of the entities that may be applicable as

22 well?

23 A.    Yes, sir.

24 Q.    All right.  Directing your attention to the upper

25 left-hand corner, did your investigation cause you to become

53

1  familiar with Mark Ciavarella?

2  A.    Yes.

3  Q.    And who did the -- just very generally speaking indicate

4  who was Mark Ciavarella.

5  A.    Mark Ciavarella was the Luzerne County Court of Common

6  Pleas judge in Luzerne County at the beginning of the

7  investigation, and he was a juvenile judge, and subsequently he

8  became the president judge.

9  Q.    Okay.  And did the investigation reveal that he had some

10  sort of connection -- and we are not -- some sort of correction

11  to an organization called Pinnacle Group of Jupiter, LLC?

12  A.    Yes.

13  Q.    And also to an organization called W-Cat, Incorporated?

14  A.    Yes.

15  Q.    Let me go down one block below.  Did the investigation

16  cause you to become familiar with a person named Michael

17  Conahan?

18  A.    Yes.

19  Q.    Who did the investigation show was Michael Conahan?

20  A.    A Luzerne County Court of Common Pleas judge as well as

21  during January of 2002 became president judge.

22  Q.    All right.  And did the investigation show that Michael

23  Conahan also had some sort of an organization called Pinnacle

24  Group of Jupiter, LLC?

25  A.    Yes, sir.

54

1   Q.   W-Cat, Incorporated?

2   A.   Yes.

3   Q.   And did the investigation show that Michael Conahan had a

4   tie to a company called Beverage Marketing of Pennsylvania,

5   Incorporated?

6   A.   Yes, sir.

7   Q.   What was Michael Conahan's role or position with Beverage

8   Marketing?

9   A.   President of Beverage Marketing of PA, Incorporated.

10  Q.   Did the investigation -- let's start with Mr. Mericle.

11  Did the investigation cause you to become familiar with a

12  person named Robert Mericle?

13  A.   Yes.

14  Q.   What did the investigation show was Mr. Mericle's position

15  in the community?

16  A.   Mr. Mericle was the owner of Mericle Construction,

17  Incorporated.

18  Q.   All right.  What kind of a business is that generally

19  speaking?

20  A.   It's a real estate company which builds buildings and

21  leases them.

22  Q.   Let's go down to the right.  Did you come familiar with a

23  person by the name of Robert Powell?

24  A.   Yes, sir.

25  Q.   And who was Robert Powell based upon your investigation?

55

1  And let's just keep it very general.

2  A.    Robert Powell is a civil litigation attorney in Luzerne

3  County.

4  Q.    Was he affiliated with a law firm?

5  A.    Yes.

6  Q.    What was the name of the law firm?

7  A.    Powell Law Group.

8  Q.    Did he also have some sort of a position with a number of

9  companies?

10  A.    Yes.

11  Q.    Would you tell the jury some of the companies you'll be

12  talking -- or actually the evidence we will be discussing

13  during the case of this trial?

14  A.    Vision Holdings, Limited Liability Corporation or LLC, PA

15  Child Care, LLC, Western PA Child Care, LLC and W-Cat,

16  Incorporated.

17  Q.    Now, directing your attention to Mr. Powell, did you

18  determine with regard to Vision Holdings, LLC -- did the

19  investigation show -- directing your attention to Government's

20  Exhibit 20.6, did your investigation show that Mr. Powell had

21  an ownership interest in this company, Vision Holdings?

22  A.    Yes, Robert Powell was 50 percent owner and his spouse,

23  Deborah Powell, was the other 50 percent holder.

24  Q.    In fact, did you determine that Vision Holdings had an

25  interest in a company called PA Child Care, LLC and Western --

56

1  A.    Yes, sir.

2  Q.    -- PA Child Care, LLC?  What was PA Child Care, LLC?

3  A.    PA Child Care, LLC is a corporate entity which owns and

4  operates a juvenile detention center located in Pittston,

5  Township, Pennsylvania.  Western PA Child Care, LLC is another

6  juvenile detention center which is run in the western part of

7  Pennsylvania.

8  Q.    All right.  And by the way, all of these charts that we're

9  discussing here, have you and Agent Grabinski and other agents

10  of the IRS and other people involved in the case put these

11  charts together to summarize some of the events and players, et

12  cetera?

13  A.    Yes, sir.

14  Q.    And do these charts -- all of these charts regarding --

15  talking about today, do they fairly and accurately reflect the

16  relationships, the transactions, et cetera?

17  A.    Yes.

18  Q.    Okay.  Now, the -- so 50 percent of PA Child Care and

19  Western PA Child Care was owned by Mr. Powell and his wife

20  through Vision Holdings, LLC?

21  A.    That's correct.

22  Q.    Now, what was the general business of PA Child Care?

23  A.    PA Child Care was an entity which housed juvenile

24  offenders both for detention purposes as well as treatment.

25  Q.    Was it a public -- was it a publically owned company?  Was

57

1  it a privately owned company?  What was the nature of it?

2  A.    Privately owned company.

3  Q.    Okay.  And as far as the detention of juveniles, who would

4  be the primary client of PA Child Care for sending juveniles to

5  be detained at the facility?

6  A.    Luzerne County.

7          MR. FLORA:  Objection, Your Honor, no foundation at

8  this point.

9          MR. HOUSER:  I didn't mean to -- I didn't mean to

10  suggest one specific client.  Let me ask you a different

11  question I think that will resolve the objection.

12  BY MR. HOUSER:

13  Q.    Did PA Child Care and Western PA Child Care essentially

14  cater to government entities?

15  A.    Yes, sir.

16  Q.    Including many government entities, correct?

17  A.    Yes.

18  Q.    Not just Luzerne County?

19  A.    That's correct.

20  Q.    And when was the PA Child Care facility built, detention

21  facility?

22  A.    The facility began construction in 2002, was completed in

23  January of 2003.

24  Q.    And what about Western PA Child Care?  Is that another

25  facility that was built by Mr. Powell and his -- and Mr.

58

1  Zappala?

2  A.    Yes.

3  Q.    When was that built?

4  A.    Construction began in 2004 and was completed in

5  approximately July of 2005.

6  Q.    Okay.  Now, as a result of the predication that you

7  developed in the initial part of your investigation, did you

8  serve subpoenas on -- I think you mentioned this already -- you

9  served subpoenas on a number of entities, correct?

10  A.    That is correct, sir.

11  Q.    Pull up the -- let me direct your attention to the portion

12  of this chart, which is 20.14 relating to financial

13  institutions.  Did you subpoena records from Citizens Bank,

14  Community Bank, First Federal Bank, First National Community

15  Bank and a number of other entities listed on this particular

16  chart?

17  A.    Yes, sir.

18  Q.    All right.  Did you also issue subpoenas to businesses

19  such as Beverage Marketing of Pennsylvania?

20  A.    Yes.

21  Q.    Mericle Construction, Pennsylvania Child Care, Pinnacle

22  Group of Jupiter, Vision Holdings, et cetera?

23  A.    Yes, sir.

24  Q.    As a result of those subpoenas, did you obtain a large

25  number of financial records?

1  A.    Yes, sir.

2  Q.    And have you gone through and identified for the purposes

3  of your testimony today a number of financial transactions that

4  you have determined to be relevant to the trial that we're

5  getting underway with here?

6  A.    Yes, sir.

7  Q.    All right.  And were there a number of aspects of this

8  investigation over a period of time -- excuse me.  Did you

9  investigate a number of alleged transactions that occurred over

10 a period of time?

11 A.    Yes, sir.

12 Q.    And have you prepared a chart -- directing your attention

13 to Government's Exhibit 20.1 -- that summarizes the general

14 areas relating to the allegations that you were investigating?

15 A.    Yes, sir.

16 Q.    All right.  Let me direct your attention to roman numeral

17 one.  What was the -- what does roman number one reflect?

18 A.    The Mericle payments that were paid based upon PA Child

19 Care construction.

20 Q.    You were in court during opening statements, correct?

21 A.    That's correct.

22 Q.    Does this area of this particular aspect of your

23 investigation related to allegations of money that went from

24 Mr. Mericle through Mr. Powell to the judges?

25 A.    Yes, sir.

60

1  Q.   Directing your attention to roman number two, what does

2  this area of the investigation relate to, the allegations?

3  A.   These were Powell checks and wire transfers which were

4  sent through Pinnacle Group of Jupiter.

5  Q.   And does that relate to the allegations that were referred

6  to in opening statements as to the condo in Florida and the

7  purported rental payments?

8  A.   Yes, sir.

9  Q.   Directing your attention to number three, what does this

10 particular allegation relate to?

11 A.   Mericle payments upon the completion of Western PA Child

12 Care for their original construction.

13 Q.   And number four?

14 A.   Mericle payments PA Child Care expansion.

15 Q.   Five?

16 A.   Powell cash payments.

17 Q.   And number six?

18 A.   Mericle payment Western PA Child Care expansion, however,

19 this one was not paid.

20 Q.   Are these the six general areas that you became -- and

21 your colleagues -- your law enforcement colleagues were

22 involved in investigating?

23 A.   Yes.

24 Q.   All right.  During 2003, did your investigation show that

25 there were a number of financial transactions of interest to

61

1  your investigation?

2  A.    Yes, sir.

3  Q.    All right.  And now I want to -- before we go into another

4  summary exhibit, I just want to go very quickly and give the

5  jury a sense of the nature of the types of records you reviewed

6  here by just offering one example of each type of record.

7  A.    Yes, sir.

8  Q.    Let me direct your attention to Government's Exhibit 3.6.

9  And pull that in a little more.  What is Government's Exhibit

10  -- why don't you highlight the top portion of it at first --

11  keep going -- just the whole -- everything where there's

12  writing.  What is Government's Exhibit 3.6?

13  A.    Government's Exhibit 3.6 would be an example of a wire

14  transfer.

15  Q.    This is a record that reflects a wire transfer, correct?

16  A.    Yes, sir.

17  Q.    Directing your attention to the top left-hand corner of

18  the document, do you see there's a line that says run date 5

19  November '07?

20  A.    Yes.

21  Q.    What does that reflect?

22  A.    The date the record we received by law enforcement

23  officials from the financial institution.

24  Q.    Actually -- so this record -- that date does not relate to

25  the actual date the transfer was made, correct?

62

1    A.    That's correct.

2    Q.    You see the next -- SND date?

3    A.    Yes.

4    Q.    What is that date?

5    A.    That is a military type date.  It stands for the 28th day

6    of January 2003.

7    Q.    Okay.  And then there's an amount, correct?

8    A.    Yes, sir.

9    Q.    Do you see the AMT?

10   A.    Yes, sir.

11   Q.    Does that reflect the amount of the wire transfer?

12   A.    Yes, $330,000.

13   Q.    Does this record reflect where the payment came from?

14   A.    Yes, CTZ stands for Citizens Bank.

15   Q.    And does this record reflect where the wire went

16   ultimately went to?

17   A.    Yes.

18   Q.    All right.  And to whom did this particular wire --

19   $330,000 wire go?

20   A.    Went to Attorney Mark A. Ciavarella, Junior.

21   Q.    We're not going to get bogged down in the detail.  I want

22   to give you -- the jury a sense of the kinds of records you

23   were reviewing.  Let me direct your attention to 3.16.  Aside

24   from wire transfer records, did you review bank records

25   relating to checks?

63

1  A.    Yes, sir.

2  Q.    All right.  And Government's Exhibit 3.16, what is this?

3  A.    This is the example of a check draft.

4  Q.    Is this what a record looks like you obtained from the

5  bank when you subpoena records relating to checks?

6  A.    Some of the records, yes.

7  Q.    And in this particular instance, are you here looking at a

8  record you received from a bank relating to a deposit?

9  A.    Yes.

10  Q.    And what is the amount of the deposit in this particular

11  case?

12  A.    $326,600.

13  Q.    And can we go to the next page of this exhibit?  This

14  particular exhibit shows the check -- shows the check that made

15  up the deposit, correct?

16  A.    Yes, sir.

17  Q.    And could you -- Maria -- in this instance, the check was

18  drawn on the account of whom?

19  A.    It is drawn on the account of Vision Holdings,

20  Incorporated.

21  Q.    That's the entity you described as being run by Mr. Powell

22  and his wife, correct?

23  A.    That's correct.

24  Q.    And this particular check is made payable to?

25  A.    Robert J. Powell.

64

1  Q.    And on the back of the check the check is endorsed by --

2  or purportedly endorsed by Mr. Powell, correct?

3  A.    That's correct.

4  Q.    And deposited into an account 541015973, correct?

5  A.    That's correct.

6  Q.    Your investigation revealed that to be whose checking

7  account?

8  A.    Checking account of Barbara Conahan.

9  Q.    All right.  Now, the final type of record I would like you

10 to just give an example of is 3.10.  And this particular type

11 of record is what?

12 A.    This would be considered an inner bank transfer.

13 Q.    All right.  So this one, for example, shows a transfer of

14 $105,000?

15 A.    Yes, sir.

16 Q.    Whose account was this money being transferred to and

17 from?

18 A.    This account was being transferred from Beverage Marketing

19 of Pennsylvania, Incorporated, the real estate account, to the

20 account of Michael Conahan.

21 Q.    So these three examples -- you reviewed many, many records

22 including all of these records I read at the beginning,

23 correct, all those exhibits?

24 A.    Yes, sir.

25 Q.    Those exhibits are now all in evidence.  Now, let me

65

1  direct your attention to Government's Exhibit 20.3.  You

2  mentioned earlier that your investigation was focused on six

3  separate areas, correct?

4  A.    That is correct.

5  Q.    This particular summary exhibit, which area does this

6  relate to?

7  A.    This relates to the very first part.  This would be the

8  payments for the construction of the original PA Child Care.

9  Q.    Directing your attention to -- first of all, there is a

10  transaction -- purported transaction January 21, 2003.  Do you

11  see that?

12  A.    Yes, sir.

13  Q.    Would you describe what your investigation showed occurred

14  on January 21, 2003?

15  A.    Records disclosed on January 21, 2003, Mericle

16  Construction wire transferred $610,000 from their account to an

17  account located at Minersville Safe Deposit Bank and Trust in

18  the name of Robert Matta, Esquire.

19  Q.    Four days later did your records show that that money was

20  transferred from Mr. Matta's account?

21  A.    Yes.

22  Q.    Where did it go on January 28th, '03?

23  A.    Transferred from Robert Matta, Esquire's account to the

24  Beverage Marketing of PA account at Leesport Bank.

25  Q.    Beverage Marketing is the company -- whose company is

66

1  that?

2  A.    Michael Conahan is the president of it.

3  Q.    All right.  And then shortly after that or actually on the

4  same day, did your records -- did a review of the records show

5  that a portion of that money was wired from the account?

6  A.    Yes.

7  Q.    And would you summarize for the jury where the funds went

8  and when?

9  A.    The records disclosed on January 28th, 2003, a wire

10 transfer in the amount of $330,000 was effected from Beverage

11 Market of PA's account to the bank of Mark Ciavarella at

12 Citizen's Bank.

13 Q.    And then once again, later a transaction -- would you

14 describe the transaction that's highlighted on the screen right

15 now?

16 A.    The records disclosed on April 30th, 2003, a $75,000 wire

17 transfer was from Beverage Marketing of PA to the checking

18 account of Mark Ciavarella at Citizen's Bank.

19 Q.    And then the next transaction, would you describe that

20 one?

21 A.    July 15th, 2003, $75,000 was wire transferred from the

22 Beverage Marketing account of PA to Mark Ciavarella at

23 Citizen's Bank.

24 Q.    Did -- what was the total amount of money that your

25 investigation showed was transferred from the Beverage

1  Marketing account to Mark Ciavarella during 2003?

2  A.    $480,000.

3  Q.    Okay.  Now, let me direct your attention to the -- coming

4  off that Beverage Marketing account, there's another wire

5  transfer of $25,000?

6  A.    Yes, sir.

7  Q.    And when did that occur?  Could you describe that?

8  A.    The records disclosed on August 13th, 2003, $25,000 was

9  transferred from the Beverage Marketing of PA account to an

10  account in Angela Sallemi's name.

11  Q.    Who is Angela Sallemi?

12  A.    Angela Sallemi is a court reporter in Luzerne County, a

13  friend of Michael Conahan.

14  Q.    And directing your attention to the next transaction

15  identified in that line, there's a -- $105,000 transaction.  Do

16  you see that?

17  A.    Yes, sir.

18  Q.    What did your investigation show occurred from the

19  Beverage Marketing account on that occasion?

20  A.    On August 21, 2003 intrabank transfer $105,000 went from

21  Beverage Marketing of PA account to a bank account of Michael

22  Conahan at Leesport.

23  Q.    Regarding the Beverage Marketing account, did you obtain

24  records relating to that account to show all of the deposits

25  going in and all of the money going out?

1    A.    Yes, sir.

2    Q.    And you have prepared a summary of those deposits,

3    correct?

4    A.    Yes, sir.

5    Q.    We will touch briefly on that later.  Generally speaking,

6    was there enough money in that Beverage Marketing account to

7    cover those payments to Mark Ciavarella to Angela Sallemi to

8    Michael Conahan if that -- that $610,000 had not been

9    transferred into the account?

10   A.    There was insufficient funds to effect the transfer.

11   Q.    This I take it is a summary of the -- the flow of this

12   particular $610,000, correct?

13   A.    Yes, sir.

14   Q.    Directing your attention to the right-hand side of the

15   transaction -- or transactions, what occurred on January 24,

16   2003?

17   A.    The records disclosed on January 24, 2003 wire transfers

18   were effected from Mericle Construction to an account of Robert

19   Powell, Esquire at First Federal Bank.

20   Q.    And then directing your attention to the 8/29/03

21   transaction, do you see that?

22   A.    Yes, sir.

23   Q.    What do the records show occurred on that day?

24   A.    The records disclosed on August 29th, 2003 the check

25   written from Vision Holdings to Robert J. Powell and

69

1  subsequently deposited into a bank account controlled by

2  Barbara Conahan.

3  Q.    To the left of that transaction, do you see a check

4  identified -- $10,000 check?

5  A.    Yes, sir.

6  Q.    Could you explain what the summary of what your

7  examination showed with regard to that particular check?

8  A.    The records disclosed on June 16th, 2005 PA Child Care

9  issued a check made payable to Robert Matta in the amount of

10 $10,000.

11 Q.    Okay.  And then the investigation showed -- total of the

12 money flowing to Michael Conahan as a result of these

13 transactions?

14 A.    $456,000.

15 Q.    Now, there is a -- we had a little bit of discussion about

16 Pinnacle Group, correct?

17 A.    Yes, sir.

18 Q.    Let me direct your attention to Government's Exhibit 20.5.

19 What is Government's Exhibit 20.5?

20 A.    20.5 is the ownership of Pinnacle Group of Jupiter, LLC

21 chart.

22 Q.    Did your investigation determine who is -- who are the

23 owners of Pinnacle Group of Jupiter, LLC?

24 A.    The owners of record are Cindy Ciavarella and Barbara

25 Conahan.

70

1   Q.    All right.  And did your investigation show that Pinnacle

2   Group of Jupiter owned an asset?

3   A.    Yes.

4   Q.    And what was the asset?

5   A.    Asset was a condominium, Unit 303 in Jupiter, Florida.

6   Q.    Did the investigation show that -- whether or not there

7   was a mortgage on that condominium?

8   A.    Yes.

9   Q.    And what was the amount of the mortgage note?

10  A.    The amount of the mortgage note was $848,000.

11  Q.    All right.  Did the investigation show who were the

12  borrowers on the mortgage note?

