1

1

2                IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
3

4   UNITED STATES OF AMERICA :
                             :
5                            :
                             :
6       vs                   :    09-CR-272
                             :
7                            :
                             :
8   MARK A. CIAVARELLA       :
                             :
9                            :

10

11

        BEFORE:      THE HONORABLE EDWIN M. KOSIK
12
        PLACE:       COURTROOM NO. 1
13
        PROCEEDINGS:  JURY TRIAL
14
        DATE:        WEDNESDAY, FEBRUARY 9, 2011
15

16

17
    APPEARANCES:
18
    For the United States:   GORDON ZUBROD, ESQ.
19                           WILLIAM HOUSER, ESQ.
                             MICHAEL CONSIGLIO, ESQ.
20
    For the Defendant:       ALBERT FLORA, ESQ.
21                           WILLIAM RUZZO, ESQ.

22

23

24

25

2

<u>INDEX TO WITNESSES</u>

FOR GOVERNMENT:    DIRECT   CROSS   REDIRECT   RECROSS

ROBERT MERICLE        3        53        77         82

ROBERT MATTA         84       102

ROBERT POWELL       105

3

1          THE COURT:  Ladies and gentlemen of the jury, at the

2    end of the day, the Court instructed you because we anticipated

3    there would be a lot of publicity about this case and, indeed,

4    there has been a lot of publicity.  You're only human even

5    though we think you're very contentious.  Have you abided by

6    the Court's instructions, you communicated with no one and no

7    one has communicated with you I take it?  Okay.  Thank you.

8          ROBERT MERICLE resumed the witness stand.

9    DIRECT EXAMINATION (cont'd.)

10   BY MR. CONSIGLIO:

11   Q.   When we left off yesterday, you got done answering some

12   questions about why you're testifying here today pursuant to

13   your guilty plea agreement with the United States.  And I

14   believe the last question we left off with was what is a

15   finder's fee.  Can you explain for the jury what is a finder's

16   fee in the business that you deal with?

17   A.   To me a finder's fee is a reward to someone who refers a

18   business opportunity to me.

19   Q.   And in what context does this occur that a reward is given

20   to someone who brings a business opportunity to you?

21   A.   When they are introducing a business opportunity that we

22   would complete a project.

23   Q.   And what type of business opportunities are we talking

24   about?

25   A.   Construction, building construction.

4

1  Q.    So if someone introduces you to a project and says you can

2  do this building project for this third party, you reward the

3  person who introduced you?

4  A.    That's correct.

5  Q.    And how much do you reward that person?

6  A.    It is based upon fee schedules.

7  Q.    And how often do you engage in these finder's fees

8  agreements with individuals?

9  A.    In almost every deal that I do.

10 Q.    How many times have you engaged in a finder's fee

11 agreement with someone who is a public official?

12 A.    One.

13 Q.    And who was that?

14 A.    Mark Ciavarella.

15 Q.    And let's talk about the construction of Pennsylvania

16 Child Care and your involvement in that project.  When were you

17 first involved in that project?

18 A.    I received a phone call from Mark Ciavarella asking if I

19 would be take a phone call from a gentleman named Bob Powell

20 who was interested in building a project, juvenile detention

21 center.

22 Q.    What did you tell Mark Ciavarella?

23 A.    That I would take the call.

24 Q.    And did Mark advise you what this project was about?

25 A.    He did.

1  Q.    What did he tell you?

2  A.    He told me that the existing facility was in bad shape and

3  that he was interested in getting a new facility for Luzerne

4  County and there was a lot of delays and there was an

5  interested person that would consider building on a private

6  basis.

7  Q.    And that interested person was Bob Powell?

8  A.    Yes.

9  Q.    Did you know Bob Powell?

10 A.    No.

11 Q.    So this contact that you were going to have with Bob

12 Powell was your first introduction to him?

13 A.    I never met him before.

14 Q.    The reason why you were introduced to Bob Powell was

15 through Mark Ciavarella?

16 A.    That's correct.

17 Q.    When did this first contact occur with Mark Ciavarella?

18 A.    I believe it was May of 2000.

19 Q.    Did you have any contact with Bob Powell subsequent to

20 your communication with Mark Ciavarella?

21 A.    I believe immediately thereafter.

22 Q.    And how did that first contact happen?

23 A.    There was -- Bob called me, I believe May 3rd, 2000.

24 Q.    And what did you discuss?

25 A.    Bob went through an overview of the project.  He basically

6

1  was looking -- the reason for my introduction --

2          MR. FLORA:  Objection as to anything Mr. Powell said

3  to him, Your Honor.

4          THE COURT:  All right.  Sustained.

5          MR. CONSIGLIO:  Mr. Powell is a coconspirator

6  involved in this matter, and this is a statement of furtherance

7  of the conspiracy.  This was a plan to develop this building

8  project.  Any statement by Mr. Powell would be admissible.

9          MR. FLORA:  He is not an alleged coconspirator of my

10 client.

11         THE COURT:  Is he or isn't he?  Is it alleged he's a

12 coconspirator named or unnamed?

13         MR. CONSIGLIO:  He is a participant in this illegal

14 conduct knowing that he was sending funds -- illegally to Mr.

15 Ciavarella.

16         THE COURT:  The objection is overruled.  You can be

17 direct in answering my question he was named or unnamed.

18         MR. CONSIGLIO:  Yes.  And, Your Honor, if I can put

19 an additional basis on for the record, the other purposes --

20 this is why this witness reacted in the way he did.

21         THE COURT:  All right.  That's another good reason.

22 Thank you.

23 BY MR. CONSIGLIO:

24 Q.   What did Mr. Powell tell you?

25 A.   Mr. Powell gave me a brief overview of the project,

1    talking about the number of buildings that he planned to build

2    on the site.  He was telling me this because he wanted to

3    solicit my help in identifying a site between Luzerne County

4    and Lackawanna County.

5    Q.    And did you take notes of that telephone call?

6    A.    Yes, I did.

7    Q.    Let me show you Government's Exhibit 1.4.  Are these your

8    handwritten notes of that communication?

9    A.    Yes, they are.

10   Q.    And the top right-hand corner, we have Bob Powell

11   identified?

12   A.    Yes.

13   Q.    This is your handwritten notes?

14   A.    Yes, they are.

15   Q.    And it's dated May 3rd, 2000?

16   A.    That's correct.

17   Q.    Following this contact with Mr. Powell, did you get

18   involved in a meeting with the principals for PA Child Care?

19   A.    Yes, I did.

20   Q.    Where did that meeting take place?

21   A.    Bob Powell asked to set up a meeting at my office for June

22   9th of 2000.

23   Q.    And did you schedule that meeting?

24   A.    Yes, I did.

25   Q.    And who arrived for that meeting?

8

1  A.    At the meeting I believe it was Bob Powell, John Kimball

2  and two people from John Kimball's firm, Keith Frederick and

3  John Minora.

4  Q.    Now, who is John Kimball?

5  A.    John Kimball is the owner of a large engineering firm

6  based in Pittsburgh.

7  Q.    Why was John Kimball there?

8  A.    John Kimball was the intended builder for the project.

9  Q.    You identified Keith Frederick?

10  A.    Yes.

11  Q.    Who is Keith Frederick?

12  A.    Keith Frederick was an employee of RZ Capital Markets.

13  That was a company that was owned by the Zappala family or Greg

14  Zappala.

15  Q.    Was Keith Frederick affiliated with Greg Zappala in this

16  project?

17  A.    Yes, he was.

18  Q.    What was Keith Frederick's role with respect to this

19  project?

20  A.    Keith was the primary person I dealt with regarding the

21  specifics of the project.  He was the person that had the most

22  interaction with me on the construction portion, financing

23  portion, and he was the one that had interaction with Luzerne

24  County.

25  Q.    And your role at this stage was what?

9

1  A.    Was just to look -- what Bob said there was site

2  identified by a business associate of his, but he wanted -- he

3  wanted to make sure that was the right site.

4  Q.    So what happens at this meeting on June 9th, 2000?

5  A.    There was an overview of the site that they were thinking

6  about looking at which was located on -- at the top of Sathers

7  Drive in Pittston, and I immediately recognized the site

8  because we owned property very close to it.

9  Q.    What did you recognize about the site?

10  A.    That this particular site was the location that was about

11  40 acres they were thinking about building their project on,

12  and I already done due diligence a number years before and knew

13  there were buried barrels on the site.

14  Q.    And so would had to have been environmental cleanup before

15  construction?

16  A.    Really at that point we went back to our file and pulled

17  out a file that shows barrels that are sticking out of the

18  ground we took photos of.

19  Q.    Based upon your disclosure to the group at the meeting,

20  what happened?

21  A.    I think they were very pleased that I had better knowledge

22  of the local site, and I think frankly my stock went up.

23  Q.    During the meeting was there a dollar figure per square

24  foot that was discussed that it was going to cost the PA Child

25  Care to build this facility?

10

A.    Originally because I -- when we first started I understood
there was going to be many buildings on site.  Immediately in
the meeting it was determined there was only going to be one
building, and, therefore, smaller than what the anticipated
project was, and it was discussed it would be $200 per square
foot or more just for the building alone.
Q.    At some point during the meeting or after the meeting, did
you disclose to the principals of PA Child Care a general cost
estimate of how much you thought it may be to build the
facility?
A.    At the end of the meeting Bob Powell asked me what I
thought of that price, and I said I thought that was very high,
I didn't understand why it would be that high that --
Q.    Did you give an example to Mr. Powell?
A.    I said, for example, you're sitting in an office building
that is a finished office building that was about $90 per
square foot.
Q.    For you to build?
A.    For me to pulled.
Q.    Safe to say based upon that disclosure as well your stock
went up higher?
A.    That's correct.
Q.    After this meeting in June of 2000, did your role change
over time from being just a person assigned to finding a piece
of land where this building can be built to actually being the

1   builder?

2   A.   Yes.

3   Q.   Over what period of time did that take place

4   approximately?

5   A.   It was almost immediate.   The -- the -- Bob Powell sent an

6   e-mail of an overview of the project of our meeting on June 9.

7   In that overview, he outlined that he was going to evaluate the

8   role of Mericle as a construction -- as the contractor and was

9   also giving notice to Kimball that through that e-mail they may

10   not be the contractor.

11   Q.   And can you describe for the jury in general terms -- not

12   specific terms, but general terms -- how this project moved

13   along from there?

14   A.   It was very slow and flipped flopped many times.   It took

15   a long time to identify -- originally they spent a lot of time

16   searching for sites.   We identified a site, and they attempted

17   to secure easements for it.   And months and months and months

18   passed as they were evaluating and trying to acquire a site.

19   Q.   Did you ultimately settle upon a site?

20   A.   Yes.

21   Q.   Where was the site that was settled upon?

22   A.   Located on Sathers Drive in the Grimes Industrial Park.

23   Q.   When was this site settled upon as the area they would

24   build PA Child Care approximately?

25   A.   Approximately early in 2001.

12

1  Q.    Now, did you take any steps to assist them in acquiring

2  this property?

3  A.    Yes, we did.

4  Q.    And when you say we, what do you mean by we?

5  A.    Well, we helped identify the location, and it was located

6  in the land that was owned by the Pittston Chamber of Commerce.

7  We acquired other sites in that park, and Lou Sebia, who is in

8  my office was on the board and helped prepare a sample

9  agreement because we had one previously for the site we

10  acquired in that park.

11  Q.    So when you say we, you're talking about you in charge of

12  Mericle Construction and your employees below you?

13  A.    Yes.

14  Q.    One of those is Lou Sebia?

15  A.    Yes.

16  Q.    And you had Lou Sebia prepare some of the documents to

17  acquire the land?

18  A.    One -- it was a sales agreement.

19  Q.    Now, that's identified as happening in 2001; is that

20  right?

21  A.    That's correct.

22  Q.    What was the plan for PA Child Care as far as you

23  understood for financing this project?

24  A.    That wasn't clear to me until 2001 very early.  I was

25  asked to provide a more detailed pricing that they can use in a

13

1  financing package to secure financing.

2  Q.    And did they explain to you why they needed -- and who

3  were you speaking to when you are saying they asked me to

4  prepare financing package?

5  A.    Both Bob Powell and Keith Frederick.

6  Q.    And is when you speak about requests for financing

7  information from you, it's either from Bob Powell or Keith

8  Frederick, is that a fair statement?

9  A.    In almost all of the cases it was both.

10  Q.    And did they explain to you how they were going to finance

11  PA Child Care?

12  A.    Originally they were going to float bonds.  Keith

13  Frederick, again, worked for RZ Capital Markets -- it was

14  explained to me they were larger bond underwriters in the State

15  of Pennsylvania and they were going to float a bond for it, and

16  then it changed based upon Keith Frederick's analysis.

17  Q.    Was it clear who was going to operate this facility in

18  2001?

19  A.    No.

20  Q.    What were the options that are presented to you in how

21  this facility was going to be operated?

22  A.    There was consideration that they would lease it to

23  Luzerne County and Luzerne County would operate it.  There were

24  considerations that they were going to bring in an independent

25  operator, and they set up meetings for that.  There was

14

1  consideration for Kids Peace where they were going to operate

2  it and lease it.  It was -- operationally they seemed like they

3  were all over the map.

4  Q.    Was there an option that this thing would be built and

5  actually sold to the county?

6  A.    Yes.

7  Q.    Was there a possibility they would build it themselves and

8  operate it themselves?

9  A.    Yes.

10 Q.    And when I say build it and operate it themselves,

11 utilizing another agency like Kids Peace or some other

12 organizations to have actually the employees to run the

13 facility; is that right?

14 A.    That's correct.

15 Q.    I want to draw your attention to a telephone call that you

16 had with Bob Powell on June 22nd, 2001.  Do you recall that

17 telephone call?

18 A.    Yes, I do.

19 Q.    What was that call about?

20 A.    Bob Powell called me to give an update on the project and

21 to ask for -- this was the second time after they -- in January

22 they looked for numbers for financing and things were delayed

23 and delayed.  He called in June and wanted final numbers to

24 incorporate into a financing package and was also trying to

25 convey that this project wasn't going to die and that, you

1  know, they were still going to move forward.  We were getting

2  frustrated it was taking so long.

3  Q.    I am showing you what's been identified as Government's

4  Exhibit 1.10.  Is this your notes from your meeting with Mr. --

5  or telephone call with Bob Powell?

6  A.    Yes, it is.

7  Q.    You have the date in the corner 6/22/01?

8  A.    That's correct.

9  Q.    You have a number one identified here.  What's written

10  next to that?

11  A.    It says define numbers by Monday.

12  Q.    Was that a request from Mr. Powell for to you define

13  finance numbers by Monday or construction numbers?

14  A.    Construction numbers.

15  Q.    You have number two.  What's that?

16  A.    Number two says, P. J., which meant to be president judge,

17  Judge Conahan, January 3rd, 2002.

18  Q.    Now, that's just a note you have jotted down.  What was

19  said to you during that telephone call on that day by Mr.

20  Powell?

21  A.    What was said was that Judge Conahan was to be the

22  president judge on January 3rd, 2002.

23  Q.    Why was that significant?

24  A.    Because later in the same message it says, order from a

25  judge that all kids will go to this facility.

1    Q.    And is that what you identified at the bottom here?

2    A.    Yes, it is.

3    Q.    And it says, order from a judge that all kids will go to

4    this facility.  There was another line below that.  What is

5    that note?

6    A.    It says reaffirmed January 3rd, 2002.

7    Q.    What does that mean?  What did Mr. Powell tell you?

8    A.    That Judge Conahan would be the president judge as of

9    January 3rd, 2002 and that he would reaffirm the discussion he

10   had with Bob Powell that -- relative to the order from a judge

11   that all kids will go to this facility.

12   Q.    There was another line here indicating what?

13   A.    It says short-term financing from commercial lending

14   sources.

15   Q.    What was that discussion about?

16   A.    The overview of this was that I needed to be assured that

17   there was financing as the contractor and there was that --

18   that was why he was giving me this overview to verify there was

19   a commitment and he needed to know what interim moneys needed

20   to be spent between that date and January 3rd or when they

21   would get the commitment to do the ultimate financing.

22   Q.    In response to this telephone call in this request from

23   Mr. Powell, what did you do?

24   A.    I prepared -- I started to prepare my final construction

25   numbers.

1  Q.    Did you provide that to the principals of PA Child Care?

2  A.    Yes.

3  Q.    Was this communication that you had with Robert Powell

4  confirmed that this was going to be a private project operated

5  by PA Child Care with the commitment from the court of common

6  pleas, particularly Judge Conahan, to commit kids to this

7  facility when he becomes president judge?

8  A.    Yes.

9  Q.    When was that confirmed?

10  A.    It was confirmed -- it was reconfirmed July 11th with an

11  e-mail -- a conversation with Bryan McManus in an e-mail to me

12  and again on August 30th.

13  Q.    I am going to show you Government's Exhibit 1.15.  What is

14  this?

15  A.    This is e-mail from Bryan McManus, who was an employee of

16  my company, one of the project managers for the construction of

17  PA Child Care to me.

18  Q.    And what does the e-mail say?

19  A.    Subject is PA Child Care financing.  Bob informed me that

20  he cannot secure financing until they have a letter of

21  commitment from the Luzerne County judges making a commitment

22  for the county to send their campers to this facility.  This

23  letter will not be signed until January 2002.  Therefore, PA

24  Child Care will have to finance project itself until January

25  2002.  Bob said that he will talk to you about it, but I am

18

1   giving you a heads up what Bob is asking for the amount of

2   payments that will come due by December 2001 that PA Child Care

3   will have to finance.

4   Q.    So by August of 2001 it's clear that PA Child Care's

5   financing is on hold until Judge Conahan can become president

6   judge and a commitment letter can be issued to him?

7   A.    That's correct.

8   Q.    During the same time period, did the principles of PA

9   Child Care ask you to prepare all financing or a potential

10  financing package for them?

11  A.    Bob Powell and Keith Frederick asked for some help in

12  preparation of the financing package and asked me for

13  enumerating allowable fees that could be incorporated into a

14  package.  In particular, Keith Frederick said he had a lot of

15  experience in large bond financing but not as much experience

16  in doing commercial financing.

17  Q.    Did you create financing information for them?

18  A.    I did.

19  Q.    And when you engaged in such a process, how do you do that

20  personally?  Do you have notes?  Mentally?  How do you work

21  this out?

22  A.    I do it with an HP 12-C calculator and notes and writing

23  down notes.

24  Q.    Are you a note person?

25  A.    I take notes on everything.  I am a constant scribbler.

19

1  Q.    Now, I want to draw your attention to Government's Exhibit

2  1.13.  What is this?

3  A.    This is the final -- it's my handwriting.  It's my notes

4  relative to pricing.  This is my final pricing for the

5  facility.

6  Q.    What is the date of this handwritten notes?

7  A.    July 12th, 2001.

8  Q.    As we look at these notes, can we generally describe what

9  these notes mean just in general terms?

10  A.    Just an overview of what would be included in the project,

11  what would be excluded.  It gives an overview of my numbers and

12  how I calculate my final price.

13  Q.    Now, as I've gone half way down these notes, there's a box

14  on the left with some writing there.  What is that?

15  A.    It says financing package by Wednesday.

16  Q.    What does that mean?

17  A.    Reminder to me I needed to finish my portion of the

18  financing package, which would be my construction numbers.

19  Q.    And what is further down here on the left?

20  A.    That is the calculation -- the detailed calculation of how

21  I arrived at the final number.

22  Q.    Showing the top part of the detailed calculation, what do

23  these numbers mean?

24  A.    The very top shows $7,080,000.  That was the original

25  quote that I provided to PA Child Care in January or February

20

1  of 2001 when they said to me I secured the job and they were

2  committed to me.  And the lower portion is the -- it was 6.52.

3  That was my final price for the job.

4  Q.    You include something here, $750,000.  Is that detention

5  equipment estimate?

6  A.    That was the portion of the work that I excluded from my

7  scope because I didn't want the liability of the specialty

8  equipment for the hardware for the doors and the windows.

9  Q.    And land with closing?

10  A.    With closing -- loan with closing costs.

11  Q.    $370,000?

12  A.    Correct.

13  Q.    And total cost of $7,640,000?

14  A.    Correct.

15  Q.    What do we have here?

16  A.    This is the more detailed breakdown of the costs.

17  Q.    What does the top line mean?

18  A.    Top line is 131 -- it says 131.  What it means is $131 per

19  square foot times 34,513 square feet is $4,520,000.

20  Q.    What's this portion mean?

21  A.    The -- additional estimate for the site work, and there

22  was about $200,000 in the 4.52.  But the site work was

23  estimated to be $700,000 because of the poor topography, and

24  rock there was an additional $500,000 in site work costs.

25  Q.    What is this line right here?

21

1  A.    That is approximately $1 million, and it represents the

2  referral fee.

3  Q.    Now, what is the referral fee?

4  A.    The referral fee is the reward for helping me --

5  introducing me to the job.

6  Q.    And who was supposed to receive that referral fee?

7  A.    That referral fee was built into my pricing and was

8  intended for Bob Powell initially.  They had asked me to put

9  additional fees in, if I can give them help for additional

10 fees.  I felt they were jamming fees into the deal and

11 thereafter went to see Mark Ciavarella about it.

12 Q.    So you went to see Mark Ciavarella about this $1 million

13 referral fee?

14 A.    That's correct.

15 Q.    When did you go see Mark Ciavarella about this $1 million

16 referral fee?

17 A.    I believe right after I finished these notes.

18 Q.    And these notes are July of 2001?

19 A.    That's correct.

20 Q.    And that's the $1 million fee?

21 A.    That's correct.

22 Q.    And this note to the side of that $1 million, you've

23 identified that as an approximate sign?

24 A.    Correct.

25 Q.    That's not an M.?

1  A.    No, it's approximate.

2  Q.    So you go see Mark Ciavarella about this million dollar

3  fee.  Where did you go see him?

4  A.    I went to see him in his office at the courthouse.

5  Q.    Why did you go see him about this fee?

6  A.    Because I would not have been doing the job for PA Child

7  Care if it was not for the referral that Mark gave me to Bob

8  Powell.

9  Q.    Did you tell Mark?

10  A.    I explained to mark that I just about finished the

11  financing -- excuse me -- the construction pricing and that

12  they -- I was -- there were a lot of fees that Bob Powell was

13  packing into the financing and one of those fees was going to

14  be a referral fee and that if anybody deserved a referral fee

15  it was Mark.

16  Q.    How did Mark respond to that?

17  A.    He said, I agree.

18  Q.    And what happened from there?

19  A.    I explained to Mark that I was delivering a price that was

20  much lower than what they anticipated and that I was -- you

21  know, I was given the opportunity because Mark introduced me to

22  Bob Powell and Bob Powell introduced me to PA Child Care.

23  Q.    What did Mark tell you to do with the referral fee?

24  A.    (No audible response.)

25  Q.    How was it supposed to be handled?

23

1  A.    Mark told me to pay Bob Powell and he would work it out.

2  Q.    And he would work it out with who?

3  A.    With Bob Powell.

4  Q.    When do you sign a contract to build PA Child Care as best

5  you can recall?

6  A.    February 19th, 2002.

7  Q.    So you're doing the numbers in the summer of 2001, but you

8  don't sign the contract until February 19, 2002.  What were you

9  waiting for?

