## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 3:09-CR-272** |
| | : | |
| **v.** | : | **(Chief Judge Conner)** |
| | : | |
| **MARK A. CIAVARELLA, JR.,** | : | |
| | : | |
| **Defendant** | : | |

## <u>MEMORANDUM</u>

Defendant Mark A. Ciavarella, Jr. ("Ciavarella"), is a former judge of the Court of Common Pleas of Luzerne County, Pennsylvania.  In February of 2011, a jury found Ciavarella guilty of racketeering, racketeering conspiracy, honest services mail fraud, money laundering conspiracy, conspiracy to defraud the United States, and subscribing and filing a materially false tax return.  (Doc. 216).  The court sentenced Ciavarella to 336 months' imprisonment and 3 years of supervised release.  (Doc. 272).  The court also ordered Ciavarella to pay restitution in the amount of $1,173,791.94 and to forfeit $997,600.  (<u>Id.</u>)

Ciavarella now moves to vacate, set aside, and correct his conviction and sentence under 28 U.S.C. § 2255.  Ciavarella also moves to supplement his original Section 2255 motion to include a claim pursuant to <u>McDonnell v. United States</u>, 579 U.S. __, 136 S. Ct. 2355 (2016).

## I.    **Factual Background & Procedural History**[1]

Ciavarella served as judge on the Luzerne County Court of Common Pleas from 1996 through January of 2009.  United States v. Ciavarella, 716 F.3d 705, 713 (3d Cir. 2013).  During his tenure, Ciavarella served primarily on the Juvenile Court. Id.  Ciavarella was appointed President Judge in January of 2007, succeeding his former colleague and codefendant, Michael T. Conahan ("Conahan").  Id. at 713-14. In late 2008, Ciavarella and Conahan were accused of receiving nearly $3 million in exchange for their respective roles in facilitating construction and ensuring continued operation of two private juvenile detention centers in the Commonwealth of Pennsylvania.  Id. at 713.  Two other key players—commercial builder Robert Mericle ("Mericle") and local attorney and businessman Robert Powell ("Powell")— were also criminally charged.  See id.

Prosecution of Ciavarella and Conahan began with the filing of a felony information on January 26, 2009.  United States v. Ciavarella, No. 3:09-CR-28, Doc. 1 (M.D. Pa. Jan. 26, 2009).  The information charged one count of honest services wire fraud and one count of conspiracy to defraud the United States against both defendants.  Id.  Ciavarella and Conahan entered Rule 11(c)(1)(C) plea agreements wherein all parties jointly agreed to a binding sentencing recommendation of 87 months' imprisonment.  See id., Docs. 3, 5.  The plea agreements contained express

---

[1] The above narrative summarizes the factual and procedural background of this case as derived from the record.  Citations to the record include the transcript of the Section 2255 evidentiary hearing convened on September 14, 2017 ("Hr'g Tr."), the transcript of trial proceedings ("[Date] Trial Tr."), and the Third Circuit Court of Appeals' precedential opinion on direct review of Ciavarella's convictions and sentence, see United States v. Ciavarella, 716 F.3d 705 (3d Cir. 2013).

waivers of several defenses, including the statute of limitations. <u>Id.</u>, Doc. 3 at 3; Doc. 5 at 3. Following receipt and review of the defendants' presentence reports, Judge Edwin M. Kosik rejected the Rule 11(c)(1)(C) agreements, observing that the proposed sentences fell "well below" the Guidelines for the offenses charged. <u>United States v. Ciavarella</u>, No. 3:09-CR-28, 2009 WL 6032443, at *2-3 (M.D. Pa. July 31, 2009). Ciavarella and Conahan withdrew their guilty pleas.

On September 9, 2009, a grand jury returned a 48-count indictment against both defendants. (Doc. 1). Albert J. Flora, Jr., Esquire ("Attorney Flora") and William Ruzzo, Esquire ("Attorney Ruzzo") entered appearances on Ciavarella's behalf. (Docs. 10-11). Defendants answered the indictment with a bevy of pretrial motions—44 in all. (Docs. 34-78). Shortly after the motions were filed, Conahan agreed to plead guilty to racketeering conspiracy. (<u>See</u> Doc. 106). Judge Kosik accepted Conahan's guilty plea on July 23, 2010. (Doc. 122).

The grand jury returned a 39-count superseding indictment on September 29, 2010 charging Ciavarella as follows:

> ∞ Count 1: racketeering in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), between approximately June of 2000 and January 1, 2007;
>
> ∞ Count 2: racketeering conspiracy in violation of 18 U.S.C. § 1962(d), from on or about December of 2001 to on or about the date of the superseding indictment;
>
> ∞ Counts 3 through 6: honest services wire fraud in violation of 18 U.S.C. §§ 2, 1343, and 1346, for a scheme executed through wire transmissions on July 12, 2004; September 23, 2004; July 15, 2005; and February 3, 2006, respectively;

∞ Counts 7 through 10: honest services mail fraud in violation of 18 U.S.C. §§ 2, 1341, and 1346, for a scheme executed through the mailing of materially false annual statements of financial interests to the Administrative Office of the Pennsylvania Courts in April 2004; March 2005; April 2006; and March 2007, respectively;

∞ Counts 11 through 20: corrupt receipt of a bribe or reward in exchange for official action in violation of 18 U.S.C. § 666(a)(1)(B) for payments received between February 15 and February 24, 2004; on April 30, 2004; on July 12, 2004; on September 23, 2004; on July 15, 2005; on February 3, 2006; on August 16, 2006; on November 1, 2006; on November 20, 2006; and on December 18, 2006, respectively;

∞ Count 21: conspiracy to launder money in violation of 18 U.S.C. § 1956(h), from on or about January 1, 2001 to on or about the date of the superseding indictment;

∞ Counts 22 through 26: money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i), on or about January 20, 2004; February 24, 2004; May 3, 2004; July 12, 2004; and September 23, 2004;

∞ Counts 27 through 34: extortion in violation of the Hobbs Act, 18 U.S.C. § 1951, for payments between February 15 and February 24, 2004; on April 30, 2004; on July 12, 2004; on September 23, 2004; on August 16, 2006; on November 1, 2006; on November 20, 2006; and on December 18, 2006, respectively;

∞ Count 35: conspiracy to defraud the United States in violation of 18 U.S.C. § 371, between on or about January 1, 2002 and May 21, 2007; and

∞ Counts 36 through 39: subscribing and filing a materially false tax return in violation of 26 U.S.C. § 7206(1), on or about April 15, 2004; April 15, 2005; April 15, 2006; and April 15, 2007, respectively.