13  A.    Yes.

14  Q.    Who were the borrowers on the mortgage note?

15  A.    Borrowers on the mortgage note were Cindy Ciavarella, Mark

16  Ciavarella, Barbara Conahan and Michael Conahan.

17  Q.    Okay.  And so the -- the mortgage note -- actually, what

18  are -- let me direct your attention to Government's Exhibit

19  4.4.  What is Government's Exhibit 4.4 that Agent Grabinski is

20  showing on the screen right now?

21  A.    That is a commitment letter from First National Community

22  Bank.

23  Q.    All right.  And the amount of the loan was?

24  A.    $848,000.

25  Q.    For 30 years?

71

1  A.    Yes, sir.

2  Q.    What was the monthly payment on the loan?

3  A.    $5,570.76.

4  Q.    The signatories to the bottom, please?

5  A.    Mark A. Ciavarella, Cindy Ciavarella, Michael T. Conahan,

6  Barbara Conahan and Barbara Conahan is the managing member of

7  Pinnacle Group of Jupiter, LLC.

8  Q.    This particular loan was obtained from which bank?

9  A.    First National Community Bank.

10 Q.    Do you know whether or not Michael Conahan had any sort of

11 relationship with First National Community Bank?

12 A.    At this time Michael Conahan was a board member.

13 Q.    First let me direct your attention now to Government's

14 Exhibit 4.3.  What is Government's Exhibit 4.3?

15 A.    It is a general warranty deed from Florida.

16 Q.    Is this the deed for the condominium you just described?

17 A.    Yes, sir.

18 Q.    And does the -- is this a document you obtained from

19 public records in Florida?

20 A.    Yes, sir.

21 Q.    And does the -- does the general warranty deed reflect the

22 name of the owner of the property?

23 A.    Yes, it does.

24 Q.    And who is the purported owner based on the record that's

25 filed publically in Florida?

72

1  A.    Should be Pinnacle Group of Jupiter as well as Barbara
2  Conahan and Cindy --
3  Q.    Well, the -- just the top -- can you see the grantor?
4  A.    Yes.
5  Q.    Who is listed as the owner of the property?
6  A.    Pinnacle Group of Jupiter.
7  Q.    Is there a mortgage that's filed along with this?
8  A.    Yes.
9  Q.    And the -- the person listed on or entity listed on the
10 mortgage is?
11 A.    Pinnacle Group of Jupiter, LLC.
12 Q.    Now, does Mark Ciavarella's name or Michael Conahan's name
13 appear on any of these publically filed documents?
14 A.    No.
15 Q.    Okay.  Directing your attention to the year 2004, did your
16 investigation identify a number of transactions involving
17 Robert Powell to Pinnacle Group, the entity you described in
18 Florida?
19 A.    Yes, it did.
20 Q.    Directing your attention to Government's Exhibit 20.7.
21 This is an exhibit that will be discussed later in the trial.
22 I will hit the highlights.  All of the right column for the
23 month of January, 2004, did the investigation show -- what did
24 the investigation show just as a summary?
25 A.    $70,000 of checks were deposited from entities of Powell

73

1 to Pinnacle Group of Jupiter.

2 Q.   Let's go down to the next line.   Summarize that, please.

3 A.   The records disclosed during the month of February

4 $200,000 worth of checks from Mr. Powell or his entities were

5 deposited into Pinnacle Group of Jupiter.

6 Q.   Next line?

7 A.   During May 2004, $100,000 worth of checks were written by

8 entities of Mr. Powell and deposited into Pinnacle Group of

9 Jupiter.

10 Q.   Next line?

11 A.   Wire transfer effected July 12th, 2004 in the amount of

12 $120,000.   September 23, 2004 there was a wire transfer in the

13 amount of $100,000.

14 Q.   And going now to the year 2005 -- by the way, this

15 particular -- that particular chart we were just looking at,

16 what was the total of payments, $590,000?

17 A.   Total payments were $590,000.

18 Q.   This particular chart does that -- which aspect of the

19 investigation does this relate to?

20 A.   Item number two in the summary.

21 Q.   Which was what?

22 A.   They were the wire transfers and checks from Powell to

23 Pinnacle Group of Jupiter, LLC.

24 Q.   Now, directing your attention to the next chart I just

25 mentioned, 20.4, what does this particular chart reflect?

74

1  A.    Flow of funds from Mericle Construction for the

2  construction of Western PA Child Care, and the lower half of

3  the chart is for the expansion of PA Child Care.

4  Q.    Is this -- do these two different transactions relate to

5  the next two general areas of the investigation?

6  A.    Yes, sir.

7  Q.    All right.  The first one on the top, what did your

8  investigation show occurred?

9  A.    July 15th, 2005, the records disclosed Mericle

10 Construction wire transferred one million dollars from their

11 account to the account of Pinnacle Group of Jupiter, LLC at

12 Wachovia Bank.

13 Q.    And then the next -- the next chart at the bottom?

14 A.    The records disclosed that on February 3, 2006, the

15 Mericle Construction upon the completion of PA Child Care

16 expansion wire transferred $150,000 from their account at

17 Wachovia to the account of Pinnacle Group at Wachovia.

18 Q.    I want to direct your attention to Government's Exhibit

19 20.11.  What is 20.11?

20 A.    20.11 is a schedule of wire transfers.

21 Q.    Does this particular chart fairly and accurately reflect

22 the wire transfers that you already discussed for the most part

23 during 2003, 2004, 2005 and 2006?

24 A.    Yes, sir.

25 Q.    And what does this chart reflect?

75

A.    Reflects the movement of electronic funds across state

lines.   Every time the color changes from state to state, it is

a change across a state boundary.

Q.    Did you obtain records from banks and from the federal

reserve and other entities involved in the transfer of

electronic funds, and do those records reflect that, in fact,

all of these wire transfers actually crossed state lines?

A.    Yes, sir.

Q.    All right.   Let's just take one example.   Directing your

attention to a transaction on July 15, 2005, what did your

investigation -- what did the information you obtained reveal

on that day?

A.    Mericle Construction's checking account in Wilkes-Barre,

Pennsylvania effected within Citizen's Bank a transmission of

electronic data to the Federal Reserve Bank.   The Federal

Reserve Bank processed that information in Riverside, Rhode

Island.   In order for them to complete the transaction, it

transmitted from that location to a clearing processing room in

New Jersey and eventually from that processing clearing room in

New Jersey effected another transmission electronically to

Winston-Salem, North Carolina, which is the account of Pinnacle

Group at Wachovia.

Q.    Now, let me now direct your attention to the aspect of the

investigation you described as the alleged cash payments.

A.    Yes, sir.

76

1  Q.    And as you investigated the case, that's -- is it fair to

2  say that's how you took it, they were allegations, correct?

3  A.    Yes, sir.

4  Q.    And did you -- did you, in fact, identify a number of

5  transactions that from your knowledge of the case you know the

6  subject of testimony later in the trial?

7  A.    Yes.

8  Q.    All right.  And now I want to direct your attention to

9  Government's Exhibit 8.21.  What is Government's Exhibit 8.21?

10 A.    Summary schedule of cash checks.

11 Q.    All right.  And does -- what does this exhibit show

12 essentially?

13 A.    It shows that during this particular year, $143,500 of

14 checks were cashed.

15 Q.    For cash, correct?

16 A.    Yes, sir.

17 Q.    And there will be testimony about that later in the trial,

18 correct?

19 A.    Yes, sir.

20 Q.    Now, let me direct your attention to Government's Exhibit

21 23.4.  What is Government's Exhibit 23.4?

22 A.    23.4 is a summary schedule of deposited items into

23 Pinnacle Group of Jupiter, LLC.

24 Q.    All right.  And directing your attention to this

25 particular exhibit, did you determine that, in fact, there were

77

1  a number of checks and wire transfers going into this account

2  from either Robert Powell or entities under his control?

3  A.    Yes, sir.

4  Q.    And, Agent, would you perhaps -- the first line -- what

5  does this particular chart show?

6  A.    This particular chart shows on January 20, 2004, total of

7  deposits of $370,000 made into that account of which was

8  comprised a check from Robert Powell in the amount of $18,000,

9  a check from Robert Powell in the amount of $52,000 and check

10  from Michael T. Conahan of $300,000.

11  Q.    Does this summary of the -- does this summary of the

12  deposits essentially reflect -- as far as the deposits into

13  this account by Mr. Powell and his entities, does it reflect

14  the checks that were contained on the other chart?

15  A.    Yes, sir.

16  Q.    It also would -- it would also reflect the wire transfers

17  that went to Pinnacle Group, correct?

18  A.    Yes.

19  Q.    So we're not going to spend any more time on this, but it

20  is of evidence in the record, correct?

21  A.    Yes, sir.

22  Q.    Was that particular exhibit prepared -- is that a summary

23  what was contained in Exhibit 4.9, the records you obtained

24  from one of the banks?

25  A.    Could you repeat that question?

78

1  Q.    Was that particular exhibit prepared as a summary of

2  records you prepared from -- obtained from the banks?

3  A.    Yes, sir.

4  Q.    Let me direct your attention to Government's Exhibit 4.36.

5  What is Government's Exhibit 4.36?

6  A.    Government's Exhibit 4.36 is a summary of checks to

7  Barbara Conahan and Cindy Ciavarella for Pinnacle Group of

8  Jupiter, LLC into their checking account at Wachovia Bank.

9  Q.    Does this summary show -- there's another page.  Does this

10 show total amount of money that Cindy Ciavarella and Barbara

11 Conahan received from Pinnacle Group?

12 A.    Yes.

13 Q.    And who did your investigation was Barbara Conahan?

14 A.    Barbara Conahan is the wife of Michael Conahan.

15 Q.    And who did the investigation show was Cindy Ciavarella?

16 A.    Cindy Ciavarella is the wife of Mark Ciavarella.

17 Q.    Okay.  And at the bottom of the -- this particular exhibit

18 first half during 2004, what did the investigation show was the

19 total deposits into this -- actually payments to -- let's start

20 with Cindy Ciavarella.

21 A.    Total amount of disbursements to Cindy Ciavarella was in

22 the amount of $210,281.

23 Q.    What about to Barbara?

24 A.    That would have been $392,626.29.

25 Q.    That related to which year?

79

1  A.    2004.

2  Q.    What about 2005?  Did Cindy and Barbara obtain money out

3  of Pinnacle Group for those years as well?

4  A.    Yes, sir.

5  Q.    And for 2005, what was the amount that Cindy Ciavarella

6  received?

7  A.    $435,500.

8  Q.    And what about Barbara Conahan?

9  A.    Same amount, $435,500.

10  Q.    Okay.  Now, directing your attention to Government's

11  Exhibit 23.2, what is this?

12  A.    This is deposit analysis of the Beverage Marketing of PA

13  account at Leesport Bank.

14  Q.    I will highlight one transaction in January 28th of 2003.

15  Directing your attention to the bottom line that's readable

16  there, do you see that?

17  A.    Yes, sir.

18  Q.    Does that reflect the transaction you described, $610,000

19  from Mr. Matta's account to the Beverage Marketing account?

20  A.    Yes, sir.

21  Q.    And this chart reflects all of the deposits to this

22  particular account in 2003, correct?

23  A.    Through the period of January 3, 2003, through August 4,

24  2003.

25  Q.    Okay.  All right.  Then let me direct your attention to

80

1  Government's Exhibit 23.3.  What is this summary exhibit?

2  A.    This is a deposit analysis of the bank account of Michael

3  T. Conahan at Leesport Bank.

4  Q.    I will highlight one transaction here.  Just one

5  transaction -- $105,000 transaction?

6  A.    Yes, sir.

7  Q.    Is that the transaction you referenced on the big chart as

8  well?

9  A.    Yes, sir.

10  Q.    Okay.  So is this -- this then shows the -- the -- how did

11  you describe it?

12  A.    Deposit analysis of the financial account of Michael T.

13  Conahan at Leesport Bank.

14  Q.    This first page shows 2003, correct?

15  A.    Yes, sir.

16  Q.    Then we will go to the next exhibit, Government's Exhibit

17  23.1.  What is 23.1?

18  A.    23.1 is a deposit analysis of the bank account of Mark A.

19  Ciavarella located at Citizen's Bank.

20  Q.    Was that an account maintained with his wife or he

21  maintained on his own?

22  A.    On his own.

23  Q.    And so this particular page we're looking at, does --

24  which year does this relate to?

25  A.    2003 year.

81

1  Q.    And directing your attention to January of 2003, is there

2  a deposit reflected in January?

3  A.    Yes, sir.

4  Q.    And would you -- is that -- can you describe that

5  particular transaction?

6  A.    January 28th, 2003 there was wire transfer into this

7  account in the amount of $330,000 for Beverage Marketing of PA.

8  Q.    That was one of the transactions you highlighted on the

9  chart, correct?

10 A.    Yes, sir.

11 Q.    And also April 2003?

12 A.    Yes, sir.

13 Q.    Was there another transaction that you note in deposited

14 items?

15 A.    April 30th, 2003 there was a wire transfer deposited into

16 this account in the amount of $75,000 from Beverage Marketing

17 of PA, Incorporated.

18 Q.    And that also was one transactions highlighted?

19 A.    Yes, sir.

20 Q.    Directing your attention to July 15 of 2003.

21 A.    July 15, 2003, there was a wire transfer deposited into

22 this account in the amount of $75,000 from Beverage Marketing

23 of PA, Incorporated.

24 Q.    Okay.  And so this particular chart shows all of the

25 deposits to this account between January and December of 2003,

82

1  correct?

2  A.    Yes, sir.

3  Q.    All right.  Would you go to the next page, please?

4        THE COURT:  Before you go to the next page, okay --

5  and I am hoping what I'm doing is clarification for the jury.

6  At the outset you introduced a lot of exhibits that were

7  numbered.  I want the jury to know that this witness is

8  referring to a summarization that resulted from his examination

9  of the exhibits the government offered into evidence.

10       Ordinarily, summaries cannot be permitted at the

11 conclusion of a witness that are the product of his work unless

12 those exhibits or records exist.  In this case, government's

13 counsel told us the defense counsel had an opportunity to

14 examine all these records and after they've examined those

15 records, they agreed they can be admitted to allow this witness

16 to come to the conclusions in the form of a summary that is

17 being presented.  Am I correct?

18       MR. HOUSER:  You are absolutely correct.  Thank you

19 very much.

20       THE COURT:  Since we're four minutes from the noon

21 hour and you're not ready to finish with this witness, we will

22 adjourn for lunch.  And the jury will be asked to return

23 downstairs by five to one so we can get you up here and start

24 soon after 1:00 as time permits.  I will be instructing the

25 jury on one occasion in this trial.  Again, you heard some

83

1  evidence in this case.  You should not on a piecemeal basis

2  when you are together to discuss any evidence between

3  yourselves.  And when you're not in the jury room under no

4  circumstances, should anything be discussed with anyone else.

5  You're in a public building.  When you go to lunch, you will be

6  passing by individuals who are here as guests to observe what

7  is going on in this trial.  There will be media people.

8          Try not to hear, and I will ask them if they don't

9  recognize you as jurors except for what's on your clothing --

10  don't allow anyone to discuss the evidence in the case in your

11  presence.  If somebody persists to do that, tell them, I'm a

12  juror in that case, shut your mouth.  If they don't, bring it

13  to our attention.  Have a very pleasant lunch.

14          (A lunch recess was taken.)

15          THE COURT:  Mr. Wylam.

16          THE WITNESS:  Thank you, Your Honor.

17          THE COURT:  I guess I should say Special Agent Wylam.

18          THE WITNESS:  Anything you like, Your Honor.

19          BENJAMIN WYLAM resumed the witness stand.

20  DIRECT EXAMINATION (cont.'d)

21  BY MR. HOUSER:

22  Q.   Agent Wylam, right before lunch we were talking about

23  Exhibit 23.1.  Directing your attention -- I believe we -- we

24  discussed this page.  This was, as I recall, the summary of the

25  deposits for 2003, correct?

84

1  A.    Yes, sir.

2  Q.    Now, directing your attention to the next page of

3  Government's Exhibit 23.1, what is that?

4  A.    This is a deposit analysis for the bank of Mark Ciavarella

5  at Citizen's Bank.

6  Q.    Directing your attention -- let's take the very first

7  transaction on February 2nd, 2004.  Do you see that?

8  A.    Yes, sir.

9  Q.    Would you explain what the summary chart shows and the

10  meaning of each column of -- we're going to give the example of

11  this particular transaction so the jury will understand the

12  chart.

13  A.    For this particular transaction, a deposit was made on

14  February 2nd, 2004.  It was in the amount of $35,000.  It was a

15  deposit.  It was into the Pinnacle Group of Jupiter -- I'm

16  sorry -- it was a check written on Pinnacle Group of Jupiter,

17  LLC bank account.  It was check No. 1001.  The account was

18  located at Wachovia Bank, and the person that the check was

19  made payable to was Cindy Ciavarella.

20  Q.    Now, directing your attention to this particular chart,

21  there are a number of charts showing deposits into Mr.

22  Ciavarella's account from Pinnacle Group of Jupiter, correct?

23  A.    Yes, sir.

24  Q.    And can we see the next page, please?  Once again,

25  directing your attention to the second and third transactions

85

1  down just by way of example, what do these transactions

2  reflect?

3  A.    The first transaction is a deposit on February 14th, 2005

4  in the amount of $50,000.  It was a deposit.  It was comprised

5  of two separate checks, one in the amount of $30,000 payable

6  from Pinnacle Group of Jupiter, LLC and a second check in the

7  amount of $20,000 payable from the Pinnacle Group of Jupiter,

8  LLC, and I believe both of those checks were made payable to

9  Cindy Ciavarella.

10 Q.    Okay.  Now, these particular checks payable to Cindy

11 Ciavarella, you indicated end up in Mr. Ciavarella's bank

12 account, correct?

13 A.    Yes, sir.

14 Q.    Let me directing your attention to Government's Exhibit

15 4.16.  All right.  What is this on the screen now?

16 A.    A check made payable from Pinnacle Group of Jupiter, LLC,

17 check number 1055 payable to Cindy Ciavarella on May 1, 2004 in

18 the amount of $33,000.  The endorsement purports that to be of

19 Cindy Ciavarella and Mark A. Ciavarella on the reverse side of

20 it.  It was deposited into the bank account of Mark A.

21 Ciavarella.

22 Q.    Now, let me direct your attention to Exhibit 4.29.  Once

23 again, directing your attention to the check and the back of

24 the check, could you indicate what this particular check shows?

25 A.    This check was drafted on the account of Pinnacle Group of

86

1  Jupiter, LLC, check number 1182 drafted on July 18th, 2005 made

2  payable to Cindy Ciavarella in the amount of $350,000,

3  endorsements on the back of the check purported to be that of

4  Cindy Ciavarella and Mark Ciavarella and was deposited into

5  Mark Ciavarella's bank account.

6  Q.    Okay.

7         MR. HOUSER:  Judge, if I may just have a moment.

8  Cross-examine.

9  CROSS EXAMINATION

10  BY MR. FLORA:

11  Q.    Mr. Wylam, I just have a few questions for you.  With

12  regards to the Pennsylvania Child Care facility, so we're clear

13  on that -- I know you identified it briefly as to what it was,

14  both detention and residential placement.  I believe that was

15  your testimony?

16  A.    Yes, sir.

17  Q.    Would you agree with me that on the detention side of the

18  facility all we're talking about is 24 beds; isn't that

19  correct?

20  A.    I believe that's correct.

21  Q.    And on the residential placement side of the facility, all

22  we're talking about is 24 beds; is that correct?

23  A.    Initially there was 48 beds.  I believe it was expanded to

24  60 if my memory serves me correctly.