10  A.    Waiting for two things.  One, they were not ready to sign

11  the contract.  They did not have their financing.  They

12  couldn't -- until they had financing, I wouldn't have done the

13  job.  I was a contractor.  I want to make sure I was going to

14  be paid.  Two, the -- that was the primary reason -- the

15  architectural plans were not done.

16  Q.    You were waiting for the financing to be approved before

17  you were going to commit to building this project; is that

18  right?

19  A.    We would not have, correct.

20  Q.    And based upon your previous conversations with Bob

21  Powell, financing had to wait until Michael Conahan became

22  president judge so he can issue an order committing juveniles

23  to PA Child Care; is that correct?

24  A.    That's correct.

25  Q.    I am showing you what's been identified as Government's

24

1  Exhibit 2.1.  What is this?

2  A.    This is the agreement between Mericle Construction and

3  Pennsylvania Child Care.

4  Q.    Dated February 19th, 2002?

5  A.    That's correct.

6  Q.    This goes on for pages and pages; is that right?

7  A.    Yes.

8  Q.    And it defines the agreement and terms of the agreement

9  that Mericle Construction has with PA Child Care for the

10  construction of this facility?

11  A.    That's correct.

12  Q.    At the same time this agreement was created, was there

13  another agreement created with respect to this referral fee?

14  A.    Yes.

15  Q.    What agreement was that?

16  A.    It was a commission agreement, referral fee agreement.

17  Q.    I'm showing you what's been identified as Government's

18  Exhibit 2.3.  What is this?

19  A.    This is the registration and commission agreement.

20  Q.    And what's the date on this registration and commission

21  agreement?

22  A.    The date is February 19th, 2002.

23  Q.    And under the plain terms of this agreement, who is

24  supposed to receive the referral fee?

25  A.    Robert Powell.

25

1  Q.    And how much was the referral fee to be?

2  A.    $997,600.

3  Q.    $997,600 is identified half way down this document?

4  A.    Yes.

5  Q.    When is the referral fee supposed to be paid?

6  A.    To be paid after the conditions in this agreement would be

7  met, which primarily are the completion of the construction and

8  the final payment for the construction.

9  Q.    This agreement is signed by you?

10  A.    That's correct.

11  Q.    And it's also signed by Robert J. Powell, Esquire?

12  A.    Yes.

13  Q.    When was this agreement created?

14  A.    February 19th, 2002.

15  Q.    And was this provided to Mr. Powell for his signature?

16  A.    Yes.

17  Q.    And then ultimately returned to you?

18  A.    Yes.

19  Q.    Now, when this agreement is executed, you understood that

20  this finder fee was to be provided to Robert Powell for Robert

21  Powell to divide with Mark Ciavarella?

22  A.    That's correct.

23  Q.    Don't want to go into detail, but did Mericle Construction

24  company build PA Child Care from the date of the contract being

25  executed on?

26

1  A.    Yes, we did.

2  Q.    And when was it complete?

3  A.    Approximately February of 2003.

4  Q.    Now, when you have a building contract -- construction

5  project like this, are there certain steps you take when the

6  construction is completed?

7  A.    Yes.

8  Q.    What steps do you take?

9  A.    There's an acceptance letter and a final -- the final

10 payment.

11 Q.    And in this case when PA Child Care was completed or about

12 to be completed, did you send an acceptance letter?

13 A.    Yes.

14 Q.    I'm going to show you Government's Exhibit 2.4.  What is

15 this?

16 A.    This is the acceptance letter request from my company to

17 PA Child Care.

18 Q.    And is this dated January 7th, 2003?

19 A.    Yes, it is.

20 Q.    And does it request them to make full and final payment on

21 the contract?

22 A.    Yes, it does.

23 Q.    And was this signed by Mr. Powell indicating that the

24 construction was complete?

25 A.    Yes, it is.

27

1  Q.    And the date on that signature from Robert Powell is

2  January 17, 2003?

3  A.    That's correct.

4  Q.    Now, what event gets triggered once this agreement saying

5  construction is completed occurs?

6  A.    We satisfied the contract, the release of the bond and

7  then payment of the referral fee.

8  Q.    Now, how were you -- how did you know where to pay this

9  referral fee?

10  A.    Bob Powell provided instructions to me.

11  Q.    And I'm showing you Government's Exhibit 3.1.  What is

12  this?

13  A.    This is the wire construction letter from Bob Powell to

14  Mericle Construction.

15  Q.    And what are these instructions?

16  A.    The instructions were to send $610,000 to Robert Matta,

17  Esquire and the $387,600 to Robert Powell.

18  Q.    Pursuant to notification from Robert Powell of where to

19  wire these moneys, did you do that?

20  A.    I provided this to my controller, and she wired the funds.

21  Q.    At the end of the year, after these funds were wired in

22  February -- or January of 2003, did your company take any steps

23  to notify these individuals of their tax consequences for

24  receiving these wires?

25  A.    Our company sent 1099s to the recipient.

28

1  Q.    Government's Exhibit 3.1, what is this?

2  A.    This is our 1099 from Mericle Construction to Robert

3  Matta, Esquire in the amount of $610,000.

4  Q.    I misspoke on the number -- that's Government's Exhibit

5  3.11.  But this is the 1099 to Robert Matta for the $610,000;

6  is that correct?

7  A.    That's correct.

8  Q.    Let me show you Government's Exhibit 3.13.  What's this?

9  A.    This is another 1099 same year from Mericle Construction

10  to Robert Powell in the amount of $387,600.

11  Q.    Now, following your involvement in PA Child Care, its

12  development and paying of this referral fee, did you get

13  involved in another project in dealing with the same principals

14  and especially in western Pennsylvania?

15  A.    Yes, I did.

16  Q.    What was that project?

17  A.    That project was named Western PA Child Care, and it was a

18  project that was about 50 percent larger than the facility in

19  Luzerne County.  It was a 72-bed facility versus a 48-bed

20  facility.

21  Q.    And were you approached by the principals of PA Child Care

22  to build that facility?

23  A.    Yes.

24  Q.    And did you enter into an agreement with them to build the

25  facility?

29

1  A.    Yes, I did.

2  Q.    And let me show you Government's Exhibit 6.1.  What is

3  this?

4  A.    This is the agreement of construction between Mericle

5  Construction and Western PA Child Care, LLC for 50,975 square

6  foot building.

7  Q.    June 8th, 2004?

8  A.    Yes.

9  Q.    And again this contract was goes on for pages and pages

10 describing the obligations of the separate parties in this

11 case?

12 A.    That's correct.

13 Q.    Now, this is a new project, Western PA Child Care, was

14 there a finder's fee affiliated with Western PA Child Care?

15 A.    Yes.

16 Q.    And who was supposed to get the finder's fee for Western

17 PA Child Care?

18 A.    It was going to be a fee that both Bob Powell and Mark

19 Ciavarella were to receive.

20 Q.    Now, why would there be another finder's fee for a

21 separate project?

22 A.    In all transactions that our company is involved with,

23 once an opportunity is identified by that referring source,

24 they are always paid for any extensions, expansions, removals,

25 relocations in every situation.

1  Q.    So from this initial introduction by Mark Ciavarella to

2  you in this project, he was to receive a finder's fee or a

3  portion of a finder's fee, as you understood it, for every

4  derivative project that flowed from that business contact; is

5  that correct?

6  A.    That is correct.

7  Q.    And if this PA Child Care kept building facilities in

8  various locations around and if you had done those

9  constructions, more fees would have gone to Mark Ciavarella?

10  A.    That's correct.

11  Q.    Did you come up with a dollar figure how much the referral

12  fee in this project would be?

13  A.    It was capped at $1 million.

14  Q.    Why do you say capped at $1 million?

15  A.    Because there is an understanding in my business that once

16  a commission gets to be above a million dollars, it is not

17  commensurate with the effort, and generally it's understood

18  that it's a million dollars.  We pay sometimes a little bit

19  over that.  For the most part commissions get capped at a

20  million dollars.

21  Q.    Was there an agreement created for that?

22  A.    Yes.

23  Q.    I'm showing you Government's Exhibit 6.3.  What is that?

24  A.    This is the registration and commission agreement for

25  Western Pennsylvania identifying the commission agreement

1    between Mericle Construction and Robert Powell for $1 million.

2    Q.    And, again, what's the date on this agreement?

3    A.    The date is June 8th, 2004.

4    Q.    And the date for signature for Robert Powell is identified

5    as the 8th day of June, 2004?

6    A.    That's correct.

7    Q.    Now, when would you have told Mark Ciavarella that he was

8    going to -- did you tell Mark Ciavarella that he was going to

9    receive another finder's fee for Western PA Child Care?

10   A.    I told him that we were doing another project and that

11   there would be another referral fee and that it would be a

12   million dollars because it would be capped based upon the upper

13   limit of the amount, yes.

14   Q.    Now, do you recall when you told Mark Ciavarella that he

15   would receive -- at least another million dollar finder's fee

16   was on its way?

17   A.    I talked to Mark before the execution of the contract.

18   Q.    So before June of 2004?

19   A.    That's correct.

20   Q.    Don't want to belabor the point.  Does Mericle

21   Construction company go out to Western PA Child Care -- to the

22   location and build Western PA Child Care?

23   A.    Yes, we do.

24   Q.    When is that complete as best you can recall?

25   A.    In June 2005.

32

1  Q.    And like the last project, is there a letter that's sent

2  to the principals of Western PA Child Care?

3  A.    Yes.

4  Q.    And what kind of letter is that again?

5  A.    That is the completion letter.

6  Q.    I'm showing you Government's Exhibit 6.4.1.  Is that this

7  letter?

8  A.    Yes, it is.

9  Q.    Dated June 24th, 2005?

10 A.    Yes, it is.

11 Q.    And does it request the final payment on the construction

12 -- payment of $1,182,343.80?

13 A.    Yes, it does.

14 Q.    Now, what is triggered once this is paid and once this is

15 signed?

16 A.    Once it's completed, there would be the release of the

17 bond and the payment of the referral fee.

18 Q.    Now, with respect to the signing of this document, do you

19 recall how this document was executed?

20 A.    It was first sent by my company in -- June 24th to Bob

21 Powell -- or around there -- and subsequently sent by me a

22 second time.

23 Q.    So when it was first sent to Bob Powell, do you know

24 whether he executed it and/or returned it to you?

25 A.    No, I did not.

1  Q.    Did you have any contact with Mark Ciavarella after you

2  had sent this letter to Bob Powell in July of 2005?

3  A.    Yes.

4  Q.    Describe for the jury how that happened.

5  A.    When it was initially sent, I'm not sure when it was sent

6  out, but I was on vacation the first week of July.  I came back

7  from vacation, and I went to see Mark Ciavarella on July 13th,

8  I believe.  There was a C. Y. C. golf tournament July 15th I

9  wanted to see if he was going to play in that tournament.

10 Q.    You went to his chambers to see if he was going to play in

11 the golf tournament?

12 A.    Yes.

13 Q.    When you go see him, is there any discussion with him

14 about this project?

15 A.    Yes.

16 Q.    What's the decision?

17 A.    He asked me the status of the project, and I told him that

18 it was complete and that we were just finishing the project up.

19 Q.    And did you indicate that you were waiting on anything?

20 A.    Yes, I said we were waiting for Bob Powell to complete the

21 paperwork.

22 Q.    And what would happen once the paperwork was completed by

23 Bob Powell?

24 A.    The referral fee would be paid.

25 Q.    When you notified Mark Ciavarella of this, how did he

34

1  react?

2  A.    Mark said, I can help with that, and he said, give me a

3  minute and he left the office.  I was with him and went out to

4  see his secretary Lori Umphred.

5  Q.    What happens then?

6  A.    He came back in, and when I finished our conversation --

7  when I walked out of his office, Lori -- either Lori or Mark --

8  I am not sure -- one of them handed me a piece of paper with

9  instructions for wiring instructions for the funds.

10 Q.    And what were those wiring instructions?

11 A.    They were just written notes on a piece of paper

12 identifying the bank number and location for the wire

13 instructions.

14 Q.    Now, what did you do with that information?

15 A.    I called Bob Powell and talked to him about getting all

16 the contracts executed.  And he told me that he was in Florida

17 and didn't have any secretarial help and asked me to put the

18 information together, which I did, and I faxed it out to him

19 that afternoon.

20 Q.    Did you receive a response?

21 A.    I talked to him -- I did.  I got it Federal Expressed back

22 the following day.  I sent it out by fax and received it the

23 following day, I believe by Federal Express.

24 Q.    Now, what did you send down to Bob?  What documents did

25 you send to him?

1  A.   I sent Bob two copies of the completion letter, the

2  registration and commission agreement and the instructions --

3  wire instructions.

4  Q.   And --

5  A.   Three documents, two copies each.

6  Q.   The wiring instructions -- when you sent him wiring

7  instructions, what specific instructions did you send him?

8  A.   (No audible response.)

9  Q.   How did it look?

10 A.   Just a single page with -- it followed the same format

11 that Bob Powell gave me in the first letter because he said he

12 was in Florida and didn't have any way to do it, he didn't have

13 secretarial help.

14 Q.   I am showing you what's been identified as Government's

15 Exhibit 6.4.3.  What is this?

16 A.   This is the instruction letter for -- the wiring

17 instructions for the $1 million.

18 Q.   And this is an instruction letter addressed to you; is

19 that correct?

20 A.   That's correct.

21 Q.   For the signature of Robert J. Powell?

22 A.   Yes.

23 Q.   Instructing that $1 million --

24 A.   There's a zero missing.

25 Q.   But the intention is $1 million?

36

1  A.    Yes.

2  Q.    Be wired to Pinnacle Group of Jupiter, LLC at the Wachovia

3  Bank and routing number identified?

4  A.    That's correct.

5  Q.    Who created this letter?

6  A.    A secretary in my office did.

7  Q.    And why did your office create a letter for Robert Powell

8  to sign and send back to you?

9  A.    Because Mark Ciavarella seemed to want to accelerate the

10 payment and Bob Powell was in Florida and he didn't have any

11 secretarial help, so we put the letter together.  And Bob

12 Powell gave me the fax number to a gentleman named Bruce in

13 Florida.  I faxed it to that number.

14 Q.    And so you received this letter back from Bob Powell

15 signed -- it's the same letter you created just with his

16 signature?

17 A.    That's correct.

18 Q.    If you already had the wiring instructions from Mark

19 Ciavarella, why did you take this extra step of having a letter

20 created and then signed by Robert Powell?

21 A.    Because my understanding when Mark went out and talked to

22 Lori that Lori got the wiring instructions from Bob Powell and

23 that they would be provided to me.

24 Q.    I'm asking a more mechanical question.  Why did you take

25 the step of actually creating the letter for Robert Powell to

37

1  sign as opposed to just getting the agreement back from Robert

2  Powell and wiring the money?  You already know where it's

3  supposed to go.

4  A.    All the documents -- I mean, mechanically in every

5  transaction we always have documents signed.  It first would be

6  the acceptance letter and then the commission agreement and the

7  wiring instructions.  The commission agreement was done that

8  time as well.

9  Q.    I'm showing you what's been identified as Government's

10 Exhibit 6.4.2.  What is that?

11 A.    Can you page back one page, please?

12 Q.    Sure.

13 A.    This is the acceptance letter.

14 Q.    Now, did you ultimately find there was two acceptance

15 letters?

16 A.    Yes.

17 Q.    The one that you sent down to him to have it signed and

18 sent back by Federal Express?

19 A.    Correct.  I didn't realize there was one in en route by

20 Bob Quigley and Lou Sebia in my office.

21 Q.    That was why there was two acceptance letters?

22 A.    I was on the vacation.  I didn't realize they had started

23 the process.

24 Q.    Now, move back in time a little bit but on a separate

25 project.  Was there an expansion to Pennsylvania Child Care,

38

1  the facility in Luzerne County?

2  A.    Yes, there was.

3  Q.    When did that begin as best you can --

4  A.    That began in '05.

5  Q.    And was there a contract executed for that expansion?

6  A.    Yes, there was.

7  Q.    And was there an agreement to have a referral fee for that

8  expansion of the project?

9  A.    Yes, there was.

10  Q.    I'm showing you what's been identified as Government's

11  Exhibit 7.1.  What is this?

12  A.    This is the construction agreement between PA Child Care

13  and Mericle Construction dated February 24th, 2005.

14  Q.    And this is for the expansion of PA Child Care?

15  A.    That's correct.  This is the 12-bed extension.

16  Q.    What's the dollar figure involved with this contract as

17  best as you can recall?

18  A.    $860,000.

19  Q.    Was there referral fee assigned to this one?

20  A.    Yes.

21  Q.    How much?

22  A.    $150,000.

23  Q.    Why was it a $150,000 for this expansion?

24  A.    It was a proportionate fee of the square footage of the

25  expansion over the total square footage times a million dollars

39

1  approximately.

2  Q.    Similar to the previous agreement -- actually when did the

3  construction complete for the expansion?

4  A.    In '06.

5  Q.    And did you send another letter in '06 indicating the

6  construction was completed?

7  A.    Yes, we did.

8  Q.    I'm showing you Government's Exhibit 7.3.  What is that?

9  A.    This is the acceptance letter for the expansion of PA

10  Child Care.

11  Q.    Dated February 2nd, 2006?

12  A.    That's correct.

13  Q.    It requests a final payment on the project?

14  A.    That's correct.

15  Q.    What was going to be triggered by the final payment?

16  A.    There was no bond in this transaction.  It would just be

17  the payment of the referral fee.

18  Q.    And again this is signed by yourself and then ultimately

19  signed by Robert J. Powell dated February 2nd, 2006; is that

20  right?

21  A.    That's correct.

22  Q.    Did you pay the $150,000 referral fee for the expansion?

23  A.    Yes, we did.

24  Q.    How did you know where to send that?

25  A.    It was in the same -- we just replicated what was done for

40

1  the million dollars, and I'm shot sure if it was a discussion.

2  I believe I talked to Bob Powell or Mark Ciavarella.  I'm not

3  sure.

4  Q.    Let me show you Government's Exhibit 7.4.  What is this?

5  A.    This is the instruction letter of $150,000 for the PA

6  Child Care expansion.

7  Q.    Is this the same template and information that was for the

8  last time?

9  A.    It is.

10  Q.    The same format?

11  A.    Correct.

12  Q.    Did you send also a draft letter to Mr. Powell for him to

13  sign off on and send it back to you?

14  A.    Yes, we did.

15  Q.    And this is essentially to maintain in your records that

16  you had instruction where this money was to be wired to?

17  A.    That's correct.

18  Q.    Did you follow this instruction and wire the money to the

19  Pinnacle Group of Jupiter bank account at Wachovia bank?

20  A.    Yes.

21  Q.    And at the end of the year, did you send an IRS form?

22  A.    Yes, we did.

23  Q.    I will show you Government's Exhibit 7.7.  What is that?

24  A.    This is the 1099 from Mericle Construction to Pinnacle

25  Group of Jupiter, LLC in the amount of $150,000.

41

1   Q.    Let me show you Government's Exhibit 6.7.  What was that?

2   Is this the IRS form for the Western PA Child Care referral?

3   A.    Correct, 1099 for the $1 million dollars.

4   Q.    Now, was there any expansion plan for Western PA Child

5   Care?

6   A.    Yes, there was.

7   Q.    What was the expansion plan for that facility?

8   A.    There was a 24-bed expansion plan for that facility.

9   Q.    Was there a referral fee planned for that institution?

10  A.    Yes, there was.

11  Q.    How much?

12  A.    $150,000.

13  Q.    I am showing you Government's Exhibit 18.1.  What is that?

14  A.    This is the construction agreement for Western PA Child

15  Care expansion dated August 29th, 2007.

16  Q.    And it's an agreement just like the other agreements for

17  construction of this expansion for Western PA Child Care?

18  A.    That's correct.

19  Q.    Was there a registration and commission agreement or a

20  referral fee agreement created for this?

21  A.    Yes, there was.

22  Q.    Was this referral fee agreement again to be given to

23  Robert Powell?

24  A.    Yes.

25  Q.    And the amount of how much?

42

1  A.    $150,000.

2  Q.    Now, the dates for this referral fee agreement, August

3  29th, 2007; is that right?

4  A.    That's correct.

5  Q.    Now, this agreement isn't signed; is that correct?

6  A.    That's correct.

7  Q.    Let's talk about what happened -- before we talk about

8  what happened from August of 2007, let me ask you some

9  questions on some side matters that are significant to this

10 case.

11         THE COURT:  Before we get into that, we expected to

12 start quarter to nine, and we were delayed.  I have a schedule

13 for taking our recess.  We've been sitting for an hour and 15

14 minutes.  So we will take a ten-minute recess.

15         (A brief recess was taken.)

16         THE COURT:  Please.

17 BY MR. CONSIGLIO:

18 Q.    Mr. Mericle, before our break, I started going into a new

19 area, but I wanted to ask you one follow-up question.  I

20 believe I failed to show you an exhibit.  It's Government's

21 Exhibit 7.2.  Is this a registration and commission agreement?

22 A.    Yes, it is.

23 Q.    Dated February 24th, 2005?

24 A.    Yes, it is.

25 Q.    For $150,000?

43

1  A.    That's correct.

2  Q.    And this is a registration commission agreement for which

3  project?

4  A.    This is for the expansion of PA Child Care in Pittston.

5  Q.    And this is the signed agreement that was received -- or

6  at least that's dated the 24th day of February, 2005?

7  A.    That's correct.

8  Q.    On some side matters, Mr. Mericle, your business --

9  yesterday when you testified you identified your business as

10 being involved in construction of buildings and having

11 approximately 200 employees.  Can you describe for the jury the

12 interstate connection that your business has with businesses or

13 entities outside of Pennsylvania?

14 A.    We have -- we would acquire materials for all of our

15 construction jobs and equipment from many other states other

16 than Pennsylvania.

17 Q.    Okay.

18 A.    We do primarily work in Pennsylvania, but we buy an awful

19 lot of things outside of Pennsylvania.

20 Q.    Material used to construct Pennsylvania Child Care,

21 Western PA Child Care and expansion for both facilities, that

22 would include material from outside of Pennsylvania?

23 A.    Definitely.

24 Q.    And equipment used to build these facilities and expansion

25 of those facilities, that equipment would have been acquired

44

1  from outside of the State of Pennsylvania?

2  A.    Yes.

3  Q.    How about the clients that you normally deal with in your

4  construction project?  Where do those clients come from?

5  A.    All over the country and all over the world.

6  Q.    Clients such as the Home Depot?

7  A.    That's correct.

8  Q.    Other multinational business concerns like that?

9  A.    Sears, CVS, yes, hundreds of them.

10  Q.    They are the clients that you build your buildings for for

11  them to bring their shop into?

12  A.    Yes.

13  Q.    Mr. Mericle, you described earlier in your testimony

14  yesterday that you have known Mark Ciavarella since you were

15  young and that you had a professional relationship with him as

16  well.  In your adult years, did you regularly provide Mark

17  Ciavarella with things of value?

18  A.    Yes.

19  Q.    How regular of a basis would you provide things of value

20  to Mark Ciavarella?

21  A.    Every year from the time I started my business when --

22          MR. FLORA:  Objection, Your Honor.

23          THE COURT:  What's the objection?

24          MR. FLORA:  Relevancy.

25          THE COURT:  Do you want to respond?

45

1          MR. CONSIGLIO:  It goes to a continuing pattern of

2    things of value at least in excess of the dollar figures that

3    this witness gave to Mark Ciavarella all of which were not

4    reported in statements of financial interest.

5          THE COURT:  All right.  Objection is overruled.  We

6    are going to run into this again with respect to other matters.