(Doc. 134). Count 1 alleged 13 separate acts of racketeering activity in support of the substantive RICO charge. (Id. at 12-28). The superseding indictment also included forfeiture allegations. (Id. at 71-74).

Ciavarella renewed his earlier pretrial motions, (see Doc. 148), and filed several additional motions to dismiss. Of particular relevance herein, Ciavarella sought to dismiss Counts 3 through 5, 7 through 9, 11 through 14, 22 through 25, and 27 through 30 on statute of limitations grounds, and all honest services-related counts based upon the Supreme Court's then-recent decision in Skilling v. United States, 561 U.S. 358 (2010). (See Docs. 149, 151). Judge Kosik denied Ciavarella's motions in a memorandum and order (Doc. 164) dated December 15, 2010. Notably, therein, Judge Kosik found that Ciavarella waived the limitations defense in his earlier plea agreement. (Id. at 2). Judge Kosik also determined that the government's allegata survived scrutiny under Skilling. (Id. at 1-2).

Ciavarella's trial commenced with jury selection on February 7, 2011. Evidence at trial established that Ciavarella introduced two local businessmen, Powell and Mericle, with the goal of constructing a private juvenile detention center in Luzerne County to replace a dilapidated county-run facility. See Ciavarella, 716 F.3d at 714. Powell and a business associate created Pennsylvania Child Care, LLC ("PACC") to develop the center and hired Mericle's construction company to build it. Id. As part of a successful effort to thwart the county's plan to build and operate its own facility, Ciavarella and Conahan executed a placement agreement between the county and PACC, guaranteeing placement of the county's juvenile offenders at PACC at a contract price of $1.314 million per year. Id. At the end of January

5

of 2003, as construction neared completion, Mericle transferred a referral fee of $997,600 in three separate payments to Ciavarella and Conahan in a series of wire transfers between various conduits. Id. In January of 2004, the defendants and their wives formed Pinnacle Group of Jupiter, LLC ("Pinnacle"), a corporation they used for channeling funds associated with PACC. Id.

The jury heard evidence that Ciavarella, in his capacity as judge on the Juvenile Court, "leveraged" his position "to place juvenile offenders with PACC" to ensure the facility's continued success. Id. at 715. According to trial testimony, the judges believed they were entitled to join in that success. See id. The judges directed Powell to transfer their perceived "share" of the profits to Pinnacle. Id. From January through September of 2004, Powell made payments to the judges totaling $590,000. Id. He disguised the payments by labeling them as "rent" for an uninhabitable condominium purchased by Pinnacle in Jupiter, Florida. Id.

When Mericle and Powell decided to build a second juvenile detention center, Western PA Child Care ("WPACC"), and to expand PACC, Ciavarella and Conahan received additional referral fees: $1 million in July of 2005 for WPACC's construction and $150,000 in February of 2006 for expansion of PACC. Id. at 714. Powell distributed additional proceeds to the judges totaling $143,500 from August through December of 2006 by delivering "boxes filled with cash" to Conahan and his judicial assistant. Id. at 715. Ciavarella admitted at trial that he falsified tax returns to conceal this income from the Internal Revenue Service and failed to report financial interests in PACC and WPACC to the Administrative Office of the Pennsylvania Courts. (See 2/15/11 Trial Tr. 58:18-59:19, 69:7-72:2); see also

Ciavarella, 716 F.3d at 714-15. He denied that any payments were bribes, kickbacks, or the product of extortion, and denied knowledge of the rent payments and the deliveries of cash. (See, e.g., 2/8/11 Trial Tr. 27:16-28:8, 31:25-45:21; 2/15/11 Trial Tr. 25:18-26:13, 67:17-19; 2/16/11 Trial Tr. 52:2-25).

After seven days of evidence and two and a half days of deliberation, the jury convicted Ciavarella on 12 of 39 counts: racketeering (Count 1), racketeering conspiracy (Count 2), all four counts of honest services mail fraud (Counts 7-10), money laundering conspiracy (Count 21), conspiracy to defraud the United States (Count 35), and all four counts of subscribing and filing a materially false tax return (Counts 36-39). (Doc. 216). On the verdict form, the jury identified two acts of racketeering activity in support of its RICO verdict on Count 1, to wit: Racketeering Act One, charging honest services wire fraud for $997,600 in wire transfers on January 21, January 24, and January 28, 2003, and Racketeering Act Thirteen, charging money laundering conspiracy. (Id. at 1, 2, 7).

Ciavarella filed several post-trial motions, one of which is pertinent *sub judice*: a motion for acquittal, contending that Counts 1, 2, and 21 are time-barred by the applicable five-year statute of limitations and that the proof at Counts 7 through 10 fails to establish the requisite bribe or kickback under Skilling. (Doc. 237). Judge Kosik denied the motion on both grounds by memorandum and order (Doc. 257) on May 26, 2011. Judge Kosik found that counsel's failure to challenge Counts 1, 2, or 21 on statute of limitations grounds by pretrial motion or by requesting a jury instruction on the subject waived the defense. (Id. at 5). He further held that the jury's verdict on the honest services mail fraud counts was

7

consistent with the Supreme Court's holding in <u>Skilling</u>. (<u>See</u> <u>id.</u> at 4). On August 11, 2011, the court sentenced Ciavarella to 336 months' imprisonment and three years of supervised release and ordered him to pay $1,173,791.94 in restitution. (Doc. 272). The court ordered Ciavarella to forfeit $997,600. (<u>Id.</u>)

Ciavarella appealed his conviction and sentence to the United States Court of Appeals for the Third Circuit. (Doc. 274). On appeal, Ciavarella raised a mélange of issues including, *inter alia*, the sufficiency of the evidence supporting Counts 1, 2, 7 through 10, and 21, and the timeliness of his prosecution on Counts 1, 2, 7, and 21. <u>Ciavarella</u>, 716 F.3d at 730-34. The panel examined the sufficiency of the evidence first. The court resolved that the government adduced ample evidence supporting the jury's determination that the January 2003 payment was a bribe, sustaining the RICO, RICO conspiracy, and money laundering conspiracy convictions, and further held that Ciavarella's failure to disclose the 2003 payment on his financial disclosure statements in 2004, 2005, 2006, and 2007 supported the honest services mail fraud convictions. <u>Id.</u> at 730-32.