25  Q.    When PA Child Care opened --

87

1  A.    When it first opened there was a total of 48 beds.

2  Q.    Twenty-four detention, 24 residential placements?

3  A.    Yes.

4  Q.    On the residential placement side, those 24 beds those

5  were limited to children who were either fire setters or sex

6  offenders; isn't that correct?

7  A.    I never got that deeply involved in exactly what it was,

8  so I can't offer an opinion on that.

9  Q.    Would you also agree at some point down the road the 24

10  detention beds in PA Child Care was reduced to 12 beds?

11  A.    Again --

12  Q.    If you don't know, you don't know?

13  A.    Thank you.

14  Q.    Can you pull up 23.3, please?  Mr. Wylam, I will have you

15  look at 20.3, Government's Exhibit.

16  A.    Yes, sir.

17  Q.    The 387,600 going from Mericle to Robert Powell on January

18  24th, '03, did that go into his personal account, or did that

19  go into his law firm account?

20  A.    That went into an account titled Robert Powell, Esquire.

21  It was not a Powell Law Group account.  It was a Powell --

22  Robert Powell, Esquire account.

23  Q.    If you stay on the flow of the moneys on that side of the

24  chart, the 387,600 going to Robert Powell and the money going

25  down, 10,000 to Matta and 326 out of Vision Holdings to Barbara

1  Conahan -- do you follow that?

2  A.    Yes, sir.

3  Q.    Follow that money down to that side.  It appears there's

4  $51,000 missing.  Where is the 51,000?

5  A.    I know that evidence hasn't been introduced.

6          MR. HOUSER:  So the record is clear -- this is not an

7  objection.  He can answer, but it would be hearsay what was

8  told to him.  He's happy to answer that.

9          MR. FLORA:  If in the summary he doesn't know, he

10  doesn't know.  That's all I have, Your Honor.

11          THE COURT:  Okay.  Any need for redirect?

12          MR. HOUSER:  No, Your Honor.

13          THE COURT:  Thank you.

14          THE WITNESS:  Thank you, Your Honor.

15          MR. HOUSER:  Your Honor, unfortunately I have a

16  matter -- rather tedious matter I have to read a number of

17  stipulations into the record at this time.  Government's

18  Exhibit 19.3 --

19          THE COURT:  You are reading from something?

20          MR. HOUSER:  Yes, they are on the screen if --

21          THE COURT:  No, okay.

22          MR. HOUSER:  I would -- I will be happy to summarize.

23  The defense requested I read the whole stipulation.

24          THE COURT:  That's fine.  You should.  If that's

25  going to be an exhibit --

89

1          MR. HOUSER:  It is.

2          THE COURT:  But I am more comfortable if you not tell

3   me but tell the jury, and it puts you physically --

4          MR. HOUSER:  I can -- I didn't realize this moved.  I

5   will turn it a little bit if I can --

6          THE COURT:  If you can't do that -- it's just --

7          MR. HOUSER:  I can face the jury.  I agree, Judge.  I

8   wish I could.  Ladies and gentlemen of the jury, at this time

9   I'm going to read to you a number of stipulations.  These are

10  matters that the government and the defense have agreed to, and

11  so I am going to read them to you now.  The judge at some point

12  in the trial will give you an instruction on the stipulation.

13  I don't know if you want to do it now or the end of the trial,

14  Judge.  I will read these stipulations.  It's a tedious

15  process.  But as a result of us entering into these

16  stipulations, we have been able to save a lot of time by --

17  because we don't have to bring witnesses in to testify as to

18  records, et cetera.  So here's the first one I am going to read

19  to you.  Government's Exhibit 19.3.

20         THE COURT:  Houser, please step back.  Try to have

21  your voice picked up by the microphone.  I want the jury to

22  hear you.  I would like to hear you, too.

23         MR. HOUSER:  Thank you, Judge.  It is hereby

24  stipulated between the United States and the defendant that the

25  following exhibits constitute business records of Citizen's

90

Bank.  The records were made in the regular course of business
and were prepared at or near the time of the acts and events
they memorialize.  The records were made by or from information
transmitted by a person with knowledge of the acts and events.
The records were kept in the regular course of business of
Citizen's Bank.  And now I will read each government exhibit
number and the description of the exhibit.

3.6, Citizen's Bank records including transaction
detail report for $330,000 wire transfer from Beverage
Marketing to Mark Ciavarella dated January 28th, 2003.

3.7, Citizen's Bank records including transaction
detail report for $75,000 wire transfer from Beverage Marketing
to Mark Ciavarella dated April 30th, 2003.

Government's Exhibit 3.8, Citizen's Bank records
including transaction detail report for $75,000 wire transfer
from Beverage Marketing to Mark Ciavarella dated July 15th,
2003.

17.1, bank statements relating to Mark Ciavarella
account 6100134776 for years 2003 to 2006.

17.2 deposit tickets and deposited items for Mark
Ciavarella account 6100134776 for years 2003 through 2006.  The
stipulation is signed by Mr. Ciavarella, his attorneys and Mr.
Zubrod on behalf of the United States.

The next stipulation, ladies and gentlemen, is
Government's Exhibit 19.6.  It is hereby stipulated between the

91

1  United States and the defendant that the following exhibits

2  constitute business records of First National Bank or Legacy

3  Bank or Leesport Bank:  The records were made in the regular

4  course of business and were prepared at or near the time of the

5  acts and events they memorialize.  The records were made by or

6  from information transmitted by a person with knowledge of the

7  acts and events.  The records were kept in the regular course

8  of business Of First National Bank or Legacy Bank or Leesport

9  Bank.  Now, I will read each government exhibit and a

10  description of the exhibit.

11          3.6, Leesport Bank advice of outgoing wire transfer

12  of $330,000 from Beverage Marketing account.

13          3.8, Leesport Bank advice of outgoing $75,000 wire

14  transfer from Beverage Marketing account.

15          3.9, Leesport Bank debit memo for $25,000 wire

16  transfer from Beverage Marketing to Angela Sallemi dated August

17  13th, 2003.

18          3.10, Leesport Bank advice of $105,000 transfer from

19  account of Beverage Marketing to the account of Michael Conahan

20  dated August 21, 2003.

21          3.16, Leesport Bank deposit ticket dated August 29th,

22  2003 and related deposited item in the amount of $326,000.

23          3.17, Leesport Bank monthly statement for account

24  number 541015973.

25          24.1, Leesport Bank monthly statements for account of

92

1  Beverage Marketing of PA, Inc., real estate account

2  number541016005 for 2003.

3      24.2, Leesport Bank deposit tickets and deposited

4  items for Beverage Marketing of PA, Incorporated, real estate

5  account number 541016005.

6      25.1, Leesport Bank monthly statements for account of

7  Michael Conahan account number 541016013 for 2000.  Leesport

8  Bank deposit tickets and deposited items for account of Michael

9  Conahan account number 541016013 for 2003.  Once again, the

10  stipulation is signed by Mr. Ciavarella, his attorneys and Mr.

11  Zubrod on behalf of the United States.

12      THE COURT:  Excuse me.  Are these stipulations as to

13  the records you've already previously identified by number and

14  agreed by stipulation to admit?

15      MR. HOUSER:  Mostly, yes.

16      THE COURT:  Why do we have to read those that are

17  already admitted?

18      MR. HOUSER:  Well, I won't -- I prefer not to read

19  them all.  I was requested to do so by the defense so --

20      THE COURT:  Why do we have to read all of them?  The

21  only reason they were necessary in this trial at all is a

22  foundation for the summaries.  You had no objection to the

23  summaries.

24      MR. FLORA:  That's correct, Your Honor.  We have no

25  objection to the summaries, but there's stipulations that go

93

1  beyond the summaries.

2        THE COURT:  If it goes beyond the summaries is

3  different matter.  I was wondering why you have to read

4  everything that's already been admitted.  Listen, I'm not

5  minimizing the defense's role in this because everything that

6  that agent testified to was based on the record they stipulated

7  that should be admitted into evidence.

8        While this is not a records case, a part of it is.

9  Ordinarily, the defense could require every piece of evidence

10 on which an agent is testifying to a summary to be identified

11 and admitted into evidence separately.  By agreeing to

12 admission of those records, they are performing a service to

13 all of us.

14       MR. HOUSER:  Directing the jury's attention to

15 Government's Exhibit 19.7, this is another stipulation relating

16 to business records, in this case First National Community

17 Bank.  I will not read this because this is something that we

18 already covered, so I will move on to the next one.  The -- the

19 following stipulation, however, is not something that we

20 covered.

21       19.8.  It is hereby stipulated between the United

22 States and the defendant that the following exhibits constitute

23 business records of the United States Department of Treasury,

24 Internal Revenue Service, IRS.  The records were made in the

25 regular course of business and were prepared at or near the

94

1  time of the acts and events they memorialize.  The records were

2  made by or from information transmitted by a person with

3  knowledge of the acts and events.  The records were kept in the

4  regular course of business of the United States Department of

5  Treasury, Internal Revenue Service, IRS.  Now I will read each

6  government exhibit number and the description of the exhibit.

7          16.1.1, transcript of account for Mark A. and Cindy

8  Ciavarella for 2003.

9          16.1.2, transcript of account for Mark A. and Cindy

10  Ciavarella for 2004.

11          16.1.3, transcript of account for Mark A. and Cindy

12  Ciavarella for 2005.

13          16.1.4, transcript of account for Mark A. and Cindy

14  Ciavarella for 2006.

15          16.2, tax return for Mark and Cindy Ciavarella form

16  1040 for tax year 2003.

17          16.3 tax return for Mark and Cindy Ciavarella form

18  1040 for tax year 2004.

19          16.4, tax return for Mark and Cindy Ciavarella form

20  1040 for tax year 2005.

21          16.5, tax return for Mark and Cindy Ciavarella form

22  1040 for fax year 2006.

23          16.16 transcript of account for Michael and Barbara

24  Conahan for 2003.

25          16.6.2, transcript of account for Michael and Barbara

95

Conahan for 2004.

16.6.3, transcript of account for Michael and Barbara Conahan for 2005.

16.6.4, transcript of account for Michael and Barbara Conahan for 2006.

16.7, tax return for Michael and Barbara Conahan form 1040 for tax year 2003.

16.8, tax return for Michael and Barbara Conahan form 1040 for tax year 2004.

16.9, tax return for Michael and Barbara Conahan form 1040 for tax year 2005.

16.10, the tax return for Michael and Barbara Conahan form 1040 for tax year 2006.

16.11 form 1040 X. amended return for 2006 for Michael and Barbara Conahan.

16.12.1, transcript of account for Pinnacle Group of Jupiter, LLC for 2004.

16.12.2, transcript of account for Pinnacle Group of Jupiter, LLC for 2005.

16.12.3, transcript of account of Pinnacle Group of Jupiter, LLC for 2006.

16.13, tax return for Pinnacle Group of Jupiter, LLC form 1065 and K.1s for 2004.

16.14, tax return for Pinnacle Group of Jupiter, LLC form 1065 and K. 1s for 2005.

96

1          16.15, tax return for Pinnacle Group of Jupiter, LLC

2  form 1065 for 2006.

3          16.16, transcript for account of Beverage Marketing

4  of PA, Inc., for 2003.

5          16.17, tax return for Beverage Marketing of PA, Inc.,

6  form 1120 for 2003.  Once again, the stipulation is signed by

7  Mr. Ciavarella, his counsel and Mr. Zubrod on behalf of the

8  United States.

9          Now, turning to stipulation 19.11.  Once again, this

10 is an item we have not summarized and has not been referred to

11 yet but which will be referred to in the next couple of

12 witnesses.  It is hereby stipulated between the United States

13 and the defendant that the following exhibits constitute

14 business records of the Luzerne County commissioners.  The

15 records were made in the regular course of business and were

16 prepared at or near the time of the and acts events they

17 memorialize.  The records were made by or from information

18 transmitted by a person with knowledge of the acts and events.

19         The records were kept in the regular course of

20 business of the Luzerne County commissioners.  I will read each

21 Government's Exhibit number and the description.

22         1.3, lease agreement dated 11/17/04 between Luzerne

23 County and PA Child Care.

24         29.1, minutes of the Luzerne County commissioners

25 meeting February 5, 2003.

97

1          29.2, memo dated 12/2/2004 to Steve Urban from

2  controller's office and letter to Thomas Makowski from Leonard

3  Pocius dated January 14th, 2003 regarding juvenile detention

4  license.

5          29.3, fax dated 4/28/05 to Steve Urban containing

6  January 9, 2003 letter from Thomas Makowski to Leonard Pocius

7  regarding juvenile detention facility license.

8          29.4, handwritten memo of Thomas Makowski dated July

9  2, 2001 regarding Court's request to consider PA Child Care

10  lease purchase agreement.

11          29.5, minutes of Luzerne County commissioners'

12  meeting of January 15th, 2003.

13          29.6, minutes of Luzerne County commissioners'

14  meeting of November 20th, 2002.

15          29.7, minutes of Luzerne County commissioners'

16  meeting of December 11, 2002.

17          29.8, agenda file for the November 17, 2004 Luzerne

18  County commissioners' meeting.  The stipulation is signed by

19  Mr. Ciavarella, Mr. Flora, Mr. Ruzzo, his counsel and by Mr.

20  Zubrod on behalf of the United States.

21          Next I will direct everyone attention to Government's

22  Exhibit 19.16.  This is a stipulation relating to bank records

23  of Minersville Safe Deposit Bank and Trust.  This particular

24  stipulation relates to records that have been discussed

25  already.  And I will for that reason not read this particular

98

1   stipulation.

2          Government's Exhibit 19.20, this is a stipulation

3   that relates to bank records that have been discussed in Agent

4   Wylam's testimony and have been admitted.  For that reason, I

5   will not read this stipulation.

6          19.23 is the same.  This stipulation relates to bank

7   records of Wachovia Bank that were referred in Mr. Wylam's

8   testimony.  Having been agreed upon, read by both parties to be

9   admitted for that reason, I will not read this particular

10  stipulation, which thank goodness -- that was a very long one.

11         19.24, this is a matter which has not yet been

12  discussed -- or I guess it was discussed briefly in Agent

13  Wylam's testimony.  This matter -- this stipulation would be --

14  relates to wire communications, so I will read this particular

15  stipulation.  It is hereby stipulated between the United States

16  and the defendant that the wire transfer alleged in count one,

17  three, four, five, and six of the superseding indictment were

18  transmitted by means of wire communication across state lines

19  and in interstate commerce.

20         It is further stipulated that the following writings,

21  signals and sounds were transmitted by means of wire

22  communication via interstate commerce.

23         Count one, Racketeering Act 1.1, on January 21, 2003

24  electronic transfer of $610,000 from a bank account at

25  Citizen's Bank held by Mericle Construction, Inc. to

99

1  Minersville Safe Deposit Bank and Trust held by Robert Matta
2  caused the Federal Reserve to send a funds transfer message
3  from Riverside, Rhode Island to New Jersey and to Minersville,
4  Pennsylvania.

5          Count one, Racketeering Act 1.2, on January 23rd,
6  2003 the electronic transfer of $387,000 from a bank account at
7  Citizen's Bank held by Mericle Construction, Inc., to First
8  Federal Bank account held by Powell Law Group caused the
9  Federal Reserve to send a funds transfer message from
10 Riverside, Rhode Island to New Jersey then to Pittsburgh,
11 Pennsylvania.

12         Count one, Racketeering Act 1.3, on January 28th
13 2003, the electronic transfer of $610,000 from a bank at
14 Minersville Safe Deposit Bank and Trust bank account -- excuse
15 me -- at Minersville Safe Deposit and Trust held by Robert
16 Matta to an account at Leesport Bank held by Beverage Marketing
17 of Pennsylvania, Inc., caused the Federal Reserve to send a
18 funds transfer message from Minersville, Pennsylvania to New
19 Jersey, then to Leesport, Pennsylvania.

20         Count one, Racketeering Act 2 and Count 5.  On July
21 15th, 2005, the electronic transfer of $1 million from a
22 Citizen's Bank account held by Mericle Construction to a
23 Wachovia Bank account held by Pinnacle Group of Jupiter, LLC,
24 caused the Federal Reserve to send a funds transfer message
25 from Riverside, Rhode Island to New Jersey then to

1  Winston-Salem, North Carolina.

2          Count one, Racketeering Act 3 and Count 6.  On

3  February 3, 2006, the electronic transfer $150,000 from a

4  Wachovia Bank account held by Mericle Construction to a

5  Wachovia Bank account held by Pinnacle Group of Jupiter, LLC,

6  caused an electronic message to be sent across state lines to

7  Winston-Salem, North Carolina.

8          Count three, on July 12th, 2004, the electronic

9  transfer of $120,000 from a bank account at Minersville Safe

10  Deposit Bank and Trust held by Vision Holdings, Inc., to a

11  Wachovia bank account held by Pinnacle Group of Jupiter caused

12  the Federal Reserve to send a funds transfer from New Jersey to

13  Winston-Salem, North Carolina.

14          Count four, on September 23, 2004, the electronic

15  transfer of $100,000 dollars from a bank account at Minersville

16  Safe Deposit Bank and Trust held by Vision Holdings, Inc., to a

17  Wachovia Bank account held by Pinnacle Group of Jupiter caused

18  the Federal Reserve to send a funds transfer message from New

19  Jersey to Winston-Salem, North Carolina.  The stipulation

20  signed by Mr. Ciavarella, his attorneys and by counsel for the

21  United States.  I have just two more, Your Honor.

22          Government's Exhibit 19.27, it is hereby stipulated

23  between the United States and the defendant that the defendant

24  did wilfully make and subscribe and did cause to be made and

25  subscribe IRS 1040 forms on or before April 15th, 2004, April

101

1    15th, 2005, April 15th, 2006 and April 15th, 2007.  It is

2    further stipulated that these forms were prepared and signed in

3    the Middle District of Pennsylvania, filed with the Internal

4    Revenue Service and verified by the written declaration that

5    was made under the penalties of perjury.  The stipulation is

6    signed by Mr. Ciavarella, his attorneys and counsel for the

7    United States.

8              Finally, Government's Exhibit 19.28.  It is hereby

9    stipulated between the United States and the defendant that PA

10   Child Care, LLC, Western PA Child Care, LLC, Luzerne County

11   Court of Common Pleas, Pinnacle Group of Jupiter, Mid-Atlantic

12   Youth Services and the Powell Law Group during the period

13   alleged in the superseding indictment were entities engaged in

14   and their activities affected interstate commerce.

15             In addition, it is stipulated that the checks issued

16   and deposited as alleged in count one through racketeering acts

17   4, 5, 6, 7, 8, count two, and count 22 through 30 were

18   financial transactions in and affecting interstate commerce.

19   The stipulation is signed by Mr. Ciavarella, by his counsel and

20   by counsel for the United States.

21             Your Honor, at this time, I would move stipulations

22   19.3, 19.6, 19.7, 19.8, 19.16, 19.20, 19.23, 19.24, 19.27 and

23   19.28.

24             THE COURT:  There being no objection --

25             MR. FLORA:  No objection.

1          THE COURT:  They are admitted.

2          MR. HOUSER:  Thank you, Your Honor.  That's all I

3   have at this time.  If I neglected to say 19.11, 19.11 as well.

4          MR. FLORA:  No objection, Judge.

5          MR. HOUSER:  Judge, I believe I moved to admit all

6   the other exhibits as well that were previously identified.