7    We have a motion addressing one of them, okay.  Objection is

8    overruled.

9          THE WITNESS:  From the time I started my business

10   when I started to hire Mark Ciavarella as my attorney from the

11   age of 19 really until 2007, I saw Mark every Christmas, the

12   day before or two days before every year from the time I was

13   19.

14   BY MR. CONSIGLIO:

15   Q.   And did you provide him gifts during that time frame?

16   A.   Yes, I did.

17   Q.   What types gifts did you give Mark Ciavarella?

18   A.   The first year I gave him 150 Cabbage Patch dolls when I

19   was in the toy business.  Then when he was my attorney

20   thereafter when I started doing the real estate business, I

21   would give him gifts ranging from original pieces of art work

22   to certificates for weekend vacations at New York with play

23   tickets.  And I provided gift certificates for travel, cash for

24   -- in a travel magazine for travel.

25   Q.   Now, you mentioned you gave Mark Ciavarella cash?

46

1  A.    Yes.

2  Q.    At what point in your relationship with Mark Ciavarella

3  did you start giving him cash as gifts?

4  A.    Back from the earliest of time from -- there were -- might

5  be in my 20s.

6  Q.    And from the time that he was an elected judge from 1996

7  on, did you give him cash?

8  A.    Yes.

9  Q.    And you talked about your holiday gifts to him from 1996

10 on.  Were those cash gifts?

11 A.    Some of them were.

12 Q.    When did they become cash gifts as best as you can recall?

13 A.    In '96 and '97 I gave him gift certificates, I believe,

14 for a two-night stay in New York for a hotel.  And in 1998 was

15 the year my dad passed away, and I was looking to people that

16 helped me in my life.  I gave Mark a gift certificate for

17 $5,000 from Patte's Travel.  And thereafter, it was -- took too

18 long to get the gift certificate.  And thereafter, I had $5,000

19 in an envelope that I would put in the travel magazine and I

20 would provide that to Mark every year thereafter the day before

21 Christmas.

22 Q.    So $5,000 in an envelope and a travel magazine from the

23 late 90s on every year you gave to Mark Ciavarella?

24 A.    That's correct.

25 Q.    When we last left off with the events dealing with PA

1  Child Care, Western PA Child Care and the expansion of Western

2  PA Child Care, you had just executed an agreement in August of

3  2007 for the expansion of Western PA Child Care?

4  A.    That's correct.

5  Q.    At some point after that, do you recall going to visit

6  Mark Ciavarella in his chambers with respect to a family matter

7  for Mark Ciavarella?

8  A.    Yes.

9  Q.    Describe for the jury what happened, first, why you went.

10  A.    A mutual friend of ours told me that Mark's mom was ill.

11  I called and asked Mark when he was going to be in the office

12  next, and he told me, and I went to see him at that time.

13  Q.    And you went to see him at his chambers in the Luzerne

14  County -- where his chambers were at that time?

15  A.    That's correct.

16  Q.    Now, can you describe for the jury your visit with him at

17  the chambers?

18  A.    Yes.  It was November 1st, 2007, and I went to his office.

19  And actually the first room that I walked in was actually dark

20  which -- it was a typical business day.  I was surprised.  I

21  went around the corner to where his office was, and Mark was

22  standing behind his desk, and it was dimly lit.  And I walked

23  in, said, hi, Mark.  And he, I think, said hi, and put his

24  finger to his lips as if to be -- to be quiet and --

25  Q.    So like this, this is what he did? (Indicating.)

48

1  A.    Yes.

2  Q.    And after he made this motion (indicating), what does he

3  do?

4  A.    He opened his desk drawer and sat down and wrote out in --

5  with a pen -- wired, yes, no, circle one.

6  Q.    And when after he wrote this down, did he show it to you?

7  A.    Yes, he did.

8  Q.    How did you indicate?

9  A.    I circled no.

10  Q.    After you circled no, what happened?

11  A.    He waved me to move into another -- to go into the

12  courtroom, and we sat down at one of the tables in the

13  courtroom.

14  Q.    When you sat down at this table, what does Mark tell you?

15  A.    Mark told me that there was a grand jury investigation

16  going on and that -- I believe a secretary of Michael Conahan

17  was already interviewed, and that he might be in trouble and

18  that he needed to talk to me.  And he went on to talk about the

19  commission agreements or the commissions I paid and said to me

20  that -- he wanted to let me know that Pinnacle was owned by --

21  he said Cindy and Barb, which was Cindy Ciavarella and Barb

22  Conahan.

23  Q.    When he said that Pinnacle is owned by Cindy Ciavarella

24  and Barbara Conahan, how did you react?

25  A.    I said, Mark, that's owned by Bob Powell, and he said no,

49

1  Rob, it's not, Bob Powell owed us money and we got all the

2  money for the Western PA Child Care, Pinnacle.

3  Q.    Now, was there a conversation that followed from that

4  about if he can be in trouble?

5  A.    He -- like I said, yes, there was.  He -- please repeat

6  that if you would.

7  Q.    Just explain for the jury what happens in the conversation

8  after that.  He discloses to you that Pinnacle Group of Jupiter

9  is actually owned by his wife and Barbara Conahan.

10 A.    Correct.

11 Q.    And is there any conversation that follows from that?

12 A.    Yes, he talks about the commission and says to me if that

13 commission went from you to me I would get a slap on the wrist

14 and it would be a reporting violation, if that commission went

15 from you to Bob Powell to me, I can go to jail.

16 Q.    Okay.

17 A.    He asked me to go back -- I said, Mark, that commission is

18 with Bob Powell, I have those documents in my office, they are

19 all over my office.  And he said, Rob, I'm asking you to go

20 back to your office and look at those, that's not the way I

21 remember it, I want you to look at them, I want you to come

22 back and see me as soon as possible.  I said, Mark, I'm jammed

23 I am busy.  We agreed that I would come back Monday at 12:00.

24 Q.    Did you go back to the office to look at the records?  Was

25 there any more conversation with Mark at that point?

1  A.    There was.  I said, Mark, what am I going to do now that,

2  you know, Pinnacle is owned by Barb and Cindy and I am doing a

3  project right now in western Pennsylvania.  He said to continue

4  to pay it to have it look it the same as the others.

5  Q.    He still wanted you to pay this other referral fee for the

6  expansion of Western PA Child Care?

7  A.    The $150,000 that was owed for Western PA.

8  Q.    Now, when you were speaking to Mark and he was saying,

9  please go back to look at your records in your office and come

10 back to meet with me, what were you understanding Mark to be

11 telling you to do?

12 A.    At that time, he said to me, Rob, I'm not asking you to

13 lie or perjure yourself, but, you know, I'm asking you to go

14 back to your office and look at those records and, you know,

15 recognize that I could -- I can go to jail and, you know, that

16 I'm a big boy but I hope my family is taken care of, and that's

17 what he said.

18 Q.    How did you interpret that?

19 A.    I interpreted it that he wanted me to go back and look

20 through those records and bring what I had back to his office.

21 And at the time I didn't -- I didn't have the realization that

22 he wanted me to change them at that moment, but thereafter I

23 did.

24 Q.    Did you go back to the office to look for the records?

25 A.    I did.

51

1  Q.    And did you realize the records were all made out to

2  Robert Powell?

3  A.    I did.

4  Q.    And did you attempt to return to Mark Ciavarella as you

5  had scheduled?

6  A.    I did.

7  Q.    What stopped you?

8  A.    I did have my coat on ready to see Mark, and at my front

9  desk I was told -- I was called back in my office.  They said

10  there were agents from the IRS and the FBI in my office asking

11  to see me.

12  Q.    Instead of meeting with Mark Ciavarella, you met with the

13  agents?

14  A.    Yes, that's correct.

15  Q.    Now, when you met with the agents, did you tell the agents

16  that you knew these finder's fees were going to Robert Powell

17  and to Mark Ciavarella?

18  A.    No, I did not.

19  Q.    Did you tell the agents that the finder's fees were only

20  going to Robert Powell?

21  A.    I did.

22  Q.    Was there subsequent contact with agents after that?

23  A.    Yes.

24  Q.    And again, you didn't disclose to the agents your

25  knowledge that these funds were going to Robert Powell and Mark

52

1  Ciavarella?

2  A.    That's correct.

3  Q.    And in addition, your knowledge about Pinnacle Group of

4  Jupiter that it is an entity controlled by Mark Ciavarella's

5  wife Cindy Ciavarella and Mike Conahan's wife Barbara Conahan?

6  A.    That's correct.

7  Q.    You didn't disclose that information to the agents at that

8  time either?

9  A.    That's correct.

10  Q.    You were called to testify before a grand jury in this

11  case; is that correct?

12  A.    That's correct.

13  Q.    And when you testified before the grand jury, you didn't

14  disclose it to the grand jury either?

15  A.    That's correct.

16  Q.    Was the work on the expansion of Western PA Child Care --

17  was it completed in 2008?

18  A.    Yes, it was.

19  Q.    And let me show you Government's Exhibit 18.4.  Is this

20  the completion letter that you sent to Western PA Child Care?

21  A.    Yes, it is.

22  Q.    Dated August 18th, 2008?

23  A.    Yes, it is.

24  Q.    This time the completion letter is submitted to Greg

25  Zappala owner, correct?

53

1  A.    That's correct.

2  Q.    And was there a certificate of occupancy obtained in

3  August of 2008 for this facility?

4  A.    I believe so.

5  Q.    18.5, is this --

6  A.    That's correct.

7  Q.    Is that it?  Certificate of occupancy appears to be --

8  A.    6/26/2008.

9  Q.    Was the date it was faxed to your office, correct?

10  A.    That's correct.

11  Q.    The finder's fee for the expansion of Western PA Child

12  Care, that was never paid; is that right?

13  A.    That's correct.

14         MR. CONSIGLIO:  With the Court's indulgence for a

15  moment.  I have no further questions for this witness, Your

16  Honor.

17  CROSS EXAMINATION

18  BY MR. FLORA:

19  Q.    Mr. Mericle, I would like to take you back to when you had

20  your first conversation with Mark Ciavarella about being

21  referred to Robert Powell, and that was sometime in 2000; is

22  that correct?

23  A.    That's correct.

24  Q.    And Mark Ciavarella called you, and at that point in time

25  he was a close friend of yours, was he not?

54

1  A.    Yes, he was.

2  Q.    The two of you had gone back many years.  In many ways you

3  looked up to him as a big brother, did you not?

4  A.    Yes, I did.

5  Q.    And when he called you on that particular day, he was

6  calling you as a friend, wasn't he not?

7  A.    I believe he was.

8  Q.    And as a friend of yours, would it be fair to say that he

9  was referring you to some individuals who may be looking at

10 developing a juvenile detention facility; isn't that correct?

11 A.    That's correct.

12 Q.    And in the course of that conversation, he never asked you

13 for any money, he never said to you, I'm referring you to these

14 people so I can get something in exchange?  He never did

15 anything like that; isn't that correct?

16 A.    That's correct.

17 Q.    And as a result of that conversation, you then called

18 Robert Powell, correct?

19 A.    I believe he called me.

20 Q.    He called you.  A meeting was set up, correct?

21 A.    That's correct.

22 Q.    In the meeting that was set up, I believe you indicated

23 there was a number of people there, Mr. Powell was there,

24 correct?

25 A.    Correct.

1  Q.   Keith Frederick was there?

2  A.   That's correct.

3  Q.   Was a Mr. Minora there?

4  A.   Yes, he was.

5  Q.   And you were there obviously?

6  A.   That's correct.

7  Q.   Was Mark Ciavarella there?

8  A.   No.

9  Q.   Up until the point of that meeting, did you ever call Mr.

10 Ciavarella back and say to Mr. Ciavarella, hey, I have this

11 meeting coming up, I'm going to go to it, I want to keep you

12 informed as to what was going on?  You never did that, did you?

13 A.   Not before that meeting.

14 Q.   Would it be fair to say on June 30th, 2000 there was

15 another meeting that you had?  Would it be fair to say at that

16 meeting John Joyce was present, Keith Frederick was present,

17 Robert Powell was present, John Minora was present, Greg

18 Zappala was present and you were present?  Isn't that correct?

19 A.   I don't know -- I don't recall Greg Zappala or John Joyce.

20 I don't believe John Joyce was there or Greg Zappala.  They

21 were given the information.

22 Q.   I'm referring you to Defendant's Exhibit 92.  I want you

23 to take a look at that.  This is a memo that you wrote, is that

24 not correct?

25 A.   It was prepared by my office, and my name is on it, but I

56

1  didn't write it, but it was delivered from my office.

2  Q.    And it was prepared at your direction, correct?

3  A.    My approval.

4  Q.    Okay.  And with your approval it lists a number of people

5  that were going to get this information; is that correct?

6  A.    That's correct.

7  Q.    And this memo relates to potential sites where this

8  facility may be built; is that not correct?

9  A.    That's correct.

10  Q.    And the people that were getting this memo were at this

11  meeting was John Joyce, Keith Frederick, Powell, Minora and

12  Gregory Zappala and yourself, correct?

13  A.    That's correct.

14  Q.    And just so we understand, Gregory Zappala, he was from

15  the -- outside of the Pittsburgh area; is that correct?

16  A.    That's correct.

17  Q.    And Keith Frederick was actually a person who was familiar

18  with bonds and he was Gregory Zappala's representative on

19  finance; is that correct?

20  A.    That's correct.

21  Q.    This memo ever go to Mark Ciavarella?

22  A.    I don't believe so.

23  Q.    Through this period of time when you were having these

24  meetings, I believe you said that your primary contact was

25  Keith Frederick and Robert Powell?

1  A.    That's correct.

2  Q.    You probably had numerous meetings with the two of them?

3  A.    Many, many meetings.

4  Q.    And in all those meetings you had with Keith Frederick and

5  Robert Powell, would it be fair to say that Mark Ciavarella was

6  not at any one of those meetings?

7  A.    That's correct.

8  Q.    Would it be also fair to say with regard to these meetings

9  you had with Keith Frederick and Robert Powell that you never

10  sent one letter or memo or note to Mark Ciavarella advising him

11  of the status of those meetings and what occurred at those

12  meetings?

13  A.    No, that's not true.

14  Q.    I would like to take you to June 22, 2001.  That is the

15  phone call you had with Robert Powell.  Do you remember that?

16  A.    Am I --

17  Q.    June 22, 2001.

18  A.    Yes, okay.

19  Q.    Do you remember that now?

20  A.    Yes.

21  Q.    Okay.  And I believe you had some handwritten notes as a

22  result of that phone conversation; is that correct?

23  A.    That's correct.

24  Q.    And at that point in time when you wrote those notes down,

25  did you indicate anywhere on those notes that you had --

58

1  subsequently had a conversation with Mark Ciavarella about your

2  phone contact with Robert Powell?

3  A.    No.

4  Q.    When Robert Powell related to you that there would be an

5  order from the judge that all kids would go to the facility,

6  how did you take that to mean?

7  A.    He was trying to convey to us and keep us interested in

8  the job because of the significant delays and was trying to

9  assure myself and Bryan McManus that he was going to get

10 financing and they were still going to go forward.

11 Q.    Did you ask Mr. Powell at that point in time, what order

12 are you talking about?

13 A.    No.

14 Q.    Did you ask Mr. Powell at that point who issued this

15 order?

16 A.    No.

17 Q.    Did you call Mark Ciavarella up at that point in time and

18 say to Mark Ciavarella, you know, Robert Powell tells me

19 there's some kind of order which is directed all kids go to

20 this facility, do you know anything about this order?

21 A.    No.

22 Q.    By the way, you were involved in the construction of

23 Western Pennsylvania Child Care?

24 A.    Correct.

25 Q.    And were you familiar at all with how financing was set up

59

1   for that project?

2   A.    Yes.

3   Q.    Were you familiar with the fact that with regards to

4   Western Pennsylvania Child Care that president judges from

5   three counties in Western PA Child Care signed orders or

6   contracts giving exclusive rights to send kids to Western PA

7   Child Care?  Were you aware of that?

8   A.    I only know that from looking at the financing commitment

9   that Bob Powell gave to me.

10   Q.    That is from president judges from three other counties

11   that signed placement agreements with Western PA Child Care,

12   correct?

13   A.    I believe that's true.

14   Q.    When you had this conversation with Robert Powell back on

15   January 22, 2001 in which he said an order would come down that

16   all kids would go to the facility, you didn't think there was

17   anything illegal about that at the time, did you?

18   A.    No, I did not.

19   Q.    I would like you to take now to July 12th of 2001.  And it

20   was on or about that time when you had finalized the numbers

21   and you were relatively certain that you were going to get the

22   construction for this project; is that correct?

23   A.    That's correct.

24   Q.    And at that point in time when you finalized the numbers,

25   you had included in those numbers a $1 million finder fee which

60

1  you believe was going to be paid to Robert Powell; is that

2  correct?

3  A.    At that moment, yes.

4  Q.    And let's talk a little about finder's fees.  You said

5  it's custom in your industry, correct?

6  A.    That's correct.

7  Q.    And finder's fees are often times paid to individuals that

8  refer you to projects; is that correct?

9  A.    That's correct.

10 Q.    And when a person refers you to a project, you would be

11 the contractor and you have a developer on the project,

12 correct?

13 A.    Sometimes that's correct.

14 Q.    And the finder fee would be paid to the person who refers

15 you; is that correct?

16 A.    That's correct.

17 Q.    It wouldn't be paid to the developer, correct?

18 A.    That's correct.

19 Q.    Robert Powell was the developer on this project, wasn't

20 he?

21 A.    He was the managing general partner.

22 Q.    A developer?

23 A.    He was a developer.

24 Q.    Who referred you?

25 A.    Bob referred me to PA Child Care, and Mark Ciavarella

61

1 referred me to Bob Powell.

2 Q.    The fact of the matter, it was Mark Ciavarella that

3 referred you, correct?

4 A.    The initial referral for my introduction to the

5 opportunity was from Mark Ciavarella.

6 Q.    Now, when you realized you were going to get the job and

7 you had this $1 million finder fee figured out, your testimony

8 here today is that you believed that Robert Powell, the

9 developer, was going to get the million dollars, correct?

10 A.    I was the one that incorporated that fee into the price.

11 And as I was physically doing it and realized the price, based

12 on the streaming income was a million dollars and they were

13 packing fees into it, I thought it was fair for me to go to

14 Mark Ciavarella because he was the original introduction for

15 the deal.

16 Q.    My question to you though is, when you were developing

17 that finalized price and you were putting in that finder's fee,

18 was it your intent at that point in time to pay the fee to

19 Robert Powell or to pay the fee to Mark Ciavarella?

20 A.    It was almost simultaneous in that I was looking to -- it

21 was incorporated into the project and instantaneously I

22 realized that Mark Ciavarella was the one that introduced me to

23 Bob Powell and I thought it was fair to go see Mark Ciavarella.

24 Q.    Up to that point, July 12th, 2001, Mark Ciavarella never

25 called you and asked you for the payment of any fee; isn't that

62

1    correct?

2    A.    That's correct.

3    Q.    You were the one who initiated this contact about the

4    finder's 's fee; isn't that correct?

5    A.    That's correct.

6    Q.    When you went in and saw him on his second floor chambers

7    at the main courthouse, that's when you had the discussion with

8    him about the payment of the finder's fee; isn't that correct?

9    A.    I'm not sure of the second floor, but I went to see him,

10   yes.

11   Q.    Do you know where in the courthouse you went to see him?

12   A.    Just his office.  I don't recall if it was the second

13   floor.

14   Q.    When you went into the room into his chambers and you saw

15   him, you sat down, you were the one that brought up about the

16   finder's fee; is that correct?

17   A.    Yes, that's true.

18   Q.    You said to Mark, Mark, for your referring me, I think

19   it's possible that I can pay you a finder's fee; isn't that

20   correct?

21   A.    No.

22   Q.    You didn't say anything like that?

23   A.    No.

24   Q.    Did you bring up the finder's fee in conversation with

25   him?

1  A.    Yes, I told him there was a referral fee that was being

2  incorporated into the price.

3  Q.    And did you say to him that you believed he should get a

4  portion of that fee?

5  A.    I said, Mark, you referred me, I believe you deserve it.

6  Q.    Okay.

7  A.    I said specifically, if anybody deserves it, it's you.

8  Q.    You're interviewed by various agents, Ben Wylam and Maria

9  Grabinski January 6th, 2009, were you not?

10 A.    Yes.

11 Q.    And in that conversation with them, did you ever indicate

12 to either of them that you told Mark Ciavarella that it would

13 be possible for you to pay a referral fee?

14 A.    I need to see that.

15 Q.    I will show you what has been marked for identification as

16 Defense 93.  If you go to the top paragraph, read that to

17 yourself.

18 A.    If anyone should get the fee for this, it should be you,

19 Mark.

20 Q.    It would be possible for him to pay a referral fee, did

21 you tell the agents that?

22 A.    That's not my exact words.  My words were that, Mark, if

23 anybody deserves it, it's you.

24 Q.    What's in that report, you disagree with the way it's set

25 forth?

64

1  A.    I would agree with the quotes, if anyone should get this

2  fee, it should be you, Mark.  I agree with that.

3  Q.    And when you told him that, would you agree that he said

4  he agreed?

5  A.    Yes.

6  Q.    And at that point in time, did you explain to Mark

7  Ciavarella how the paperwork would be drawn up?

8  A.    No.

9  Q.    And, in fact, the government has shown you as part of

10 their exhibits a number of commission agreements that were

11 executed by you and Robert Powell.  With regards to any of

12 those commission agreements, did you ever send any of them to

13 Mark Ciavarella?

14 A.    No.

15 Q.    Did you ever call Mark Ciavarella at any point in time

16 when those commission agreements were signed and say to Mark

17 Ciavarella, Mark I'm sending these commission agreements up and

18 I am putting Robert Powell's name on them, is this okay?  Did

19 you ever do anything like that?

20 A.    No.

21 Q.    You've indicated on direct examination that you were

22 interviewed by the FBI at least on two separate occasions in

23 2007, I believe in November or December of 2007 and both

24 occasions you lied to the FBI; is that correct?

25 A.    I failed to tell them about Mark Ciavarella's involvement,

1    correct.

2    Q.    You testified before the grand jury, and you lied in front

3    of the grand jury; is that not correct?

4    A.    I failed to disclose.

5    Q.    I would now like to take you to the time of your plea in

6    2009.  I want to ask you some questions with regards to the

7    charge you pled guilty.  You were present in court at the time

8    of your plea with your lawyer, Mr. Zubrod was present; is that

9    not correct?

10              MR. CONSIGLIO:  Objection, Your Honor.  May we

11    approach?  I believe we are getting -- now we are at the time

12    that is ripe for our motion in limine.

13              THE COURT:  Talking to him about the plea agreement?

14    Isn't that what you're questioning him about?

15              MR. FLORA:  The plea colloquy, Your Honor.

16              THE COURT:  Okay.

17              (The following discussion took place at sidebar:)

18              MR. HOUSER:  Your Honor, the government at this point

19    would ask for an offer of proof and the proffered basis for

20    admissibility of the offer.

21              MR. FLORA:  The offer, Your Honor, is basically I

22    will make an inquiry of this particular witness as to the

23    things that he acknowledged at the time of the entry of his

24    guilty plea, the surrounding circumstances of the offense to

25    which he pled guilty.  In particular, Your Honor, I am going to

1  ask this witness whether he acknowledged based upon

2  representations by the government that the money that was paid

3  to Mark Ciavarella was not a kickback or bribe in any sense.