The Third Circuit then turned to the statute of limitations issue. The court of appeals held that trial counsel waived a timeliness defense to Counts 1, 2, and 21—RICO, RICO conspiracy, and money laundering conspiracy—by failing to raise it before or during trial. <u>Id.</u> at 733 (quoting <u>United States v. Karlin</u>, 785 F.2d 90, 92-93 (3d Cir. 1986)). The panel agreed with Ciavarella that he "would have been entitled to an instruction on the applicable statute of limitations," but held that trial counsel's failure to preserve the issue for appeal barred the court from considering the defense. <u>Id.</u>

8

As to the honest services mail fraud charge at Count 7, however, the panel found the limitations defense to be both properly preserved and valid.  The court of appeals observed that the original indictment was filed more than five years after the April 2004 mailing that supported Count 7, and thus concluded that Count 7 was "clearly time-barred absent any waiver by Ciavarella."  Id.  The court of appeals further held that withdrawal of the initial Rule 11(c)(1)(C) plea agreement rescinded that document's statute of limitations waiver.  Id.  Accordingly, the court vacated the conviction at Count 7.  Id. at 734.  Because *vacatur* did not impact the Guidelines sentencing range, the Third Circuit did not order resentencing *de novo*, but directed the district court to reduce the $100 special assessment on Count 7.  Id. at 734-35.  The Third Circuit denied Ciavarella's request for *en banc* and panel rehearing on July 24, 2013.  United States v. Ciavarella, No. 11-3277 (3d Cir. July 24, 2013).  The Supreme Court denied Ciavarella's petition for *certiorari* on March 3, 2014.  Ciavarella v. United States, 134 S. Ct. 1491 (2014).

Ciavarella timely filed his instant Section 2255 motion together with supporting brief and exhibits, as well as a motion for leave to proceed *in forma pauperis* and for appointment of counsel.  (Docs. 322-25).  Following the Supreme Court's McDonnell decision in June of 2016, Ciavarella moved for leave to amend his underlying Section 2255 motion to include an additional ground for relief.  (Doc. 337).  This case was thereafter transferred to the undersigned.  On July 21, 2017, we issued an order appointing counsel and scheduling a hearing on Ciavarella's Section 2255 motion.  (Doc. 346).  We convened an evidentiary hearing on September 14, 2017 and heard testimony from Attorneys Ruzzo and Flora.

Following supplemental briefing by both parties, (see Docs. 356, 357, 359, 360), Ciavarella's motions are fully briefed and ripe for review.

**II.** **Standard of Review**

Under 28 U.S.C. § 2255, a federal prisoner may move the sentencing court to vacate, set aside, or correct the prisoner's sentence. 28 U.S.C. § 2255. Courts may afford relief under Section 2255 on a number of grounds including, *inter alia*, "that the sentence was imposed in violation of the Constitution or the laws of the United States." 28 U.S.C. § 2255(a); see also 28 U.S.C. § 2255 Rule 1(a). The statute provides that, as a remedy for an unlawfully-imposed sentence, "the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b). The court accepts the truth of the defendant's allegations when reviewing a Section 2255 motion unless those allegations are "clearly frivolous based on the existing record." United States v. Booth, 432 F.3d 542, 545 (3d Cir. 2005). A court must hold an evidentiary hearing when the motion "allege[s] any facts warranting § 2255 relief that are not clearly resolved by the record." United States v. Tolliver, 800 F.3d 138, 141 (3d Cir. 2015) (quoting Booth, 432 F.3d at 546).

## III.  **Discussion**

Ciavarella contends that trial counsel were constitutionally ineffective for failing to pursue and preserve a statute of limitations defense to Counts 1, 2, 8, 9, 10, and 21 of the superseding indictment.[2]  Ciavarella also seeks leave to amend his Section 2255 motion to assert a claim based on the Supreme Court's decision in McDonnell v. United States, 579 U.S. __, 136 S. Ct. 2355 (2016).

### A.  **Ineffective Assistance of Counsel**

A collateral attack based on the Sixth Amendment's guarantee of effective assistance of counsel is governed by the two-pronged test set forth in Strickland v. Washington, 466 U.S. 668 (1984).  To prevail on this claim, a defendant must demonstrate, *first*, that trial counsel's representation fell below an objective level of reasonableness based on prevailing professional norms and, *second*, that the deficient representation prejudiced the defendant.  See id. at 687-88.  Courts refer to Strickland's elements as the "performance" and "prejudice" prongs, respectively. Bey v. Superintendent Greene SCI, 856 F.3d 230, 238 (3d Cir. 2017).  A defendant must establish both elements to obtain relief.  See United States v. Washington, 869 F.3d 193, 204 (3d Cir. 2017) (quoting United States v. Travillion, 759 F.3d 281, 289-90 (3d Cir. 2014)).

Ciavarella claims his trial counsel were ineffective by depriving him of a viable statute of limitations defense.  (See Doc. 356 at 4-14).  Specifically, he asserts

---

[2] Ciavarella initially asserted a second claim, alleging that the government violated its disclosure obligations under the Jencks Act, 18 U.S.C. § 3500, and Brady v. Maryland, 373 U.S. 83 (1963), (see Doc. 322 ¶¶ 41-56), but he withdrew this claim during the evidentiary hearing on September 14, 2017.  (Hr'g Tr. 6:8-23).

that Attorneys Ruzzo and Flora were ineffective in failing to know or to research the applicable law concerning when a statute of limitations defense must be raised in a federal criminal case, resulting in counsel's failure to request a jury instruction on the limitations period applicable to Counts 1, 2, 8, 9, 10, and 21. (See id.) Each of these counts is governed by a five year statute of limitations. 18 U.S.C. § 3282(a); Ciavarella, 716 F.3d at 732 n.18. The parties agree that counsel did not present a statute of limitations defense at trial and that counsel did not request a statute of limitations jury instruction. With this as background, we address the Strickland prongs *seriatim*.