7          THE COURT:  I think you did that earlier.

8          MR. HOUSER:  Okay.

9          MR. CONSIGLIO:  The government calls Nicholene

10  DiPasquale.

11         NICHOLENE DiPASQUALE, called as a witness, being duly

12  sworn, testified as follows:

13  DIRECT EXAMINATION

14  BY MR. CONSIGLIO:

15  Q.   Good afternoon.

16  A.   Good afternoon.

17  Q.   State your name.

18  A.   Nicholene DiPasquale.

19  Q.   Where are you employed?

20  A.   Administrative Office of PA Courts.

21  Q.   And what is the Administrative Office of Pennsylvania

22  Courts?

23  A.   It's the administrative arm of the Supreme Court of

24  Pennsylvania.

25  Q.   And what does the administrative arm of the Supreme Court

1  of Pennsylvania do?

2  A.    The administrative offices, assistance.

3  Q.    You provided assistance to the various courts of

4  Pennsylvania?

5  A.    Correct.

6  Q.    And what are your duties particularly in your employment

7  with the --

8  A.    I work in the department called judicial services.

9  Q.    And what is your role in the judicial services?

10  A.    Pertaining to today, our department, judicial services, is

11  the keeper of the record of financial interest statements.

12  Q.    What are financial interest statements?

13  A.    By order of the Court, 1984, all judicial officers in the

14  state are required to file financial interest statements May 1

15  of every calender year for the previous year.

16  Q.    You just made reference to a Court order?

17  A.    Yes.

18  Q.    I am showing you what's been identified as Government's

19  Exhibit 9.1.  What is that?

20  A.    That is the Court order that we were referring to.

21  Q.    That's the order dated April 13th, 1984?

22  A.    Correct.

23  Q.    What does this Court order instruct?

24  A.    That judicial officers must file a financial interest

25  statement with the administrative office May 1 every year for

1  the previous calender year.

2  Q.    And is there a standard form that is used every year?

3  A.    Yes.

4  Q.    Now, what is your particular role with respect to

5  gathering these statements and financial interest?

6  A.    Well, within the department, we accept the financial

7  interest statements.  More likely than not, they are mailed.

8  They are date stamped.  We collect them, and we file them in

9  order within the department.

10  Q.    I'm going to show you what's been identified as

11  Government's Exhibit 9.2.  Do you see that?

12  A.    Not real good, but I recognize it.

13  Q.    Do you recognize it?

14  A.    Yes, I do.

15  Q.    What is this?

16  A.    This is a financial interest statement.

17  Q.    And it's a financial interest statement for whom?

18  A.    It is for Judge Ciavarella for the year 2003.

19  Q.    And is that what is identified down here, 2003?

20  A.    Correct.

21  Q.    And you identified it as being Mark Ciavarella because

22  it's typed up at the top; is that correct?

23  A.    Correct.

24  Q.    And is there a signature line at the bottom of the

25  statement of financial interest?

1  A.    There is a signature.  Its dated 4/12/04.

2  Q.    Now, is this the statement of financial interest that is

3  part of your duties with the AOPC you received from Mark

4  Ciavarella for calender year 2003?

5  A.    Correct.

6  Q.    Now, you just described there was an obligation for

7  judicial officers to file these statements of financial

8  interest on an annual basis?

9  A.    Yes.

10  Q.    What particular things are judicial officers required to

11  report in their statement of financial interest?

12  A.    Well, like the instructions that are on the back of all of

13  the financial interest statements, they are required for -- to

14  report real estate interests, creditors, income, direct and

15  indirect sources of income, honoraria, gifts.

16  Q.    And I'm showing you what would be the back of this

17  financial interest statement?

18  A.    Correct.  You would also have to list any office of

19  directorship.

20  Q.    Now, is the judicial officer required to report just their

21  own financial interests?

22  A.    They are required to file any financial interest direct or

23  indirect.

24  Q.    And is it just for the direct and indirect for the judge,

25  or does it extend to their spouse and their dependant children?

106

1  A.   Correct, it does.

2  Q.   Now, to draw your attention to this exhibit, 9.2, which we

3  are displaying for the jury, for calender year 2003, does Mark

4  Ciavarella report in the statement of financial interest any

5  real estate interests?

6  A.   This statement shows none.

7  Q.   And how about creditors?

8  A.   Also none.

9  Q.   How about direct or indirect sources of income?

10  A.   That would be the Commonwealth of Pennsylvania.

11  Q.   What would the Commonwealth of Pennsylvania mean?

12  A.   I would guess it would be the judicial salary.

13        MR. FLORA:  Objection as to guessing.

14        THE WITNESS:  Sorry.

15        MR. CONSIGLIO:  I can clarify the question.

16  BY MR. CONSIGLIO:

17  Q.   As of this time for calender year 2003, were they required

18  to report their actual salary from the Commonwealth of

19  Pennsylvania for being judge?

20  A.   Yes, yes.

21  Q.   So if a judge appropriately filled out this form, they

22  would fill out Commonwealth of Pennsylvania?

23  A.   Correct.

24  Q.   At later forms, is it just incorporated into the form

25  itself?

107

1  A.    It's prepopulated.

2  Q.    But for this form, it's identified as Commonwealth of

3  Pennsylvania; is that right?

4  A.    Correct.

5  Q.    Is there any indication of gifts received?

6  A.    It's indicated none on this form.

7  Q.    And any indication of honoraria?

8  A.    None again.

9  Q.    How about office or directorship or employment in any

10  business?

11  A.    None is indicated.

12  Q.    Financial interest in any legal entity in business or

13  profit?

14  A.    Once again, none is indicated.

15        MR. CONSIGLIO:  We will try and switch this to the

16  computer, Your Honor.

17  BY MR. CONSIGLIO:

18  Q.    I am going to show you the statement of financial interest

19  identified in Exhibit 9.3.  Do you see this exhibit?  Switch

20  back.  Thank you.  Do you see this exhibit?

21  A.    Yes.

22  Q.    And is this the statement of financial interest for Mark

23  Ciavarella?

24  A.    Yes.

25  Q.    And is there a date received?

1    A.    Yes, March 28th, 2005.

2    Q.    What does a date stamp?

3    A.    Just when it's received at the office.  Whoever takes it

4    in would date stamp it.  It's the indication that it was

5    received by the office because they are date sensitive nature.

6    It's our way of saying it got here on time.

7    Q.    And for this exhibit, 9.3, is this for a particular

8    calender year?

9    A.    That would be for 2004.

10   Q.    And is there a signature by Mark A. Ciavarella, Junior on

11   that form?

12   A.    Yes.

13   Q.    And the date on that signature?

14   A.    That would be March 22nd, 2005.

15   Q.    Now, on this statement of financial interest, is there a

16   real estate interest, creditors identified?

17   A.    This statement indicates none.

18   Q.    How about gifts or honoraria or directorship or employment

19   in any business and financial interest in any legal entity in

20   business for profit?

21   A.    This statement would indicate no.

22   Q.    As far as direct or indirect sources of income in the year

23   2004 for Mark Ciavarella?

24   A.    Commonwealth of Pennsylvania.

25   Q.    I am showing you what's been identified as Government's

1  Exhibit 9.4.  Is this another statement of financial interest

2  for Mark A. Ciavarella, Junior?

3  A.    Yes, it is, for the year 2005.

4  Q.    Is that indicated in the bottom signature by Mark A.

5  Ciavarella, Junior?

6  A.    Yes.

7  Q.    Signature date when he signed it?

8  A.    That would be April 20th, 2006.

9  Q.    And is there a date it was received by the AOPC?

10 A.    April 24th, 2006.

11 Q.    Again, what does Mark Ciavarella disclose in the statement

12 of financial interest regarding real estate interests

13 creditors, gifts, honoraria, office or directorship or

14 employment in any business, financial interest in any legal

15 entity in business for profit?

16 A.    This form would indicate none.

17 Q.    And as far as direct and indirect sources of income?

18 A.    This is the year that the forms were self-populated with

19 Commonwealth of Pennsylvania.

20 Q.    Again, this was received April 24th, 2006?

21 A.    Yes.

22 Q.    I will show you Government's Exhibit 9.5.  Now, the

23 statement of financial interest for Mark A. Ciavarella, Junior?

24 A.    Yes.

25 Q.    For what year is this?

110

1  A.   That would be 2006 signed March 23rd, 2007, received March

2  26th, 2007.

3  Q.   With the signature of Mark Ciavarella, Junior?

4  A.   Yes.

5  Q.   And again, are there any disclosures of real estate,

6  creditors, direct or indirect sources of income, gifts,

7  honoraria, office of directorship or employment in any

8  business?

9  A.   On this financial interest statement there is indirect,

10  direct source of income.  That is the Commonwealth of

11  Pennsylvania.  None is indicated on other questions.

12  Q.   Financial interest in any legal entity, correct?

13  A.   Correct.

14  Q.   9.6, what is this?

15  A.   Financial interest statement for 2007 for Judge Mark

16  Ciavarella, and it is signed.  And the signature is March 27th,

17  2008.  And the stamp is a little fuzzy, but it looks as if it

18  was received on the 31st, 2008, March -- February -- March,

19  sorry.

20  Q.   Is that a signature for Mark A. Ciavarella for that --

21  A.   Yes.

22  Q.   Now, as far as disclosures of financial interest for 2007,

23  is there any real estate interest disclosed?

24  A.   None on this form.

25  Q.   Is there any direct or indirect sources of income

111

1  disclosed?

2  A.    Commonwealth of Pennsylvania.

3  Q.    Any others?

4  A.    There's attachments.

5  Q.    Is there an attachment listed for Paragraph 8?

6  A.    No.

7  Q.    How about gifts?

8  A.    No.

9  Q.    Honoraria?

10  A.    None as well.

11  Q.    Office or directorship or employment in any business or

12  entities?

13  A.    There's an attachment.

14  Q.    Financial interest in any legal entity in business for

15  profit?

16  A.    There's an attachment as well.

17  Q.    These would be the instructions for the form; is that

18  correct?

19  A.    Correct.

20  Q.    Is this the attachment that I'm showing you, which is page

21  three of that exhibit?

22  A.    Yes.

23  Q.    As far as creditors, what does Mark Ciavarella report as a

24  creditor for the calender year 2007?

25  A.    Listed Beverage Marketing and Michael Conahan.

1  Q.    How about office or directorship or employment in any

2  business?

3  A.    A Basket to Remember, Pinnacle Group of Jupiter.

4  Q.    Is it identified to any particular person who has an

5  interest in that entity?

6  A.    Partner, Cindy J. Ciavarella.

7  Q.    Now, the rule that you described before that a judge is

8  required to report the financial interest of themselves and

9  their spouse and their dependant children, was that applicable

10 for ever year of financial statement that you discussed?

11 A.    Correct.

12 Q.    How about financial interest in any legal entity in

13 business for profit?

14 A.    Listing on this form is a Basket to Remember, Pinnacle

15 Group of Jupiter and W-Cat, Inc.

16 Q.    Now, for these statements of financial interest that we

17 just reviewed for the years 2003 through 2007 for Mark A.

18 Ciavarella, where there reported in any these statements of

19 financial interest income direct or indirect and interest in or

20 creditors from the entities of Vision Holdings, Pennsylvania

21 Child Care, Western Pennsylvania Child Care or Mericle

22 Construction, Mericle Construction, Inc., or any entities

23 related to those?

24 A.    Not listed on these forms.

25 Q.    I'm showing you what's been identified as Government's

113

1  Exhibit 9.7.  Did you also get the statements of financial

2  interest for Michael Conahan?

3  A.    Yes, sir.

4  Q.    I'm going to show you 9.7, statement of financial

5  interest.  Does that appear to be from Michael Conahan?

6            MR. FLORA:  Objection, Your Honor.  Objection as to

7  the relevance of any forms related to Michael Conahan.

8            THE COURT:  Do you want to respond?

9            MR. CONSIGLIO:  It's part of conspiracy, Your Honor.

10  It's a statement in furtherance of the conspiracy.

11            THE COURT:  I think that's the answer.  Objection

12  overruled.

13            THE WITNESS:  Yes.

14  BY MR. CONSIGLIO:

15  Q.    This is a statement of interest for Michael Conahan?

16  A.    Yes.

17  Q.    Is it identified for any particular year?

18  A.    2003.  It's signed and dated April 14th, 2004.

19  Q.    The date that's received by the AOPC?

20  A.    April 19th, 2004.

21  Q.    As far as real estate interests --

22  A.    This form would indicate none.

23  Q.    How about creditors?

24  A.    Creditors and direct and indirect sources of income, both

25  see attachment is listed.

1   Q.    That would be exhibit A.

2   A.    Yes.

3   Q.    Is there an indication of honoraria or gifts?

4   A.    On this form it indicates none.

5   Q.    And how about office or directorship or employment in any

6   business what's identified?

7   A.    Beverage Marketing of PA.

8   Q.    And financial interest in any legal entity in business for

9   profit, what's identified?

10  A.    Beverage Marketing of Pennsylvania.

11  Q.    Is there another entity further to the right?

12  A.    Yes, there is, Kencon Partnership.

13  Q.    Is this the exhibit A. that accompanies this statement of

14  financial interest?

15  A.    Yes, it is.

16  Q.    With respect to creditors for Michael T. Conahan,

17  identified as Citizen's Bank?

18  A.    Correct.

19  Q.    Janney Montgomery Scott?

20  A.    Yes.

21  Q.    Community Banks?

22  A.    Yes.

23  Q.    With respect to question ten dealing with direct or

24  indirect sources of income, Michael T. Conahan identified

25  Kencon Partnership?

115

1    A.    Yes.

2    Q.    Beverage Marketing of Pennsylvania, judicial salary and

3    First National Community Bank, director?

4    A.    Yes.

5    Q.    For Barbara Ann Conahan is 21st and North Vine Street Real

6    Estate Partnership and 21st and North Vine Streets, Inc., as

7    direct and indirect sources of income?

8    A.    Yes.

9    Q.    With respect to question 14 which deals with financial

10   interest in any legal entity and business for profit, is

11   Barbara Ann Conahan identified for 21st and North Vine Street,

12   Inc., 21st and North Vine Streets Real Estate Partnership and

13   Hazleton Area School District?

14   A.    Yes.

15   Q.    On this statement of financial interest, is there a

16   disclosure of an interest from -- interest or directorship or

17   relationship with W-Cat?

18   A.    No.

19   Q.    How about Vision Holdings, receipt of anything of value

20   from Vision Holdings?

21   A.    No.

22   Q.    How about Robert Powell?

23   A.    Not on this form.

24   Q.    Mericle Construction?

25   A.    I don't see anything on this form.

1  Q.   I'm showing you Government's Exhibit 9.8.  What is this?

2  A.   Financial interest statement for Judge Michael T. Conahan

3  for 2004.

4  Q.   Again, is it signed?

5  A.   Yes.

6  Q.   Dated?

7  A.   Yes, March 1st, 2005.

8  Q.   And when does it indicate received?

9  A.   March 7th, 2005.

10 Q.   As far as the disclosure by Michael Conahan and statements

11 of financial interest, is there any real estate interest

12 disclosed?

13 A.   None on this one.

14 Q.   Gifts and honoraria?

15 A.   None as well.

16 Q.   Office or directorship or employment, does he identify

17 Beverage Marketing of Pennsylvania?

18 A.   Yes.

19 Q.   Trans-Med, director?

20 A.   Yes.

21 Q.   Looks like S/H?

22 A.   Yes.

23 Q.   FNCB director?

24 A.   Yes.

25 Q.   S/H -- shareholder perhaps?

117

1    A.    Shareholder, president, director.

2    Q.    These, again, are the instructions.  What's the disclosure

3    for Michael Conahan as far as creditors?

4    A.    Citizens Bank.

5    Q.    Is that Janney Montgomery Scott?

6    A.    Correct, and Community Bank.

7    Q.    That's for both of them?

8    A.    Yes, joint.

9    Q.    And with respect to question ten dealing with direct or

10   indirect sources of income, again it's disclosed Kencon

11   Partnership, Beverage Marketing of PA, judicial salary, First

12   National Community Bank, director and Trans-Med, director?

13   A.    Yes.

14   Q.    And for Barbara Conahan, 21st and North Vine Street and an

15   entity called RAB, trading as Ocean Auto Sales?

16   A.    Yes.

17   Q.    I'm showing you what's been identified as Government's

18   Exhibit 9.9.

19   A.    Financial statement for Judge Michael Conahan for 2005.

20   Q.    Okay.

21   A.    Signed February 28th, 2006, received March 30th, 2006.

22   Q.    Again, is there a disclosure of financial real estate

23   interests?

24   A.    None on this form.

25   Q.    Gifts or honoraria?

118

1  A.    None for gifts and honoraria.

2  Q.    With respect to direct or indirect sources of income,

3  directorships and financial interest in any legal entities, is

4  there a reference and attached Exhibit A.?

5  A.    Yes, as well as creditors.

6  Q.    And creditors are again identified as Citizen's Bank for

7  Michael Conahan, Janney Montgomery Scott for Barbara Conahan

8  and Community Bank for Barbara and Michael Conahan, correct?

9  A.    That's correct.

10  Q.    With respect to direct or indirect sources of income,

11  directorship and financial interests, there's several entities

12  that are identified for Michael Conahan and Barbara Conahan; is

13  that correct?

14  A.    Yes.

15  Q.    Including Beverage Marketing of PA, First National

16  Community Bank, director, and other holding entities, correct?

17  A.    Correct.

18  Q.    And this disclosure for 2005, is there any indication of

19  direct or indirect sources of income from Vision Holdings, PA

20  Child Care, Mericle Construction or any entities related to

21  those?

22  A.    Not indicated on this form.

23  Q.    I am showing you what's been identified as Government's

24  Exhibit 9.10.  What is that?

25  A.    Financial interest statement for Judge Michael Conahan for

119

1  the year 2006.  It's signed April 10th, 2007 and received April

2  18th, 2007.

3  Q.    Is that April 16th --

4  A.    16th, I'm sorry.

5  Q.    Now, is there a disclosure of real estate interest or

6  gifts or honoraria for Michael Conahan for that year?

7  A.    Not on this form.

8  Q.    How about creditors, indirect or direct sources of income,

9  office or directorship or financial --

10 A.    Exhibit A. attached.

11 Q.    And again, as far as creditors, Michael Conahan, Citizen's

12 Bank, Barbara Conahan, Janney Montgomery Scott, Michael and

13 Barbara Conahan, Community Bank, correct?  As far as direct or

14 indirect sources income, office or directorship of financial

15 interest, there was a series of entities that are disclosed by

16 Michael Conahan in the statement of financial interest; is that

17 right?

18 A.    Yes.

19 Q.    And what is disclosed is Beverage Marketing of

20 Pennsylvania, First National Community Bank and other entities;

21 is that correct?

22 A.    Correct.

23 Q.    Vision Holdings, PA Child Care, Western PA Child Care,

24 Mericle Construction, any entities related to those

25 organizations, Robert Matta, none of those are disclosed in

120

1  these statements of financial interest?

2  A.    Not on this form.

3  Q.    I'm showing you Government's Exhibit 9.11.  What is that?

4  A.    Judge Michael Conahan's financial interest statement for

5  2007.

6  Q.    Is it signed?

7  A.    It is.  March 3rd, 2008.

8  Q.    And what was the date it was received?

9  A.    It looks like March 20th.

10 Q.    2008?

11 A.    Correct.

12 Q.    As far as real estate interests, gifts or honoraria, none?

13 A.    None would be indicated.

14 Q.    As far as direct or indirect sources of income, creditors,

15 directorship or financial interest in any legal entity --

16 A.    There's an attached exhibit.

17 Q.    As far as creditors are concerned -- Michael Conahan,

18 Citizen's Bank, FNCB; is that right?

19 A.    Yes.

20 Q.    Barbara Conahan LPL?

21 A.    Correct.

22 Q.    Direct or indirect sources of income includes for Michael

23 and Barbara Conahan a number of entities?