4         I'm going to ask him whether he acknowledged at the

5  time of the entry of his plea that it was common practice to

6  pay finder's fees in accordance with standard practice and that

7  the fees to the judges was, in fact, a finder's fee, whether he

8  acknowledged that at the time of the entry of his plea.  I'm

9  going to ask him whether at the time of the entry of his plea

10 he acknowledged that the payment of the fee was what he had

11 done hundreds of times before and was not related to the office

12 of the judges held or any decisions by the judges.

13        I'm also going to ask him at the time of the plea he

14 acknowledged that the judges steered him to Mr. Powell because

15 he can build a building cheaper than anyone else and, in fact,

16 he was the lowest bidder and that's why he was chosen.  And I

17 am going to ask him whether he acknowledged at the time of his

18 plea that there was no quid pro quo.

19        MR. HOUSER:  And that is all entirely consistent with

20 everything he testified to here today, and so for the proffer

21 -- the offer that's been made, it's hearsay and there's no

22 exception.

23        THE COURT:  He's going to -- he's going to ask the

24 witness whether -- he can question the witness about his plea

25 agreement and the plea.

67

1          MR. HOUSER:  And I have no problem with that.

2          THE COURT:  That's all he's asking him to

3  acknowledge.

4          MR. HOUSER:  That's not true.  What he's asking to do

5  is go through the colloquy and read the transcript where there

6  was that purported admission by the government, and that's what

7  he's offering to do here, Judge.

8          THE COURT:  That's what he said.

9          MR. HOUSER:  Well, that's what he's going to do.

10          THE COURT:  He's going to ask the witness on those

11  occasions he made those acknowledgements.  If it's limited to

12  that, you have a right to do that.

13          MR. HOUSER:  My question is, is it your intention to

14  go through the colloquy and to put on the statements of Mr.

15  Zubrod as well?

16          THE COURT:  If you do that, I will sustain the

17  objection.  He said he's going to ask the witness to

18  acknowledge on that occasion whether he acknowledged all of the

19  things that he mentioned.  He didn't mention the transcript.

20  He didn't mention Zubrod's name in his offer.

21          MR. FLORA:  That's correct.

22          MR. HOUSER:  So you are not going to do that?

23          THE COURT:  If he does, you object.  I mean, I can't

24  fine tune it.  I am going to hold you to what you put on the

25  record.

68

1          MR. FLORA:  What I am going to do -- I am going to

2    ask him at the time of the entry of his plea that he

3    acknowledged the following.

4          THE COURT:  That's the way you repeated it time after

5    time on the record here, and I am holding you and limiting you

6    to that.

7          MR. FLORA:  Well, I want to acknowledge who was doing

8    the questioning.

9          THE COURT:  Listen, you put on the record that you

10   were going to ask him at the time of his plea he acknowledged

11   those various things.  I am allowing you to do that.  Now

12   you're changing it.

13         MR. FLORA:  I don't believe I am, Your Honor.

14         THE COURT:  Well, listen, I am limiting you to what

15   you said on the record earlier, and I am not going to fine tune

16   it by asking her to repeat it because I know what you said.

17   And if you don't want to do that, then you can't do anything.

18   Go ahead.

19         (The discussion at sidebar concluded.)

20   BY MR. FLORA:

21   Q.   Going to your plea of September 2nd, 2009 when you were

22   present in court, and you testified under oath; is that

23   correct?

24   A.   That's correct.

25   Q.   And were the responses you gave that day truthful?

69

1   A.    Yes, they were.

2   Q.    In the course of that guilty plea hearing, did you

3   acknowledge before the Court that this was not a kickback or a

4   bribe in any sense?

5   A.    To me, that's correct.

6   Q.    And we're talking about this was not a kickback or a bribe

7   in any sense, we're talking about this money, this finder fee

8   money that it's been referred to as, correct?

9   A.    That's correct but as it was relayed to me.

10  Q.    Did you also acknowledge in the plea that it was a common

11  practice between businessmen in real estate transactions?  Did

12  you acknowledge that at the time of the plea?

13  A.    Yes.

14  Q.    Did you acknowledge at the time of the plea that you

15  simply paid a finder's fee to the judges in accordance with

16  standard practice?

17  A.    Yes.

18  Q.    Did you acknowledge at the time of the plea that the

19  payment of the fee was what you had done hundreds of times

20  before and was not related to the office the judges held or any

21  decisions by the judges?

22  A.    Yes.

23  Q.    Did you acknowledge that the judges steered you, steered

24  you because you can build the building cheaper than anyone

25  else?

70

1    A.    I acknowledged that at the plea, yes.

2    Q.    Did you acknowledge at the time of the plea that you were

3    the lowest bidder on the project?

4    A.    Yes.

5    Q.    Did you acknowledge at the time of the plea that because

6    you were the lowest bidder that was why Mr. Powell chose you?

7    A.    Yes.

8    Q.    Did you acknowledge at the time of the plea that with

9    regards to the money that was paid to Mr. Ciavarella and Mr.

10   Conahan that there was no quid pro quo?

11   A.    With regards to me, that's correct.

12   Q.    With regards to the misprision charge you pled guilty to

13   -- so the jury understands, misprision is basically where you

14   failed to report crime to the government; isn't that correct?

15   A.    That's correct.

16   Q.    And in this particular instance the charge to which you

17   pled guilty plea dealt with failing to report matters relating

18   to income tax violations by Mr. Ciavarella; isn't that correct?

19   A.    That's correct.

20   Q.    It does not relate in any way to the payment of bribes or

21   kickbacks, isn't that correct?

22   A.    That's correct.

23   Q.    And, in fact, in the entire plea hearing that you held in

24   -- you had in court, at no time -- at no time did you ever

25   indicate to the judge or indicate to the government that the

71

1  moneys that you paid to Mark Ciavarella and Michael Conahan was

2  either a bribe or a kickback; isn't that correct?

3  A.    To me, that's correct.

4  Q.    Well, when you say to me, you never said in open court at

5  the time of your plea that it was either a bribe or a kickback,

6  that's correct, isn't it, sir?

7  A.    I didn't say the things you enumerated.  That was said by

8  Mr. Zubrod.

9  Q.    And you acknowledged those things?

10  A.    I did.

11  Q.    Okay.

12  A.    To me.

13  Q.    You acknowledged those things under oath?

14  A.    I did.

15  Q.    When you acknowledged those things, you were truthful in

16  that acknowledgement; isn't that correct, sir?

17  A.    That's true.

18         MR. FLORA:  If I can have one moment to confer with

19  the defendant, Your Honor.

20  BY MR. FLORA:

21  Q.    Would you agree with me you never paid Mr. Ciavarella a

22  kickback or a bribe?

23  A.    That's correct.

24         MR. HOUSER:  Judge, we have a -- we have redirect,

25  but we -- at this point may we approach?  We have a matter --

72

1    we have a request for the Court at this point.

2         THE COURT:  All right.  If we have to we have to.

3         (The following discussion took place at sidebar:)

4         MR. HOUSER:  I have to hand it to Mr. Flora, he did

5    an excellent job.  He complied with Your Honor's -- he did.  I

6    agree.  However, at the end of the testimony the witness

7    indicated that this was a statement came from Mr. Zubrod, and

8    he agreed to it.  And so now since this has occurred, we would

9    request an instruction to the jury regarding the limited

10   admissibility of that particular evidence.

11        And in particular, I would request -- the government

12   would request an instruction as follows be given.  In certain

13   instances, evidence may be admitted only for a particular

14   purpose and not generally for all purposes.  You have heard

15   evidence that Robert Mericle at his guilty plea proceeding

16   agreed with or adopted a statement made by government counsel

17   concerning Mericle's intent or state of mind regarding payments

18   made by Mericle to the defendant.  That evidence was admitted

19   to explain Mericle's own intent or state of mind and not the

20   intent or state of mind of any other person including Mark

21   Ciavarella, Michael Conahan or Robert Powell.  You may consider

22   this evidence only to explain Mericle's own intent or state of

23   mind.  You may not, however, consider this evidence as an

24   admission by the government that Mericle's payments to the

25   defendant were lawful finder's fees.  The question of whether

1  the Mericle payments to the defendant were lawful finder's

2  fees, illegal bribes or illegal kickbacks is a question for

3  you, the jury, to decide during your deliberations at the

4  conclusion of the case after all of the evidence has been

5  received and after I have instructed you on the law.  For the

6  limited purpose for which this evidence has been received, you

7  may give it such weight as you feel it deserves.  You may not,

8  however, use this evidence for any other purpose not

9  specifically mentioned.  We're requesting that instruction

10  because at this point with Mr. Ruzzo's opening statement

11  regarding the admissions by the government which had not been

12  ruled as admissions at any time and this particular -- the way

13  this testimony transpired, it's the government's position this

14  is giving an unfair inference to what went on here under the

15  circumstances.

16      THE COURT:  At the end of this case, I will be happy

17  to charge the jury on what you just asked.

18      MR. HOUSER:  Okay.

19      THE COURT:  But you can question the witness with the

20  early part of this statement that the -- those were his

21  intentions.

22      MR. HOUSER:  Your Honor, I am satisfied that --

23      THE COURT:  That's the government's position.

24      MR. HOUSER:  At the end of the case, that will be

25  fine if you want to give it at that point.

74

1          MR. RUZZO:  We will oppose this instruction.  We

2    oppose it.

3          THE COURT:  I didn't give it yet.

4          MR. RUZZO:  If it does.  We just want to put you on

5    notice, Your Honor.

6          THE COURT:  I'm asking you to question the witness on

7    the earlier part of the statement that that was his intention.

8          MR. HOUSER:  Okay.

9          THE COURT:  Because that's all the government tried

10   to establish that it was his intention.

11         MR. HOUSER:  Okay.  All right.  Thank you.

12         MR. RUZZO:  That's their view.  That's their view,

13   Your Honor.

14         THE COURT:  Yes, but the witness may tell us that was

15   his view.

16         MR. HOUSER:  One more thing I want to clarify because

17   this is important.  At that particular juncture at the plea

18   proceeding, Zubrod makes a little side statement saying I want

19   to explain to you, Judge, why we entered into this plea

20   agreement.  So this is really not -- the point is this isn't

21   about Mericle's intent at all.  He acknowledged all those

22   things by way of his plea.  But this particular discussion is

23   Zubrod explaining to you why the government entered into the

24   plea agreement.  It has nothing to do with Mericle's intent at

25   all.  Its explaining why Zubrod decided to enter into this plea

75

1   agreement.

2            THE COURT:  Zubrod was reflecting Mericle's intent.

3            MR. HOUSER:  That's correct.  I agree.

4            THE COURT:  Then ask Mericle if that's what he

5   intended.

6            (The discussion at sidebar concluded.)

7            THE COURT:  Ready for redirect?

8            MR. FLORA:  I have a couple more, questions.

9            THE COURT:  I thought you were done.

10           MR. FLORA:  Just a couple more.

11  BY MR. FLORA:

12  Q.   Mr. Mericle, I would like to take you back to the meeting

13  that you had with Mark Ciavarella --

14           THE COURT:  Let me ask you a question.  Why would I

15  have had a sidebar with the government's counsel and the

16  defense counsel at the request of the government's counsel just

17  before a cross examination -- or redirect examination?

18           MR. HOUSER:  I thought he was through as well.

19           THE COURT:  I definitely had that impression.

20  Otherwise, it would have been a waste of time for me to

21  anticipate what the government wanted to do on redirect.

22           MR. FLORA:  I did not indicate I gave up the witness.

23  They simply asked for a sidebar as I was conferring with Mr.

24  Ciavarella.

25           THE COURT:  In preparation for their redirect, and if

76

1  -- listen, I have no problem even if you said, Your Honor, I

2  turn over the witness but I want to reconsider that, and that's

3  fine.  Go ahead.  I'm just trying to convey to you my

4  impression.

5            MR. FLORA:  I would ask, Your Honor, I be permitted

6  to ask a few more questions.

7            THE COURT:  You may, but one thing follows another.

8  And it was certainly premature for me to give consideration to

9  the government's request for sidebar for redirect examination.

10 Go ahead.

11 BY MR. FLORA:

12 Q.    Taking you to November or December of 2007, Mr. Mericle,

13 when you went to see Mark Ciavarella, okay --

14 A.    Yes.

15 Q.    -- you went in.  And part of the conversation related to

16 the commission or the finder's fee.  Do you remember that

17 conversation?

18 A.    Yes.

19 Q.    And fair to say that in the course of that conversation

20 one thing that Mark Ciavarella told you specifically, don't

21 obstruct justice and don't lie.  He told you those two things,

22 didn't he?

23 A.    He did.

24 Q.    And you left his chambers, and you lied to the FBI twice

25 and you lied to the grand jury.  You didn't take his advice,

77

1  did you, sir?

2  A.    (No audible response.)

3          MR. FLORA:  That's all I have, Your Honor.

4          THE COURT:  Okay.

5  REDIRECT EXAMINATION

6  BY MR. CONSIGLIO:

7  Q.    With respect to that last point, Mr. Mericle, I got a

8  couple of questions on redirect for you.  The words that came

9  out of Mark Ciavarella's mouth may have been, don't lie to the

10 FBI, don't obstruct justice, but in the totality of what he

11 said, what did you interpret upon reflection what he was asking

12 you to do?

13 A.    To go back in my office and to make sure that the

14 documents would say that it went between me and Mark directly,

15 not between me and Bob Powell and Mark.

16 Q.    So you interpreted what he was saying was obstruct

17 justice, lie to the FBI?

18 A.    Upon reflection, yes, and -- correct.

19 Q.    Do you recall the defense asking you some questions about

20 whether you had any follow-up contact with Mark Ciavarella

21 related to the project after he initially introduced you to the

22 project, and you answered in cross examination, that's not

23 correct, that you did do follow-up with Mark Ciavarella?

24 A.    That's correct.

25 Q.    And what type of follow-up did you do with Mark

1  Ciavarella?

2  A.    I sent Mark detail of the site analysis that we had done

3  so that I was being respectful to follow up on his original

4  request to be helpful with the land site.

5  Q.    Government's Exhibit 1.8; is that right -- I'm sorry.

6  Switch that back.  Thank you.  Government's Exhibit 1.8, is

7  that the fax you sent to Mark Ciavarella?

8  A.    Yes, it is.

9  Q.    March 7th, 2001.  Enclosed is the version of the map

10 depicting the lands in Pittston Township.  Mr. Mericle is out

11 of the office until Monday, March 21st.  Feel free to contact

12 Brian McManus if you feel you have any questions.  Thank you.

13 A.    That's correct.

14 Q.    That's the map?

15 A.    That's correct.

16 Q.    Now, beyond this fax, was there other verbal communication

17 you had with Mark Ciavarella about the progress of the project?

18 A.    I believe I spoke to Mark a number of times just giving

19 him general updates.

20 Q.    Did he seem interested in the progress of the project?

21 A.    Yes.

22 Q.    Do you recall being asked in cross examination by the

23 defense counsel about Western Pennsylvania Child Care and

24 guarantee agreements presented by other judges in other

25 counties committing their juveniles to Western PA Child Care if

1  it was constructed?

2  A.    Yes.

3  Q.    Do you know whether those commitment guarantee agreements

4  executed by those other counties were done without consultation

5  to other public officials in those counties?  Do you know

6  whether they were or weren't?

7  A.    No, I don't know.

8  Q.    Do you know whether these commitments were made with

9  specific dollar amounts of how much the county would be on the

10  hook for per year for the guarantee agreement?

11  A.    No, I have no knowledge of that.

12  Q.    And finally, with respect to any of those other county

13  judges who issued these guarantee agreements, did you pay any

14  of them finder's fees?

15  A.    No, I did not.

16  Q.    Do you recall being asked on cross examination about your

17  friendship with Mark Ciavarella dating back years?

18  A.    Correct.

19  Q.    And that's why you considered him as a big brother in many

20  respects?

21  A.    That's correct.

22  Q.    Is that why you lied to federal agents and to a grand jury

23  or failed to disclose information that would be relevant to

24  their investigation?

25  A.    When I met with Mark in that November meeting and he told

1  me that Pinnacle was owned by Barb and Cindy and he could

2  potentially go to jail, I did not want to be the person that --

3  I knew it was Bob Powell, Mike Conahan and Mark involved and I

4  did not want to be the person to lay Mark out.  I didn't want

5  to --

6  Q.   You didn't want to be the guy to convict Mark Ciavarella

7  for this circumstance?

8  A.   Mark and I go back a long time.  His friends are my mutual

9  friends.  I did not want to be the person that laid that

10 information out.

11 Q.   Do you recall being asked on cross examination some

12 questions concerning your guilty plea to misprision of a

13 felony?

14 A.   Yes.

15 Q.   On cross examination you repeatedly answered the questions

16 by defense counsel as, to me, it wasn't a bribe or a kickback;

17 is that correct?

18 A.   That's correct.

19 Q.   Let me back step a little bit.  This was the first time

20 that you had a referral arrangement with a public official; is

21 that right?

22 A.   That's correct.

23 Q.   All other referral fees dealt with private individuals who

24 deal in this industry regularly; is that correct?

25 A.   That's correct.

81

1  Q.    So in the private world, private industry referral fees is

2  a normal common practice; is that right?

3  A.    That's correct.

4  Q.    Now, you said that to your mind this wasn't a quit pro quo

5  but this was a quit pro quo to some degree, wasn't it, Mr.

6  Mericle?  Mr. Ciavarella gave you something.  He introduced you

7  to a deal; is that right?

8  A.    In the sense of the referral fee being a reward for

9  introducing me to the deal, yes.

10 Q.    He introduced you to a deal, and you gave him something

11 back; isn't that right?

12 A.    Yes.

13 Q.    At the time he introduced you to the deal, wasn't he the

14 Luzerne County juvenile court judge?

15 A.    He was.

16 Q.    And wasn't he trying to get something built for the

17 juveniles in Luzerne County for a place for them to be

18 detained?

19 A.    Yes.

20 Q.    He was doing that as part of his job, wasn't he?

21 A.    He definitely had an interest in trying to get a new

22 facility built.

23        MR. CONSIGLIO:  If I can have the Court's indulgence

24 for a moment.  I have no further questions for this witness.

25        MR. RUZZO:  One moment, Judge.

82

1          THE COURT:  This becomes a delicate area when we have

2    cross examination, redirect and a recross.  Sometimes that's

3    taking it too far.  So be very limited, please.

4          MR. FLORA:  Very limited, Your Honor.

5    RECROSS EXAMINATION

6    BY MR. FLORA:

7    Q.    Mr. Mericle, would it be fair to say that the only thing

8    Judge Ciavarella did for you was refer you to Robert Powell?

9    A.    Yes.

10   Q.    And he referred you to Robert Powell as a friend, correct?

11   A.    At the time that was my belief.

12         MR. FLORA:  That's all I have, Your Honor.

13         THE COURT:  I have a couple questions for

14   clarification I hope for the jury and for myself.  During your

15   direct examination, you indicated that you went to Mr.

16   Ciavarella's office to discuss the referral fee?

17         THE WITNESS:  Yes, Your Honor.

18         THE COURT:  And that he told you to pay Mr. Powell

19   that fee and they would work it out?

20         THE WITNESS:  Correct.

21         THE COURT:  I believe you testified to that so that

22   because the money went to Powell it was at the instruction or

23   suggestion of the defendant in this case, correct?

24         THE WITNESS:  That's correct, Your Honor.

25         THE COURT:  And then generally about the practice of

83

1  bidding a job where you know you want to pay a referral fee to

2  someone, in this case at least on one occasion and maybe on

3  others, you calculated the referral fee into the bid?

4          THE WITNESS:  In all cases.

5          THE COURT:  Correct?

6          THE WITNESS:  Correct, Your Honor.

7          THE COURT:  So in the end when the referral fee is

8  being paid by you, somebody else is paying the referral fee?

9          THE WITNESS:  That's correct, Your Honor.

10         THE COURT:  If I had a contract with you and in the

11 bid that I accept you have a referral fee, you're not paying

12 that fee, I'm paying the fee?

13         THE WITNESS:  That's --

14         THE COURT:  You don't pay the referral fee and pay it

15 out of your pocket?

16         THE WITNESS:  That's correct.

17         THE COURT:  You want us to believe that's normal

18 practice in paying referral fees?

19         THE WITNESS:  Yes.

20         THE COURT:  Okay.  All right.  I have no further

21 questions.  You may step down, sir.  Thank you.

22         MR. CONSIGLIO:  I move for the admission of exhibits

23 the government referenced in direct and cross examination of

24 Mr. Mericle, and I believe we have a stipulation to the -- that

25 evidence as being business records, and that stipulation is

84

1  19.15.  If the Court's inclined, I can read through the

2  stipulation --

3          THE COURT:  If they agree to the stipulation, then

4  they are admitted.  There's not been a short stipulation in

5  this case.  That's why I want to avoid it if you can.

6          MR. FLORA:  Judge, I did not write the stipulation.

7          MR. CONSIGLIO:  So the record is clear, the records

8  -- the records reflect in the stipulation 19.15 are admitted

9  into evidence.

10          MR. FLORA:  That's correct, Your Honor.

11          THE COURT:  And they are.

12          MR. CONSIGLIO:  Thank you, Your Honor.

13          MR. ZUBROD:  We're prepared to call our next witness,

14  Your Honor.  The United States calls Robert Matta to the stand.

15          ROBERT MATTA, called as a witness, being duly sworn,

16  testified as follows:

17  DIRECT EXAMINATION

18  BY MR. ZUBROD:

19  Q.    You are Robert Matta?

20  A.    That's correct.

21  Q.    Mr. Matta, by whom are you employed?

22  A.    Currently I'm self-employed as an attorney.

23  Q.    And what is your training as an attorney?

24  A.    I was -- I am a graduate of Villanova University with a

25  degree in accounting, and I'm a graduate of Delaware Law

1   School.

2   Q.   Was there a time when you were employed by the Minersville

3   Safe Deposit and Trust Company in Schuylkill County?

4   A.   Yes, I was.

5   Q.   In what capacity were you employed by them?

6   A.   I was the -- originally the CEO and the president and CEO

7   of the bank.

8   Q.   How long did you serve -- for how long did you serve at

9   the Minersville bank?

10   A.   From 1990 to 2009.

11   Q.   Do you know an individual by the name of Robert Mericle?

12   A.   I know of him.

13   Q.   You never met him at all?

14   A.   Never met him.

15   Q.   Do you know an individual by the name of Michael Conahan?

16   A.   Yes, I do.

17   Q.   How do you know Mr. Conahan?

18   A.   I was introduced to Mr. Conahan in the early 1990s.

19   Q.   And was it basically a friendship relationship, or was

20   there also a business aspect to it?

21   A.   I originally met Mr. Conahan through a business

22   relationship at that time.  Mr. Conahan was involved with some

23   other people interested in starting a bank in the Hazleton

24   area.

25   Q.   Now, you at some point were given an offer by Mr. Conahan,

86

1  were you not?

2  A.    I got to know Michael a lit bit socially, yes.

3  Q.    Did you ever -- did you ever travel down to Florida to

4  stay in a place he owned?

5  A.    In approximately 1994 I was going through a divorce.  I

6  ran into Mike.  I believe it was at a dinner somewhere.  We

7  chatted, and I mentioned I was going through a divorce.  And he

8  offered -- asked if I can -- if I wanted to use his condominium

9  in the Fort Lauderdale area for vacation.