### 1. *Ineffective Assistance – Performance*

In determining whether counsel has satisfied the objective standard of reasonableness under the first prong, courts must be highly deferential toward counsel's conduct. Strickland, 466 U.S. at 689. The Strickland test is exacting, and there is a strong presumption that counsel exercised reasonable professional judgment in making significant decisions. Burt v. Titlow, 571 U.S. __, 134 S. Ct. 10, 17 (2013) (quoting Strickland, 466 U.S. at 690). Overcoming this deference requires a showing that "the suggested strategy (even if sound) was not in fact motivating counsel," or that "the actions could never be considered part of a sound strategy." Thomas v. Varner, 428 F.3d 491, 499 (3d Cir. 2005). Even if a defendant identifies an error, Strickland still requires the defendant to establish that the error was so egregious as to fall outside "the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. The test tasks the court to assess counsel's performance

"on the facts of the particular case, viewed as of the time of counsel's conduct." Jacobs v. Horn, 395 F.3d 92, 102 (3d Cir. 2005).

Trial counsel testified that failing to raise a statute of limitations defense during Ciavarella's trial was not a deliberate or informed choice. Attorney Ruzzo testified that there was no "strategic decision" made not to raise the defense. (Hr'g Tr. 12:3-6, 12:25-13:5, 43:3-23). He also testified that the defense never denied that Ciavarella accepted payments in January of 2003, only whether those payments were in fact bribes or kickbacks. (Id. at 13:6-14:17). Thus, a limitations defense would not have conflicted with the defense strategy. (Id.) When asked whether he believed he erred in handling the limitations issue in this case, Attorney Ruzzo replied, "Absolutely." (Id. at 23:22-24). Attorney Flora confirmed that the defense team did not purposefully forgo the limitations defense. (Id. at 46:22-47:5, 52:7-10). To the contrary, he agreed that a limitations instruction would have been entirely consistent with the defense strategy. (Id. at 48:4-18). Attorney Flora revealed that the team had erroneously assumed the limitations defense could only be raised post-verdict because the RICO, conspiracy, and honest services mail fraud counts each alleged some conduct within the five-year statutory period. (Id. at 48:19-50:11).

We must determine whether trial counsel's failure to present a statute of limitations defense falls outside the wide range of reasonable professional assistance. Third Circuit precedent squarely resolves this inquiry. "It is well settled that a criminal defendant is entitled to an instruction on the applicable statute of limitations." United States v. Jake, 281 F.3d 123, 129 (3d Cir. 2002) (citing Grunewald v. United States, 353 U.S. 391, 396-97 (1957)). Indeed, the Third Circuit

13

on direct appeal in this case has already held that Ciavarella *"would have been entitled"* to a limitations instruction had counsel requested one. Ciavarella, 716 F.3d at 733 (emphasis added). As a general rule, failure to suggest a favorable instruction will be deemed "constitutionally deficient" performance unless the failure was a "strategic choice." Bey, 856 F.3d at 238 (quoting Everett v. Beard, 290 F.3d 500, 514 (3d Cir. 2002)). On the record before the court, there can be no dispute that counsel's failure to raise and preserve a limitations defense was not strategic.[3]

Compounding this threshold error is counsel's failure to conduct research on the preclusive effect of forgoing a limitations defense. Both counsel conceded that they did not research the issue of *when* a limitations defense must be raised until after trial. (Hr'g Tr. at 11:21-12:1, 50:12-19). Attorneys Ruzzo and Flora each testified that they *assumed*, but never confirmed, that the defense was jurisdictional and, as such, could be raised post-verdict. (See id. at 11:14-12:2, 43:5-2, 49:25-50:19). Cursory research would have disabused counsel of this notion. The Third Circuit announced nearly a quarter century before Ciavarella's trial that "the statute of limitations does *not* go to the jurisdiction of the court but is an affirmative defense that will be considered waived if not raised in the district court before or at trial."

---

[3] We recognize that the trial court's disposition of certain pretrial motions— resolving that both Ciavarella and Conahan had waived the statute of limitations in their rescinded Rule 11(c)(1)(C) plea agreements—suggests that the trial court may have rejected a request for a statute of limitations instruction. (See, e.g., Doc. 164 at 2). We also note that the Third Circuit squarely rejected the trial court's waiver analysis. See Ciavarella, 716 F.3d at 733-34. We conclude that speculation over the trial court's handling of the matter is unnecessary, as objecting to the court's declination to provide a specific limitations instruction would have adequately preserved the issue for appellate review. See Jones v. United States, 527 U.S. 373, 387-88 (1999); Jake, 281 F.3d at 130.

Karlin, 785 F.2d at 92-93 (emphasis added).  Counsel's ignorance of and failure to conduct "basic research" on a point of law fundamental to their client's case is "a quintessential example of unreasonable performance under Strickland."  Hinton v. Alabama, 571 U.S. __, 134 S. Ct. 1081, 1089 (2014) (citations omitted).

This confluence of errors mandates the conclusion that trial counsel's performance fell below prevailing professional norms.  We underscore that this holding is not the result of counsel's personal beliefs as pertains their respective performances, which both attorneys supplied quite candidly on the witness stand.  Rather, our finding that trial counsel's performance was ineffective is based on the familiar "objective standard of reasonableness," Strickland, 466 U.S. at 687-88, and our examination of counsel's performance based on the trial record and binding precedent.  Counsel operated exclusively and unjustifiably on an erroneous assumption concerning a crucial point of law.  As we explain *infra*, that error deprived Ciavarella of a viable defense.  Ciavarella satisfies the first Strickland prong.

## 2.    *Ineffective Assistance – Prejudice*

To satisfy the prejudice prong, the petitioner must establish a reasonable probability that, but for counsel's errors, the outcome of the proceeding would have been different.  See Strickland, 466 U.S. at 694.  A reasonable probability is one that "undermine[s] confidence in the outcome."  Id.  The Third Circuit has rejected a preponderance of the evidence standard under Strickland, to wit: a defendant "need not show that counsel's deficient performance more likely than not altered the outcome of the case—rather, he must show only a probability sufficient

to undermine confidence" in the proceedings. <u>Jacobs</u>, 395 F.3d at 105 (internal quotation marks omitted) (quoting <u>Strickland</u>, 466 U.S. at 693-94). This threshold has been described as "relatively low." <u>Boyd v. Waymart</u>, 579 F.3d 330, 354 (3d Cir. 2009).