24 A.    Yes.

25 Q.    As well as a number of entities that disclosed for

121

1  directorship and financial interest in entities?

2  A.    Correct.

3  Q.    Disclosed on this statement is Beverage Marketing of

4  Pennsylvania?

5  A.    Yes.

6  Q.    First National Community Bank; is that right?

7  A.    Yes.

8  Q.    And W-Cat, Inc.?

9  A.    Yes.

10 Q.    Now, is this the first time on the statements of financial

11 interest that we reviewed that W-Cat, Inc. appears; is that

12 right?

13 A.    Yes.

14 Q.    Are the other entities that I've previously reviewed with

15 you, Pennsylvania Child Care, Western PA Child Care, Robert

16 Mericle, Mericle Construction, Vision Holdings, any those

17 entities, Robert Matta, identified on this statement of

18 financial interest as having provided a gift or direct or

19 indirect source of income to Michael Conahan for calender year

20 2007?

21 A.    Not indicated on this form.

22 Q.    I have a few more mechanical questions for you.  You

23 indicated that all of these statements of financial interest,

24 they had a stamp on them?

25 A.    Yes.

122

1  Q.    That they had been received by the AOPC?

2  A.    Correct.

3  Q.    What are the two ways that the AOPC receives these

4  financial interests normally?

5  A.    Normally they arrive by mail.  The only other indication

6  -- the only way they can arrive is if somebody would walk it

7  over -- it would still be stamped -- if they were in the area.

8  From 2004 forward, you're able to file your financial interest

9  statement on line.

10  Q.    If a financial statement was filed on line.  Would it look

11  like the ones we just reviewed?

12  A.    They wouldn't be handwritten.

13  Q.    Would it have the stamp on it as -- as we just displayed?

14  A.    No, that's a hand stamp.  We have an indication when it

15  was received in the computer.

16  Q.    The signature -- would they be signatures like we have

17  seen --

18  A.    No, because you agree to an electronic signature.

19  Q.    Every year from 2003 through 2007 that are of interest to

20  us, what did the AOPC do with all of the statements of

21  financial interest that were received from all of the judges in

22  Pennsylvania?  Did they distribute them to any other government

23  body?

24  A.    After they are all submitted, which they need to do by May

25  1 for the previous calender year, at that point they are

123

1  organized, copied and a full set of those copies is sent to the

2  judicial conduct board.

3  Q.    And how is it sent to the judicial conduct board?

4  A.    UPS.

5  Q.    That was the practice for every year from 2003 through

6  2007?

7  A.    Correct.

8          MR. CONSIGLIO:  The government offers 9.1 through

9  9.11 for admission at this time.

10          MR. FLORA:  As to the financial interest statements

11 of Mark Ciavarella, Your Honor, no objection.  As to financial

12 interest statements of Michael Conahan, we continue to object.

13          THE COURT:  Okay.  As to the former, they are

14 admitted.  As to the latter they are admitted over objection.

15          MR. CONSIGLIO:  Thank you, Your Honor.  One final

16 matter before we proceed to cross examination for this witness.

17 I believe there's a stipulation between the government and

18 defense that the signatures of -- that purports to be of

19 Michael -- Mark A. Ciavarella, Junior on each of these

20 financial interest is the signature of the defendant on those

21 documents.

22          MR. FLORA:  That is correct, Your Honor.

23          THE COURT:  Okay.

24          MR. CONSIGLIO:  No further questions for this

25 witness.

124

1    CROSS EXAMINATION

2    BY MR. FLORA:

3    Q.   I just have a few questions for you.  With regards to the

4    what -- whatever came down from the Pennsylvania Supreme Court

5    in 1994 with regard to filing of financial interest statement

6    with members of the judiciary, would you agree we are not

7    dealing with a law that was adopted by the state legislature?

8    A.   Yes.

9    Q.   Okay.  With regards to the forms themselves the judges

10   fill out -- the bottom of the form where the signature goes,

11   would you agree with me there's nothing on that form which

12   indicates that the signature is under penalties of perjury?

13   A.   I guess you would just assume someone would be telling the

14   truth.

15   Q.   I am not asking you to assume.

16   A.   I'm sorry.

17   Q.   I am asking you any specific language on that form which

18   says the subject signing that form is signing it under

19   penalties of perjury?

20   A.   Supposedly it doesn't say that in black and white.

21   Q.   Didn't say that in black and white.  With regards to the

22   order the state supreme court handed down in 1984, is there

23   anything in that order which specifically says that if a judge

24   files a false financial form he has committed perjury under

25   law?

125

1  A.    None to my knowledge.

2  Q.    Is there anything in that order handed down by the Court

3  in 1984 which indicates if a judge false financial form which

4  he has committed falsification to authorities, which is a

5  Pennsylvania crime?

6  A.    Not in writing.

7  Q.    With regards to the financial interest form that the judge

8  actually signs, is there anything specifically in that form

9  which indicates that the filing of this form would be under the

10 crime of unsworn falsification to authorities if the form is

11 false?

12 A.    Listed on the form?

13 Q.    Yes.

14 A.    No.

15 Q.    With regards to the forms themselves, would you agree with

16 me that the judge does not have to put down the amount of money

17 that he receives from a particular source?

18 A.    You don't have to list amounts, but you have to list all

19 of the your direct or indirect sources of income.

20 Q.    My question is, would you agree with me there was nothing

21 on that form which indicates the judge must list the amount of

22 money that he receives from a source?

23 A.    What is indicated on the form it's over a specific amount,

24 which is on the instructions if you listed it.

25 Q.    Would you agree with me -- and again if it's over a

126

1    specific amount, the judge does not have to list the particular

2    amount?  Would you agree with me there?

3    A.    Yes.

4    Q.    Generally speaking, would you also agree with me that

5    judges from time to time list various sources of income on

6    those forms?

7    A.    Yes.

8    Q.    Would you agree with me that often times judges will list

9    other business interests that they hold?

10   A.    Yes.

11   Q.    And would you agree with me that often times judges will

12   list other investments that they have?

13   A.    Yes.

14   Q.    And would you also agree with me that when judges list

15   other business interests that they hold or other investments

16   that they hold that there's nothing under state law as far as

17   you know that precludes a judge from having an outside business

18   interest; isn't that correct?

19   A.    Correct.

20          MR. FLORA:  Nothing further, Your Honor.

21          THE COURT:  Is that it?

22          MR. CONSIGLIO:  A few questions on redirect, Your

23   Honor.

24   REDIRECT EXAMINATION

25   BY MR. CONSIGLIO:

127

1  Q.    You were asked in cross examination if there were

2  threshold dollar amounts that are required to be reported under

3  statements of financial interest and depending upon the

4  interest the dollar figures vary; is that right?

5  A.    Correct.

6  Q.    What is the dollar threshold for a gift?

7  A.    $250 or more.

8  Q.    Any gift over 250 bucks you got to disclose it?

9  A.    Yes.

10  Q.    How about direct or indirect sources of income?

11  A.    That would be 1,300.

12  Q.    So $1,300 of direct or indirect income you've got to

13  report?

14  A.    Correct.

15  Q.    And finally these documents when they are filed with you

16  at the AOPC, are they public record?

17  A.    Yes, they are.  They are -- can be viewed by the public

18  during normal business hours.

19         MR. CONSIGLIO:  With the Court's indulgence.  No

20  further questions for this witness.

21         MR. FLORA:  One brief follow-up question.

22  RECROSS EXAMINATION

23  BY MR. FLORA:

24  Q.    With regards to Mark Ciavarella's statements of interest,

25  how many members of the public actually looked at those?  How

128

1  many?  How many members of the public actually looked at Mark

2  Ciavarella statements of financial interest?

3        MR. HOUSER:  I make an objection.  Put a time on

4  there.

5  BY MR. FLORA:

6  Q.  With regards to the statements of financial interest that

7  you've identified here, during that period of time of those

8  financial interests of statements, how many members of the

9  general public actually examined those statements?

10  A.  Well --

11        THE COURT:  If you know?  Do you know how many people

12  --

13        THE WITNESS:  I don't know how many.

14  BY MR. FLORA:

15  Q.  Would you agree judges file those statements of financial

16  interest and no one looks at them?

17  A.  Yes.

18        THE COURT:  Thank you.

19        MR. CONSIGLIO:  Thomas Makowski.

20        THOMAS MAKOWSKI, called as a witness, being duly

21  sworn, testified as follows:

22        THE COURT:  Keep your voice up, please.

23  DIRECT EXAMINATION

24  BY MR. CONSIGLIO:

25  Q.  Good afternoon.

129

1  A.    Good afternoon.

2  Q.    Please state your name for the jury.

3  A.    Thomas A. Makowski.

4  Q.    Where are you currently employed?

5  A.    I'm vice president of marketing and business development

6  at Borson Lawson Engineering and Architecture.

7  Q.    How long have you held that position?

8  A.    One year.

9  Q.    And were you previously an elected official in Luzerne

10 County?

11 A.    Yes, I was.

12 Q.    What position were you elected to?

13 A.    I was county commissioner from 1996 until 2003.

14 Q.    Okay.

15 A.    From 1996 until 2001 -- the end of 2001 I was the chairman

16 of the county commissioners.

17 Q.    How many commissioners are there at any given time?

18 A.    There are three elected every four years.  Two of them

19 constitute the majority, and one is a minority commissioner.

20 Then the three commissioners elect a chairman.

21 Q.    So you're saying when you were elected your first term and

22 the first two years of your second term you were majority

23 commissioner and the chairman for Luzerne County?

24 A.    That is correct.

25 Q.    And in the last two years of your service, you were a

1  majority commissioner, but you were not the chairman?

2  A.    That's correct.   Tom Pisano was the chairman.

3  Q.    The last four years of your service as county commissioner

4  so, from 2000 to December 2003?

5  A.    That's correct.

6  Q.    Who did you serve on the Luzerne County commission with?

7  A.    Luzerne County board of commissioners from 2000 to 2003

8  were myself, Tom Pisano and Steve Urban.

9  Q.    And Steve Urban was the minority commissioner during that

10 time period?

11 A.    Yes.

12 Q.    I want to draw your attention to the Luzerne County

13 detention facility.   Do you recall that facility?

14 A.    Yes, I do.

15 Q.    Was that facility during your term as a county

16 commissioner an issue for discussion by the county

17 commissioners?

18 A.    Yes, it was.   Probably for all of the second term that I

19 held and probably part of the first term we had some issues

20 with the facility.

21 Q.    With a type of issues did you have with the facility?

22 A.    It was an old building.   It used to be an old women's

23 prison.   It was in disrepair.   There were rodent infestations,

24 bug problems, leaky pipes and heat problems.   We repaired it as

25 best we can to keep it functional, and the state routinely

131

1  approved it for use as a juvenile detention facility.

2  Q.    The approval you received from the state, that was often

3  referred to a license to use this facility?

4  A.    Yeah, we had a license.  They did a review, I believe, on

5  an annual basis to make sure the facility met the requirements

6  of state law.

7  Q.    Was there a discussion while you were county commissioner

8  that this older Luzerne County detention facility should be

9  replaced?

10  A.    Oh, yes, many of them.  It probably started in my first

11  term, but I can recall many discussions in my second term from

12  2000 to 2003 what we were talking about the need to -- either

13  repair or replace the facility.  We had applied for a grant.  I

14  believe we received a grant to do some repair work on it, which

15  we were considering.  We had also applied for some grant money

16  to build a new facility, but we were told that we had to go and

17  reapply for that grant because we didn't do it through the

18  proper procedures.

19       The discussion along the lines of that facility was that

20  it was needed desperately for us to do something to repair or

21  place it.

22  Q.    Now, as of 2001, had the county commissioners taken steps

23  to start to replace this facility?

24  A.    We had many discussions.  There were some discussions

25  internally about where we would build one, how we would build

1  it, what design it would have, how we would finance it.  So,

2  yes, we were talking along the lines of doing something -- as

3  in an all things in government, I mean those things move

4  slowly.  But we were certainly moving towards doing something

5  to replace that facility as early as 2000 and 2001.

6  Q.   Who was a part of the conversation -- this wasn't just

7  talk between commissioners.  Was there other parts of county

8  government that were involved in building of a new facility as

9  early as 2001?

10  A.   Yes, our staff, which would be the county engineer, county

11  solicitor, the director of Children and Youth Services for the

12  county, director of human services for the county and obviously

13  the director of probation and parole.

14      We were all in discussions over a many year period talking

15  about the facility and what we could do to replace it.

16  Q.   I want to draw your attention to outside proposals that

17  were brought to your attention as a way so the county wouldn't

18  have to build a facility.  Do you recall being apprised of a

19  possibility of leasing or purchasing another facility instead

20  of county building its own?

21  A.   Yes, I do.  Sometime in 2000, probably in the early

22  summer, I received either from the Court or from probation or

23  the court administrator a proposed lease purchase agreement

24  from PA Child Care to be reviewed by the county commissioners.

25      I remember sending -- circulating it to the county

133

1  solicitor, county engineer, chief clerk and the other

2  commissioners asking them to take a look at it and determine

3  whether or not this was a possibility we can consider to

4  resolve the issue of our presently existing facility.

5  Q.    I'm showing you on the screen Government's Exhibit 29.4.

6  What is this?

7  A.    That's the note I just referred to I sent to Tom Pisano,

8  Steve Urban, Jim Patte, Jim Blaum, the county solicitor, Jim

9  Torbik, the chief clerk and Jim Brozena, the county engineer

10 circulating that lease purchase agreement that I received.

11 Q.    The date on this is July 2nd, 2001?

12 A.    That's correct.

13 Q.    This is a note card from your desk?

14 A.    Stationary from my desk I used to write notes.  That's my

15 signature on the bottom right-hand corner.

16 Q.    You identified on the top right-hand note is confidential.

17 Why is this confidential?

18 A.    It's a consideration for a lease or a lease or a contract

19 so that we would discuss it internally and determine whether or

20 not it was something that we interested in doing.  We were

21 going to negotiate.  We certainly didn't want to do in it in

22 public.

23 Q.    You identified in this note -- you referred to Tom.  Is

24 that the Tom Pisano, fellow majority commissioner?

25 A.    Yes.

134

1  Q.    Steve Urban?

2  A.    Steve Urban.

3  Q.    Minority commissioner?

4  A.    Yes.

5  Q.    The courts asked us to review the attached proposal for a

6  new detention facility?

7  A.    Yes.

8  Q.    As an option to us; is that correct?

9  A.    Yes.

10  Q.    Do you recall today who from the courts provided this

11  proposal to you?

12  A.    No, I don't.

13  Q.    But it occurred in July of 2001?

14  A.    That is correct.

15  Q.    You also identified as an option to us this may be one way

16  we negate the need to bond money, et cetera?

17  A.    Correct.

18  Q.    By this note, is this -- does indicate your recollection

19  about how far along you were in building your own facility?

20  A.    Yes, it helps a little bit.  It -- I clearly remember that

21  we were talking along the lines of building a private -- or a

22  public facility ourselves and talking about bonds and how much

23  money we were going to have to spend when I received this.  So

24  obviously I was indicating that we may -- not to have forego

25  down the route of doing a bond issue if we were to lease or

135

1  purchase another facility but the numbers had to be right.

2  Q.    I am showing you the attachment to this.  Was the

3  attachment that you circulated for the other commissioners and

4  county officials?

5  A.    Yes, this is.

6  Q.    This is lease purchase agreement between Pennsylvania

7  Child Care, LLC as lessor and County of Luzerne, Pennsylvania

8  as lessee dated as of July 1, 2001?

9  A.    Correct.

10  Q.    As best as you can recall, what was the terms of this

11  proposal?

12  A.    The proposal was a 30-year lease for approximately a

13  million dollars or a million two per year, and then there was

14  at the end of the lease a buyout for an additional payment so

15  that the county could then own the facility free and clear.

16  Q.    Now, you indicated that you circulated it to the

17  commissioners.  You indicated you circulated it to Jim Brozena?

18  A.    Yes.

19  Q.    Who is Jim Brozena?

20  A.    County engineer.  He basically is in charge of all

21  buildings in the county along with other engineering duties.

22  And we counted on him with regard to any construction or

23  different types of things we were going to do as to the costs,

24  integrity, different various things that we do regarding

25  buildings.

136

1  Q.    Did you get a response from Jim Brozena?

2  A.    Yes, I did.

3  Q.    Okay.  I am showing you Government's Exhibit 1.12.  What

4  is this?

5  A.    It's a letter dated July 10th, 2001 addressed to me

6  regarding the juvenile detention center and indicating a number

7  of terms that were interpreted by the county engineer's office

8  regarding the lease purchase agreement from PA Child Care.

9  Q.    Was there an assessment as to the financial lethica of

10  this project?

11  A.    Yes.  According to the letter signed by Jim Brozena, his

12  analysis indicated that the cost of the facility for 30 years

13  would be approximately $37 million and then the lease purchased

14  it -- that's to lease it.  If we lease purchased it, it could

15  be anywhere from $37 million to $44 million.

16  Q.    And what would it cost as far as your estimate was to

17  build your own facility?

18  A.    Our estimates were between 7 and 9 million and with

19  financing it might be as high as $15 million.  I point out that

20  I believe this facility was a little different in size than the

21  facility we were looking at.  The one we were going to build, I

22  think, was a little smaller than this one.

23  Q.    What was the end result of this proposal from PA Child

24  Care to have Luzerne County lease purchase their proposed

25  facility?

1  A.    Well, it went along on a parallel stream sort of along

2  with the county trying to build their own facility for the

3  remainder of my years in office.  I mean, we talked about this

4  option as something that we would consider.  I tried to keep an

5  open mind and -- and continually talk with the other

6  commissioners about taking a look at that along with our other

7  alternative.

8       I remember at some point we even talked about purchasing

9  that building outright rather than leasing if it was possible.

10 But I believe we never resolved any kind of a compromise on the

11 price.  So we continued our efforts to build the county

12 facility while Pennsylvania Child Care was still on the table

13 for us as a consideration.

14 Q.    At the time of this proposal in July 2001, did you have

15 any idea how far along Pennsylvania Child Care was into the

16 development of building their own facility?

17 A.    No, I don't think I did.  I certainly knew that they were

18 going to be able to move it along a lot faster than the county

19 was.  So I am not sure exactly how far along they were.

20 Q.    From this point forward in July of 2001, do you recall any

21 steps that you took even by the end of the year, 2001, to get

22 the -- a new facility built by Luzerne County?

23 A.    We had many discussions internally with our staff,

24 Children and Youth with the engineering office.  At some point

25 we hired a consultant to do some work on a -- some renderings

138

of some -- the facility design.  We were approved for a
Department of Justice grant and went to Colorado to see a
facility that was built by I think the National Bureau of
Prisons.  We saw a state-of-the-art juvenile facility there.
We --

Q.    When you say we, does that include yourself?

A.    Yes, I was there along with four others from the county on
the contingency from the Department of Justice allowing us to
observe this facility.

Q.    When was that trip?

A.    I believe late in the summer of 2001.  So I would say
around August, September of 2001.  And then we attended daily
classes for several hours a day where they explained to us how
to build these facilities, how to finance them, how large a
facility do you need, what's state-of-the-art these days.  So
it gave us an idea about what we should do to build our
facility, should we pursue that line of construction.

Q.    By the end of the year 2001, had there been steps taken by
the county to start to get the funds necessary for the building
and so forth?