10  Q.    In Fort Lauderdale, Florida?

11  A.    Yes.

12  Q.    Did you take him up on it?

13  A.    Yeah.  Yes, I did.

14  Q.    Do you know an individual by the name of Mark Ciavarella?

15  A.    I met Mark, yes.

16  Q.    The individual to whom I refer as Mark Ciavarella, do you

17  see him in court, and if so, can you point him out?

18  A.    Yes, he is, over there. (Indicating.)

19         MR. ZUBROD:  Let the record reflect the witness

20  identified the defendant, Mark Ciavarella.

21  BY MR. ZUBROD:

22  Q.    How do you know Mr. Ciavarella?

23  A.    I know him to be a judge.

24  Q.    I mean, you knew that as an attorney he was a judge for

25  Luzerne County?

87

1  A.    That's correct.

2  Q.    All right.  In any other -- have you had any other

3  relationships with Mr. Ciavarella?

4  A.    In approximately 2005 our bank in borrowing a loan to

5  Ciavarella.

6  Q.    How much was that loan for?

7  A.    I believe it was approximately $75,000.

8  Q.    Do you know an individual by the name of Robert Powell?

9  A.    Yes, I do.

10  Q.    How do you know Mr. Powell?

11  A.    I was introduced to Mr. Powell in the mid 1990s.

12  Q.    By whom?

13  A.    Mike Conahan.

14  Q.    And did you conduct -- did you get loans for Mr. Powell or

15  a loan?

16  A.    Yes, I was first introduced Mr. Powell from Mike Conahan.

17  And Mike called me and said he was friends with an attorney in

18  the Hazleton area and he thought there could be a business

19  relationship in terms of the bank and him borrowing and things

20  of that nature.

21  Q.    Did you form any other sort of business or professional

22  relationship with Robert Powell?

23  A.    Yes, I did.  As a practicing attorney, I kept the private

24  practice while also as presidency of the bank, and I would

25  refer personal injury cases to Mr. Powell.

1  Q.   And what would you get -- for this referral of a case to

2  Mr. Powell, what would you get?

3  A.   Typically a referral fee arrangement that's permissible

4  whereby an attorney would refer a personal injury case to an

5  attorney who specializes in that type of work.

6  Q.   When you say permissible, what do you mean by that?

7  A.   It's permissible under the rules of professional

8  responsibility under the attorney rules.

9  Q.   An attorney is allowed to make a referral to another

10 attorney?

11 A.   Yes, he is or she is.

12 Q.   And what is this thing you refer to as a referral fee?

13 A.   Typically the arrangement is an attorney who has a client

14 who may have been involved in a personal injury case will

15 contact an attorney who specializes in it.  When the -- when

16 the attorney -- second attorney takes the case, if they get an

17 award of some type or settlement, the referral fee -- typically

18 could be one third or one half of the amount that the attorney

19 earns will go back to the finding attorney, the attorney who

20 originally represented the client.

21 Q.   Okay.  So I understand you saying a referral fee is you

22 give something -- a case to the attorney, the attorney makes

23 money from that case and something goes back to you as a

24 finder's fee -- kind of reward or thank you from the attorney?

25 A.   That's correct.

89

1  Q.    Is there a term that the lawyers use?

2           THE COURT:  True love.

3           THE WITNESS:  Never enough.  I don't know.

4  BY MR. ZUBROD:

5  Q.    You've heard the term quid pro quo, have you not?

6  A.    Yes, I have.

7  Q.    What is quid pro quo?

8  A.    Basically it's doing one thing and in return receiving

9  something else.

10 Q.    Is that what a referral fee in your understanding as an

11 attorney?

12 A.    Yes, it is.

13 Q.    Now, were you aware of building of PA Child Care in

14 Luzerne County in 2002?

15 A.    Generally speaking, yes, I was aware.

16 Q.    What did you know about it?

17 A.    I was aware that there was -- there was discussions in

18 Luzerne County about building a juvenile delinquency home.

19 Q.    When you say discussion, what do you mean by discussion?

20 A.    I think I -- my recollection is I read something in the

21 paper -- in the papers about it and --

22 Q.    Conflict?  Were you aware there was a conflict relating --

23 A.    Yeah, I -- generally speaking, I don't live in the

24 Wilkes-Barre area or Luzerne County area.  However, I recall

25 seeing that some of either the commissioner or county

90

1  controllers were not in agreement about building a facility.

2  Q.    Were you ever approached by anyone to help finance part of

3  the building of PA Child Care?

4  A.    I was approached by Bob Powell about the financing the

5  child -- the juvenile delinquency center.

6  Q.    What is it he wanted to you do initially?

7  A.    Initially he called me to request borrowing for the

8  purchase of the real estate and also for some engineering

9  costs, things of nature, start-up costs.

10  Q.    Did Mr. Powell approach you later regarding financing the

11  total cost of the youth detention center?

12  A.    Yes, he did.

13  Q.    What did you do?  Did you do it?

14  A.    No, we did not.

15  Q.    Why not?

16  A.    It exceeded the bank's lending limit.

17  Q.    And did you inform that -- inform Mr. Powell that you

18  could not because of -- could not lend him the money?

19  A.    That's correct.

20  Q.    Did you later have any other dealings with these

21  individuals?

22  A.    Yes, I did.

23  Q.    Tell us what happened.

24  A.    In January 2003 I received a call from Bob Powell.

25  Q.    And can you tell us what took place?  What did he say?

91

1  A.    Bob Powell called me.  He asked me if I could handle a

2  real estate transaction as an attorney in regards to a real

3  estate deal he was involved in.

4  Q.    Now, and he called this a real estate transaction on a

5  real estate deal?

6  A.    Yes.

7  Q.    What was it -- well, did Mr. Powell explain to you how he

8  wanted the transaction handled?

9  A.    He told me that he was involved in a real estate deal and

10  wanted me to handle as an attorney, wanted my account

11  information, my attorney account information, would pay me a

12  fee for handling the real estate transaction.

13  Q.    Did Mr. Powell tell you how he wanted you to handle it?

14  A.    Initially he wanted my bank account information, again, my

15  attorney account information, my escrow account and he would

16  send me some proceeds -- some moneys to me.

17  Q.    Did Mr. Powell explain in any way why he would contact an

18  attorney in Schuylkill County to handle a real estate

19  transaction that was occurring up in Luzerne County?

20  A.    He told me at the time that he wanted the matter -- he

21  wanted to low key the transaction, he didn't want to go through

22  his own bank in Luzerne County.

23  Q.    As an attorney, as a banker, as an accountant you handled

24  numerous business transactions, haven't you?

25  A.    Yes.

92

1  Q.    Normally, as I recall my experience as a private attorney,

2  the attorney handling the real estate transaction usually has

3  to do a heck of a lot of work to earn his fee for a real estate

4  transaction, am I right?

5  A.    Depending on what the attorney is required to do, yes.

6  Q.    But normally, an attorney would have to do the HUD

7  filings, he would have to do the due intelligence reports, he'd

8  have to do -- he'd have to be explain all the financing issues,

9  correct?

10  A.    Sure.

11  Q.    Okay.  The -- generally it involves a substantial amount

12  of work, does it not?

13  A.    It could.

14  Q.    Okay.  And how much would you normally charge for the full

15  service in a normal real estate transaction?

16  A.    It depends on the amount of time, and it depends on, you

17  know, what it entails.

18  Q.    Okay.  Well, in your case, what did it entail?  What did

19  you have to do?

20  A.    Well, at least initially I received the wire transfer in

21  the --

22  Q.    So money came into your account?

23  A.    That's correct.

24  Q.    And later went out of your account?

25  A.    Yes, it did.

1  Q.   That's all you did?

2  A.   That's correct.

3  Q.   So it's fair to say that the lifting wasn't particularly

4  heavy?

5  A.   That's correct.

6  Q.   How much would you normally -- well, how much would you

7  normally charge for a -- the normal real estate transaction

8  where you do the title search, HUD declaration, property tax

9  loan documents, title search?

10 A.   Could be a couple dollars depending on the amount of time

11 and effort and work required.

12 Q.   What was the fee in this case for holding an amount of

13 money for a few days?

14 A.   Mr. Powell -- when I first discussed it with him told me

15 he would pay me a fee of $10,000.

16 Q.   That's a whopping amount for such little work, isn't it?

17 A.   I wasn't sure what was to be required of me at least

18 initially.

19 Q.   Didn't set off any warning bells in your head or anything?

20 A.   No, not really.

21 Q.   Have you been told by Mr. Powell or by the individual who

22 called you after this which you're about to testify to -- let

23 me say, have you been told by Robert Powell and Michael Conahan

24 that the money amounting to $610,000 was actually a finder's

25 fee to be paid to a judge, what would you have done?

94

1  A.    I would not have been involved in it.

2  Q.    Why?

3  A.    It would have looked like it wasn't right, that it wasn't

4  legal.  It wasn't legal.

5  Q.    Assume for the moment that the origin and purposes of the

6  funds had not been disclosed to you but had only been described

7  as a real estate transaction, did that affect your behavior?

8  A.    Not really.  I mean, it was --

9  Q.    You just said had I been told it was going to a judge as

10  payment, I wouldn't have touched it.  But you touched it.  Did

11  the fact it was described to you as real estate transaction

12  affect your decision to touch it?

13  A.    Sure.  It did.

14  Q.    Had you known it was a referral fee to a judge --

15  A.    I would not have touched it, absolutely not.

16  Q.    And as a matter of fact, as an attorney and member of the

17  bar, had you known that, what steps would you have taken as an

18  attorney?

19  A.    I would have carefully looked over the rules to determine

20  whether or not it was a proper transaction and perhaps reported

21  it if need be.

22  Q.    Reported it to whom?

23  A.    Well, reported it either to the bar association or

24  disciplinary report or something of that nature if it didn't

25  look right.  That would have been my obligation.  I would have

95

1   felt that would have been my ethical obligation.

2   Q.   I want to show you what's been marked as Government's

3   Exhibit 3.2.  What is this?

4   A.   This is a -- wire transfer record produced by the

5   Minersville bank which reflects wire transfer to my attorney

6   account for $610,000 on January 21st, 2003.

7   Q.   Okay.

8   A.   It says incoming.  In other words it came into my account.

9   Q.   And it came in on what date, January 21st, 2003?

10  A.   That's correct.

11  Q.   And what happened to that money?

12  A.   It was placed in my attorney escrow account.

13  Q.   Stay there?

14  A.   Yes, it did.

15  Q.   How long did it stay there?

16  A.   One week.

17  Q.   I will show you what's been marked as Government's Exhibit

18  3.4.  What is this?

19  A.   This is an outgoing wire transfer dated January 28th, 2003

20  in the amount of $610,000 coming from my attorney escrow -- out

21  of my attorney escrow account.

22  Q.   Where it did go?

23  A.   Beverage Marketing of P.A., Inc.

24  Q.   How did it come to go to Beverage Marketing of P.A.?

25  A.   I believe the day before I received a call from Mike

96

1  Conahan.

2  Q.    Of course, you knew Mr. Conahan?

3  A.    Yes.

4  Q.    And what, if anything, did Mr. Conahan tell you?

5  A.    Mike had called me, told me that he had talked to Bob

6  Powell, told me -- he knew that I was holding $610,000 in my

7  attorney escrow account and that he wanted the funds

8  transferred to his business account.

9  Q.    Did you know what Beverage Marketing was?

10  A.    I was generally aware that Mike had an interest in that

11  particular company.

12        THE COURT:  Gordon, I hope this is a good time for us

13  to take our noon recess.

14        MR. ZUBROD:  Whatever the Court wants.

15        THE COURT:  We will ask the jurors to be back by five

16  to one so we can get started close to 1:00.  As I told you

17  yesterday, whenever you leave the courtroom, you will run into

18  people out on the street and everywhere else.  Remember my

19  instructions.  It's very important that you do that.  See you

20  in the afternoon.

21        (A lunch recess was taken.)

22        ROBERT MATTA resumed the witness stand.

23  DIRECT EXAMINATION (cont.'d)

24  BY MR. ZUBROD:

25  Q.    When we left off -- Mr. Matta, when we ended my

97

1  questioning of you earlier today, I had asked you a series of

2  questions.  You said you'd received a call from Michael

3  Conahan, he said the money that Robert Powell gave you I want

4  you to wire to Beverage Marketing, and you knew at the time a

5  -- the judge -- that Michael Conahan was the president judge of

6  Luzerne County, correct?

7  A.    Yes.

8  Q.    And you knew at the time that Michael Conahan was the

9  owner of -- or associated in some way with Beverage Marketing,

10 am I right?

11 A.    Yes, yes.

12 Q.    Did it strike you as odd that a large sum of money coming

13 from the owner of PA Child Care, which is a juvenile youth

14 detention center, would be sending that money to the president

15 judge of Luzerne County?  Did it set off any alarm bells?

16 A.    It did not in that context.

17 Q.    I mean, you had to be aware that the -- the Court of

18 Common Pleas for Luzerne County would likely be sending kids to

19 PA Child Care?

20 A.    Generally speaking, yes.

21 Q.    What do you mean in that context it didn't set off any

22 alarm bells?

23 A.    Because it was presented to me as a real estate

24 transaction.  Mr. Powell called me and said he was involved in

25 real estate transaction, that I received the funds.  And then a

1  week later when Conahan had called me to wire it to his

2  business account, I assumed that they were partners in a deal

3  and things have gone well.

4  Q.    In a real estate transaction?

5  A.    In a real estate transaction, yes.

6  Q.    That kind of turned off the alarm bell for you?

7  A.    Yes.

8  Q.    Who gave you the information regarding where -- you know,

9  the wire transfer information, how to get the money from your

10  account into Beverage Marketing?

11  A.    I received a call from Mike Conahan.  Again as I explained

12  that he was -- that he had talked to Bob Powell and to send

13  money up to his business account.  I believe later that day or

14  the next day, I received a call from his secretary by the name

15  of Lisa.  She provided the information to me.

16  Q.    Okay.  I would like you to take a look at Government's

17  Exhibit 3.11.  Do you recognize this document?

18  A.    Yes.

19  Q.    What is it?

20  A.    It is a 1099 document that I had received from Mericle

21  Construction.

22  Q.    For those who are English majors, what is a 1099?

23  A.    A federal tax form which identifies someone as a recipient

24  from some type of transaction.

25  Q.    Who sent it to you?

99

1   A.    That came from Mericle Construction.

2   Q.    Okay.

3   A.    That was to me individually through my attorney account.

4   Q.    Now, why would you get a 1099?  You're just a settlement

5   agent.

6   A.    I don't know.

7   Q.    I mean, normally it would have been gone to the party who

8   received the money.

9   A.    That's correct, normally.

10  Q.    Now, you received the $610,000 from Robert Mericle, you

11  testified, in January of 2003?

12  A.    I received it from what I -- at the time thought it was

13  Mericle Real Estate Services/Mericle Construction.

14  Q.    When did you get this Government's Exhibit 3.11?  When did

15  you get the 1099?

16  A.    January or February of 2004 the following year.

17  Q.    Did that strike you as odd?

18  A.    It did strike me a little bit odd, but at the same time,

19  you know.

20  Q.    And what did you do once you had a 1099?

21  A.    My responsibility as an attorney -- I do it to this day --

22  is to prepare a 1099, similar type documents and obtain the --

23  excuse me -- tax identification information about the ultimate

24  recipient of those moneys, in this case the $610,000.

25  Q.    I show what has been marked as Government's Exhibit 3.12.

100

1    A.    Yes.

2    Q.    Do you recognize this?

3    A.    Yes.

4    Q.    What is it?

5    A.    It is the 1099 document that I prepared forwarding the

6    information to the recipient and also to the IRS identifying

7    Beverage Marketing of P.A., Inc., as the entity that received

8    the $610,000.

9    Q.    Now, let's go back to that $10,000 fee you got for holding

10   the money in your account for one week and then sending it on

11   and the $10,000 fee that you were paid for that.  When were you

12   paid?

13   A.    I was paid in June of 2005.

14   Q.    Now, again we know the transaction was in January of 2003?

15   A.    Yes.

16   Q.    I show you what's been marked as Government's Exhibit

17   3.18.  Could we crop, please, the top -- the front of the

18   check?  Now, I note that the date is June 16th, 2005.  And who

19   issued this check to you?

20   A.    That was issued by PA Child Care.

21   Q.    Are you still the president and CEO of Minersville Safe

22   Deposit and Trust Bank?

23   A.    No.

24   Q.    What happened?

25   A.    The bank fired me.

1  Q.   Are you presently in litigation with the bank for wrongful

2  termination?

3  A.   I have a civil litigation against the bank, its chairman

4  and a law firm that they hired both for wrongful discharge and

5  defamation of my character.

6            MR. ZUBROD:  May I have one moment, Your Honor?

7  BY MR. ZUBROD:

8  Q.   As a point of clarification, why were you fired by

9  Minersville bank -- not to go into the gross details but just

10  -- why were you fired?  What was the act that you allegedly did

11  that got you fired?

12  A.   Well, the basis that the bank claims is that -- they hired

13  an outside law firm of McNeice Wallace who provided --

14  Q.   I don't want to get down in the weeds here.  I want to

15  know what was the accusation.

16  A.   The accusation is that I was involved -- actively involved

17  in this proceeding, that I knew what was going on, that I was

18  corrupt, that I was an active participant, that I was a

19  conspirator in this -- this whole thing here.

20  Q.   I mean, if you knew what was going on and you had gone

21  through with taking the money from Mericle and having been

22  advised by Powell and sending it on to Conahan and you knew,

23  what was the offense for handling that money in the way it was

24  handled that would have made you exposed?

25  A.   I am not sure what you're asking.

102

1  Q.    Would that have been money laundering?

2  A.    Yeah, I mean, they accused me of doing that.

3  Q.    That's the essential accusation?

4  A.    Some of it, that's correct.

5          MR. ZUBROD:  Now, Your Honor, at this time I have a

6  stipulation to enter into the record regarding that these are

7  the records of Robert Matta kept in the regular course of

8  business and are, in fact, business record.  It's been

9  stipulated to -- unless the defense desires, I will offer the

10  stipulation in writing.  And I will now move for the admission

11  of Government's Exhibits -- the government exhibits --

12          THE COURT:  Those that have been alluded to during

13  his testimony?

14          MR. ZUBROD:  Yes, sir.

15          THE COURT:  Any objection to those?

16          MR. FLORA:  No.

17          MR. ZUBROD:  I move for the exhibits identified by

18  the witness.

19          MR. RUZZO:  No objection, Your Honor.

20          MR. ZUBROD:  No further questions.

21          THE COURT:  Cross.

22  CROSS EXAMINATION

23  BY MR. RUZZO:

24  Q.    Mr. Matta, when you did this transaction, perform your

25  service, you thought you were doing something legal, correct?

1  A.    Yes.

2  Q.    Wouldn't have done anything if you thought it was illegal?

3  A.    No, I would not have.

4  Q.    And you had agreed with Robert Powell for $10,000 fee,

5  correct?

6  A.    He quoted that fee for my services, yes.

7  Q.    You have a written plea agreement with him --

8  A.    I --

9  Q.    Did you have a written fee agreement with him?

10  A.    No, I did not.

11  Q.    And so Powell told you, I will give you $10,000 for this

12  transaction.  You took his word for it.  Money was wired into

13  your account.  You wired it out in about a week, correct?

14  A.    When he quoted me on that fee to handle the real estate

15  transaction, yes, that's what I did, yes.

16  Q.    So you never talked to Mark Ciavarella about any of this,

17  did you?

18  A.    No.

19  Q.    Never sent him any documents?

20  A.    No.

21  Q.    Never got any documents from him ?

22  A.    No.

23  Q.    Just want to ask you one more question about -- you recall

24  on direct Attorney Zubrod asked you about getting a referral

25  fee when one lawyer refers a -- say, a personal injury case to

104

1  another.

2  A.    Yes.

3  Q.    Assuming you're the personal injury lawyer and I refer you

4  a case, we have an agreement you're going to give me 50 percent

5  of your fee, let's say?

6  A.    Yes.

7  Q.    And if you eventually settle the case, all I had to do is

8  refer you the case, correct?

9  A.    Yes.

10  Q.    Ordinarily, I don't have to do anything else?

11  A.    No, no, not usually.

12  Q.    Just give you the case and that's it?

13  A.    That's correct.

14  Q.    The client originally I may have represented on some other

15  matter or I just -- client may be a neighbor or friend or

16  whatever.  I refer it to you, and that's the end of my

17  function, correct?

18  A.    Correct.

19  Q.    And this is what we call referral -- I think you referred

20  to it as I found the client?

21  A.    Yes.

22  Q.    Therefore, the finder's fee, correct?

23  A.    Perhaps, yes.

24          MR. RUZZO:  Nothing further, Your Honor.

25          MR. ZUBROD:  No redirect.

1          THE COURT:  Okay.  Thank you very much.

2          MR. ZUBROD:  Your Honor, at this time we'd like to

3   play a clip from a news conference, Government's Exhibit 1.1.

4          THE COURT:  You must know what he's talking about.

5          MR. FLORA:  Yes, Your Honor.

6          (Video clip was played at this time.)

7          MR. ZUBROD:  Your Honor, we place in the record that

8   that -- that interview occurred on December 19th, 2002 with

9   WBRE news.  At this time, the United States calls Robert Powell

10  to the stand.

11          ROBERT POWELL, called as a witness, being duly sworn,

12  testifed as follows:

13  DIRECT EXAMINATION

14  BY MR. ZUBROD:

15  Q.    You are Robert Powell?

16  A.    I am.

17  Q.    Mr. Powell, what is your profession?

18  A.    I was an attorney.  My license is suspended.

19  Q.    And what was the nature of your legal practice?

20  A.    Primarily civil trial practice.

21  Q.    What did you do prior to becoming a lawyer?

22  A.    I was in the commercial real estate business and property

23  management and development.

24  Q.    Are you from northeastern Pennsylvania?

25  A.    I grew up in West Hazleton, Pennsylvania.

106

1  Q.   There's been some things said about you in the opening

2  statement, which I will get to at some point.  But could you

3  tell us your background?  Where do you come from?

4  A.   Sure.  I was born -- as I said -- and grew up in West

5  Hazleton, Pennsylvania.  I graduated from West Hazleton High

6  School in 1977.

7  Q.   What did your dad do?

8  A.   My dad worked primarily at the Hazleton Brick Plant.

9  There he pretty much worked in the kiln, and he hearted bricks

10 into and out of ovens outside.  So he was out in the heat and

11 cold.  My mom was -- stayed at home until I was a freshman in

12 high school.  Then she worked as a teacher's aide.  In 1977 I

13 graduated from West Hazleton and received a division one

14 college basketball scholarship at St. Francis then college, now

15 Saint Francis University.  After I graduated in 1981 with a

16 degree in business management, I moved to the Boston area where

17 I quantity my career in commercial real estate.

18      In 1983 I enrolled in the New England School of Law in the

19 night program so I can continue to work during the day.