The jury supported its RICO verdict at Count 1 by finding that Ciavarella committed two predicate acts: wire fraud involving $997,600 in a series of payments on January 21, 2003, January 24, 2003, and January 28, 2003, and the undated predicate act of money laundering conspiracy. (Doc. 216 at 1-2, 7). The jury also found Ciavarella guilty of Counts 2 and 21, which charged undated RICO and money laundering conspiracies, (<u>id.</u> at 7, 10), as well as Counts 7 through 10, charging four counts of honest services mail fraud dated April 2004, March 2005, April 2006, and March 2007, respectively. (<u>Id.</u> at 8). The jury found Ciavarella not guilty of all dated RICO predicate acts and all financial crimes following the final January 28, 2003 wire transfer. (<u>Id.</u> at 1-13).

Ciavarella claims it is reasonably probable that, had the jury been instructed on the applicable statute of limitations, the verdict on Counts 1, 2, 8, 9, 10, and 21 would have been different. At the outset, we reject the argument that Ciavarella would have achieved acquittal on Counts 8, 9, and 10. These counts expressly include conduct occurring after September 9, 2004, the date on which the limitations period expired. The verdict form itself cites the date of the charged conduct in question: Count 8 concerns failure to disclose financial interests anent

the 2003 payments[4] on a March 2005 financial disclosure statement; Count 9 concerns nondisclosure on an April 2006 statement; and Count 10 concerns nondisclosure on a March 2007 statement. (Doc. 216 at 8).

Mailing is a requisite element of the offense for each of these counts. <u>See</u> <u>United States v. Riley</u>, 621 F.3d 312, 325 (3d Cir. 2010); <u>see</u> <u>also</u> <u>Ciavarella</u>, 716 F.3d at 731-32. There is no dispute that the mailing of the financial disclosure statements subject to Counts 8, 9, and 10 occurred well within the limitations period. (<u>See</u> Hr'g Tr. 30:19-32:13; <u>see</u> <u>also</u> Doc. 216 at 8). For comparison, in vacating Ciavarella's conviction on Count 7, the Third Circuit focused exclusively on the fact that the count was "based on a mailing in April 2004," five months beyond the limitations period. <u>See</u> <u>Ciavarella</u>, 716 F.3d at 734. The jury's verdict necessarily establishes that a central element of Counts 8, 9, and 10 occurred within the five-year statute of limitations. Hence, the result for these counts would not have been different had counsel requested an instruction on the limitations period.

Analysis of Counts 1, 2, and 21 is more complex. It is clear that the first predicate act supporting the jury's RICO verdict—three instances of wire fraud in January of 2003—is time-barred. The government concedes this point. (Doc. 357 at 42). But the second RICO predicate, money laundering conspiracy, is undated on

---

[4] Ciavarella suggests that the jury could not rely on a 2003 payment for Counts 8, 9, and 10, but instead must have determined that a payment during the year preceding each subject mailing—2004, 2005, and 2006, respectively—formed the basis of the count. (<u>See</u> Doc. 356 at 14-15, 21-22). On direct appeal, however, the Third Circuit determined that the 2003 bribe provided sufficient evidence to support the jury's honest services mail fraud verdicts for nondisclosure in 2005, 2006, and 2007. <u>Ciavarella</u>, 716 F.3d at 731-32.

the verdict form, as are both of the conspiracy charges at Counts 2 and 21. (Doc. 216 at 7, 10). The jury plainly did not believe Ciavarella accepted additional kickbacks or bribes after January 2003, but whether it believed the conspiracies continued beyond that date is simply unclear. (See generally Doc. 216). Accordingly, we must determine whether the jury's consideration of the conspiracy predicate of Count 1 and the conspiracy charges at Counts 2 and 21 may have been impacted by an instruction on the limitations period.

To find Ciavarella guilty of RICO, RICO conspiracy, and money laundering conspiracy in the face of an appropriate statute of limitations instruction, the jury would have to find that the respective conspiracies continued into the limitations period. See Jake, 281 F.3d at 123 n.6. In other words, the government would need to establish beyond a reasonable doubt that its September 9, 2009 indictment was "brought within five years of the last overt act" in furtherance of the conspiracies. See id. If the jury resolved that the conspiracies concluded before September 9, 2004, it would be required to acquit Ciavarella on Counts 1, 2, and 21. See id.

The jury's verdict constrains us to find that an appropriate limitations instruction *may* have altered the outcome of these proceedings. See Strickland, 466 U.S. at 694. The government asseverates that the jury could have considered Ciavarella's mailing of false statements of financial interest in 2005, 2006, and 2007, (Doc. 357 at 42-47), or falsification of tax returns in the same years, (Doc. 329 at 14-16), to be overt acts in furtherance of the respective conspiracies. It emphasizes that the jury convicted Ciavarella of both honest services mail fraud and filing a

18

materially false tax return in connection with this conduct.  (<u>See</u> Doc. 357 at 42-47; <u>see</u> <u>also</u> Doc. 329 at 14-16).

We do not disagree with the government's postulation.  However, it is equally likely that the jury believed the money laundering and RICO conspiracies terminated much earlier.  An alternative view of the verdict form is that the jury concluded that Ciavarella's financial crimes ended with the final January 2003 wire transfer, that all payments received thereafter were lawful, and that Ciavarella was liable for honest services fraud and filing false tax returns solely because he failed to report his financial interests and income lawfully developed and obtained. The jury's verdict on Counts 8 through 10 and Counts 35 through 39 suggests that Ciavarella did engage in efforts to cover up his own financial relationships within the limitations period; but it does not *ipso facto* signal that the jury believed he engaged in *conspiratorial* acts of concealment during that time.

Resolution of this pivotal issue—when the RICO and money laundering conspiracies terminated, and whether they terminated within the five-year statute of limitations period—must wait for retrial.  Given the jury's unequivocal finding that Ciavarella's financial crimes ended with the final January 2003 wire transfer, it is reasonably probable that a proper instruction on the statute of limitations would have altered the result on Counts 1, 2, and 21.  <u>See</u> <u>Strickland</u>, 466 U.S. at 694.  As a consequence, failing to present a limitations instruction did not create a mere "possibility of prejudice."  <u>Bey</u>, 856 F.3d at 242 (quoting <u>United States v. Frady</u>, 456 U.S. 152, 170 (1982)).  It worked to Ciavarella's "*actual* and substantial disadvantage" by entirely foreclosing a defense.  <u>See</u> <u>id.</u>  We are compelled to grant

Ciavarella's motion and vacate his conviction and sentence on Counts 1, 2, and 21 of the superseding indictment.