A.    Well, I did -- as I said before, I talked about many times
doing a bond issue to get the county facility moving forward.
I believe at the end of 2001, I indicated publically that we
were going to bond some money in the very short near future
with regard to us moving forward with our facility.  So I --

139

1  I'm not -- I don't think we did -- I know we didn't do the bond
2  issue then.  I know we were talking about it, and I was hoping
3  that I can get it on the commissioners' agenda at some point
4  before the end of the year.
5  Q.    Did anything happen from the end of 2001 through -- let's
6  go to October of 2002 -- for the actual building of a new
7  detention facility by Luzerne County?
8  A.    To the best of my recollection, again, we were talking
9  with possibilities of purchasing the Pennsylvania Child Care
10 facility if that was feasible.  Still on the table were the --
11 was the possibility of leasing it as well.  And Luzerne
12 County's facility, I believe we continued to discuss the
13 possibilities of doing the bond issue and moving forward with
14 other plans for the construction of the facility.
15 Q.    I want to draw your attention to October 2002.  Were there
16 budgetary hearings going on at that time?
17 A.    Yes, every year we would hold budget hearings late in
18 October, November, towards the commissioners completing the
19 budget, which was required to be done by the end of December.
20 So in October of 19 -- excuse me 2002, we did hold budget
21 hearings for every department as we did every year.
22 Q.    So you hold those in October, hoping to get a budget
23 together by when?
24 A.    By the middle to the end of December we were required by
25 state law to have the budget together.  And --

140

1  Q.    That's the budget for the coming year?

2          THE COURT:    Can we get to the point whether they

3  decided to build it or not build it?

4          MR. CONSIGLIO:    Unfortunately this is the way the

5  process went, Your Honor.    I think the answer is going to get

6  here.

7  BY MR. CONSIGLIO:

8  Q.    What happened in October of 2002 with respect to the

9  budget from the courts?

10 A.    At a budget meeting, the court administrator came to the

11 budget meeting and indicated to the -- to the county

12 commissioners or to the county that they were going to close

13 the juvenile detention facility that we presently owned by the

14 end of the year.

15 Q.    Now, did they indicate they were going to close the

16 juvenile detention facility, or what did they indicate they

17 were going to do?

18 A.    They indicated that they were not going to send children

19 to that -- to -- juveniles to that facility any longer after

20 December 31st.

21 Q.    After December 31, 2002 they were no longer going to send

22 children to the old juvenile detention facility?

23 A.    Correct, the gentleman -- the court administrator came in

24 and explained that because of the deplorable conditions at the

25 facility that they were no longer going to send children there.

1  Q.    How did you respond?

2  A.    Well, we tried to figure a way where we could resolve the

3  issue so we can we can reopen the facility.  We thought about a

4  lot of things.  Initially we were extremely concerned because

5  the cost of the county by not having that juvenile detention

6  facility was going to certainly cause us some problems in our

7  budget.  But we hoped that we could resolve it through some

8  discussions with the Court so that we could reopen that

9  facility and avoid that additional charge.

10     I remember that I tried to -- in every way possible void

11  any kind of confrontation.  We had a good relationship with the

12  Court, and we wanted to try to keep it that way.  So I tried to

13  find a way that we could resolve this so we can reopen that

14  facility and continue to use it instead of having to send our

15  children elsewhere.

16  Q.    Now, you indicated that you wanted to avoid conflict with

17  the Court.  Were you preparing for conflict with the Court?

18  A.    We certainly looked at every -- every avenue available to

19  us, and the county solicitor's office reviewed the potential

20  for some kind of litigation.

21     But in the long run, it just didn't seem as though we

22  would be in a very good posture to do anything with regard to

23  trying to reopen the old facility.  We -- I went so far as to

24  have discussions with the regional director of Children and

25  Youth Services for the state about the license and whether we

142

1  could get it back.  They indicated that under certain

2  conditions we could get it back but it was going to require us

3  to do something -- some work in the facility, that it wasn't

4  just going to be a simple process of getting the license back.

5  So --

6  Q.    Let me interject for a moment.  We haven't spoken about

7  the license going back.  I want to show you the commissioners

8  meeting notes from November 20th, 2002, Government's Exhibit

9  29.6.  Were you present at the county commissioner meeting?

10 A.    Yes, I was.

11 Q.    And was there a request made by the public or public

12 comment about the Court's decision to close down -- to no

13 longer send juveniles to this facility as of December 31, 2002?

14 A.    Yes, the public comment section someone asked a question.

15 Q.    And did you respond to that and make a public comment?

16 A.    It seems apparently I did.

17 Q.    What did you indicate?

18 A.    It said that -- I said at that meeting that we needed a

19 new facility but the present facility is a -- unusable and if

20 the county decides to construct a new one we hope we don't have

21 to go through litigation.  We're hoping we can work through the

22 issues together with the Court.

23 Q.    But as early as November 2002, you're contemplating

24 litigation with the Court?

25 A.    Yeah, I said it was one of the options we were considering

143

1    and our solicitors were reviewing, of course.  If we can get

2    the facility open again until we built a new facility, we would

3    have liked to have done that if we can be assured the kids were

4    going to be sent there.

5    Q.    Did you ultimately approve a budget?

6            THE COURT:  We will take a ten-minute recess, okay.

7            (A brief recess was taken.)

8            THE COURT:  Please sit, counsel.

9    BY MR. CONSIGLIO:

10   Q.    Mr. Makowski, before we left off before the break, you

11   were -- you were making reference to Government's Exhibit 29.6,

12   which was minutes from a commissioner's meeting in November of

13   2002; is that correct?

14   A.    That's correct.

15   Q.    And this is in the wake of the Court notifying the

16   commissioners that they were no longer going to send juveniles

17   to the then existing Luzerne County Juvenile Detention Center?

18   A.    That's correct.

19   Q.    I did want to clarify one part of what you had read from

20   those minutes.  These were comments attributed to you.  You had

21   indicated, I believe, that the facility was unusable when you

22   first testified.  But actually what the minutes read is

23   Commissioner Makowski feels a new facility is needed but the

24   present facility is usable if the county decides to construct a

25   new one.  He hopes it does not have to go through litigation

144

1   and that they are able to work through the issues?

2   A.   That's correct.

3   Q.   Word you used was usable?

4   A.   That's correct.  I apologize for the error.

5   Q.   You had mentioned that the Court said it was not going to

6   send any more kids to this facility.  Who's the ultimate

7   decider on budgets for Luzerne County?

8   A.   County commissioners.

9   Q.   At the end of 2002, did you approve a budget for 2003?

10  A.   We did.

11  Q.   Did you include in that budget financing for the employees

12  that would be necessary for the Luzerne County Juvenile

13  Detention Facility?

14  A.   No.

15  Q.   Why didn't you?

16  A.   The Court had removed the employees for the juvenile

17  detention facility from their budget, and we adopted the budget

18  as the Court submitted it to us.  Since we realized the Court

19  wasn't going to send juveniles to the detention center and

20  their intention was not to have workers at that facility, we

21  had -- we were in a very difficult position and adopted the

22  budget as the Court submitted to us.

23  Q.   You mentioned earlier in your testimony that the license

24  was returned to the state.  You made some reference to it

25  earlier in your testimony.

145

1    A.    Yes, I did.

2    Q.    I want to draw your attention to the end of 2002 --

3    December of 2002.  When did you become aware that steps were

4    taken with respect to the license for the Luzerne County

5    Juvenile Detention Facility?

6    A.    I'm not exactly sure whether it was the end of 2002 or

7    beginning of 2003.  But at some point, I was told that our

8    license has been returned to the Department of Public Welfare

9    and that we no longer were holding a license to operate the

10   presently existing Luzerne County Juvenile Detention Facility.

11   Q.    Were you consulted before this license was returned to the

12   Department of Public Welfare?

13   A.    Personally, no.

14   Q.    Were you aware whether the -- the Luzerne County

15   commissioners were consulted before this action was taken?

16   A.    No, I don't believe so.

17   Q.    Were you informed what entity did return this license?

18   A.    I was informed that it was the Court, and I don't know

19   who.  I don't recall who anyway at least, but it was the court

20   of common please that returned the license to the state.

21   Q.    Did you take any steps to try to get the license back?

22   A.    Yes, I did.  We talked internally about again -- as I

23   referred to earlier about our posture with the Court and our

24   attempts to compromise on these issues, we also talked about

25   the potential for litigation.  But we had hoped that we could

146

1    resolve this amicably.  So I contacted the northeast region of

2    the Children and Youth Services and asked them -- as I am

3    reiterating -- what we can do to have the license returned.

4    They told us they would be able to reissue the license but we

5    have to go through a review, spend some money on upgrades or --

6    actually that's the better word -- fixing up some of the

7    presently existing conditions.

8         So we discussed that internally amongst the staff.  And we

9    looked at the potential of getting the license back, doing the

10   work that was necessary and spending money on it.  The Court

11   had already indicated we had adopted a budget with no juvenile

12   detention workers, and the Court had already indicated to us

13   that they were no longer going to send juveniles to the

14   facility.

15        And we just made an internal decision that it was better

16   if we didn't pursue that avenue, it might be fruitless.

17   Q.   I am showing you what's been identified as Government's

18   Exhibit 29.3.  Is this your letter to Mr. Len Pocius of the

19   Northeast Regional Office of Children and Youth Services?  This

20   for the Department of Public Welfare?

21   A.   Yeah, that's correct.

22   Q.   This is your letter January 9th, 2003?

23   A.   Yes.

24   Q.   Does this concern the actual return of the license and

25   your attempts to get it back?

147

A.    Yes.   We requested a return of our certificate of

compliance, which is technically the license I believe.

Q.    So references to license and certificate of compliance,

they are interchangeable?

A.    Yes.

Q.    And did you receive a response from Mr. Pocius?

A.    Yes.

Q.    I am showing you a portion of Government's Exhibit 29.2.

What is this?

A.    Letter dated January 14th, 2003 to me from the Northeast

Region of Pennsylvania Children and Youth Services, Leonard

Pocius, regional director, indicating he received my letter and

outlining to us what we can do to possibly reopen our center

and get our certificate of compliance back.

Q.    It also identifies that -- according to Mr. Pocius, he

agrees the Luzerne County commissioners are, in fact, the legal

authority for the operation of the juvenile detention center,

given the fact that it's no longer being used, et cetera?

A.    Yes.

Q.    And the letter goes on to describe the conditions that

must be met for Luzerne County to get this facility compliant

and available?

A.    And get our certificate back, correct.

Q.    Now, as of the time that this certificate of compliance

was sent back as of December 31, 2002, the license for this

148

1  facility was still in good standing with the Department of

2  Public Welfare, wasn't that correct?

3  A.    Yes.

4  Q.    While these events are going on with the old Luzerne

5  County Detention Facility, what steps are taken for the new

6  facility at the same time period?

7  A.    Now approximately early 2003, correct?

8  Q.    Yes.

9  A.    Again, we were moving forward on our pathway to hopefully

10  start the process for construction of the Luzerne County

11  Juvenile Detention Center.  Sometime in the early part of 2003,

12  the commissioners on the agenda approved a bond issue for the

13  construction of a facility.  I believe the approximate amount

14  of the money -- money that was in that bond issue was

15  approximately $9.5 million for the construction of a juvenile

16  detention center for Luzerne County.

17  Q.    I'm showing you what's been identified as Government's

18  Exhibit 29.5.  These are minutes from the commissioners'

19  meeting of January 15, 2003.  I will draw your attention to the

20  -- page eight of those minutes.  Is this the bond issue that

21  you made reference to?

22  A.    Yes, it is.

23  Q.    And this is a request for $27 million in bond

24  approximately?

25  A.    Correct, correct.

149

1  Q.    And item No. 1 for that bond is designing, acquiring,

2  constructing, installing, furnishing and equipping of a new

3  juvenile detention center of the county?

4  A.    Yes, that is correct.

5  Q.    That's what the bond was for as of January 15, 2003?

6  A.    Well, there were a number of items, as you can see, in the

7  bond issue that we covered with that $27 million.  And, of

8  course, we indicated that's what we wanted to do with the

9  money, but, you know, that's -- that's just a mechanism by

10  doing the bond issue.  I mean, we can spend the money in other

11  places, but we had to at least initially determine and indicate

12  to the public where this bond issue money was intended to be

13  spent.  One of them clearly was the juvenile detention

14  facility.

15  Q.    The old detention facility is closed December 31st, 2002?

16  A.    Yes.

17  Q.    Where are the juvenile going from that day on?

18  A.    I don't know specifically.  At some point at a

19  commissioners' meeting we approved some per diem rate contracts

20  for five or four or six outside-of-the-county juvenile

21  detention facilities to send the kids to.

22  Q.    Okay.

23  A.    I don't remember exactly what meeting that was at, but we

24  approved the -- the per diem rates for other facilities for the

25  Courts to send the children to other than the juvenile

150

1  detention center.

2  Q.   Was it your understanding that Luzerne County was sending

3  its committed juveniles to a variety of institutions?

4  A.   Yes, we -- we -- we never monitored kids when we were

5  adjudicated, so we certainly wouldn't have any authority to

6  monitor where they were going when they were going in

7  detention.  But we had to approve a contractual rate for those

8  facilities to be used.

9  Q.   You knew the one place they weren't going was the old

10  Luzerne County Juvenile Detention Center?

11  A.   Yeah, that was closed, and there were no employees there.

12  Q.   I will show you Government's Exhibit 29.1.  These are

13  commissioner meeting notes from February 5th, 2003.  Go the

14  eighth page of those notes.

15  A.   Okay.

16  Q.   Having reviewed these notes from your commission meeting,

17  does this assist you in recalling the different facilities you

18  approved for the county to send juveniles to?

19  A.   Yes, it does.  There were -- looks like at least six

20  different facilities that we -- we approved contracts with to

21  use as a detention facility pending the either outcome of -- --

22  or pending the construction, I believe, of a new center from

23  Luzerne County by the commissioners.

24  Q.   And one of those facilities that was approved by the

25  commissioners was for PA Child Care, LLC?

1  A.    Correct.

2  Q.    And for the time period for that contract was January 1,

3  2003 through December 31st, 2003 at rate of $268 per diem?

4  A.    Yes.

5  Q.    Now, was it your understanding when you approved this

6  contract that was one of multiple facilities the Luzerne County

7  Courts were going to use to commit juveniles?

8  A.    Yes, they could use any -- once the rates were approved,

9  they can use any of these facilities to hold juveniles in

10  detention.

11  Q.    An included reference in this motion is for -- to approve

12  a contract with Dauphin County, Lackawanna County and other

13  locations, Northampton County; is that right?

14  A.    Yes.

15  Q.    When the vote for that -- those contracts was made on

16  February 5th 2003, you voted in favor of PA Child Care and

17  these other county facilities being contracted with of Luzerne

18  County?

19  A.    Yes.

20  Q.    Do you know anyone who dissented in the vote?

21  A.    I believe Commissioner Urban dissented on the vote to PA

22  Child Care.  I believe he concurred in the vote on the other

23  facilities.

24  Q.    Describe for the jury if you could, Mr. Makowski, what

25  happened after you issued this bond for the building of a new

152

facility for Luzerne County.  You indicated in January 2003 you
got $27 million bond issuance and some of that was for new the
detention facility.  Describe for the jury what happens from
there for the new facility?

A.   Well, the county was continuing on its plan to build a
facility itself.  We still thought that financially it was the
better option for us to take.  We were doing renderings.  We
hired a consultant.  The engineer was working on it.  We had --
at one point I pitched the idea of actually putting juveniles
in the Valley Crest Nursing Home that the county owned.  There
was a wing of the nursing home -- a very large nursing home by
county standards.

There was a wing that was vacant.  But we ran into some
road blocks with trying to use that because there were
requirements by law you can't put juveniles in certain places.
So we were unable to utilize the Valley Crest facility itself.
But we did come up with the idea that we can utilize the land
we owned, which was about 60 or 80 acres of land around the
nursing home to potentially build our new juvenile detention
facility.

So in the process of going forward with the bond issue, of
getting everything in order to start designing our own juvenile
detention facility, we also identified the land at Valley Crest
Nursing Home in Plains Township to build our facility.

Q.   Now, what happened with that plan to use the Valley Crest

153

1  location for this new juvenile detention facility?

2  A.    We were required by state law that we have to get a zoning

3  variance for that juvenile detention facility to be built in

4  that zone in Plains Township.  So we -- the county applied to

5  the Zoning Board of Plains Township for a variance in order to

6  get approval to build a juvenile facility on that land.

7       And at some point during the year, we were given approval

8  by the Plains Township Zoning Board to go ahead.  And they

9  changed -- approved the request of the county.  And we were

10 then authorized to go forward and to build our facility there.

11 Q.    But did anything stop that?

12 A.    Well, by law you're allowed to object.  I mean, there is

13 an objection process, and there were some objectors to the

14 facility being built there.  And so as a right, once the

15 objection occurs, then Plains Township zoning and the objectors

16 proceed further on the objections and the county is sort of out

17 of the picture at that point.  It goes to the court of common

18 pleas for further disposition.

19 Q.    Was that litigation resolved by the time your term as

20 county commissioner ended?

21 A.    No, it wasn't.

22 Q.    When did your term as county commissioner end?

23 A.    I left office in December of 2003.  And at the time I left

24 office, there had been no final decision on the ability to use

25 that land at Valley Crest to build the juvenile detention

154

1  facility.

2  Q.    Who replaced you as county commissioner?

3  A.    Commissioner Urban remained.  He ran for reelection.  Re

4  remained minority commissioner.  Commissioner Pisano and myself

5  did not run for reelection that year.  We were replaced by

6  commissioners Greg Skrepanek and Commissioner Todd Vonderheid.

7  Q.    Back to February 5th, 2003.  When you proved the contract

8  to commit juveniles to Pennsylvania Child Care, at the time you

9  voted in favor of that contract to commit Luzerne County

10 juveniles to that facility, were you aware that Luzerne County

11 judges were scheduled to receive funds from the builders of

12 Pennsylvania Child Care?

13 A.    No.

14 Q.    If you were aware, what would you have done?

15 A.    I would not have approved the contract with that facility

16 for that per diem rate, and I would have conducted some kind of

17 an internal investigation.

18        MR. CONSIGLIO:  With the Court's indulgence for a

19 moment.  A couple follow-up questions.

20 BY MR. CONSIGLIO:

21 Q.    At the time that you were in your second part of your last

22 term, last couple years that you were county commissioner, who

23 was the president judge for Luzerne County?

24 A.    Judge Michael Conahan became president judge, I believe,

25 in 2000 -- January of 2002.  I served under three president

155

1  judges, Judge Joseph Augello before Judge Conahan and Judge

2  Patrick Toole, Senior -- excuse me -- junior before that.  So

3  it would have been Judge Conahan in the last couple years I was

4  county commissioner.

5  Q.    So the budget proposal in October 2002 where it's

6  presented to the commissioners that their courts are no longer

7  going to send juveniles to the old Luzerne facility, that was

8  during the tenure of Michael Conahan as president judge?

9  A.    Yes, that would be correct.

10  Q.    At that time, who was the juvenile court judge for Luzerne

11  County?

12  A.    In 2002 would have been Judge Mark Ciavarella.

13          MR. CONSIGLIO:  Your Honor, I move for the admission

14  of Government's exhibits.  I believe they have admitted in the

15  previous stipulation if I am incorrect.  I will ask opposing

16  counsel.  They are all admitted.

17          MR. FLORA:  No objection from the defense.

18          THE COURT:  Thank you.  They are admitted.

19  CROSS EXAMINATION

20  BY MR. RUZZO:

21  Q.    Mr. Makowski, as a commissioner you are aware, are you

22  not, that the commissioners in effect control the purse

23  strings, correct?

24  A.    Yes, sir.

25  Q.    And as a practical matter, it's the commissioners who

1  really decide where juveniles are detained or placed; isn't

2  that correct?