20      I graduated from the New England School of Law in 1987.  I

21 stayed in the New England Area for a few year and then moved to

22 Philadelphia.  I was married there, had my first son there and

23 began practicing law there.  And about six months after my son

24 was born, I moved back to northeastern Pennsylvania.  My first

25 job here was for Hourigan, Kluger, Spohrer, then Spohrer and

1  Quinn.  I worked for Joe Quinn for a year.  Then I opened my
2  own practice.
3  Q.    In Hazleton?
4  A.    Yes, in Hazleton.
5  Q.    What was -- what was, again, the nature of your practice?
6  A.    Civil trial work, primarily personal injury.
7  Q.    I show you what has been marked as Government's Exhibit
8  22.5.  Can you tell us what this document is?
9  A.    That is my plea agreement that I signed related to these
10  matters.
11  Q.    And what did you agree or -- to what did you agree to
12  plead?
13  A.    I agreed to two counts of misprision of a felony and a tax
14  count.
15  Q.    What is your exposure under those charges?
16  A.    Up to five and a half years in prison, $500,000.  I had to
17  forfeit a boat that I owned and my rights to an airplane.
18  Q.    Do you know a man by name of Michael Conahan?
19  A.    I do.
20  Q.    How do you know him?
21  A.    I first met him when I moved back to the area and opened
22  my practice of law.
23  Q.    Okay.  Was he -- what was he doing at that time?
24  A.    He at the time was magistrate and had run for judge and
25  had just won the judgeship.  He had taken office when I first

1  met him.

2  Q.   Did you practice in front of him when he was at the court

3  of common pleas?

4  A.   I did.

5  Q.   Did you enter into any business relationship with him?

6  A.   Yes, in early, 2000, 2001, myself and my partner, Jill

7  Moran, formed a real estate partnership called W-Cat and Mr.

8  Conahan was a garauntor of certain obligations to that

9  partnership undertook.

10  Q.   I show you what's been marked as Government's Exhibit

11  15.2.  What is this?

12  A.   That is the description of the W-Cat incorporation.

13  Q.   And if you can scroll down, please.  And does it identify

14  the individuals affiliated with the business?

15  A.   It does.  The other individuals affiliated with the

16  business are myself, Michael Conahan, Mark Ciavarella and my

17  partner who I mentioned, Jill Moran.

18  Q.   Okay.  If you go to page two, please.  And what is the --

19  what is this document -- a loan review summary?

20  A.   It's a brief description of the terms and conditions of

21  the loans that W-Cat, Inc., had over a period from June 4th of

22  '04 through May 3rd of '05.

23  Q.   If you go down to the lower right-hand corner of that

24  second page, please.  And who has the liability for that loan?

25  A.   The liability initially -- I'm sorry.  The liability

109

1  initially lies with W-Cat, Inc., and if W-Cat, Inc., the

2  company, can't meet its obligations, then the guarantors that

3  are listed have to meet the obligations of W-Cat, Inc.

4  Q.    And who are the guarantors?

5  A.    The guarantors are Mark Ciavarella and his wife, Michael

6  Conahan and his wife, Jill Moran, myself and my wife and

7  Michael Cestone and his wife.

8  Q.    Who is Michael Cestone?

9  A.    He was -- I initially met him -- he was the builder of the

10  office building for my law office, and he was hired to be the

11  builder of the townhouse project.

12  Q.    Now, you said that you knew Mr. Conahan and you knew him

13  for practicing in front of him.  You knew him because you

14  engaged in a business relationship.  Is there any other context

15  in which you knew --

16  A.    Sure.  I knew him personally as well.

17  Q.    Did you ever give him any money?

18  A.    Yes, I did.

19  Q.    We will get to that.  Do you know the defendant, Mark

20  Ciavarella?

21  A.    Yes, I do.

22  Q.    Do you see him in court?  And if so, can you point him

23  out?

24  A.    Seated in the first row.

25            MR. ZUBROD:  Let the record reflect the witness has

110

1 identified the defendant, Mark Ciavarella.

2 BY MR. ZUBROD:

3 Q.    How do you know Mark Ciavarella?

4 A.    I first met him when he was a practicing judge.

5 Q.    And did you practice in front of him?

6 A.    I did.

7 Q.    I know his name is on W-Cat.  Did you enter into a

8 business relationship with him?

9 A.    Yes, I had.

10 Q.    During the period set forth in this indictment, which

11 starts -- I mean, the scheme starts back in 2000, 2001 and goes

12 up through 2007 and later.  Was W-Cat in operation?

13 A.    Yes.

14 Q.    Okay.

15 A.    At some point during that time in 2000, 2001, yes.

16 Q.    Fair to say it was in operation 2003 through 2006 or at

17 least?

18 A.    Yes.

19 Q.    And did you pay him any money?

20 A.    Mr. Ciavarella?

21 Q.    Yes.

22 A.    Yes, I did.

23 Q.    Did you have a personal relationship with Mr. Ciavarella

24 the way you had with Judge Conahan?

25 A.    No, I did not.

111

1  Q.   Did you eventually develop a friendship with him?

2  A.   Yes, my friendship first was with Mr. Conahan.  A

3  friendship with Mr. Ciavarella developed as a result of my

4  relationship with Mr. Conahan.

5  Q.   Now, I want to direct your attention to Government's

6  Exhibit 20.6.  And I will ask you -- are you familiar with two

7  business entities known as PA Child Care and Western PA Child

8  Care?

9  A.   Yes, sir.

10  Q.   And what -- what was your involvement with that?

11  A.   I formed a company called Vision Holdings, LLC.  My wife

12  and I owned 50 percent of that.  That's shown here.  My

13  partner, Gregory Zappala, formed a company called Consulting

14  Innovations and Services, Inc.  He owned 50 percent of that

15  with his wife Candy.  Those two entries, Vision Holdings and

16  Consulting Innovations and Services jointly first owned PA

17  Child Care and then owned Western PA Child Care.

18  Q.   You told us that you were a practicing attorney.  How did

19  you become to be involved in running youth detention centers?

20  A.   The first case that I tried in front of Judge Ciavarella,

21  the jury had been asked to go and deliberate.  We had completed

22  our case, both sides.  And Judge Ciavarella asked the

23  participants, the plaintiff's lawyers and the defense lawyers,

24  if he could adjudicate some juveniles.  And I didn't really

25  know what that was.  As it turned out, there were a number of

1  juvenile offenders who had been brought up to the third floor

2  in the courtroom -- in the courthouse, and he wanted to conduct

3  some hearings while we waited for the jury to go out because

4  they just left and we thought -- we both thought -- both us and

5  the defense thought they would be out for a while, so we said,

6  yes, he can do that.  After we had to leave the courtroom and

7  after he had done that, he asked if he could talk to me about

8  what had just occurred.  And I said, sure.

9  Q.   What had just occurred?  Can you describe that?

10  A.   I wasn't in the courtroom because of the nature of the

11  juvenile proceedings.  But a number of very young kids had just

12  been taken into the courtroom, some in shackles.  I was struck

13  by the fact at the time that -- one of the kids kind of

14  reminded me of my son.  When was young and small at the time.

15  Judge Ciavarella then said, do you know anything about this.

16  And I said no.  He said, well, I know you've done some bond

17  work with Mr. Zappala for the county, and we would like to

18  build a new detention center to house these kids, the current

19  place where they are housed is deplorable and maybe at some

20  point after this trial and a little bit later on we can get

21  together and you and perhaps Mr. Zappala could help the county

22  figure out how to build a new facility.

23  Q.   When Judge Ciavarella asked you to help the county out and

24  using some of the your background knowledge in bond work, what

25  was your reaction?

113

1  A.    I thought, sure, that would be a good thing to do.  I

2  mean, I didn't really appreciate what was going on with the

3  juvenile population at the time.  I had a young kid, and I was

4  more than willing to help.

5  Q.    I want to show you Government's Exhibit 1.6.  What is

6  this?

7  A.    This is a memo that I wrote on Powell Law Group letterhead

8  arranging for a meeting between a fellow by the name of John

9  Kimball, Keith Frederick and Rob Mericle to have a meeting

10 about a juvenile detention project at Mr. Mericle's offices.

11 The meeting was to take place on June 9th, 2000.

12 Q.    Was this the kickoff meeting?

13 A.    That was the kickoff meeting, yes.

14 Q.    Didn't Luzerne County have a juvenile detention center?

15 A.    As it turned out, they did.  I later found out that they

16 had a detention center that was located near the courthouse.  I

17 also found out that the detention center was antiquated, did

18 not lack the proper security facilities and, in fact, was in

19 such bad condition that lunches were actually brought in for

20 the kids from the prison because the conditions to cook wasn't

21 even sanitary.

22 Q.    What was the specific task that Judge Ciavarella asked you

23 to undertake?

24 A.    He told me that he had and Rob Mericle were good friends

25 and that enlisted the help of Mr. Mericle to start this process

114

1    off.  I had never met Rob Mericle.  The other fellow who is
2    listed on there is a fellow by the name of John Kimball.  His
3    company is called Kimball Consulting, I believe.  They have
4    designed and helped construct many prisons on the east coast.
5    The Kimballs knew my partner, Greg Zappala.  Greg couldn't make
6    that initial meeting, but the other name you see on there,
7    Keith Frederick, was a financial specialist who worked for
8    Greg's company, which is in the municipal bond finance
9    business.  So Greg was setting Mr. Frederick to pen for him
10   because he couldn't make it.
11   Q.    Okay.  I'm not going to belabor this.  I want to go along.
12   Tell us how this moved along.  You had the meeting.  Rob
13   Mericle was present, Keith Frederick representing Zappala, Mr.
14   Kimball, the guy who designed and built other places.  Where
15   did it go from there, and who got one assignments?
16   A.    Well, we didn't know what this process was going to look
17   like.  So Mericle was the fellow who had the experience in the
18   development from ground up, and he certainly had the experience
19   locally in developing projects.  So he quickly -- very quickly
20   took the reigns.  And what we decided is we first needed to
21   know what needed to be built, what the -- the conditions that
22   had to be followed and was it feasible to construct such a
23   facility.  Judge Ciavarella then arranged for several members
24   of the juvenile probation staff to attend a few meetings after
25   that.

1          We learned that the Bucks County facility in Bucks County,

2    Pennsylvania seemed to be a model for the people in the

3    juvenile probation office.  And we gravitated toward visiting

4    that facility, which the folks in probation set up.  Mr.

5    Frederick went down there several times.  And I should say Mr.

6    Frederick also had a real estate development background as

7    well.  So he visited the Bucks County facility several times,

8    and then we had periodic meetings to report what we found out,

9    whether it was about possible finance issues, construction

10   issues or juvenile issues.

11   Q.   Well, did Robert Mericle have any other function?

12   A.   Yes, he was the coordinator of the project because he had

13   experience in pulling people together to build these things.

14   We all had jobs that we were working at during the day, so it

15   was a unique situation.

16   Q.   And so in terms of acquiring land and in terms of getting

17   this thing off the ground, what was it Mr. Mericle did other

18   than --

19   A.   He was the captain of the ship.  It was -- he was going to

20   take control of bringing in everything that had to happen to

21   build the facility that was going to be built.  He also quickly

22   in several discussions with Kimball determined that he thought

23   Kimball was far too pricey and that he with his background and

24   experience if we got to the point of construction could build a

25   facility cheaper and designed it better than Mr. Kimball.  So

1  Kimball fell out of the group because Mericle felt he can do it

2  better.

3  Q.    Okay.  And was the property acquired for this purpose?

4  A.    It was.

5  Q.    Who did it?

6  A.    Mericle acquired it at the Pittston -- Pittston Industrial

7  Park.

8  Q.    Now, where Judge Conahan and Judge Ciavarella ever updated

9  on how the process was going?

10  A.    Yes.

11  Q.    Who would update?

12  A.    I know Mericle would update them and I would update them

13  as well.  Also their staff from time to time attended meetings,

14  so I know their staff updated them.

15  Q.    I show you what's been marked as Government's Exhibit 1.1.

16  I'm sorry -- 1.5.  What is this document?

17  A.    This is the agreement of sale between the Pittston Area

18  Industrial Development Authority and Pennsylvania Child Care,

19  LLC, which is the company that Greg Zappala and I formed to

20  build the building.

21  Q.    What is the date on this?

22  A.    This is dated the 13th of June, 2001.

23  Q.    And who signed the document?

24  A.    For the -- if I see the signature page -- the Pittston

25  Area Industrial Development Authority was Michael Insalaco Mike

117

1  Mixell, who was the lawyer for PA Child Care and the assistant

2  secretary of the company signed for PA Child Care.

3  Q.    This is on the land Mr. Mericle acquired with Pittston

4  Area?

5  A.    Yes, sir.

6  Q.    Now, I suppose the next problem would be to get financing.

7  Were you able to get financing?

8  A.    That took us the longest, and it was the most difficult

9  part of the project.

10  Q.    How come?

11  A.    Well, because there was several factors.  Mr. Zappala and

12  I had never constructed anything together, and we certainly had

13  never constructed a juvenile detention facility.  So many banks

14  or lenders looked at such a specialty function that they --

15  they asked, well, what assurances do we have this thing will

16  succeed.  Many of the banks and lenders also said because of

17  our inexperience and because we never built or run a facility

18  that it's possible that we would have trouble getting enough

19  kids and, therefore, getting enough money to pay the mortgage.

20        And so pretty much everybody that -- not pretty much.

21  Everybody who we approached initially said that unless we had

22  some type of concrete agreement or something that would show

23  the banks that they would be repaid that they weren't willing

24  to lend to us.

25  Q.    I will show you Government's Exhibit 1.11, which is a

1  document from Bryan McManus to Robert Mericle.  Were you

2  familiar with this communication, familiar with the facts

3  contained therein?

4  A.    Bryan McManus was part of the group up that would meet as

5  part of our meetings, and he worked directly for Rob Mericle.

6  And this is an e-mail from him to Rob recounting a conversation

7  that I had with McManus, which basically says Bob told me that

8  they had discussions with the county today and the outcome is

9  they will not be entering into a lease agreement with the

10  county.  So it was pretty much obvious that if there was no

11  county lease that unless we had some type of agreement to show

12  the banks that we would be putting kids in there on something

13  more than a kind of a haphazard catch come basis that we

14  probably would be able to build the facility.

15  Q.    Did you discuss this with Judge Conahan and Judge

16  Ciavarella?

17  A.    Yes.

18  Q.    What was the fallout from that discussion?  What was their

19  reaction?

20  A.    Well, I told them that unless we had an agreement either

21  with the county or some other entity that could promise us kids

22  that the facility wouldn't get built, and if the judges and/or

23  the county wanted it built that somebody was going to have step

24  up to the plate and do something or there would be no facility

25  because we wouldn't get the funds to build it.

1  Q.    When did this meeting take place?

2  A.    Right around this time of the McManus e-mail, July 11,

3  2001.

4  Q.    When you told them someone had to step up to the plate to

5  help get financing, what were you told by Judge Ciavarella and

6  Judge Conahan?

7  A.    Tell us, come back to us with a plan as to how the courts

8  can help and we will consider it, if it's possible we will do

9  it.

10  Q.    Did you do that?

11  A.    I did.

12  Q.    What was the plan?

13  A.    The plan was get an agreement called placement guarantee

14  signed by the judge president to show that to the banks or bank

15  that we were talking and hope it would be enough to provide

16  financing.

17  Q.    And who was the president judge at that time?

18  A.    At that time it was I believe Judge Augello.  Judge

19  Conahan had been elected to the president judge post and was

20  going to take that in January of next year.

21  Q.    January 2002?

22  A.    Yes, sir.

23  Q.    All right.  When you presented that with them to them,

24  what did Judge Conahan and Judge Ciavarella say?  Was this a

25  joint meeting with the two of them?

120

1  A.    Yes, Judge Conahan said he was willing to do it if his

2  solicitor, to Mr. Gelso said he can do it, he will sign the

3  agreement to get the facility built.

4  Q.    And was he ready to sign it right then?

5  A.    Well, he knew that he couldn't because he wasn't the

6  president judge at the time and the -- the only person that

7  could bind the judges was the president judge.

8  Q.    So was a decision made to wait until he became the

9  president judge in January 2002?

10 A.    Yeah, we had to do that for him to be able to sign as

11 president judge.

12 Q.    Now, did Michael Conahan become president judge in January

13 2002?

14 A.    Yes.

15 Q.    I will show you Government's Exhibit 1.2.  What is this?

16 A.    This is the placement guarantee agreement that we used to

17 get PA Child Care funded.

18 Q.    What is the date?

19 A.    This is 29 January 2002.

20 Q.    Does this document -- this is the guarantee that Judge

21 Conahan said he would get to you?

22 A.    Yes.

23 Q.    I would like you to take a look at the -- take a look at

24 item No. 6.

25 A.    Yes, sir, the Court shall pay rental installments to PACC,

121

which is PA Child Care, in an amount equal to $1,314,000 per

annum.  Said rental installments shall be paid monthly in

advance without setoff or deductions to PACC.  The obligation

of the Court to make payment of the rental installments shall

be absolute and unconditional.

Q.    And how long is this lease to run?

A.    I don't believe that it had a date that it was to expire

at all.

Q.    An open ended commitment?

A.    Yes, sir.

Q.    Okay.  And if you go to the last page, who signed it?

A.    Mike Mixell signed as assistant second and attorney for PA

Child Care, and the signature for the court of common pleas is

Mike Conahan.

Q.    Now, what was the effect of having this document saying we

give you an absolute and unconditional guarantee that we will

give you $1.3 million a year?

A.    We were able to get financing.

Q.    And how much of a loan did you get?

A.    About -- little bit in excess of $12 million.

Q.    And who saw this document?

A.    Ourselves, Judge Conahan, his lawyer, Judge Ciavarella and

the bank.

Q.    Were -- was this shown to the county commissioners since

they are the ones that have to come up with the money?

122

1    A.    No, it wasn't.

2    Q.    Why?

3    A.    Because Judge Conahan didn't want them to see it.

4    Q.    Were the commissioners still at this time trying to build

5    a facility?

6    A.    Yes.

7    Q.    So you got the loan.  When did you get it approximately?

8    A.    I believe it was March of that year.

9    Q.    And did that building go forward?

10    A.    It did.

11    Q.    Now, was a contract signed by Mericle Construction?

12    A.    It was.

13    Q.    I show you what's been marked as Government's Exhibit 2.1.

14    Do you recognize this document?

15    A.    This is the contract between PA Child Care and Mericle

16    Construction for the construction of PA Child Care.

17    Q.    Okay.  And I would like you to look at as well Page 4 to

18    Page 11.  Who signed this document?

19    A.    That's my signature on behalf of PA Child Care.

20    Q.    Right here?

21    A.    Yes, sir, and Rob Mericle's signature on behalf of Mericle

22    Construction, Inc.

23    Q.    That's here?

24    A.    Yes, sir.

25    Q.    Were the costs to Mericle Construction laid out as well?

123

1  A.    They were.

2  Q.    I will show you Government's Exhibit 2.2.  What is this?

3  A.    This is the Exhibit C. contract sum.  And what this does

4  is sets forth the costs for the base building, and they are

5  totaled at $5,594,100, so five million-five.

6  Q.    I get the impression that since you got a $12 million loan

7  other things that had to go in as well?

8  A.    There were several areas that were not contracted for with

9  Mericle that he wanted us to have separate contracts with.

10 Primarily they were -- the most important contract after

11 Mericle was the people that provided the computers and the

12 security and the locking systems which were specialty ordered

13 and specialty made.  And some of the other technology and

14 things that were involved in the security portion of the

15 contract, Mericle didn't want them under his umbrella.  He

16 wanted us to have them separately.

17 Q.    Let's focus on Judge Conahan.  What steps did Judge

18 Conahan take beginning in July of 2001 to get PA Child Care up

19 and running?

20 A.    Well, he signed the placement guarantee agreement, but in

21 addition to that, he said that he was going to close the

22 existing county facility and essentially not budget for that

23 facility to be used the following year.  And so he was

24 preparing for us to open and for the county facility to close.

25 Q.    Other than not budgeting for the county facility, did he

124

1  announce what he was going to do with the children?

2  A.    Yeah, he said he was going to send them to our facility so

3  long as it was what we promised it would be.

4  Q.    And how much did Judge Ciavarella help in getting PA Child

5  Care, or what did he do to help get PA Child Care off the

6  ground?

7  A.    Well, he actively went on TV and in the newspapers as it

8  relates to promoting the building of a new facility and closing

9  of the other one.  And his staff helped us to set up interviews

10  with the existing employees of the detention center to talk to

11  the people that we had hired to manage the new facility so that

12  we can hire the best of the best employees at the old facility

13  to work for the management company that we were hiring at the

14  new facility.

15  Q.    So not only did he close it down, but contracts were

16  signed with the other employees so that the county couldn't

17  hire them back basically?

18  A.    Yes, we had --the bank required us to hire a company that

19  knew about management and staffing detention facilities.  That

20  was a company called Northwestern Human Services.  They had

21  their own facilities that the county was currently sending

22  people to.  So everybody in juvenile probation and Judge

23  Ciavarella knew their people.  So it was easy for him to set up

24  interviews with Northwestern and his staff so that we would

25  hire -- Northwestern would hire the county people on their

125

1  staff and put them in our facility.

2  Q.    This had to have brought Judge Conahan and Judge

3  Ciavarella into open conflict with the county commissioners.

4  Did you become aware of anything along those lines?

5  A.    They were in direct conflict because the county

6  commissions wanted to push forward with building their own

7  facility.

8  Q.    And where -- when did this come to a head?

9  A.    I knew it came to a head personally.  I was told there was

10  a huge fight between Judge Ciavarella and Tom Makowski, who is

11  then commissioner, as to who said what about whom.  And after

12  that fight, the opportunity for us to even engage in kind of

13  discussions with the county about them ever doing anything with

14  the facility pretty quickly dwindled after that.

15  Q.    Didn't the county have a license to run a juvenile

16  detention center?

17  A.    That was sent back to the state once it was issued.

18  Q.    Do you know who directed it go back?

19  A.    Judge Conahan.

20  Q.    Did the commissioners try to stop it to your knowledge?

21  A.    At some point I believe they pretty much gave up and said

22  if the juveniles were going to be sent to our place and they

23  realized with the way the judiciary was there was pretty much

24  nothing they can do they can do about it.

25  Q.    When was the construction of PA Child Care complete?

126

1  A.    On or about January of the following year.

2  Q.    Now, I want to show you Government's Exhibit 2.4.  Do you

3  recognize this document?

4  A.    I do.

5  Q.    And I would like to focus on the date.  What's the date on

6  it?

7  A.    The date is January 7th, 2003.

8  Q.    And what is this document?

9  A.    This is a document that Mericle devised which was what he

10 called his final payment document.  And what this required was

11 Mericle would send it to me and I would send it our architects

12 and engineers to make sure everything Mericle had promised to

13 do in the contract was done.  And once they signed off on it,

14 then I would sign it and say that it says essentially that

15 Mericle -- I am warranting that Mericle has done everything

16 that he has said he was going to do under the contract and that

17 he should be given his final payment having completed the

18 contract.

19 Q.    Okay.  And I would like to look at the last page.  Who

20 signed off on it?

21 A.    Robert K. Mericle for Mericle Construction, Inc., and me

22 on behalf of PA Child Care.  That was done January 17th, 2003.

23 Q.    I want -- just before January 7 when Mericle finished

24 budding the building -- by the way, when did you go up -- go up

25 on line on business?

1  A.    When we started about -- took us about 12 months soup to

2  nuts to get the facility built.

3  Q.    Once the January 7th letter came saying I'm done from

4  Mericle, how much longer did it take to you get running?

5  A.    Grand opening was about a month and a half after that.

6  Q.    I want to go back before that.  Did anything happen in

7  late December that gave you some disquiet about this -- the

8  building and running and future of PA Child Care?