### B.     Proposed **McDonnell** Claim

Ciavarella also moves to amend his Section 2255 motion to add a claim of instructional error based on the United States Supreme Court's 2016 decision in <u>McDonnell</u>.  (Doc. 337).  The Federal Rules of Civil Procedure govern motions to amend habeas petitions.  <u>See</u> <u>Riley v. Taylor</u>, 62 F.3d 86, 89-90 (3d Cir. 1995).  Courts must "freely give leave when justice so requires," Fed. R. Civ. P. 15(a)(2), and generally will grant leave to amend unless the opposing party demonstrates undue delay, bad faith, prejudice, or futility.  <u>See</u> <u>Arthur v. Maersk, Inc.</u>, 434 F.3d 196, 204 (3d Cir. 2006); <u>see</u> <u>also</u> <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962).  Rule 15 aims to offer the "maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities."  <u>United States v. Thomas</u>, 221 F.3d 430, 435 (3d Cir. 2000) (citations omitted).  We will grant the motion to amend and consider Ciavarella's <u>McDonnell</u> claim as part of his Section 2255 motion.[5]

Ciavarella asserts that <u>McDonnell</u> narrowed the range of conduct which qualifies as honest services mail fraud.  He maintains that it is possible that the jury convicted him of conduct which the law no longer criminalizes.  (<u>See</u> Doc. 356 at 32-44).  The government asks the court to deny Ciavarella's claim for three reasons:

---

[5] The government bases its opposition to Ciavarella's motion exclusively on futility grounds.  (<u>See</u> Doc. 360 at 1).  A court measuring futility should deny leave to amend if the proposed alteration "is frivolous or advances a claim or defense that is legally insufficient on its face."  <u>Massarsky v. Gen. Motors Corp.</u>, 706 F.2d 111, 125 (3d Cir.), <u>cert. denied</u>, 464 U.S. 937 (1983).  Although we ultimately conclude that Ciavarella has procedurally defaulted his <u>McDonnell</u> claim, we cannot find that the claim is frivolous.

*first*, Ciavarella cannot show cause to overcome his procedural default; *second*, the jury instructions at trial were consistent with McDonnell; and *third*, assuming instructional error, the evidence at trial would nonetheless support a guilty verdict under McDonnell.[6]  (Doc. 360 at 1-21).

Our analysis begins and ends with the issue of procedural default.  When a defendant fails to raise a claim on direct appeal, he "procedurally defaults" the claim for purposes of collateral review.  See Bousley v. United States, 523 U.S. 614, 622 (1998).  A defendant may overcome default in two ways: by demonstrating "that he is 'actually innocent,'" or by showing "cause" and "actual 'prejudice'" should the default be given preclusive effect.  Id.  Ciavarella argues cause and prejudice alone.  (Doc. 356 at 28-44).  Only if both elements are met may we consider his defaulted claim.  See United States v. Jenkins, 333 F.3d 151, 155 (3d Cir. 2003) (citing Frady, 456 U.S. at 167; Bousley, 523 U.S. at 622).

### 1.    *Procedural Default – Cause*

Ciavarella asserts that the argument for a proper jury instruction on the definition of "official act" was not reasonably available to his trial counsel because McDonnell was not decided until 2016, more than five years after his trial.  (Doc. 356 at 29).  To support this argument, Ciavarella relies exclusively on a report and recommendation issued in Cordaro v. United States, No. 3:17-CV-215, Doc. 34 (M.D.

---

[6] The government does not dispute that Ciavarella's proposed claim is timely under 28 U.S.C. § 2255(f)(3) or that McDonnell is retroactively applicable to cases on collateral review.  (Doc. 342 at 5 n.1).  Because we hold that Ciavarella cannot overcome his procedural default, we do not address these issues further.

Pa. Sept. 1, 2017), <u>adopted without objection by</u> 2017 WL 6311696, *6 (M.D. Pa. Dec. 11, 2017).  <u>Cordaro</u> is legally distinguishable.

<u>Cordaro</u> concerned a petition brought pursuant to Section 2241, which carries a unique gatekeeping standard distinct from the procedural default paradigm under Section 2255.  <u>See</u> <u>Cordaro</u>, 2017 WL 6311696, at *6.  The defendant in <u>Cordaro</u> had been convicted for various actions taken in his capacity as county commissioner and sought to invoke <u>McDonnell</u> to invalidate a number of those convictions.  <u>See</u> <u>Cordaro</u>, No. 3:17-CV-215, Doc. 34 at 1.  The magistrate judge acknowledged that the Third Circuit allows an "extremely narrow" category of Section 2241 petitions to proceed when the petitioner claims actual innocence and "has had no earlier opportunity to test the legality of his detention since the intervening Supreme Court decision issued."  <u>Id.</u> at 17-19 (quoting <u>Bruce v. Warden Lewisburg USP</u>, 868 F.3d 170, 180 (3d Cir. 2017)).  The magistrate judge opined that, because Cordaro had no prior opportunity to challenge his convictions after <u>McDonnell</u> issued, Section 2241 was available as a means to seek relief.  <u>Id.</u> at 21.

The standard for procedural default of Section 2255 claims is different.  To show cause adequate to overcome procedural default, a defendant must establish that an "objective factor external to the defense" prevented him from advancing the claim at a procedurally appropriate time.  <u>United States v. Pelullo</u>, 399 F.3d 197, 223 (3d Cir. 2005) (quoting <u>McCleskey v. Zant</u>, 499 U.S. 467, 493 (1991)).  Factors sufficient to excuse default include, *inter alia*, "a showing that the factual or legal basis for a claim was not reasonably available to counsel" at the relevant time.  <u>Id.</u> (quoting <u>Wise v. Fulcomer</u>, 958 F.2d 30, 34 n.9 (3d Cir. 1992)).  It is of no moment

that "subsequent legal developments have made counsel's task easier." <u>Smith</u>

<u>v. Murray</u>, 477 U.S. 527, 537 (1986). We consider only whether, at the time of the

default, "the claim was 'available' at all." <u>Id.</u>

Ciavarella fails to demonstrate that the legal basis for his instant claim

was not reasonably available to him at trial. Despite ample opportunity to brief the

issue of default, Ciavarella has not identified a single, objective impediment—legal

or factual—to asserting a claim of instructional error at trial. (<u>See</u> Doc. 356 at 29-

32). He argues only that he could not have been expected to raise an argument

akin to <u>McDonnell</u> until the Supreme Court issued its decision in June of 2016.