3  A.    I believe that if we provided a juvenile detention

4  facility for the Court that they would then send children or

5  the juveniles to that facility.

6  Q.    So if you don't have an agreement -- if I own a juvenile

7  facility and I don't have an agreement with the commissioners

8  to pay me, I'm not accepting any juveniles; is that correct?

9  A.    Let me just -- if I could -- maybe I can answer the

10  question this way.  The county regularly received contracts for

11  per diem rates for facilities to be utilized by the Court,

12  whether it's post adjudication or detention preadjudication.

13  We routinely approve those per diem rates sometimes

14  retroactively.  So it was not -- it's not unusual that there

15  may be a use of a facility by the Court without a contract that

16  had been approved by the commissioners but we eventually get to

17  do it.

18  Q.    It's temporarily.  If you don't approve it, eventually

19  they can't send children to that particular facility.  They

20  can't be paid?

21  A.    Again, I know that we've had occasion that I remember

22  specifically over the years where the judges would -- after

23  they just indicate a child delinquent would send them to

24  various facilities across the country and we may or may not

25  have had contracts signed with them but we always did do it

1  even if it was retroactive.  Your answer is yes.  If we don't

2  approve it, they don't get paid.

3  Q.   They can send somebody on a temporary basis but that would

4  be very temporary if you refused to pay the facility?

5  A.   I don't recall in my years we ever refused to pay a post

6  adjudication facility.

7  Q.   For example, you were shown a list of juvenile facilities

8  that you voted for to approve per diem rates.

9  A.   Yes, sir.

10 Q.   And you said you wouldn't have voted for Pennsylvania

11 Child Care under certain circumstances, correct?

12 A.   Yes.

13 Q.   So if you don't vote for that and they don't have a

14 contract, they are not one of the places you approve, children

15 aren't going to go there?

16 A.   I would think that would send a message -- I agree.  I

17 don't remember not approving a contract with a facility.  This

18 is the first time we saw detention on the agenda.  It was

19 always rehabilitation.  I think clearly -- you're right.  We

20 would have sent a message saying, we are not going to pay this

21 right now and that facility would have been on notice.

22 Q.   Eventually, Mark Ciavarella came to you and encouraged you

23 -- this is back in the early days before the juvenile facility

24 was even closed.  I am bringing it to that time frame.  He

25 asked you to use your influence or your office to have the

158

1  county build a new juvenile facility, correct?

2  A.    Yes, he did.

3  Q.    Do you recall when that was?

4  A.    No, I don't.

5  Q.    Before the juvenile facility was closed?

6  A.    I would think that -- I would think that was accurate.

7  Q.    But his emphasis to you was, he wanted the county to build

8  it, correct?

9  A.    Yes, I do recall that there were times when the courts

10  either through a judge or court administration had indicated

11  they wanted the county to build a facility.

12  Q.    And it's -- would you agree with me that many times you

13  had heard people either from juvenile probation or from the

14  bench about the conditions of the old juvenile facility?

15  A.    Yes.

16  Q.    And they complained about the rodent infestation?

17  A.    Yes.

18  Q.    The security was complained about; is that correct?

19  A.    Yes.

20  Q.    And just a general condition of the old facility, correct?

21  A.    Yes, as I indicated, it was an old building and it was in

22  need of replacement.

23  Q.    And some people were appalled at the facility itself,

24  correct?

25  A.    Well, I don't know about that, counselor.  I know that the

159

1  state approved that facility for use on an annual basis for at

2  least -- I believe it was an annual basis.  So we tried to keep

3  the thing in repairs as much as we could.  And, you know,

4  realizing most of the kids were there for a period of probably

5  three to five days, we did our best to keep that facility in as

6  good repair as we could.

7  Q.    You had -- are you in possession -- or did you recall

8  reading the Strack Associates (ph.)  engineering surveys?  I

9  believe you commissioned them.

10 A.    We had consulted Strack Associates.  I don't recall those

11 and --

12 Q.    And do you recall -- if I refreshed your recollection, I

13 say that the Strack assessments in '98 and 2001 said that the

14 place was beyond repair and a new facility had to be built?

15 A.    That would probably be correct, yes.

16 Q.    So let's -- going back now from 1998 and 2001 that those

17 engineering surveys that you -- as commissioners commissioned,

18 their assessment was a new facility is necessary?

19 A.    Yes.

20 Q.    And they believe the old facility was not usable, correct?

21 A.    Well, it was usable, but it should have been replaced.

22 Q.    Now, you referred to a letter that -- it was a

23 confidential letter?

24 A.    It was a note, handwritten note by me.

25 Q.    Note.  And you said that the Court encouraged you or at

160

1  least asked you to take a look -- the commissioners to take a

2  look at the feasibility of a lease purchase agreement, correct?

3  A.    Yes.

4  Q.    And do you know who the president judge was at that time?

5  A.    2001, that would have been Joseph Augello.

6  Q.    Now, when the judges -- or when -- at least when Mark

7  Ciavarella approached you and suggested that the county

8  undertake some assessment and some feasibility of a new

9  facility, he told you he didn't think the conditions were

10 livable, correct?

11 A.    I can't remember the specific conversation, but I'm sure

12 that -- I mean over the years Judge Ciavarella and others had

13 indicated to us that they really wanted a new facility.

14 Q.    Now, while the juvenile facility was closed -- and by the

15 way, the Courts didn't really have the power to close a

16 facility; is that correct?

17 A.    Well, the license or the certificate of compliance was in

18 the name of the Luzerne County commissioners.  But when we got

19 a note -- excuse me.  When we got a message through the court

20 administrator that the children -- the juveniles were no longer

21 going to be sent there and we also -- we saw that the Court had

22 removed the juvenile detention workers from the budget, we kind

23 of realized or thought that it would -- was pretty clear that

24 the Court didn't want to use that facility any longer.

25 Q.    The Court removed from its budget, correct -- they removed

161

1  the money from its budget?

2  A.    Yes.

3  Q.    Essentially if the Court takes money out of their budget,

4  it reverts to the county.  They just took it out of their

5  budget.  They said, you want to use a juvenile facility, use

6  your own money, we are not putting it in your budget; isn't

7  that right?

8  A.    I can't answer that question clearly because the state

9  contributes towards the salaries of employees that work for

10  juvenile detention or probation.  I also don't know because

11  there may have been other funds that the Courts were -- that

12  Courts had available to them that the county didn't.  There

13  were many times when the Courts would provide funding for

14  things that they had in their budget through either state funds

15  or other ways that would help the commissioners in balancing

16  the county budget.

17        So I can't remember exactly whether that would fall --

18  those workers would fall in that category.

19  Q.    If the Court removed -- let's say the Court removed from

20  its budget, the county could still -- if they wanted use their

21  own funds could still fund the building of a new facility,

22  repair the old facility or what you wanted to do.  And as a

23  matter of fact, you can hire personnel if you wanted to?

24  A.    That's correct.

25  Q.    So although the Court removed it from its budget, it was

162

1  possible for the county to fund its own building of a new

2  facility or repair of the old facility; isn't that correct?

3  A.    That's correct.

4  Q.    And while the facility was being -- when I say the

5  facility was not being used, the county had to send their

6  juveniles out of county, correct?

7  A.    Or to some other facility, yes.

8  Q.    And you were aware -- are you aware that they were being

9  funded almost a hundred percent level?  They were being

10 reimbursed between state and federal funds -- Luzerne County

11 was being reimbursed for practically the whole cost?

12 A.    The county is regularly reimbursed for per diem rates at

13 juvenile detention and also for per diem rates in

14 rehabilitation.  But there's a state maximum limit on the

15 amount that's paid for -- I can't -- I believe it's both

16 services.  There are state maximums that Children and Youth

17 won't exceed.  And I remember in the past I had had some

18 difficulty with the Children and Youth budget because we had

19 exceeded those maximums.

20     I had to meet with people in Harrisburg from Children and

21 Youth to restore some of the additional funding in the budget.

22 Q.    Do you know if during that time to which I referred where

23 the children were being sent out of county, that they were

24 exceeding that budget?  Do you know that?

25 A.    I don't know that.

163

1  Q.    Now, just so we're clear, if the county built a new

2  facility on its own -- and I believe on direct with Mr.

3  Consiglio, you discussed different plans that the county had to

4  build a facility on its own.  Do you recall that?

5  A.    Yes, sir.

6  Q.    Let's assume the county through a bond issue or any other

7  way funded and built a new juvenile facility wherever in the

8  county and then refused to sign any placement agreement with

9  another facility.  In that particular circumstance would every

10 child have to go to your facility -- to the county's facility?

11 A.    Well, I would think that the relationship we had with the

12 Court if we built a facility they would send kids there.

13 Q.    And there was nothing that said whether Pennsylvania Child

14 Care had a private facility or any other private facility that

15 if Luzerne County had its own facility and refused to go into

16 any other agreement with any other private facility, the Court

17 would have to send any juveniles either to detention or

18 placement to that facility, correct?

19 A.    Well, we had a juvenile facility, and we had workers there

20 and the Court decided not to send them any longer.

21 Q.    If you had a facility and refused to pay or sign any

22 placement agreements with any other facility, they would be

23 left with sending juveniles to that facility; isn't that

24 correct?

25 A.    Again, I'm sure that they would.

1  Q.    So they would have to send them there.  Pennsylvania Child

2  Care could have died on the vine or gotten children from other

3  facilities, correct?

4  A.    (No audible response.)

5  Q.    From other counties I mean.

6  A.    Sure, they --

7  Q.    They would have been left with that possibility?

8  A.    I don't know where they -- I don't know -- you have to

9  clarify your question.  As far as Luzerne County is concerned

10 --

11 Q.    It would die on the vine, correct, if Luzerne County said

12 --

13 A.    If our old facility had reopened or we built a new

14 facility, I'm sure the judges would have sent the kids there.

15 But our old facility was not reopened and --

16 Q.    You talked about a bond issue being floated for how much

17 money?

18 A.    27 and a half million dollars or somewhere thereabout.

19 Q.    Despite the fact that you had the bond issue, you didn't

20 build a new juvenile facility, correct?

21 A.    Correct.

22 Q.    And the money was spent other places I take it?

23 A.    I don't know.  I left office in January -- December of

24 2003, and money was still in the budget for the juvenile

25 detention facility.

1  Q.   As far as you know -- we all know that juvenile facility
2  was not built.  But in your experience, what would happen to
3  money that the county got in the bond issue or otherwise and
4  was it used for a specific purpose?
5  A.   Sometimes it was.  Sometimes it wasn't.  What the
6  commissioners would do is in the minutes of the meeting when
7  they were to pass the bond issue, they would outline a number
8  or desires or projects they would desire to fund with that bond
9  issue.  By law that could be changed by another action of the
10 county commissioners at a later date.
11 Q.   And one of the monkey wrenches -- one of the road blocks
12 in the way of the county's facility was some dispute over
13 zoning, correct?
14 A.   Yes.
15 Q.   And just so the jury is clear -- I think they are not from
16 Luzerne County.  Where was that going to be built -- at least
17 planned to be built?
18 A.   Valley Crest Nursing Home was where the juvenile facility
19 was planned to be built, Plains Township adjacent to interstate
20 81 and Route 315.  It's near the Wyoming Valley Mall and
21 Veteran's Administration Hospital.  That's the best way to
22 describe where it is.
23 Q.   All these plans were being made at public meetings and
24 other meetings with the commissioners and others.  Did Mark
25 Ciavarella ever come to you and say, Commissioner -- you were

166

1  on a first name basis with him, correct?

2  A.    Yes.

3  Q.    Did he say, Tom, I don't want you to build this facility,

4  I want you to send people to PA Child Care?  Did he say, don't

5  do that?

6  A.    No.

7           MR. RUZZO:  If I can have a moment, Your Honor.

8  BY MR. RUZZO:

9  Q.    Just so we are clear, it wasn't only Mark Ciavarella that

10 came to you and said we have to close that juvenile facility,

11 we can't use it.  For example, Judge Augello came to you and

12 said the same thing; isn't that correct?

13 A.    I don't recall specifically, but I'm sure he could have.

14 I know I heard it from many people.

15 Q.    And before you left office, you signed several placement

16 agreements, correct?

17 A.    Oh, yes.  That one meeting that I -- I referred to earlier

18 there were five or six different facilities listed on that.

19 Q.    You signed those placement agreements?

20 A.    We approved them at a commissioners' meeting, so, yeah, I

21 probably signed them.

22 Q.    In your capacity as commissioner?

23 A.    Yes.

24 Q.    Just so we are clear -- sorry.  The placement agreements

25 were Pennsylvania Child Care until 2005, correct?

167

1  A.    I have to look at the document again, Mr. Ruzzo.

2  Q.    If I showed you some of the documents, would that refresh

3  your recollection?

4  A.    It certainly may.

5         THE COURT:  Can't you agree when that occurred?  He

6  said he remembered the question.  I don't know that counsel

7  did.

8  BY MR. RUZZO:

9  Q.    The agreements are January 1st, 2004, signed the placement

10  agreement for another six months and your signature on there.

11  You take our word for that?

12  A.    Yes, sir.

13  Q.    And February 15th of 2003, another placement agreement.

14  Your signature is on that, correct?

15  A.    I will take your word for it, yes.

16  Q.    Okay.

17         MR. RUZZO:  Thank you, Your Honor.

18         THE WITNESS:  Thank you.

19         THE COURT:  Do you have any redirect?

20         MR. CONSIGLIO:  A few questions, Your Honor.

21  REDIRECT EXAMINATION

22  BY MR. CONSIGLIO:

23  Q.    Do you recall on cross examination Mr. Ruzzo the steps

24  county commissioners could have taken to keep the Luzerne

25  County Juvenile Detention Facility open even though the courts

168

1   had indicated that they were to longer going to commit

2   juveniles to this facility?

3   A.    Yes.

4   Q.    And do you recall Mr. Ruzzo asking you some questions in

5   cross examination suggesting that you could have opened up this

6   facility with county employees; is that right?

7   A.    Yes.

8   Q.    What would the use have been for a facility open with

9   county employees if you have a juvenile court that won't send

10  kids to that facility?

11  A.    Well, that was part of the consideration we took under

12  discussion for a while.  I mean, it seemed like a futile thing.

13  We had a facility that we thought was usable.  We had employees

14  that were employees of the Court that were manning that

15  facility.

16        The Court cut the employees out of the budget, sent the

17  license back to the Commonwealth and told us they were no

18  longer going to send kids there.  It seemed to me based on what

19  I can recall pragmatically it just didn't seem feasible that we

20  were going to be able to get the Court to send juveniles

21  anywhere except the new facility if we built one and that was

22  going to take us some time.

23  Q.    Was this a political problem for you to wrestle with?  You

24  got juveniles with no place to go.

25  A.    Yeah, that -- it certainly was a difficult situation for

Case 3:09-cr-00272-CCC    Document 232    Filed 03/02/11    Page 169 of 189

169

1  us, yes.  We dealt with difficult situations before.  That's

2  the nature of that job, but it was a very difficult situation.

3  Q.    And who started that situation in October of 2002?

4  A.    When the Court notified us that they were no longer going

5  to use the facility, that started all of the difficulty with

6  the budget and the use of our facility from that point on.

7  Q.    Do you recall on cross examination Mr. Ruzzo asking you

8  some questions about you were not obligated as a county

9  commissioner to sign off on contracts for these various other

10 institutions such as Lackawanna County, Northampton County,

11 Dauphin County, and PA Child Care, that you weren't required to

12 sign off on those agreements?

13 A.    Yes.

14 Q.    Do you remember when you signed off on those agreements?

15 A.    It was sometime after our juvenile detention facility was

16 closed and I believe after our juvenile detention workers were

17 no longer working at the facility when we had to no place to

18 send the kids.

19 Q.    In your direct testimony, you referenced your February

20 5th, 2003 commissioner meeting minutes where you approved those

21 contracts?

22 A.    Yes.

23 Q.    So this is been going on for five weeks where kids are

24 being committed by Luzerne County; is that right?

25 A.    Yes.

170

1  Q.    Without contracts approved by the Luzerne County

2  commissioners?

3  A.    Correct.

4  Q.    Do you recall on cross examination Mr. Ruzzo asking you a

5  question that if you did not sign a contract allowing Luzerne

6  County juveniles to go to PA Child Care, then PA Child Care

7  would not have been paid for the kids committed to that?

8  A.    Yes.

9  Q.    Do you recall the phrase used by Mr. Ruzzo, PA Child Care

10 could have died on vine?  Do you remember that?

11 A.    Yes.

12 Q.    Did PA Child Care die on the vine?

13 A.    No.

14 Q.    It flourished, right?

15 A.    Our -- our detention facility -- our kids were sent there

16 at juvenile detention, and they were paid.

17 Q.    Do you recall on cross examination Mr. Ruzzo asking you a

18 series of questions about when Mark Ciavarella came to you and

19 personally asked, will you do something about the old juvenile

20 detention facility?

21 A.    I do.

22 Q.    And at any point in any of those conversation you had with

23 Mark Ciavarella, did he tell you, by the way, if you sign off

24 on PA Child Care, I can make a lot of money?

25         MR. RUZZO:  Objection, Your Honor.

171

1          THE COURT:  It's cross examination.  Overruled.

2          THE WITNESS:  No, he did not say that to me.

3          MR. RUZZO:  It's redirect, Your Honor.

4          MR. CONSIGLIO:  With the Court's indulgence for a

5    moment.  No further questions.

6          THE COURT:  Limit yourself to what was raised on

7    redirect, please.

8    RECROSS EXAMINATION

9    BY MR. RUZZO:

10   Q.   Just so we're clear, Mr. Makowski, the county

11   commissioners have -- had -- let me start again.  County

12   commissioners had to approve any facility to which juveniles

13   were sent; isn't that correct?

14   A.   Yes.

15   Q.   And if you didn't approve a certain facility, children, as

16   a practical matter, could not be sent there very long, correct?

17   A.   Technically correct, but that's not the way the process

18   works.

19   Q.   I think you told me on direct -- by my cross originally as

20   a practical matter people could -- people don't get paid can't

21   send juveniles there, correct?

22   A.   Yes, but --

23   Q.   The answer is yes?

24   A.   Yes.

25   Q.   Now, the one placement agreement that we showed you --

172

1  referred to was referred to as Defendant's 10.  You signed that

2  February 15th, 2003.  And it was retroactive to January 1st,

3  2003 and for 12 months; is that correct?

4  A.    Yes.

5  Q.    And just so we're clear, the bond issue that you were

6  aware of and that was obtained -- the bond that was obtained by

7  the county commissioners, they could have built a new juvenile

8  facility with that money; isn't that correct?

9  A.    Yes.

10  Q.    And they chose not to?

11  A.    Well, we are proceeding along that line, but we needed to

12  get the land approved in the zoning before we can start

13  construction.

14  Q.    Aside from overcoming the zoning obstacle or building it

15  someplace else, they had the money and they could have done it?

16  A.    Yes, I could have done it until I left office at the end

17  of 2003.

18  Q.    The commissioners could?

19  A.    New commissioners board could do the same thing when they

20  got there if the money was there.

21              MR. RUZZO:  Nothing further.

22              THE COURT:  Thank you.  You may step down.

23              MR. ZUBROD:  If the Court has no objection, I can go

24  over in front of the jury and read the stipulation.

25              THE COURT:  It would be better if you read it from

173

1   where you're standing now.