9  A.    Well, about a year before this right as we were starting

10 on Christmas Eve my --

11 Q.    2001?

12 A.    2001.  I was with Mike Conahan.  He asked me to take him

13 up to show him the land that we were going to build the

14 facility on.

15 Q.    What time of day was it?

16 A.    It was early afternoon.

17 Q.    And what took place there?  You walked around?

18 A.    Walked around, showed him the land.  The land was in rough

19 shape -- told him generally what we were going to do because it

20 was tough to envision at that time.  And we had a general --

21 initially had a general conversation about the facility.

22 Q.    And did anything happen during that time which gave you

23 some alarm?

24 A.    He was happy to see it.  He thought it was going to be

25 good.  He told me at one point, you know, when we get this

1  thing done, we are going to have to do something to take care
2  of Mark.
3  Q.    What did you understand that to mean?
4  A.    Mark Ciavarella.
5  Q.    And when you say take care of Mark, what did you
6  understand?
7  A.    I understood that it was going to be some financial
8  requirement to take care of Mark.
9  Q.    How -- what was your reaction when you --
10 A.    I was surprised that he would say that.  But given the
11 fact that we had not formally broken ground and I thought that
12 there was a significant amount of things that had to be done
13 before we even come to fruition, you know, I thought, okay,
14 well, that's what he says, but I got a lot on my plate to do to
15 get this facility even opened and then licensed.  So while he
16 said it, I thought about it, but I still thought we were a
17 long, long way away.
18       You have to understand that I never believed truly that
19 the facility was going to open until we got our license from
20 the state.  So I was hopeful we were going to get it done, but
21 I knew there were a lot of things that had to take place before
22 that.
23 Q.    Let's go now to 2003, the completion of PA Child Care.
24 Did you have a meeting with Judge Ciavarella and Judge Conahan?
25 A.    Well, I first got a phone call.

1  Q.    From whom?

2  A.    Both of them.  And on the phone call they told me that

3  they had been told by Rob Mericle that he was going to pay them

4  what he called a finder's fee and that finder's fee was going

5  to be some percentage of the contract sum.

6  Q.    And did they tell you anything else?

7  A.    Well, they said that he was going to work out the details

8  and that Rob would be in touch with me about it.

9  Q.    And since Rob Mericle was paying a finder's fee to them,

10  what involvement did you have?

11  A.    Well, at first I was shocked because in my dealings with

12  Rob Mericle, he was not the kind of guy that threw money around

13  easily.  He held our feet to the fire in terms of paying him on

14  time, making sure his invoices were up to date.  I was shocked

15  he was going to pay any money to anybody.  But when I found out

16  the amount, it was doubly shocked.

17  Q.    What was the amount?

18  A.    Close to a million dollars.

19  Q.    And were you eventually told by Mr. Ciavarella and Mr.

20  Conahan what your role was going to be in this?

21  A.    Well, they said Rob would be in touch with me shortly.

22  And a day or two after that he called me.  And he said, you

23  know I know you've been told that there's going to be a

24  finder's fee paid here, I want to you sign off it, I'm going to

25  send somebody down with an agreement, sign it and give it back

130

1  to me.  And shortly thereafter that happened.

2  Q.   Did you have any agreement with Rob Mericle to get money

3  from him -- get a finder's fee from him?

4  A.   Did I personally?

5  Q.   You personally.

6  A.   No.

7  Q.   Well, when the document came, were you able to -- what was

8  your reaction?  For that I want you to go to Government's

9  Exhibit 2.3.

10  A.   Yeah --

11  Q.   What is this?

12  A.   This is the bogus agreement that I signed that pays for

13  Mericle -- it says Mericle is going to pay me a finder's fee.

14  Q.   What's the date on this?

15  A.   19th day of February, 2002.

16  Q.   And when were you told you would be signing this?

17  A.   Much after this.  I was told after the letter of the final

18  -- the letter of final completion was signed.

19  Q.   That's January 7th, 2003?

20  A.   Correct.

21  Q.   Okay.  And so this later was back dated?

22  A.   Absolutely, not by me.

23  Q.   And what does this document purport to represent?

24  A.   Well, it purports to represent that I personally am going

25  to be paid a referral fee once the construction of PA Child

1  Care is complete and Mericle is paid.  But it never was

2  intended for me to receive a referral fee.

3  Q.    Now, was your understanding that you were expected to sign

4  this document?

5  A.    Absolutely.

6  Q.    Did you discuss it with Mericle?

7  A.    He told me someone is going to come down with an agreement

8  for the fee for Mark and Mike and I should sign it and send it

9  back to him.  That's exactly what I did.

10  Q.    So okay.  You're not getting the money.  You understand

11  it's going to whom, to Judge Conahan and Judge Ciavarella?

12  A.    Sure.  They told me that.

13  Q.    Did you have any trouble signing it?

14  A.    Well, I did.  I mean --

15  Q.    Why?

16  A.    I knew it was wrong.

17  Q.    What do you mean knew it was wrong?

18  A.    I wasn't getting this referral fee.  I knew who it was

19  going to.  We had paid for the work.  A developer doesn't get a

20  referral fee and then turn around and pay the develop -- pay a

21  contractor to build a facility.  It's not the way it works.

22  This was not a referral fee to me.  It was a kickback from

23  Mericle to the judges.

24  Q.    You're a lawyer.  You know the implications of people

25  paying kickbacks to judges.  You knew you were about to step

132

1  into a crime by signing this document?

2  A.    Yeah, and I inherently knew that by putting myself in the

3  middle of it I was opening myself up to all kind of wrong.

4  Q.    So why did you sign it?

5  A.    Because I knew if I didn't sign it, all hell would have

6  broken loose from the judges.

7  Q.    In what way?

8  A.    There was no question that I was told that I had to sign

9  this agreement.  If I went back to them and said I wasn't

10  signing it, they could have very significantly impacted what we

11  had just went through pretty much five years to build.

12  Q.    So you signed it?

13  A.    I did.

14  Q.    And let's talk for a moment -- you signed the document.

15  What happens next in terms how this money starts moving around?

16  A.    Mike Conahan called me and tells me he wants to tell me

17  how he wants the money -- how he wants the money to be handled.

18  Q.    I want you to take a look at Government's Exhibit 3.1.

19  What is this document?

20  A.    This is a document that I drafted January 16th of 2003

21  telling Rob Mericle to pay the -- a portion of the payment

22  $610,000 to Robert Matta, Esquire.

23  Q.    Now, why did you pick -- first of all, how did you come to

24  draft this letter?

25  A.    I was told by Judge Conahan where he wanted the money to

133

1  go.

2  Q.    And where was that?

3  A.    Bobby Matta.

4  Q.    Do you know Bobby Matta?  You seem to have known him.

5  A.    I knew him in that we borrowed money from his bank in the

6  past.

7  Q.    So you filled this out.  And then you send it right back

8  with the courier?

9  A.    Yes.

10  Q.    So how did this -- after told him to pay the finder's fee

11  to Matta, how did the money move after that?

12  A.    Mericle wired it to Matta.  There was a sum left over.

13  Conahan told me to hold on it and he would tell me what to do

14  with it later.

15  Q.    Well, you got -- it's 997,000.  We're only accounted for

16  610,000.  That leaves $387,600.  What happened to the three

17  eighty-seven six?

18  A.    It stayed in my account until Conahan gave me instructions

19  as to what he wanted me to do with it.

20  Q.    First of all, it was in Mericle's account.  How did it get

21  to you?

22  A.    I told Mericle to send it to Rob Matta because Conahan

23  said that's where they wanted the money to go.

24  Q.    387,000?

25  A.    Oh, no that stayed in my bank account.  Conahan said, hold

134

1  on to it, I will tell you what to do with it when I'm ready.

2  Q.    So Mericle wire transferred the three eighty-seven six to

3  you?

4  A.    Yes.

5  Q.    And you did it that way because you were instructed by

6  Judge Conahan to do that?

7  A.    Yes.

8  Q.    I will show you Government's Exhibit 3.3.  What is that?

9  A.    Wire transferring instructions from me to Mericle telling

10  him what to do with the $387,600.

11  Q.    And where did you get the information to wire the money?

12  A.    From Judge Conahan.

13  Q.    I show you what's been marked as Government's Exhibit 3.4.

14  What is this?

15  A.    A wire funds transfer record indicating Rob Matta was to

16  receive the wire transfer for $610,000.

17  Q.    What's the date?

18  A.    1/28/03.

19  Q.    Do you send Matta any instruction regarding sending the

20  money to Beverage Marketing?

21  A.    No.

22  Q.    I will show you Government's Exhibit 3.13, which has been

23  previously identified as a 1099.  What is this?

24  A.    This is from Mericle Construction to me personally

25  indicating that he paid me $387,600.

135

1  Q.   And who owns Beverage Marketing?

2  A.   Mike Conahan.

3  Q.   What happened to the 387 -- well, wait a minute.  Where

4  was the 387,000 put?

5  A.   In my firm account.

6  Q.   And what firm?

7  A.   The Powell Law Group.

8  Q.   I will show you Government's Exhibit 3.14.  What is that?

9  A.   That is an account of Vision Holdings, Inc., with

10 Minersville Savings Bank, and it's signed by myself and Mike

11 Mixell, the assistant secretary.

12 Q.   Is that a checking -- who owns Vision Holdings?

13 A.   Myself and my wife.

14 Q.   By the way, you got a 1099.  Did you pass that on to

15 Conahan and Ciavarella?

16 A.   No.

17 Q.   Why not?

18 A.   Because I knew they wouldn't pay it.

19 Q.   Who paid the taxes on 387?

20 A.   I did.

21 Q.   I will show you what's been marked as Government's Exhibit

22 3.16.  What is that?

23 A.   Check on Vision Holdings paid to the order of myself and

24 signed by me in the amount of $326,000.  And then it's endorsed

25 by me for deposit only.

1  Q.    So you issued a check to yourself, and then you endorsed

2  it.  What did you do with that check?

3  A.    Gave it to Mike Conahan.

4  Q.    Did you mail it to him or --

5  A.    I handed it to him.

6  Q.    And did -- was that your plan, or did he tell you to do

7  that?

8  A.    No, he told me that -- I didn't know that.  But he told me

9  if I wrote a check to myself and endorsed it and gave it to him

10 the funds wouldn't be traceable.

11 Q.    Did that cause you any concern when he said that -- he

12 asked you to do this transaction because no one would be able

13 to trace the funds?

14 A.    Well, I know -- knew he didn't want anybody to trace it,

15 so, yeah, I was concerned, but that's --

16 Q.    Why?

17 A.    Because he didn't want anybody to know that he got it.

18 Q.    Why is the fact that you wrote out a check that Michael

19 Conahan told you would not be traceable bother you?

20 A.    Well, because I knew it was wrong.

21 Q.    I mean, wrong -- I mean morally wrong?

22 A.    No, it's illegal.  It was money laundering.

23 Q.    It's money laundering?

24 A.    Yes.

25 Q.    And what do you understand money laundering to mean?

1  A.    When you're hiding or moving money from one person to

2  another and not declaring it.

3  Q.    So to whom did you -- ultimately do you know who got this

4  check?

5  A.    I gave it to Mike Conahan.

6  Q.    The -- it's $326,000.  That's about $60,000 short of the

7  three eighty-seven six that you got?

8  A.    Yes.

9  Q.    What happened to the rest of the money?

10 A.    He told me to keep it because he had used the boat in the

11 past and he planned on using my boat in the future and I should

12 put it toward boat expenses.

13 Q.    Is it expensive to have a boat?  How big is the boat?

14 A.    It's a 56-foot boat.

15 Q.    Is it expensive?

16 A.    It's very expensive.  I had a captain and a first mate.

17 You have a slip, fuel expenses.  It's a very expensive

18 proposition.

19 Q.    And he told you to keep that money to pay --

20 A.    To keep it, put it towards the cost of his past use of the

21 boat and his future use of the boat.

22 Q.    He been using the boat a lot?

23 A.    He had used the boat in the past and he planned to use it

24 in the future, yes.

25 Q.    Let's go back to Government's Exhibit -- let's go to

138

1  Government's Exhibit 3.15.

2  A.    Yes, sir.

3  Q.    This is the Vision Holding check?

4  A.    It shows check number 109 cleared in the amount of

5  $326,000 on the Vision Holdings account on September 2nd, 2003.

6  Q.    Now, let's go back to your transaction with Mr. Matta.

7  Did there come a time that the issue of the fee for his

8  handling that transaction, taking $610,000 and putting it into

9  Minersville attorney account and then transferring it out to

10  Beverage Marketing?

11  A.    Yes, much later.

12  Q.    When?

13  A.    I believe it was in '05.

14  Q.    Okay.  The transaction occurred in '03?

15  A.    Correct.

16  Q.    Okay.  What happened in '05?

17  A.    He had called me to tell me that he had someone that was

18  -- that was injured that he would like me to represent.  And I

19  told him I was happy to do that, we will meet with the people

20  and determine if they had a case.  After that he said, you

21  know, I'm still owed $10,000.  And I said, I don't know what

22  you're talking about, Bobby, for what.  He said, well, I was

23  supposed to be paid $10,000 to handle that transaction, meaning

24  the $610,000 and nobody paid me.  And I said, well, are you

25  looking me to pay you, I didn't get any of that money.  He

1  said, somebody's got to pay me.  He said, so, you know, I want

2  the money.

3  Q.    And did you pay him?

4  A.    I did.

5  Q.    I will show you what's been marked as Government's Exhibit

6  3.18.  What is this?

7  A.    Check drawn on PA Child Care to Bob Matta for $10,000.

8  Q.    What's the date on it?

9  A.    June 16th, 2005.

10  Q.    Did there come a time when you were told that you had to

11  start coming up with money?

12  A.    There did.

13  Q.    Describe to us what happened.  Now, we got the -- the

14  payment in 2003 of $997,000 from Mericle to Mr. Conahan and Mr.

15  Ciavarella.  Describe what happened here.  About when did this

16  happen?

17  A.    October or November time frame.

18  Q.    Of 2003?

19  A.    Yes, sir.

20  Q.    Tell us what happened.

21  A.    I was called to a meeting at Judge Ciavarella's chambers.

22  Judge Conahan was there.  And I was told specifically by Judge

23  Ciavarella how well he thought the PA Child Care facility was

24  doing financially and that at that time it was now time for me

25  to give him and Mike Conahan money.  And I said, are you

1  telling me that you guys blew through a million bucks already.

2  And they both kind of laughed and said, you guys are doing

3  very, very well.  Specifically, Judge Ciavarella had on a piece

4  of paper some numbers written down on an account and said, I

5  know what's going on up there, I know what's happening, I want

6  a part of it.

7  Q.   Do you know what the numbers represented?

8  A.   It represented his calculation of how many kids had been

9  sent there and what are -- essentially what --

10  Q.   Sent by whom?

11  A.   By him and by others, other counties.  So it was a rough

12  calculation of approximately how many kids we had at the

13  facility on a daily basis, what our basic costs would be and

14  how much was left over.

15  Q.   Okay.  Now, I want to do something along a parallel line

16  at the same time.  Did there come a time when you -- you wanted

17  to move down to -- or move your boat down to Florida?

18  A.   Well, I had it in Florida, but I had it at one marina and

19  I moved it to another at the suggestion of my captain.

20  Q.   Your boat captain?

21  A.   Yes.

22  Q.   And when did you move it to the new place?

23  A.   It would have been in the late summer, early fall of that

24  year.

25  Q.   2003?

1  A.    Yes.

2  Q.    So this was prior to when you were confronted by Conahan

3  and Ciavarella saying we want money?

4  A.    Yes.

5  Q.    And where did you take the boat?

6  A.    To a new marina which had been just opened in Jupiter.

7  Q.    Did anything happen down there that involved Mark

8  Ciavarella and Michael Conahan?

9  A.    Well, I had, you know, been down there on the boat.  When

10 I came back, I told Judge Conahan what a nice setup it was.

11 Judge Conahan had previously owned a condo in Fort Lauderdale

12 and he said he was interested in buying another condo and -- he

13 sold that but he wanted to get back to Florida.  And a few

14 weeks later after I told him how nice it was, he and his wife

15 took a trip down there and looked at stuff.

16 Q.    Did they buy anything?

17 A.    They first rented a condo, which was in the marina --

18 Jupiter marina area.  There were rental condos and new condos

19 being built on the other side of the water.  They rented a

20 condo on the right-hand side if you were looking at the marina.

21 Ultimately they bought another condo on the left-hand side.

22 Q.    So they bought a condo right next -- right in the same

23 place where you got your boat?

24 A.    Yes, sir.

25 Q.    Do you know if Mark Ciavarella ever got involved in that?

1  A.    Yes, they formed a company called Pinnacle, which was

2  formed by they and their wives.

3  Q.    That's the Pinnacle Group of Jupiter?

4  A.    Yes.

5  Q.    Let's go back.  When they said we know how many children

6  were sending you, you got -- it's now time for you to step up

7  and pay us for the privilege, what was your reaction when you

8  were told that you had to start paying them for the income that

9  they said they were helping you generate at PA Child Care?

10  A.    Well, I first tried to explain Judge Ciavarella while he

11  may have a calculation as to how much he thought we were

12  making, it was a startup business and that we had costs and

13  expenses that were -- hadn't even been paid yet from the

14  startup operation.  On top of it while on its face, it would

15  seem as if the business was profitable.

16       The business was dependant on us being paid from Luzerne

17  County and other counties where we had the kid -- from whom the

18  kids came to us.  And I explained that the counties were slow

19  if at all paying us and from a cash flow standpoint we didn't

20  have the amount of cash on hand that he thought we did.  And so

21  for him to say that things are going well while on its face we

22  did have kids in the facility, from a cash flow standpoint in

23  the business that wasn't the case.

24  Q.    When you told them that, what did Judge Ciavarella and

25  Judge Conahan say to you?  What was their response?

143

1  A.    Judge Ciavarella was very animated.  He said he didn't
2  care.  He said he didn't care, I know what's going on up there
3  and I want to be paid.  Judge Conahan was always trying to be
4  the peacemaker, let's calm down, we will figure this out,
5  nobody get upset.
6  Q.    Did they ever tell you didn't have to pay them?
7  A.    No.
8  Q.    Did they tell you you were going to have to pay?
9  A.    Absolutely.
10  Q.    How did they say it?
11  A.    They said that they had formed Pinnacle Group of Jupiter
12  and they were going to work this out but I was going to pay.
13  Q.    Did they say why -- had they set up any means for you to
14  get them money in a way that couldn't be traced back to you?
15  A.    Well, they said that I -- they were going to buy a condo
16  and I can use the condo and it would appear as if I was using
17  the condo and that what I was paying was actually rent.
18  Q.    Well, let's go -- did you start -- did you agree to do
19  that?
20  A.    I unwillingly agreed.  I wasn't given much choice in the
21  matter.  I was going to pay.
22  Q.    Now, I show you what's been marked as Government's Exhibit
23  4.35.  Before we get into the payments, I want you to look at
24  this document.  What is it?
25  A.    This is the slip rental agreement for my boat at the

1  marina in Jupiter.

2  Q.   Okay.  And who is Robert Arrington?

3  A.   My captain.

4  Q.   What does this document purport to establish?

5  A.   This is our -- for lack of a better word -- our rental

6  agreement for the slip.  When you have a boat, you have to park

7  it in a parking spot known as a slip.  You have to pay for the

8  parking spot.  This is our agreement to pay on a monthly basis

9  in Jupiter.

10  Q.   What were you required to pay to the marina for keeping

11  your boat there?

12  A.   $12,109.44 a year or a thousand nine dollars and twelve

13  cents a month.

14  Q.   Did you pay that?

15  A.   Well, Mr. Arrignton paid it from the American Express that

16  he had that was ours.

17  Q.   When you say ours --

18  A.   It was --

19  Q.   From Vision Holdings?

20  A.   Yes, sir.

21  Q.   And so you gave him a credit card, and he would pay that

22  on a monthly basis?

23  A.   Yes.

24  Q.   I show you what's been marked as Government's Exhibit 4.1.

25  What is that?

1   A.   This is the aerial shot of the marina, the rental place

2   that I was referring to on the left-hand side where the

3   Conahans rented an apartment is on the left.  Where the arrow

4   is and the newer condos that were being developed is directly

5   across the water on the right.

6   Q.   What is the second picture?

7   A.   That's the new condos as they became to be developed.

8   Q.   Now, take a look at Government's Exhibit 20.5.  Is this

9   how you understand -- understood the corporate structure of

10  Pinnacle Group of Jupiter?

11  A.   Yes, sir.

12  Q.   And I note that there's a mortgage note for Pinnacle Group

13  of Jupiter.  Much how much is that?

14  A.   $848,000.

15  Q.   Now, let's go to the payments.  Now, did they explain to

16  you -- Mr. Ciavarella and Mr. Conahan explain to you the

17  purpose of Pinnacle Group of Jupiter?

18  A.   Well, they said they were going to own at least one piece

19  of real estate down there, the condo and that we -- that they

20  would use that as the place for me to send them the money and

21  that I would say that it was rental.

22  Q.   Now, I want you to take a look at -- I want you to take a

23  look at Government's Exhibit 20.7.  What is this?

24  A.   It is a series of payments -- it is the series of payments

25  that I made to Pinnacle Group of Jupiter, LLC.

146

1  Q.    Have you reviewed the documents that make up this chart?

2  A.    Yes, sir, I have.

3  Q.    Is this chart an accurate representation of the underlying

4  documents that it depicts on here?

5  A.    Yes, it is.  It is an -- it is the representation of the

6  total payments I made to Pinnacle in the amount of $590,000.

7  Q.    I am going to have you go to the actual checks because

8  it's difficult to read off this chart.  I want you to take a

9  look at Government's Exhibit 5.1.  What is this?

10  A.    This is a check from me to Pinnacle Group of Jupiter in

11  the amount of $18,000.

12  Q.    What's the date?

13  A.    January 13th, 2004.

14  Q.    And what is the memo portion?  How do you explain that?

15  A.    I wrote rent prepay.

16  Q.    Now, was this rent?

17  A.    No.

18  Q.    Why did you put rent prepay?

19  A.    In order to cover the fact it wasn't rent.

20  Q.    Attempt to conceal the true nature of the payment?

21  A.    Absolutely.

22  Q.    Take a look at Government's Exhibit 5.2.

23  A.    That's a check again with my signature again dated January

24  13th, 2004 in the amount of $52,000.

25  Q.    Now, why -- I know it's the same date you issued two

1  separate checks, one for $18,000, one for $52,000.  And why did

2  you do it that way?

3  A.   Well, first off, because Mike Conahan told me he wanted

4  them broken up and he wanted it to look as if I was making

5  payments for various things that had to do with Pinnacle.  So

6  on the memo section I wrote rent even though I had already

7  written rent once, and I also wrote the marina prepay.

8  Q.   Rent slash marina prepay?

9  A.   Yes.

10 Q.   You paid rent prepay before, and now it's rent prepay

11 marina prepay both issued the same day?

12 A.   Yes.

13 Q.   How did they know how much you had to pay?

14 A.   They told me.

15 Q.   Government's Exhibit 5.3, what is this?

16 A.   This is a check that I wrote on Vision Holdings on

17 February 15th, 2004 to Pinnacle Group of Jupiter in the amount

18 of $78,000.

19 Q.   And what is the amount -- what is the purpose for it?

20 A.   It says reserving lease.

21 Q.   What did you understand that to mean?

22 A.   It was non-sense.  It was non-sensible as two rent prepays

23 and a marina prepay.  It was done in order to hide the real

24 nature of the payment by me.