The law is clear that a claim is not futile simply because it may have been

"unacceptable to a particular court at that particular time." <u>Bousley</u>, 523 U.S.

at 623 (internal quotation marks omitted). Other defendants raised the argument

prior to <u>McDonnell</u> being decided. <u>See</u>, <u>e.g.</u>, <u>United States v. Jefferson</u>, No. 1:07-

CR-209, 2017 WL 4423258, at *10-11 (E.D. Va. Oct. 4, 2017) (finding <u>McDonnell</u> claim

was not procedurally defaulted because defendant objected to instruction as being

overbroad at trial). And <u>McDonnell</u> itself is grounded, in part, in the Court's prior

jurisprudence. <u>See</u> <u>McDonnell</u>, 136 S. Ct. at 2367-68, 2370 (quoting <u>United States</u>

<u>v. Sun-Diamond Growers of Cali.</u>, 526 U.S. 398 (1999)). Even <u>Cordaro</u>, the decision

invoked by Ciavarella himself, recognizes that the claim of instructional error "may

have been viable under circuit and Supreme Court precedent as it existed" prior to

<u>McDonnell</u>. <u>See</u> <u>Cordaro</u>, No. 3:16-CV-215, Doc. 34 at 21.

This is not a case where the Supreme Court overruled its precedent,

overturned a unanimous body of lower court authority, or rebuked a practice

arguably sanctioned by its prior decisions, placing an earlier claim outside of the defendant's reach at trial. Cf. Reed v. Ross, 468 U.S. 1, 17 (1984); see also Parkin v. United States, 565 F. App'x 149, 151-52 (3d Cir. 2014) (nonprecedential). The Supreme Court simply sought to, and did, "clarify the meaning of 'official act.'" McDonnell, 136 S. Ct. at 2361. There is no justification for Ciavarella's failure to challenge the breadth of the instructions at trial. Accordingly, Ciavarella has not established cause for his procedural default.

### 2. *Procedural Default – Prejudice*

Assuming *arguendo* that Ciavarella could establish cause, he nonetheless fails to demonstrate prejudice. Ciavarella contends that, in view of McDonnell, he may now be incarcerated for lawful conduct. (Doc. 356 at 33-44). The government rejoins that the trial court's instructions were consistent with McDonnell and that, assuming error, Ciavarella cannot show actual prejudice. (See Doc. 360 at 5-21).

McDonnell involved a public corruption prosecution against former Virginia Governor Robert McDonnell ("McDonnell"). See McDonnell, 136 S. Ct. 2355. Over a three year period, McDonnell accepted more than $175,000 in payments, gifts, and loans from a Virginia businessman in exchange for McDonnell's efforts in hosting various events and coordinating meetings with other state officials. See id. at 2361-64. At trial, several charges required the jury to find that McDonnell had accepted these payments in exchange for an "official act" under the federal bribery statute, 18 U.S.C. § 201. See id. at 2361, 2365-66. The trial court first provided the statutory definition of "official act": "The term official action means any decision or action on any question, matter, cause, suit, proceeding, or controversy, which may at any

24

time be pending, or which may by law be brought before any public official, in such public official's official capacity."  United States v. McDonnell, 792 F.3d 478, 505 (4th Cir. 2015) (quoting 18 U.S.C. § 201(a)(3)).  The court further instructed:

> Official action as I just defined it includes those actions that have been clearly established by settled practice as part of a public official's position, even if the action was not taken pursuant to responsibilities explicitly assigned by law.  In other words, official actions may include acts that a public official customarily performs, even if those actions are not described in any law, rule, or job description.  And a public official need not have actual or final authority over the end result sought by a bribe payor so long as the alleged bribe payor reasonably believes that the public official had influence, power or authority over a means to the end sought by the bribe payor.  In addition, official action can include actions taken in furtherance of longer-term goals, and an official action is no less official because it is one in a series of steps to exercise influence or achieve an end.

Id. at 505-06.

The district court denied McDonnell's request for more restrictive instructions, viz., that "merely arranging a meeting, attending an event, hosting a reception, or making a speech are not, standing alone, 'official acts,' even if they are settled practices of the official," or that an official act "must intend to or 'in fact influence a specific official decision the government actually makes—such as awarding a contract, hiring a government employee, issuing a license, passing a law, or implementing a regulation.'"  McDonnell, 136 S. Ct. at 2366.  The jury convicted McDonnell of honest services fraud, extortion, and other offenses, and the Fourth Circuit Court of Appeals upheld the conviction.  See McDonnell, 792 F.3d 478.

The Supreme Court granted *certiorari* and reversed. See McDonnell, 136 S. Ct. 2355. The Court held that official action comprises two components: *first*, a particularized "question, matter, cause, suit, proceeding or controversy" which "may at any time be pending" or "may by law be brought" before a public official, and *second*, a decision or action "on" that question, matter, cause, suit, proceeding or controversy, or an agreement by the official to do so. Id. at 2368. Regarding each of these requirements, the Court elucidated:

> [A]n "official act" is a decision or action on a "question, matter, cause, suit, proceeding or controversy." The "question, matter, cause, suit, proceeding or controversy" must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee. It must also be something specific and focused that is "pending" or "may by law be brought" before a public official. To qualify as an "official act," the public official must make a decision or take an action on that "question, matter, cause, suit, proceeding or controversy," or agree to do so. That decision or action may include using his official position to exert pressure on another official to perform an "official act," or to advise another official, knowing or intending that such advice will form the basis for an "official act" by another official. Setting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—does not fit that definition of "official act."

Id. at 2371-72.

After clarifying the definition of "official act," the Court determined the trial judge's instructions to be "significantly overinclusive" and lacking "important qualifications." Id. at 2373-74. The Court took issue specifically with the district court's statement, *inter alia*, that official acts "may include acts that a public official customarily performs," including acts taken "in furtherance of longer-term goals"

26

or "in a series of steps to exercise influence or achieve an end." Id. at 2373. The Court also noted that the trial court failed to adequately explain how to identify the question, matter, cause, suit, proceeding or controversy at issue; that same must be specific and focused and not merely a broad policy objective; and that the public official must decide or act "*on*" the particular question, matter, cause, suit, proceeding or controversy. Id. at 2374. Absent such clarifications, the Court found that the jury may have erroneously convicted McDonnell solely for arranging calls or meetings, without finding that he agreed to make a decision or take an action on a properly defined issue. Id. at 2374-75. The Court vacated McDonnell's convictions and remanded for further proceedings.