2          MR. ZUBROD:  Your Honor, we have a stipulation that

3   has been entered into between the United States and the

4   defendant.  This is Government's Exhibit 19.29.  It is hereby

5   stipulated between the United States and the defendant that if

6   called to testify, Steven A. Urban, would have testified as

7   follows:  I, Steven A. Urban, was sworn in as a Luzerne County

8   commissioner January 3rd, 2000.  I remain a Luzerne County

9   commissioner from January 3rd, 2000 until the present day.  In

10  January of 2000, Thomas Makowski and Thomas Pisano were

11  majority commissioners.

12         Commissioner Makowski was the chairman of the

13  commissioners, and I was the minority commissioner.  At the

14  time of my swearing in, in 2000, one of the issues I faced by

15  Luzerne County commissioners was what to do with the aging

16  Luzerne County Juvenile Detention Facility.  We had to decide

17  where detained juveniles would be placed in coming years.

18         At one point, in an effort to make some improvements

19  to the facility, Luzerne County received a grant of

20  approximately $200,000 to improve the facility, but I do not

21  recall whether the money was actually spent.  Mark Ciavarella

22  was the judge court for judge for Luzerne County when I became

23  commissioner.  He publically complained about the county-owned

24  juvenile detention facility and publically stated that the

25  facility needed to be replaced.

174

1         While the county commissioners were considering
2  replacing the facility with a new county-owned facility, I
3  became aware sometime in 2001 that a private organization
4  called PA Child Care, LLC was proposing to develop a privately
5  owned and operated juvenile facility in Luzerne County.  On
6  July 2, 2001, Commissioner Makowski forwarded me a copy of a
7  written PA Child Care proposal for a lease purchase by the
8  county of a facility to be developed by PA Child Care.
9         Commissioner Makowski indicated that the Courts had
10 asked us to review proposal.  Government's Exhibit 29.4 is a
11 copy of the materials forwarded to me by Commissioner Makowski
12 on July 2nd, 2001.  Under the terms of the proposed agreement,
13 Luzerne County would lease and ultimately purchase a juvenile
14 detention facility to be built by PA Child Care.  My receipt of
15 the copy of the proposal forwarded by Commissioner Makowski
16 marked the first time that I had heard of this proposal.
17        During the remainder of 2001, county officials
18 continued to take steps toward construction of a county-owned
19 to replace the old juvenile detention center.  For example, in
20 August of 2001, a number of persons who represented the county,
21 including Sandra Brulo, Commissioner Makowski and county
22 engineer James Brozena traveled to Longmont, Colorado to attend
23 a seminar on planning a detention center.
24        In September of 2001, I publically opposed the lease
25 purchase of the facility PA Child Care planned to build.  The

175

1  cost to the county of the lease purchase of the facility to be

2  built by PA Child Care was $36 million, which I believed was

3  much too high.  The county engineer had estimated it would cost

4  approximately $7 million to the county to build its own

5  facility.  In November of 2001, the commissioners discussed

6  issuing a $9 million bond to obtain funds to build a county

7  owned facility.

8         However, no bond was issued during 2001.  In early

9  2002, there was some discussion of a potential lease by the

10  county of the PA Child Care facility.  I was against the

11  proposed lease since in my view it was much too expensive.

12  Commissioner Makowski also publically indicated that he was not

13  in favor of a lease.  Commissioner Pisano indicated he was in

14  favor of the lease.  On April 18th, 2002, local media reports

15  disclosed that PA Child Care was owned by Vision Holdings, Inc.

16  a business owned by Robert Powell.

17         These media reports were the first time that I was

18  aware that Robert Powell was involved in the project.  I

19  believe that Powell had a conflict of interest because he

20  served as solicitor for Luzerne County Planning Commission at a

21  time when Luzerne County was attempting to find land which --

22  upon which to build a county-owned and operated juvenile

23  detention facility.  In addition, I was concerned that Robert

24  Powell had not filed statements of financial interests as

25  required by law when he was solicitor for the planning

176

1  commission.   Thereafter, I voiced opposition to the proposed

2  lease purchase agreement because it was too costly and resulted

3  in too much of a windfall to PA Child Care.  Commissioner

4  Makowski was originally in favor of building a facility.

5  Commissioner Pisano was in favor of leasing the facility.

6         On October 9th, the Luzerne County commissioners held

7  a private budget meeting to discuss the 2003 Luzerne County

8  budget.  Representatives from the various county entities made

9  presentations concerning their budgetary needs.  Paul McGarry

10 attended the meeting on behalf of the court of common pleas and

11 announced that the court of common pleas would not house any

12 juveniles at the county detention facility after December 31,

13 2002.

14         This was a complete shock to me.  I believed that

15 juveniles would continue to be placed at the county detention

16 facility as long as it passed inspection.  Following this

17 announcement, I learned that the Department of Public Welfare

18 had renewed the license for the facility.  This raised further

19 questions in my mind as to why the Court would decline to house

20 juveniles at a facility that was licensed.  The county

21 commissioners were at odds with the Court over the decision not

22 to house the juveniles to the county-owned juvenile detention

23 facility after December 31, 2002.

24         I objected to the decision by the Court not to house

25 juveniles in the county-owned facility after December 31, 2002

1  since PA Child Care facility was not even open yet and there

2  would be no operating juvenile detention facility in Luzerne

3  County.  During late 2002 and early 2003, the county

4  commissioners openly discussed taking legal action against the

5  court of common pleas for closing the detention facility.

6          On December 11, 2002, the Luzerne County

7  commissioners adopted a budget for 2003, which as a result of

8  the decision of the court of common pleas not to staff the

9  juvenile detention facility after December 31, 2002 eliminated

10 14 employee positions at the juvenile detention facility.  At

11 the end of 2002, someone at the juvenile probation office, an

12 office within the court of common pleas, returned the

13 certificate of compliance, the license for the county-owned

14 detention facility to the Department of Public Welfare.  I

15 questioned whether the Court had the legal authority to take

16 this action.

17         On January 9th, 2003, Commissioner Makowski sent a

18 letter to the Children and Youth and Families Northeast

19 Regional Office, Department of Public Welfare, questioning the

20 authority of the Court to return the license.  Although the

21 believe the Luzerne County Juvenile Detention Facility should

22 have remained open after December 31, 2002, the return of the

23 certificate of compliance to the Department of Public Welfare

24 by someone at the juvenile probation office, an office within

25 the court of common pleas, the loss of staff and the Court's

178

expressed refusal to house juveniles at the facility made the
continued operation of the facility by Luzerne County
impractical.  On January 15th, 2003 Commissioner Makowski and I
approved the issuance of a general bond obligation in the
amount of $9.2 million.  The bond was issued for the purpose of
building and equipping a county-owned juvenile detention
facility.  Sometime thereafter, PA Child Care opened.

However, the other commissioners and I continued to
consider the other options for the detention of juveniles.
Because the Court removed funding for the detention facility
from its budget and someone from the juvenile probation office
returned the certificate of compliance for the facility to DPW,
and since the county did not fund the facility, the county
needed to house the juveniles at other locations.

On February 5th, 2003, Commissioners Makowski and
Pisano voted to temporarily use PA Child Care for detention
services at the rate of $268 per day.  They also approved the
use of other facilities.  I voted against the contract with
Pennsylvania Child Care.

In 2003, the commissioners and I made plans to build
a county-owned juvenile detention facility at Valley Crest, a
60-acre parcel of land owned by Luzerne County.  Because of
zoning issues, the county obtained a variance to use the
property to build a detention facility.  Local property owners,
the Cornfelds, sued Plains Township, the local government

179

1  entity that controlled zoning at the Valley Crest location, to

2  stop construction of the facility.  In February of 2004,

3  Luzerne County judge, Peter Paul Olszewski ruled the juvenile

4  facility could not built at that location.  I wanted the county

5  to find another location to build a county-owned detention

6  facility because a bond had already been approved for the

7  money.  However, in January of 2004, Commissioner Makowski, who

8  like me was in favor of the county building its own facility,

9  and Commissioner Pisano left office.

10         They were replaced by Commissioners Todd Vonderheid

11  and Greg Skrepanek.  Commissioner Vonderheid and Commissioner

12  Skrepanek did not discuss with me any matters relating to the

13  juvenile detention facility until October 18th, 2004.  At a

14  public work session on October 18th, 2004, without any prior

15  notice to me, Commissioner Skrepanek and Vonderheid indicated

16  that the next commissioners' meeting on October 20th they

17  wanted to vote on a proposed contract to lease Pennsylvania

18  Child Care's juvenile detention facility for $58 million.

19         I was against the contract.  Two days later on

20  October 20th, 2004, the commissioners voted on the $58 million

21  agreement with Pennsylvania Child Care.  Commissioners

22  Skrepanek and Vonderheid voted for the 20-year lease agreement.

23  I voted against it.  The lease was submitted to the solicitor

24  for further consideration, and some modifications were

25  suggested.  On November 17th, 2004, Commissioner Skrepanek and

180

1  Commissioner Vonderheid voted for the $58 million lease with

2  some modifications and signed the lease.

3          Under the lease agreement, the county leased the

4  property but still had to contract with an organization to run

5  the facility.  At some time after January 2005, Luzerne County

6  entered into an annual agreement with Mid-Atlantic Youth

7  Services to operate PA Child Care Juvenile Detention Facility.

8  The county paid Mid-Atlantic Youth Services a monthly rate.

9  Annually, the county executed agreements with Mid-Atlantic

10  Youth Services to run the facility.

11          I did not know that Mid-Atlantic Youth Services was

12  owned and operated by Robert Powell until it was exposed by the

13  media sometime after January 2009.  I have been shown

14  Government's Exhibit 1.2, which is a document titled placement

15  guarantee agreement between Pennsylvania Child Care and the

16  Court of Common Pleas of Luzerne County.

17          The document is dated January 29th, 2002 and purports

18  to be signed by Michael Conahan in his capacity as president

19  judge for Luzerne County.  The placement guarantee agreement

20  binds the court of common pleas to lease a PA Child Care

21  facility for 20 years at an annual rental fee of $1,314,000.

22  The first time I ever saw the placement guarantee agreement was

23  when it was shown to me on February 3, 2011.  At no time did

24  Michael Conahan or anyone else consult with me about the

25  placement guarantee agreement either before or after it was

1  signed.  I do not think the president judge had the authority

2  to enter into a placement guarantee agreement that obligates

3  specific county funds.  To my knowledge, no county funds were

4  ever paid to PA Child Care in connection with this placement

5  guarantee agreement, signed Steven Urban, and stipulated to by

6  Mark Ciavarella the attorneys for Mr. Ciavarella and a

7  representative of the United States.  I move the admission of

8  1.29.

9          THE COURT:  Any objection?

10          MR. FLORA:  Yes, Your Honor, there is.  We object to

11  the opinion expressed as to the authority of the president

12  judge of the county.

13          THE COURT:  Expressed, where?  In the stipulation?

14          MR. FLORA:  In the stipulation.

15          THE COURT:  He started out saying that it's a

16  stipulation.  Either it is or it isn't.

17          MR. FLORA:  It was our understanding it was a

18  stipulation subject to a reservation to make an objection on

19  that one particular matter.

20          MR. ZUBROD:  Your Honor, this is a stipulation of

21  what an individual would testify to.  It is not a stipulation

22  of fact.  They are stipulating that if Commissioner Urban was

23  called that -- what he would testify to.  They are not

24  stipulating that they agree with everything that was said in

25  it.

182

1          MR. FLORA:  That's correct, Your Honor.

2          THE COURT:  Okay, fine.  The jury will receive it in

3    that context.

4          MR. ZUBROD:  May we approach, Your Honor?

5          THE COURT:  Why do you want to approach?

6          MR. ZUBROD:  Because I don't want to yell.

7          THE COURT:  Well, something you can't represent from

8    where you're standing?

9          MR. ZUBROD:  Our next witness is going to be

10   extremely long.  It is now almost ten minutes before four, the

11   Court's normal designated quitting time.  We are asking the

12   Court what is its wish regarding calling the next witness.

13         THE COURT:  We still have ten minutes to go.

14         MR. ZUBROD:  All right.

15         ROBERT MERICLE, called as a witness, being duly

16   sworn, testified as follows:

17   DIRECT EXAMINATION

18   BY MR. CONSIGLIO:

19   Q.   Good afternoon, sir.

20   A.   Good afternoon.

21   Q.   Will you please state your name for the jury?

22   A.   Robert Mericle.

23   Q.   There is a microphone there.

24   A.   Robert Mericle.

25   Q.   And if you can speak loud and clear so the whole courtroom

183

1  can hear you.  So, sir, where are you employed?

2  A.    Mericle Commercial Realty Services.

3  Q.    What is that business entity?

4  A.    A full service real estate development company.

5  Q.    And what is your position with respect to this business?

6  A.    I'm the president.

7  Q.    And did you start this business?

8  A.    Yes, I did.

9  Q.    When did you start this business?

10  A.    I started the business in 1985.

11  Q.    How many employees do you have approximately in this

12  business?

13  A.    200 plus employees.

14  Q.    What type of business is this?

15  A.    It is a real estate development company.  We construct

16  buildings.  We own buildings, and we manage buildings.

17  Q.    What type of buildings do you normally deal with?

18  A.    Commercial building.

19  Q.    And can you give the jury a flavor of the type of

20  commercial buildings you normally construct?  Just give us

21  couple of examples, please.

22  A.    Warehouse buildings, distribution buildings, office

23  buildings, medical office buildings.

24  Q.    And you've been involved in this business since 1985?

25  A.    That's correct.

184

1  Q.   Do you know Mark Ciavarella?

2  A.   Yes, I do.

3  Q.   And can you identify him in the courtroom, please?

4  A.   (Indicating).

5       MR. FLORA:  We will stipulate, Your Honor.

6       THE COURT:  All right.  I don't think you need that.

7  Go ahead.

8  BY MR. CONSIGLIO:

9  Q.   How long have you known Mark Ciavarella?

10 A.   I've known Mark Ciavarella since I was 16.

11 Q.   Would you describe your relationship with Mark Ciavarella

12 as a friendship?

13 A.   Yes.

14 Q.   And a friendship that dates back to your teenage years?

15 A.   That's correct.

16 Q.   Did you also have a professional relationship with Mark

17 Ciavarella?

18 A.   Yes, I did.

19 Q.   What was that nature of that professional relationship?

20 A.   Mark was my attorney from the time I was 19 until about

21 1996.

22 Q.   Why did -- was he no longer your attorney in 1996?

23 A.   He became a Luzerne County judge.

24 Q.   And did he provide you legal representation with respect

25 to the business entities that you were involved with?

1  A.    Yes, he did.

2  Q.    Why are you testifying here today?

3  A.    Based upon a plea agreement that I signed with the

4  government.

5  Q.    And that guilty plea agreement is for what crime?

6  A.    Misprision of a felony.

7  Q.    And what have you entered a guilty plea to?

8  A.    Failure to report to the authorities the false tax filing

9  of another person.

10 Q.    What's the maximum punishment you face under this guilty

11 plea?

12 A.    Three years.

13 Q.    And the maximum fine?

14 A.    I believe $250,000 fine.

15 Q.    Are you required to make any special payments to the

16 community under this plea agreement?

17 A.    Yes, I am.

18 Q.    And what are the special payments that you have to make?

19 A.    There's a payment of approximately $2,150,000.

20 Q.    Who did you enter this guilty plea before?

21 A.    Before Judge Kosik.

22 Q.    And are you awaiting sentencing on that guilty plea?

23 A.    Yes, I am.

24 Q.    And your sentence date has not been determined as of yet;

25 is that correct?

1  A.    That is correct.

2  Q.    Under this guilty plea agreement, were you required to

3  cooperate fully and completely with the government?

4  A.    Yes, I was.

5  Q.    And that's under the original guilty plea agreement; is

6  that correct?

7  A.    That is correct.

8  Q.    Since your original guilty plea agreement, has there been

9  a motion filed with Judge Kosik to amend the terms of your

10 guilty plea agreement?

11 A.    Yes, there has.

12 Q.    Does the original guilty plea agreement make promises by

13 the government to make certain sentencing recommendations for a

14 more lenient sentence for you, Mr. Mericle?

15 A.    Yes, it does.

16 Q.    And in the motion now pending before Judge Kosik to amend

17 this guilty plea agreement, it -- it will change those

18 conditions thereby allowing the government to make

19 recommendations up to and including the maximum punishment

20 facing you under that charge of three years of incarceration?

21 A.    That is correct.

22 Q.    This guilty plea agreement was amended, and this motion

23 was filed because you failed to fully and completely cooperate

24 with the government; is that correct?

25 A.    That's correct.

187

1  Q.   When questioned by government officials, you were asked

2  whether you had made cash payments to certain elected

3  officials; is that correct?

4  A.   That's correct.

5  Q.   And initially when interviewed by federal officers and

6  agents, you denied making any cash payments to a government or

7  political -- or public officials; is that correct?

8  A.   That's correct.

9  Q.   Subsequently in your cooperation, it was learned you

10 didn't and you disclosed that you had made payments to other

11 public officials and elected officials; is that correct?

12 A.   That's correct.

13 Q.   And as a result of this failure to disclose these payments

14 to other public officials is why your guilty plea agreement has

15 been amended and it's under consideration by this Court; is

16 that right?

17 A.   That's correct.

18 Q.   You've been involved in this business of real estate for

19 25 years?

20 A.   That's correct.

21 Q.   Can you describe for the jury what a finder's fee is.

22              THE COURT:  Before you get into that phase of your

23 presentation, we are closer to the hour of four.  We will

24 adjourn until tomorrow at 8:30.  Before we adjourn, please, we

25 haven't adjourned yet.  Ladies and gentlemen, we will be going

188

1  home now.  I think the weather is supposed to be better

2  tomorrow, so if you can make it by 8:30, we can start by

3  quarter to nine.  The same rule applies.  If the weather

4  changes, we have an hour leeway.  Don't worry about it.  I

5  don't want you to be concerned about being on time.  You'll be

6  going home, and we heard evidence today that you have not heard

7  yesterday.

8           There's voluminous news coverage of this case.  I

9  can't speak to that personally because I'm not privy to having

10 been aware of it, but I suspect that there is voluminous news

11 coverage.  You will be with members of your family.  You will

12 be with friends.  It's only natural somebody may attempt to

13 discuss this case with you.  Please don't discuss it with

14 anyone for fear that somebody else's opinion might be

15 communicated to you which should not be communicated to you

16 remembering ultimately the only opinion we want in this case is

17 your opinion at the appropriate time to do so.  It's impossible

18 for you to do avoid the news coverage.  But if you are

19 subjected to it, just ignore it.

20          I can't tell you anything else in order to fulfill

21 your obligation.  It's there.  You're aware of it.  Put it

22 aside because it doesn't belong in your head.  Other than that,

23 I wish you a good evening, a safe trip home and a safe trip

24 back tomorrow morning.

25

189

1                    REPORTER'S CERTIFICATE

2

3       I, LAURA BOYANOWSKI, Official Court Reporter for the

4  United States District Court for the Middle District of

5  Pennsylvania, appointed pursuant to the provisions of Title 28,

6  United States Code, Section 753, do hereby certify that the

7  foregoing is a true and correct transcript of the

8  within-mentioned proceedings had in the above-mentioned and

9  numbered cause on the date or dates hereinbefore set forth; and

10  I do further certify that the foregoing transcript has been

11  prepared by me or under my supervision.

12

13

14                    _____

                       Laura Boyanowski, RMR
15                     Official Court Reporter

16  REPORTED BY:

17      LAURA BOYANOWSKI, RMR
        Official Court Reporter
18      United States District Court
        Middle District of Pennsylvania
19      Scranton, PA  18503

20

            (The foregoing certificate of this transcript does not
21  apply to any reproduction of the same by any means unless under
    the direct control and/or supervision of the certifying
22  reporter.)

23

24

25