25 Q.   The date on that was the 15th of February, 2004?

1  A.    Yes, sir.

2  Q.    Let's go to Government's Exhibit 5.4.  And the previous

3  date was February 15th, 2004.  What's the date on this one?

4  A.    This one is also February 15th, 2004.

5  Q.    And how much did you pay?

6  A.    This is an amount of $75,000 again payable to Pinnacle

7  Group, signed by me.  The notation I made there is February,

8  March, and I inserted April rental.

9  Q.    You had just prepaid rent in the same month I think --

10  yeah, same month -- you had already done two different rent

11  prepayments.  Now you're paying rent again?

12  A.    I wasn't paying rent.  This was done by me once again to

13  conceal the real nature of the payment which was just to give

14  money to Pinnacle Group.  It had nothing to do with rent.

15  Q.    Government's Exhibit 5.5.  What is this?

16  A.    This is another check on Vision Holdings, Inc., dated 2000

17  -- I'm sorry -- February 1st, 2004 payable to Pinnacle Group of

18  Jupiter in the amount of $47,000.

19  Q.    What was the stated purpose for these payments?

20  A.    I wrote slip slash rental fees, and now it's --

21  Q.    Slip rental slash fees?

22  A.    I'm sorry.  Then January, February and -- I just scratched

23  it out.

24  Q.    Looks like March and April?

25  A.    It could have been or -- could have been March and April.

1  Yeah, on this comments -- March and April on this cleaner copy.

2  Q.   Now, this is at a time when you're paying on the lease

3  $1,009.12 for the rent on a monthly basis for the rental fees?

4  A.   Yes, these checks to Pinnacle Group of Jupiter had nothing

5  to do with the fact that I had to pay a real marina fee every

6  month to keep my boat there.  These had nothing to do with

7  that.

8  Q.   Certainly the fees -- it was $12,000 a year.  How much did

9  you pay for that slip rental fee?

10  A.   A thousand nine dollars a month.

11  Q.   But on the check, was that $47,000?

12  A.   Yes, sir.

13  Q.   $47,000.  So you would have paid up to four years?

14  A.   Again, Pinnacle Group of Jupiter had nothing to do -- no

15  ownership over the slip where I actually kept my boat.  I had

16  to -- I paid them legitimately to keep my boat there.  Pinnacle

17  Group of Jupiter had no slip or no marina or anything.

18  Q.   Did Mark Ciavarella or Michael Conahan -- did they have a

19  slip that they wanted you to rent from?

20  A.   No, they didn't.

21  Q.   They had no slip?

22  A.   No, they didn't have a slip.

23  Q.   Government's Exhibit 5.6.

24  A.   This is a check April 30, 2004 in the amount of $75,000 to

25  Pinnacle Group that I instructed my bookkeeper at the time to

1  prepare for Pinnacle.

2  Q.    Leda Burkhardt was your bookkeeper?

3  A.    She was.

4  Q.    What occurs?

5  A.    My writing is lease expenses April, May and June.

6  Q.    Take a look at Government's Exhibit 5.7.  The previous --

7  the previous 5.6 was $75,000 on May 3rd, 2004.  What's the date

8  on this?

9  A.    This one is April 30, 2004 again payable to Pinnacle Group

10 in the amount of $25,000.  And in my handwriting I wrote dock

11 expenses, slash related, April, May and June.

12 Q.    In once sense you're writing the same payments over and

13 over again, March, April, May, April, May, June and you've --

14 A.    Because -- it wasn't a payment for anything, and there was

15 only so much you can write to make things up in this period of

16 time, and now it looks foolish.  But the intention then was to

17 put a notation on the check to make it look like it was for

18 something legitimate.

19 Q.    All right.  And again, these numbers are being given to

20 you by Mr. Ciavarella or Mr. Conahan or --

21 A.    Both.

22 Q.    Take a look at Government's Exhibit 5.8.  Now, this is not

23 a check, is it?

24 A.    No, this is evidence of a wire transfer that I made to

25 Pinnacle Group of Jupiter, LLC.

1  Q.   What's the date?

2  A.   That's July 13th, 2004.

3  Q.   What is the amount?

4  A.   The amount is $120,000.

5  Q.   Okay.  Now, you've been paying amounts as low as 25,000

6  and as high as I think 75,000 which you paid on numerous

7  occasions.  Now, the numbers are going up?

8  A.   Yes, sir.

9  Q.   And was there a reason why you switched from paying by

10 check to paying by wire transfer?

11 A.   Michael Conahan told me he wanted this by wire transfer

12 and no check.

13 Q.   Did he tell you why?

14 A.   No.

15 Q.   Government's Exhibit 5.9.  I want to go that page one and

16 look at the date.

17 A.   This is September 24 of 2004.

18 Q.   What's the amount?

19 A.   The amount is a hundred thousand dollars payable to the

20 Pinnacle Group of Jupiter, LLC from my account at Vision

21 Holdings.

22 Q.   The Vision Holdings account is at Minersville?

23 A.   Yes.

24 Q.   Now, let's go back to the -- to Government's Exhibit 20.7.

25 And I want to look at -- not that -- I want to go back, please.

152

1  I want to look at the amounts that you gave.  How much did you

2  pay during the month of January?

3  A.    January 13th of '04 I paid -- I'm sorry, yeah, two checks

4  I paid $18,000 and $52,000.

5  Q.    For -- we will summarize on the right-hand corner.  How

6  much did you pay for that month?

7  A.    70,000.

8  Q.    The month of February 2004?

9  A.    $200,000.

10  Q.    The month of May 2004?

11  A.    $100,000.

12  Q.    And then we get to the wire transfers the month of July

13  2004?

14  A.    $120,000.

15  Q.    The September of 2004?

16  A.    $100,000.

17  Q.    What's the total amount you paid?

18  A.    $590,000.

19  Q.    That's 590,000 of rent in less than -- what -- how many

20  months?  In less than seven or eight months?

21  A.    Yes, sir.

22  Q.    Why did the payments stop?

23  A.    I knew that the only way to stop this was for me to get

24  out of Florida.  So I asked my captain to research some places

25  I can take the boat to get away from that marina and from

1  Florida.  And he said the furthest we can go is Costa Rica, and

2  I said, let's go there.  So I went to Central America to get

3  away from Florida.

4  Q.    Why did you do that?

5  A.    Because I thought it was the only way I can get away from

6  making these payments to Pinnacle Group of Jupiter.  If the

7  boat wasn't there and I wasn't there, then how could I be asked

8  to pay rent?

9  Q.    Where did the money come to pay this $590,000 to Mark

10  Ciavarella and Michael Conahan?

11  A.    PA Child Care draws that were taken by me.

12  Q.    And as a draw, does that mean it is -- is it recorded as

13  such?

14  A.    Yes, sir.

15  Q.    Okay.  This is money that you came and took out --

16  A.    You have to understand I didn't have anything to do with

17  the records or the checks other than what I did with these

18  payments.  I -- Pat Owens was our CFO.  He handled all the

19  bookkeeping and accounting for the law firm, PA Child Care and

20  other entities.

21  Q.    By the end of September, you paid $590,000.  I want to

22  direct your attention to Government's Exhibit 1.3.  Did

23  anything happen after you paid all this money -- were any

24  actions taken by the county which benefitted PA Child Care?

25  A.    Yes, this is a lease agreement that is between PA Child

154

1   Care and the county in which the county leased the entire

2   facility from PA Child Care in Pittston Township.

3   Q.    What's the terms?

4   A.    Twenty years.

5   Q.    Go to Page 2, item number five.  What is the yearly amount

6   that is going to be paid?

7   A.    From the county to PA Child Care, $2,900,000 per year.

8   Q.    Now, you already have this document that says that the

9   county -- signed by Judge Conahan -- saying that the county is

10  going to pay $1.3 million a year and now there's -- within a

11  year you have a document that says they are going to pay $2.9

12  million -- $2.9 million a year?

13  A.    Yeah, the difference between the agreements is the

14  placement guarantee agreement was done for us solely to get

15  financing.  The county didn't know about that agreement.  This

16  agreement is with the county because only the county officials

17  have the right to pay money.  And it's with the county for the

18  purpose of them leasing the entire facility.

19  Q.    Look at Page 3.  Does it talk about continuation of the

20  rent?

21  A.    Yes, the rental payment under the lease agreement with the

22  county is $193,333.33 a month.

23  Q.    Now, did there come a time that you began to -- you and

24  Greg Zappala decided to expand into western Pennsylvania?

25  A.    Yes, sir.

155

1    Q.    Can you tell us about that?

2    A.    Sure.  We thought that we liked our facility design and --

3    I think the users of the other counties from the facility liked

4    what we were doing.  And so we thought that there was a need

5    just based on the statistics that were put forth by the

6    Commonwealth of Pennsylvania as to juvenile justice and the

7    need for additional facilities that if we located our

8    facilities strategically in western Pennsylvania that it would

9    be another -- could be a good business model.

10   Q.    Who was hired to build the Western PA Child Care facility?

11   A.    Rob Mericle and his firm.

12   Q.    Okay.  And do you know if Mark Ciavarella and Michael

13   Conahan discovered the building of Western PA Child Care?

14   A.    Yes.

15   Q.    How do you know that?

16   A.    I told them.

17   Q.    And what did they say to you?

18   A.    They said that they were going to talk to Rob.

19            MR. FLORA:  Your Honor, if he can define -- he uses

20   the word they.  If they can define who said what.

21   BY MR. ZUBROD:

22   Q.    Did you have a conversation with Judge Ciavarella?

23   A.    Yes.

24   Q.    Did you have a conversation with Judge Conahan?

25   A.    Yes.

1  Q.   Were they together when you had the conversation?

2  A.   They were.

3  Q.   What did they say?

4  A.   They said they were going to talk to Rob to make sure he

5  would make the same deal with them on that facility that he

6  made with them on the first facility.

7  Q.   Did they tell you what your role was going to be in the

8  payment of this finder's fee?

9  A.   Not initially until it came to pass the finder's fee was

10 going to be paid by Mericle to them.

11 Q.   When that came, what did they tell you your role was going

12 to be?

13 A.   That I would do the same thing I did the first time, that

14 Rob would send me the paperwork and they would tell me where

15 they wanted the money sent.

16 Q.   What was your reaction when you were told you were going

17 to become, again, the conduit for the payment of yet another

18 finder's fee?

19 A.   That I was getting into something deeper and deeper that

20 wasn't going to end well.

21 Q.   Do you know if Mr. Mericle was in agreement with the

22 decision to pay another finder's fee to Mark Ciavarella and

23 Michael Conahan?

24 A.   Being Mr. Mericle came up with the idea with the two

25 judges, I was sure he was going to do it a second time because

157

1  it was his idea the first time.

2  Q.   When did the building of Western PA Child Care commence?

3  A.   In '05 I believe.

4  Q.   I show you Government's Exhibit 6.1.  I would like you to

5  look at Page 1.  What is this document?

6  A.   I was jumping ahead to completion.  This is the contract

7  between Western PA Child Care, again owned by Greg Zappala and

8  our companies and I.  And it's dated June 8th, 2004 with

9  Mericle Construction, Inc.

10  Q.   Go to page 2, and go to the last page.  Go to the

11  signature page.  Who signed off?

12  A.   I signed on behalf of Western PA Child Care, and Robert

13  Mericle signed on behalf of Mericle Construction, Inc.

14  Q.   Now, take a look at Government's Exhibit 6.2.  What is

15  this document?

16  A.   This is again the contract sum which outlines the total --

17  breaks down the amount of payments that would be made to

18  Mericle for the various parts of the work he was going to do.

19  Q.   What is the total cost?  And it's down under hard cost

20  total.  What does hard cost mean?

21  A.   Hard cost total is the amount that Western PA Child Care

22  would pay to Rob Mericle's company, but it did not include

23  again the technology, the locks, the software that was

24  necessary for the security portion of the facility.  Each

25  facility had individual rooms which were concrete blocks, super

158

1  secure, as were the doors.  And so the doors and the security

2  portion of it Mericle always wanted us to contract directly for

3  that.

4  Q.    Now, this is the hard cost total if you can scroll down to

5  the final total.  What was the total contract sum?

6  A.    9,745,300.

7  Q.    Incidentally, let me ask you a question about whether or

8  not PA Child Care and Western PA Child Care once they are up

9  and running acquired items and dealt in interstate commerce.

10  A.    Well, sure.  We used the mail and phone, fax.

11  Q.    Food coming from outside of the Commonwealth?

12  A.    Yeah, in fact, the -- the company that made the specialty

13  locks, as I recall, was in the midwest and the various other

14  vendors were as well.

15  Q.    In terms of the running of it, did it continue to acquire

16  goods and to deal in interstate commerce?

17  A.    Yeah, for example, Western PA Child Care had a very

18  successful track record with kids from the State of Maryland.

19  So the State of Maryland used the facility more and more and

20  more as it became available to them.

21  Q.    So both facilities were actively involved in interstate

22  commerce during this entire period?

23  A.    Yes, sir.

24  Q.    When was PA Child Care completed?

25  A.    Western PA Child Care?

1    Q.    Western PA Child Care.

2    A.    About a year later.

3    Q.    And what was your total debt by this time?

4    A.    Well, the debt for PA Child Care was personally guaranteed

5    by myself and my wife and Greg Zappala and his wife.  That was,

6    as I said, a little over $12 million.  This is a little over

7    $13 million, so the total was about $25 million or more that

8    Greg and I and our wives personally guaranteed.

9    Q.    I will show you 6.4.1.  What is this document?

10   A.    This is, again, the Mericle form of the final payment,

11   which he would send to me indicating that he and his company

12   believed that they had completed their work at Western PA Child

13   Care, that I in turn would send to our architect who'd approve

14   it, make sure that everything that he said he was going to do

15   was done -- make sure that everything he said he was going to

16   do -- I'm sorry -- was done.  And then after our architect,

17   Highland, would approve it, I would sign it.

18   Q.    Now, the -- again, this is signed by Mr. Mericle and by

19   whom?

20   A.    That looks like my signature, and it's dated June 15th of

21   2005.  But then July is written in and Rob Mericle's signature

22   looks as if it's initialed and it's not his signature.  It's

23   someone else's initials.

24   Q.    Now, the last time when PA Child Care was built, this is

25   the document that triggered the payment of the finder's fee

1  because all the work by Mericle had been done, am I right?

2  A.    Yes.

3  Q.    Did it play the same function with Western PA Child Care?

4  A.    Yes.

5  Q.    Take a look at Government's Exhibit 6.3.  What is that?

6  A.    That's the same bogus registration and commission

7  statement that Mericle would sign to me -- or send to me and

8  say, sign it so he can pay the judges.

9  Q.    So who prepared this document?

10  A.    Mericle.

11  Q.    And is the date accurate on it?  What is the date?

12  A.    No, it's dated again the 8th day of June, 2004, which is

13  we only when we commenced construction.

14  Q.    When did you actually sign this document?

15  A.    I signed it at the completion -- after we would have

16  signed the completion letter you just sent me a year or so

17  later.

18  Q.    Let's take a look at that.  The -- now, this agreement

19  says all of the money is going to you.  Is that true?

20  A.    No, that's a lie.

21  Q.    Are you getting any of this?

22  A.    None of it.

23  Q.    Did you ever tell Mericle you were getting -- you were

24  splitting this with Mr. Ciavarella?

25  A.    No, Mericle knew it was going to Conahan and Ciavarella.

161

1  Q.   Where were you when you were told to sign this document?

2  A.   I was in Florida.

3  Q.   Where in Florida?

4  A.   At the condo.

5  Q.   So you were using the Florida condo?

6  A.   I used it two Julys in a row.

7  Q.   July in Florida?

8  A.   It was very hot.

9  Q.   I've never been to Florida in July.

10 A.   It's very hot.

11 Q.   Why didn't you use it during the winter?

12 A.   Because it wasn't available to us.  It was being --

13 constantly being used by other people so we couldn't get access

14 to it.

15 Q.   Did you try to set time aside?

16 A.   Several times.

17 Q.   What were you told?

18 A.   It was being used.

19 Q.   So the only time you got to use it was in July?

20 A.   In July twice.

21 Q.   You used it twice?

22 A.   Yes, sir.

23 Q.   $590,000, and you used it twice?

24 A.   That's correct.

25 Q.   Now, this document says it was signed on the 8th day of

1    June, 2004.  You say, no, it happened in July of 2005 when I

2    went down there.  If you can go to Page 2, please.  What is

3    this document?

4    A.    This is a fax cover sheet on Mericle's letterhead, and it

5    says it's from --

6    Q.    Date of it?

7    A.    7/13.

8    Q.    Look in the -- what's the date?

9    A.    7/13/2005.

10   Q.    And where is it from?

11   A.    From Mericle Commercial Real Estate.

12   Q.    And who was the sender?

13   A.    Bruce care of Bob Powell.

14   Q.    What was in here?  What was the purpose of this document

15   that they were sending this to you?

16   A.    The bogus registration statement.

17   Q.    That's the one you signed earlier?

18   A.    On July 13th of 2000 -- July 14th, 2005.

19   Q.    What was amount that was going to be paid this time for

20   Western PA Child care as a finder's fee?

21   A.    $1 million.

22   Q.    I want to show you the next page of the fax cover sheet

23   and the last page, which is the document attached to it.  Well,

24   the next page -- what is this?

25   A.    That's the Fed Ex airbill that I filled out.  That's my

163

1  handwriting from me using our office address because that's

2  where our account number -- was sending the agreement that I

3  signed on the 15th -- the 14th of July 2005 back to Rob

4  Mericle.

5  Q.   Okay.  Those are all the signed documents?

6  A.   Yes, sir.

7  Q.   Would you go back one page?

8          JUROR:  Your Honor, may I have one minute?

9          THE COURT:  You can't.  I will explain that in a

10  minute.

11          MR. ZUBROD:  Perhaps this may be time to take a

12  break.  The jury has been sitting a while.

13          THE COURT:  You do your job.  I will do my job.  I

14  consulted with the jurors and said we are going to adjourn at

15  3:00.  They were perfectly happy to sit through.  Does that

16  satisfy you?

17          MR. ZUBROD:  If it satisfies the Court, it satisfies

18  me.

19  BY MR. ZUBROD:

20  Q.   Now, take a look at 6.4.3.

21  A.   Yes, sir.

22  Q.   What are these?

23  A.   This is the wire transfer instructions that I prepared and

24  sent and gave to Mericle telling him where to send the million

25  dollar fee to the judges.

1  Q.    And who gave you this information?

2  A.    Mike Conahan.

3  Q.    Now, what was your reaction when you found yourself having

4  to sign this agreement?  I mean, why did you sign it at this

5  point knowing that you put yourself deeper into what you

6  understood as an attorney to be obviously criminal activity?

7  A.    Because Conahan and Ciavarella told me to, and they made

8  it clear it wasn't an option.  If I wouldn't sign this

9  agreement, there would have been hell to pay.

10  Q.    I want to go to -- well, did there come a time when there

11  needed to be an expansion of PA Child Care?

12  A.    Yes, sir.

13  Q.    Can you tell us about that?

14  A.    Our information that we were gathering from the field and

15  from various sources was that there was a need to be able to

16  treat juvenile arsonists, fire starters.  We thought if we

17  built an extension on to PA Child Care that we had the staffing

18  and the ability to treat these kids in an appropriate way.  And

19  so we went ahead and built a 12-bed expansion.  That -- the

20  facilities were built in 12-bed pods, so we added another pod

21  on to PA Child Care.

22  Q.    And -- if we can quickly go through Government's Exhibit

23  7.3.  Excuse me -- let's go to 7.1.  What is this document?

24  A.    This is the contract between PA Child Care and Mericle

25  Construction for the construction of the additional 12-bed pod.

165

1  Q.    And what's the date of this?

2  A.    24 February 2005.

3  Q.    And if you go to the last page, what are the costs?

4  A.    Total contract sum from Mericle was 841,664.65.

5  Q.    And take a look at 7.3.

6  A.    Yes, sir.

7  Q.    When did this project begin?

8  A.    The date that I just said the contract was dated.

9  Q.    When did it end?

10  A.    Well, it would have been suggested by Mericle that he was

11  done on February 2nd of 2006, hence the final completion

12  letter.

13  Q.    And then 7.3, is this the completion letter that would

14  trigger -- that has previously triggered the payment of the

15  finder's fee?

16  A.    Yes, that would be the kickback he would pay the judges.

17  Q.    Take a look at Government's Exhibit 7.2.  What is this?

18  A.    This is the same bogus registration and commission

19  agreement that I signed twice before.

20  Q.    And how much was it for?

21  A.    This one is in the amount of $150,000.

22  Q.    And was this money -- this transfer completed?

23  A.    Yes.

24  Q.    Take a look at Government's Exhibit 7.4.  What is that?

25  A.    These are the same wire instructions I would have given to

1  Mericle as previous telling him where to send the $150,000

2  payment.

3  Q.   Who gave you the figures to get it to Pinnacle Group?

4  A.   Well, the address and the wire transfer instructions came

5  from Mike Conahan.  The amount was already in the --

6  registration agreement.

7  Q.   Now, you said that to get away from Conahan and Ciavarella

8  you went down to Costa Rica.  Did there come a time when Mr.

9  Conahan and Ciavarella again began to demand more money from

10  you directly?

11  A.   Yes.

12  Q.   Tell us about it.

13  A.   Well, after I left and went to Costa Rica, I thought I

14  insulated myself because they couldn't ask me to pay anything

15  to Pinnacle Group if I left.  And I didn't think even they

16  could demand any more money payable to Pinnacle Group from me

17  because there wouldn't even be a reason for me to do that.  So

18  for the period of time -- if you look at this on a time line,

19  the money they were getting was from Mericle, albeit it was

20  $1.1 million, but they left me alone.  When that money ran out,

21  they came back to me.

22  Q.   And tell us about the meeting.  Was Mr. Ciavarella there?

23  A.   They were both there.  Ciavarella and Conahan were both

24  there.

25  Q.   Now, did you take any steps to try to avoid it?  Did they

1  reach out for you?

2  A.    They would start a phone chain -- leaving messages or

3  telling people -- my receptionist people that they were looking

4  for me, and that's the way it would start.  I successfully

5  avoided just because you can hide for some period of time --

6          THE COURT:  The lord is telling us it's time to

7  adjourn.  I have to do this, please.  Review my instructions in

8  your mind, and please consciously abide by them.  We will see

9  you tomorrow morning at 8:30.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

168

REPORTER'S CERTIFICATE

1

2

3      I, LAURA BOYANOWSKI, Court Reporter for the United States

4  District Court for the Middle District of Pennsylvania,

5  appointed pursuant to the provisions of Title 28, United States

6  Code, Section 753, do hereby certify that the foregoing is a

7  true and correct transcript of the within-mentioned proceedings

8  had in the above-mentioned and numbered cause on the date or

9  dates hereinbefore set forth; and I do further certify that the

10  foregoing transcript has been prepared by me or under my

11  supervision.

12

13

14                           _____

                                 Laura Boyanowski, RMR
15                               Official Court Reporter

16  REPORTED BY:

17      LAURA BOYANOWSKI, RMR
        Official Court Reporter
18      United States District Court
        Middle District of Pennsylvania
19      Scranton, PA  18503

20

21          (The foregoing certificate of this transcript does not
    apply to any reproduction of the same by any means unless under
    the direct control and/or supervision of the certifying
22  reporter.)

23

24

25