With McDonnell's clarifications in mind, we examine the instructions provided to the jury in this case. The court specifically instructed the jury as follows:

> . . . The term official act includes any act within the range of the official's duty of a public official and any decision, recommendation or actions on any question, matter, cause, proceeding or controversy which at any time may be pending or which may by law be brought before any public official in such public official's capacity.
>
> Official acts include decisions or actions generally expected of the public official. In addition, official action includes the exercise of both formal official influence such as a judge's performance and duties in court proceedings and informal official influence such as the judge's behind-the-scenes influence on the other judges or employees of the judiciary.
>
> Official action also includes a public official's altering his or her official acts, changing the position which he or she would otherwise have taken or taking action in his or her

> official capacity that he or she would not have taken but
> for the scheme. . . .

(2/16/11 Trial Tr. 77:5-22).

The instructions provided by Judge Kosik are arguably overbroad. The instructions expand the definition of "official act" to include not only actions or decisions on a question, matter, cause, suit, proceeding or controversy, McDonnell, 136 S. Ct. at 2371-72, but also "*any act within the range* of the official's duty [as] a public official." (2/16/11 Trial Tr. 77:5-10 (emphasis added)). Combined with the unqualified statement that official acts "include decisions or actions generally expected of the public official," (id. at 77:11-12), the jury instructions in this case align closely with similarly broad language—that official acts "include acts that a public official customarily performs"—held to be overinclusive by the Supreme Court. McDonnell, 136 S. Ct. at 2373-74.

The parallels between this case and McDonnell end there. To establish prejudice and overcome procedural default, Ciavarella must demonstrate that the instructional error "so infected the entire trial that the resulting conviction violates due process." Frady, 456 U.S. at 169. Based on the trial record, we cannot find that Ciavarella would have benefitted from more restrictive instructions.

Ciavarella asserts that the act of connecting two private businessmen to discuss constructing a private juvenile placement facility cannot qualify as an official act under McDonnell. (See Doc. 356 at 41-42). Were facilitation of this business relationship the sole basis of Ciavarella's honest services mail fraud convictions, we would be inclined to agree. But Ciavarella's actions were not so

innocuous as merely bringing two private parties together to discuss private business. In charging documents and in evidence at trial, the government identified manifold acts which remain unlawful in <u>McDonnell</u>'s wake.

The evidence showed that Ciavarella and Conahan shared a common objective with the businessmen and worked steadfastly to facilitate that objective. For example, the record reflects that defendants worked with Powell and Mericle to create a placement agreement between PACC and Luzerne County to secure financing for the new detention facility, which lease obligated the county to house juvenile offenders at PACC. (<u>See</u> 2/9/11 Trial Tr. 118:4-121:23, 123:17-125:1, 154:8-18; 2/10/11 Trial Tr. 81:13-84:10); <u>see</u> <u>also</u> <u>Ciavarella</u>, 716 F.3d at 714. Testimony at trial generally established that Ciavarella worked to shutter the county's existing juvenile detention center, thwarted efforts to build a new county center, and moved the county's best juvenile detention employees to PACC. (<u>See</u> 2/9/11 Trial Tr. 124:4-125:1); <u>see</u> <u>also</u> <u>Ciavarella</u>, 716 F.3d at 731. The record also showed that Ciavarella "leveraged" his appointment to the Juvenile Court to place hundreds of juveniles at PACC and ensure success of the business venture, and that he expected a share of its profits in return. (<u>See</u> 2/9/11 Trial Tr. 142:5-143:21); <u>Ciavarella</u>, 716 F.3d at 714.

<u>McDonnell</u> is distinguishable on this central point. The full extent of the government's case against McDonnell were its allegations that the former governor had arranged meetings, hosted events, and made calls in exchange for payments, gifts, and loans. <u>See</u> <u>McDonnell</u>, 136 F.3d at 2365-66. In this case, *per contra*, the government has never argued or suggested that Ciavarella's introduction of Powell and Mericle itself constituted a criminally cognizable "official act." <u>Compare</u> (Doc.

134 at 3-4, 35-38, 42-43; 2/16/11 Trial Tr. 7:1-36:6) with McDonnell, 136 S. Ct. at 2365-66. The government's position *sub judice* has always been Ciavarella forced the county-run juvenile detention center to close, forestalled efforts to construct a new county center, facilitated construction of a private detention center, and placed the county's juvenile offenders there in exchange for money. (See generally Doc. 134; 2/16/11 Trial Tr. 7:1-36:6); see also Ciavarella, 716 F.3d at 713-15. The jury's verdict reflects its finding that the government proved this theory with respect to the January 2003 payments. (See Doc. 216 at 1-2).

We have little difficulty concluding that Ciavarella's conduct falls squarely within the category of "official acts" as clarified by McDonnell. The Third Circuit recently resolved that "facilitation of the award of [municipal] contracts is an 'official act'" as defined by the Supreme Court. United States v. Repak, 852 F.3d 230, 254 (3d Cir. 2017). Ciavarella's efforts to facilitate an agreement between the county and PACC, one which he profited from considerably, constitutes an "official act" both before and after McDonnell. The government also established that, after facilitating the agreement, Ciavarella ordered countless children to be detained at PACC, ensuring continued financial success of the facility. See Ciavarella, 716 F.3d at 714. This conduct is not merely "similar in nature to" a case pending before a court—it *is* action by the court. See McDonnell, 136 S. Ct. at 2371-72. We find that a jury provided with a more nuanced post-McDonnell instruction would convict Ciavarella all the same. Ciavarella cannot overcome his procedural default.

## IV.    Conclusion

For the reasons stated herein, the court will grant in part and deny in part Ciavarella's motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255.  In light of clear Third Circuit precedent, we are compelled to vacate Ciavarella's convictions on Counts 1, 2, and 21 of the superseding indictment and to convene a new trial wherein a proper statute of limitations instruction will be given.  The court will deny Ciavarella's Section 2255 motion to the extent he seeks a new trial on Counts 8, 9, and 10 of the superseding indictment.

The court will schedule a new trial forthwith during which a jury will test the defendant's guilt or innocence on Counts 1, 2, and 21 of the superseding indictment. An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:        January 8, 2018